Sheila A.G. Armbrust (SBN 265998)
sarmbrust@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200
Facsimile: (415) 772-7400

James W. Ducayet (*pro hac vice*)
jducayet@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853 7000
Facsimile: (312) 853 7036

Michele L. Aronson (*pro hac vice*)
maronson@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
Telephone: (202) 736 8000
Facsimile: (202) 736 8711

*Attorneys for Defendant TaxAct, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

NICOLAS C. SMITH-WASHINGTON, on behalf of himself and all others similarly situated,

Plaintiff,

v.

TAXACT, INC.,

Defendant.

Case No. 3:23-CV-00830-VC

Assigned to Hon. Vince Chhabria

**DEFENDANT TAXACT, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

Date: July 20, 2023
Time: 10:00 a.m.
Place: Courtroom 4, 17th Floor

Case Removed: February 23, 2023

(Superior Court of California Alameda County, Case No. 23cv026204)

TO PLAINTIFF NICOLAS C. SMITH-WASHINGTON AND HIS COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on July 20, 2023, at 10:00 a.m., or as soon thereafter as it may be heard, Defendant TaxAct, Inc. ("TaxAct") hereby moves to compel arbitration and stay this litigation pending arbitration and then during the pendency of the arbitration. TaxAct's motion will be heard before the Honorable Vince Chhabria of the United States District Court for the Northern District of California in Courtroom 4, located at 450 Golden Gate Avenue, San Francisco, California 94102.

TaxAct moves this Court for an order compelling arbitration and staying this case pending the outcome of the arbitration proceedings. This motion is brought pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3 *et seq*., and well-settled law on the grounds that Plaintiff and TaxAct agreed to arbitrate all disputes on an individual basis when Plaintiff agreed to the Terms of Service and License Agreement and continued to visit and use TaxAct's website and tax return preparation products. All seven of Plaintiff's Causes of Action in the instant lawsuit fall within the scope of that arbitration provision.

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, and the Declaration of Mark Jaeger filed concurrently herewith, the record in this action, and any oral argument permitted by the Court.

Date: June 8, 2023

Respectfully submitted,

By: */s/ Sheila A.G. Armbrust*

Sheila A.G. Armbrust (SBN 265998)
sarmbrust@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772 1200
Facsimile: (415) 772 7400

*Attorneys for Defendant TaxAct, Inc.*

# TABLE OF CONTENTS


Page

INTRODUCTION ... 1

FACTUAL BACKGROUND ... 2

A. Smith-Washington Brings This Case as a Putative Class Action. ... 2

B. All TaxAct Customers Must Accept the Terms to Use TaxAct's Services. ... 2

C. The Terms Include an Arbitration Agreement with an Opt-Out Provision. ... 3

D. The Arbitration Agreement Has Been in Effect for the Entire Time Period in Which TaxAct Deployed the Meta Pixel. ... 4

E. TaxAct Prominently and Repeatedly Reminded Customers of Their Acceptance of the Terms or Opportunity to Decline the Terms. ... 4

F. Multiple TaxAct Records Demonstrate Smith-Washington's Acceptance of the Terms and Arbitration Agreement. ... 5

G. Smith-Washington's Use of TaxAct's Services for TY 2018 did not Trigger the Meta Pixel. ... 6

H. Smith-Washington Did Not Exercise His Right to Opt-Out of Arbitration at Any Time During the Use of TaxAct's Services. ... 6

ARGUMENT ... 7

A. Plaintiff Entered into a Contract with TaxAct—and Agreed to the Terms —Every Tax Year from 2017–2021 ... 7

B. The Court Must Compel Arbitration and Stay Proceedings. ... 8

1. The FAA Embodies the Strong National Policy in Favor of Arbitration. ... 8

2. All Remaining Questions Regarding the Validity, Interpretation, and Scope of the Arbitration Agreement Have Been Delegated to, and Must Be Decided by, the Arbitrator. ... 9

3. Even if the Court Considers the Merits, Arbitration is Appropriate. ... 10

a) The Arbitration Agreement Is Valid and Enforceable. ... 10

b) Plaintiff's Claims Fall Within the Scope of the Arbitration Agreement. ... 13

CONCLUSION ... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahlstrom v. DHI Mortg. Co., Ltd., L.P.*,
21 F.4th 631 (9th Cir. 2021) ........ 7, 9

*Al-Safin v. Circuit City Stores, Inc.*,
394 F.3d 1254 (9th Cir. 2005) ........ 10

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
475 U.S. 643 (1986) ........ 13

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) ........ 9

*Carnival Cruise Lines, Inc. v. Shute*,
499 U.S. 585 (1991) ........ 11

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
207 F.3d 1126 (9th Cir. 2000) ........ 8

*Cordas v. Uber Techs., Inc.*,
228 F. Supp. 3d 985 (N.D. Cal. 2017) ........ 12

*Cox v. Ocean View Hotel Corp.*,
533 F.3d 1114 (9th Cir. 2008) ........ 8

*Datel Holdings Ltd. v. Microsoft Corp.*,
712 F. Supp. 2d 974 (N.D. Cal. 2010) ........ 11

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985) ........ 9

*Epic Sys. Corp. v. Lewis*,
138 S. Ct. 1612 (2018) ........ 8

*Estrella v. Freedom Fin.*,
No. C 09-03156 SI, 2011 WL 2633643 (N.D. Cal. July 5, 2011) ........ 13

*In re Facebook Biometric Info. Priv. Litig.*,
185 F. Supp. 3d 1155 (N.D. Cal. 2016) ........ 12

*Farrow v. Fujitsu Am., Inc.*,
37 F. Supp. 3d 1115 (N.D. Cal. 2014) ........ 9

*First Options of Chi., Inc. v. Kaplan*,
514 U.S. 938 (1995) ... 10

*Fontana v. Chefs' Warehouse Inc.*,
No. 16-cv-06521-HSG, 2017 WL 2591872 (N.D. Cal. June 15, 2017) ... 8

*Graf v. Match.com, LLC*,
No. 15-cv-3911-PA, 2015 WL 4263957 (C.D. Cal. July 10, 2015) ... 12

*Hill v. Gateway 2000, Inc.*,
105 F.3d 1147 (7th Cir. 1997) ... 11

*Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*,
379 F.3d 159 (5th Cir. 2004) ... 11

*Kim v. Tinder, Inc.*,
No. 18-cv-03093-JFW, 2018 WL 6694923 (C.D. Cal. July 12, 2018),
*appeal dismissed*, No. 21-55951, 2022 WL 1087824 (9th Cir. Mar. 9, 2022) ... 12

*Lee v. Ticketmaster L.L.C.*,
817 F. App'x. 393 (9th Cir. 2020) ... 11, 12

*Little v. Auto Stiegler, Inc.*,
29 Cal. 4th 1064 (2003) ... 10

*Luckert v. Tesla Energy Operations, Inc.*,
No. 21-CV-03027-VC, 2021 WL 3721967 (N.D. Cal. Aug. 5, 2021) ... 9

*Madden v. Kaiser Found. Hosps.*,
17 Cal. 3d 699 (1976) ... 7, 10

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) ... 8, 13

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ... 12

*Savetsky v. Pre–Paid Legal Servs., Inc.*,
Case No. 14–03514 SC, 2015 WL 604767 (N.D. Cal. Feb. 12, 2015) ... 12

*Snow v. Eventbrite, Inc.*,
No. 3:20-cv-03698-WHO, 2021 WL 3931995 (N.D. Cal. Sept. 2, 2021) ... 11

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*,
363 U.S. 574 (1960) ... 10

*Vianna v. Doctors' Mgmt. Co.*,
27 Cal. App. 4th 1186 (1994) ... 11

**Statutes & Rules**

Federal Abritration Act, 9 U.S.C. § 3 *et seq.* .......... 1, 2, 8, 9

JAMS Streamlined Arbitration Rules & Procedures .......... 3, 10

Defendant TaxAct, Inc. ("TaxAct " or "Defendant") respectfully moves to compel arbitration and stay proceedings pending the completion of arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3 *et seq*.

**INTRODUCTION**

Plaintiff Nicolas C. Smith-Washington ("Smith-Washington" or "Plaintiff") brings this putative class action against TaxAct, a tax preparation software company, claiming that TaxAct breached his and others' confidentiality and privacy when it "disclosed and released confidential tax return information to Meta." Compl. ¶ 7.[1] Plaintiff asserts claims on behalf of himself and "all natural persons residing in California who used Defendant's website's tax preparation services to prepare a tax return . . . on or prior to November 23, 2022." *Id.* ¶ 3.

On May 25, 2023, the Court heard argument on TaxAct's original motion to stay pending arbitration. The Court denied the motion without prejudice and invited TaxAct to file a new motion including additional facts regarding Plaintiff's agreement to arbitrate his claims for every year that he used TaxAct during the relevant period. This motion sets forth that evidence. Specifically, Plaintiff agreed to arbitrate any disputes and to do so on an individual, rather than class-wide, basis (the "Arbitration Agreement") from tax year ("TY") 2017 through TY 2021,[2] i.e., when the Meta Pixel was initially deployed through Plaintiff's last use of TaxAct's Services. Not only did Plaintiff's use of TaxAct's websites, mobile applications, online and offline tax return preparation products, and filing services (collectively, the "Services") constitute acceptance of the TaxAct Terms of Service and License Agreement (the "Terms") during each of the relevant years, but he also affirmatively acknowledged acceptance of the Terms when he signed into his TaxAct account and when he submitted his tax returns for at least TY 2019, TY 2020, and TY 2021.[3] Moreover, the

[1] *See* Exhibit A to the Decl. of Sheila A.G. Armbrust in Support of Def.'s Not. of Removal (Feb. 23, 2023), ECF No. 1-4.

[2] Many of the dates included in this motion and supporting materials refer to "tax years" (or "TY"). Because TaxAct is a tax return preparation software company, many of its internal records are keyed to tax years. Generally, an individual will file tax returns for a given tax year in the following calendar year (e.g., TY 2019 returns are generally filed in calendar year 2020).

[3] As explained in Factual Background Section G, *infra*, TaxAct does not have the additional record of Smith-Washington's acknowledgment of the Terms for TY 2018 because he did not submit his tax return from TaxAct's submission pages (which include the checkbox acknowledgement, and

Terms permitted Plaintiff to opt out of arbitration while still using TaxAct Services. He never did. As such, Plaintiff's claims must be arbitrated pursuant to Section 4 of the FAA, and this litigation should be stayed pursuant to Section 3 of the FAA until that arbitration has been completed.

## FACTUAL BACKGROUND

### A. Smith-Washington Brings This Case as a Putative Class Action.

Plaintiff Smith-Washington was a TaxAct customer who alleges that TaxAct "secretly transmitted to Meta Platforms, Inc." his and putative class members' respective activities on TaxAct's website, including confidential personal and financial information shared with TaxAct. Compl. ¶ 5. He purports to bring this action on behalf of himself and all natural persons residing in California who used TaxAct's website for tax preparation services to prepare a tax return on or prior to November 23, 2022. *Id.* ¶ 3. The Complaint alleges that there are "hundreds of thousands, if not millions of Class Members in the state of California." *Id.* ¶ 7.

On May 25, 2023, the Court heard argument on TaxAct's original motion to stay pending arbitration. The Court denied the motion without prejudice and invited TaxAct to file a new motion including additional facts regarding Plaintiff's agreement to arbitrate his claims.

### B. All TaxAct Customers Must Accept the Terms to Use TaxAct's Services.

Every visitor or user of TaxAct's websites, mobile applications, online and offline tax return preparation products, and filing services (collectively, the "Services") is subject to a set of contractual terms and conditions of service (the "Terms") that are publicly available on the TaxAct website at https://www.taxact.com/legal-notice. Declaration of Mark Jaeger in Support of Defendant TaxAct, Inc.'s Motion to Compel Arbitration and Stay Proceedings ("Jaeger Decl.") ¶ 4.a. For the relevant period—from the first deployment of the Meta Pixel on TaxAct's website on December 5, 2017, through the last date in which Plaintiff printed or efiled a tax return using TaxAct Services on April 18, 2022—a hyperlink to the Terms has been listed at the footer of every page on the TaxAct

---

which contained the pixel instance at issue). Rather, he printed his TY 2018 tax returns from the Print Center page on the TaxAct website, which does not contain the instance of the Meta Pixel at issue.

website and software, as well as in the emails that TaxAct sent to its customers regarding updates to TaxAct's privacy notice in calendar years 2019, 2020, and 2022. *Id.* ¶ 4.b.

Two versions of the Terms were in effect during the relevant period: (1) Terms that became effective January 5, 2017 (the "2017 Terms"), *id.* Ex. B; and (2) Terms that became effective November 17, 2020, and are in place today (the "2020 Terms"), *id.* Ex. C. The 2017 and 2020 Terms each provide: "You may not use the Services until you have read and agreed to this Agreement. By using the Services, you indicate your unconditional acceptance of this Agreement. If you do not accept this Agreement, you must terminate your use of the Services." *Id.*, Ex. B at 1, Ex. C at 1. Both also provide that they set forth "TaxAct's and the Participating Parties' entire liability and your exclusive remedy with respect to the services, [and comprise] a complete statement of the agreement between you and TaxAct." *Id.* Ex. B at 4, Ex. C at 3. The 2020 Terms further provide that they "supersede any prior understandings" of their subject matter. *Id.*

### C. The Terms Include an Arbitration Agreement with an Opt-Out Provision.

The 2017 and 2020 Terms each include a section titled "Dispute Resolution; Binding Arbitration" (the "Arbitration Agreement") that contains detailed information regarding binding arbitration, including the following language in bold font: "**You and TaxAct agree that any dispute arising out of or related to these Terms or our Services is personal to you and TaxAct and that any dispute will be resolved solely through individual arbitration and will not be brought as a class arbitration, class action or any other type of representative proceeding.**" *Id.* Ex. B at 5, Ex. C at 4. The only material difference between the two versions of the Terms is the arbitral forum: Linn County, Iowa under the 2017 Terms and Dallas County, Texas under the 2020 Terms. *Id.* Ex. B at 5, Ex. C at 4.

The Arbitration Agreement requires that disputes with TaxAct be resolved through individual arbitration in accordance with the Streamlined Arbitration Rules & Procedures of the Judicial Arbitration and Mediation Services ("JAMS Rules"). *Id.* Ex. K. JAMS Rule 11(b) provides: "Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper

Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter." *Id.* at 8. The Arbitration Agreement also includes an opt-out provision, which provides clear instructions on how to opt out: "You have the right to opt out of binding arbitration within thirty (30) days of the date you first accepted the terms of this Section by sending an email to arbitraton@taxact.com." *Id.* Ex. B at 5, Ex. C at 4. Opting out of arbitration does not result in account termination or termination without a refund, or in any other penalty. *Id.* ¶ 5.e.

**D. The Arbitration Agreement Has Been in Effect for the Entire Time Period in Which TaxAct Deployed the Meta Pixel.**

On December 5, 2017, TaxAct began deploying the Meta Pixel in a limited capacity on its website, including the landing and product launch pages. Jaeger Decl. ¶ 6.a. On January 4, 2018, TaxAct configured the Meta Pixel through certain product pages. *Id.* Five separate instances of the Meta Pixel were first placed on the website. *Id.* ¶ 6.b. One of those instances, "CHTML – Conversion – Facebook – complete_all," was placed on the efiling submission page on January 4, 2018, and appears to be the basis of the allegations in *The Markup* article and Smith-Washington's complaint. Ex. J at 2; *see* Compl. ¶¶ 6, 7, 37, 61.

**E. TaxAct Prominently and Repeatedly Reminded Customers of Their Acceptance of the Terms or Opportunity to Decline the Terms.**

Beginning in the TY 2017 filing season, TaxAct required individuals who created an account on the TaxAct website to acknowledge acceptance of the Terms to complete account creation. Jaeger Decl., Ex. D.[4] For TY 2017 and TY 2018, these acknowledgments instructed an individual creating an account to "Scroll to review our Privacy Policy [hyperlinked], and Terms of Service/License Agreement [hyperlinked]. By clicking accept, you are agreeing to these policies" in order to "Accept and continue" to create an account. *Id.* at 5, 7. For TY 2019, TY 2020, and TY 2021, these acknowledgments included a required checkbox that read: "I agree to the TaxAct Terms of Service

[4] TaxAct's source code for the account creation pages prior to the TY 2017 filing season was stored on a server that has since been decommissioned and the history of the changes for that timeframe is not in the current source code repository. While the account creation code for years prior to the TY 2017 filing season is not available, TaxAct's practice has been to require acceptance of the Terms upon account creation throughout and before the relevant time period. Jaeger Decl. ¶ 7.b.

& Terms of Use [hyperlinked], and have read and acknowledge the Privacy Statement [hyperlinked].” *Id.* at 8-10.

Users were also required to acknowledge the Terms each time they used the Services. Jaeger Decl. ¶ 7.j. During the relevant period and up to October 2018, the account sign in page provided an additional notice and acknowledgment of the Terms by stating, directly below the “Sign In” button: “By clicking ‘Sign In’ you agree to our License Agreement [hyperlinked] and consent to our Privacy Statement [hyperlinked]. You also consent to receive periodic promotional materials.” *Id.* Ex. E at 4–5. In 2018, TaxAct introduced an additional notice and acknowledgment within the in-product experience that rendered the sign in page notice and acknowledgment a secondary, supplemental acknowledgment. *Id.* ¶ 7.o. Specifically, TaxAct updated its software to create a Basic Information Worksheet record for TaxAct’s use to strengthen its records regarding consent to the Terms; from then on, users were required to affirmatively check a checkbox to create a record of their acknowledgment of their acceptance of the Terms in order to efile or paper file their tax returns, and the Basic Information Worksheet saves a record of this action specific to the user’s profile. *Id.* ¶ 7.p. Thus, efiling and paper filing pages from TY 2018 and later include a required checkbox that reads: “I agree to the terms and conditions [hyperlinked]” and users were required to check the checkbox acknowledging their acceptance of the Terms in order to continue to the filing step. *Id.* Ex. G at 1–3.

### F. Multiple TaxAct Records Demonstrate Smith-Washington’s Acceptance of the Terms and Arbitration Agreement.

Smith-Washington created an online TaxAct account on January 21, 2016, and used TaxAct’s Services to file his tax returns on the TaxAct website for TY 2015 through TY 2021. *Id.* ¶ 8.b–d.[5] Smith-Washington encountered the Terms (and acknowledged agreement 6 times for TY 2015, 9 times for TY 2016, and 18 times for TY 2017) when he signed in on dozens of occasions, multiple times each tax year for TY 2015 through TY 2021. *Id.* ¶ 8.d, Ex. K. Smith-Washington was required to agree to the Terms in order to use TaxAct’s Services, including at least

[5] The Complaint alleges that Smith-Washington used TaxAct’s website to prepare and file his federal and state income taxes from approximately 2005 to 2022. Compl. ¶¶ 9, 96. Prior to the TY 2015 filing season, Smith-Washington would have had to create a new account each year.

each time Smith-Washington used TaxAct's Services to file or attempt to file a tax return on January 31, 2016; June 11, 2016; February 2, 2017; January 27, 2018; March 5, 2018; March 14, 2018; April 3, 2018; February 21, 2019; July 15, 2020; July 27, 2021; and April 18, 2022. *Id.* ¶ 8.d. Smith-Washington checked the checkbox on the filing page, creating a record in the Basic Information Worksheet of his acknowledgment of his acceptance of the Terms when he filed his TY 2019 tax returns (on July 15, 2020), TY 2020 tax returns (on July 27, 2021), and TY 2021 tax returns (on April 18, 2022). *Id.* Ex. I at 2–4.

**G. Smith-Washington's Use of TaxAct's Services for TY 2018 did not Trigger the Meta Pixel.**

For one of the tax years at issue, TY 2018, Smith-Washington's use of TaxAct's Services did not trigger the Meta Pixel. TaxAct's records indicate that Smith-Washington did not navigate to either the efiling page or to the paper filing page when he used TaxAct's Services for TY 2018 as part of the standard filing process, but instead printed his TY 2018 tax return the from Print Center page on the TaxAct website. *Id.* ¶ 9.c..

The pixel instance for the Meta Pixel, "CHTML – Conversion – Facebook – complete_all," which appears to be the basis of the allegations in Smith-Washington's complaint, was not placed on the Print Center page. Accordingly, Plaintiff printing his TY 2018 tax return from the Print Center page would not have resulted in any of his data being collected by the "CHTML – Conversion – Facebook – complete_all" pixel instance.

**H. Smith-Washington Did Not Exercise His Right to Opt-Out of Arbitration at Any Time During the Use of TaxAct's Services.**

TaxAct has no record that Smith-Washington exercised his right to opt-out of arbitration. Jaeger Decl. ¶ 10. TaxAct has no record indicating that communication from Smith-Washington or his user account occurred with a TaxAct Support representative and, specifically, no record that Smith-Washington communicated an intent to opt-out of binding arbitration. *Id.* And while Smith-Washington alleges that he created a TaxAct account and used the Services, he does not allege that he opted-out of the Arbitration Agreement for any given tax year.

## ARGUMENT

### A. Plaintiff Entered into a Contract with TaxAct—and Agreed to the Terms —Every Tax Year from 2017–2021

While nearly all issues regarding the Arbitration Agreement must be delegated to the arbitrator as discussed below, the formation of an agreement to arbitrate must be addressed by the Court. *See Ahlstrom v. DHI Mortg. Co., Ltd., L.P.*, 21 F.4th 631, 635 (9th Cir. 2021) (holding "that parties cannot delegate issues of formation to the arbitrator"). "[O]ne who assents to a contract is bound by its provisions and cannot complain of unfamiliarity with the language of the instrument." *Madden v. Kaiser Found. Hosps.*, 17 Cal. 3d 699, 710 (1976).

TaxAct anticipates that Plaintiff will dispute that he formed an agreement to arbitrate with TaxAct. The evidence shows, however, that Plaintiff agreed to the Terms and therefore assented to arbitrate any and all claims for the relevant period, i.e., TY 2017 through TY 2021.[6] As noted above, Plaintiff accepted the Terms—including the Arbitration Agreement—every single time that he used the Services, which according to the Complaint, was every year during the relevant period. Compl. ¶¶ 9, 96; Jaeger Decl., Exs. B at 1, C at 1 ("By using the Services, you indicate your unconditional acceptance of this Agreement."). Moreover, Plaintiff had notice of his acceptance of the Terms when using the Services because they were available on the footer of the TaxAct website and software. Plaintiff was further made aware of changes to the Terms through the emails that TaxAct sent to its customers annually regarding updates to TaxAct's privacy notice. *Id.* ¶ 4.b.

In addition, Plaintiff's account sign-in established that he agreed to the Terms. Until October 2018 (i.e., for TY 2017 and a few months after), the sign in page required him to acknowledge his acceptance of the Terms every time he signed into his TaxAct account. *Id.* Ex. E. As such, he would have acknowledged the Terms each time he signed into his account to prepare and file his TY 2017 tax returns, at least on January 27, 2018; March 5, 2018; March 14, 2018; and April 3, 2018.

The record of Plaintiff's acknowledgment of his agreement to the Terms is further strengthened in TY 2018 and later, where TaxAct has an additional record of his affirmative

[6] Plaintiff's acceptance includes TY 2018 through his sign in and use. However, as described above, Plaintiff's use of TaxAct's Services for his TY 2018 tax returns did not trigger the Meta Pixel.

checking of a box indicating agreement to the Terms prior to filing his returns. *Id.* Exs. F, G. TaxAct's enhanced records system for this time period shows that Smith-Washington *did* check the checkbox at the filing page for his tax returns for TY 2019 (on July 15, 2020), TY 2020 (on July 27, 2021), and TY 2021 (on April 18, 2022). *Id.* Ex. I at 2–4.

In short, Plaintiff agreed to be bound by the Terms—including the Arbitration Agreement—numerous times every year for the relevant period. Not only that, but there is no record that Plaintiff objected to the Terms, terminated his use of the Services, or opted-out of the Arbitration Agreement as he was expressly permitted to do during the relevant period. *Id.* ¶ 10.

### B. The Court Must Compel Arbitration and Stay Proceedings.

#### 1. The FAA Embodies the Strong National Policy in Favor of Arbitration.

Section 2 of the FAA mandates that arbitration agreements in contracts "evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. As the Supreme Court recently reiterated, the FAA establishes a "liberal federal policy favoring arbitration agreements." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). An arbitration agreement governed by the FAA, such as the Arbitration Agreement here, is presumed to be valid and enforceable, and the party resisting arbitration "bears the burden of establishing a defense to the agreement's enforcement by a preponderance of the evidence." *See Fontana v. Chefs' Warehouse Inc.*, No. 16-cv-06521-HSG, 2017 WL 2591872, at *2 (N.D. Cal. June 15, 2017). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1131 (9th Cir. 2000) (quoting *Moses*, 460 U.S. at 24–25).

A dispute is subject to arbitration when two conditions are satisfied. First, there must be a valid arbitration agreement. *See Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008). Second, the court must evaluate whether the arbitration agreement encompasses the dispute at

issue. *Id*. If these two conditions are satisfied, arbitration is required per Section 4 of the FAA. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) ("By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration."). Moreover, Section 3 of the FAA further provides that if an issue is "referable" per an arbitration agreement, the court hearing the case "*shall* on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3 (emphasis added). Accordingly, if all of Plaintiff's claims are subject to a valid arbitration agreement, the Court should compel arbitration. *Farrow v. Fujitsu Am., Inc.*, 37 F. Supp. 3d 1115, 1126 (N.D. Cal. 2014).

**2. All Remaining Questions Regarding the Validity, Interpretation, and Scope of the Arbitration Agreement Have Been Delegated to, and Must Be Decided by, the Arbitrator**.

TaxAct expects Plaintiff to, as before, dispute the validity and scope of Arbitration Agreement on various grounds. Those claims must be decided by the arbitrator—not by this Court. Disputes regarding the unconscionability or scope of an arbitration agreement may be delegated to the arbitrator where "the parties clearly and unmistakably provide." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (emphasis omitted). This Court has likewise held that incorporation of the JAMS Rules into an arbitration agreement delegates the question of arbitrability to the arbitrator:

> The applicable [JAMS] rule provides: 'Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought ... shall be submitted to and ruled on by the Arbitrator.' That type of language has been held to 'clearly and unmistakably' delegate the question of arbitrability to the arbitrator.

*Luckert v. Tesla Energy Operations, Inc.*, No. 21-CV-03027-VC, 2021 WL 3721967 (N.D. Cal. Aug. 5, 2021).[7]

Here, for the entire relevant period, the Arbitration Agreement expressly incorporated the JAMS Rules by providing that "all disputes arising out of or relating to these Terms or our Services

[7] Although *Ahlstrom* overrules *Luckert* with respect to whether disputes related to formation may be delegated to an arbitrator, *Luckert*'s holding that all other issues may be delegated remains good law.

will be resolved through confidential binding arbitration held in [Linn County, Iowa / Dallas County, Texas] in accordance with the Streamlined Arbitration Rules and Procedures ("Rules") of [JAMS], which are available on the JAMS website and hereby incorporated by reference." Jaeger Decl., Ex. B at 5, Ex. C at 4 (emphasis omitted). JAMS Rule 11(b) provides that "disputes over the formation, existence, validity, interpretation or scope of the [arbitration] shall be submitted to and ruled on by the Arbitrator." *Id.* Ex. K at 8. In light of the clear language of the Arbitration Agreement that unmistakably delegates any dispute related to arbitrability to an arbitrator, the Court's analysis should and must stop here. Under controlling law, such questions should be determined in the first instance by the arbitrator.[8]

**3. Even if the Court Considers the Merits, Arbitration is Appropriate.**

Should the Court nevertheless consider the merits of the arbitrability of Plaintiff's claims, it should still compel arbitration and stay the case. This is because: (1) the Arbitration Agreement is valid and enforceable, and (2) Plaintiff's claims fall squarely within the Arbitration Agreement.

**a) The Arbitration Agreement Is Valid and Enforceable.**

Since "arbitration is a matter of contract," *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960), the existence of a valid arbitration agreement is determined under applicable state law.[9] *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Al-Safin v. Circuit City Stores, Inc.*, 394 F.3d 1254, 1257 (9th Cir. 2005). Here, Plaintiff was provided with and required to accept the Terms before proceeding with their use of TaxAct's services. This evidence establishes a valid and enforceable agreement to arbitrate.

California's public policy, like federal policy under the FAA, is strongly in favor of arbitration agreements. *Little v. Auto Stiegler, Inc.*, 29 Cal. 4th 1064, 1079 (2003); *Madden*, 17 Cal. 3d at 706–07 ("[A]rbitration has become an accepted and favored method of resolving disputes . . .

---

[8] Because TaxAct submits that this Court may not (and should not) reach the merits of Plaintiff's arguments regarding the enforceability or validity of the Arbitration Agreement, it does not re-raise those substantive arguments here. TaxAct will address any such arguments on reply if Plaintiff raises those arguments. In any event, TaxAct laid out the applicable case law and argument undermining such claims in prior briefing. *See* ECF No. 33 at 3-10.

[9] Although Texas, Iowa, or California could apply for the pertinent tax years, TaxAct's review of the law indicates that all three are substantially similar with respect to the issues relevant to this motion.

praised by the courts as an expeditious and economical method of relieving overburdened civil calendars.") (citations omitted). Under California law, "arbitration agreements should be liberally interpreted, and arbitration should be ordered unless the agreement clearly does not apply to the dispute in question." *Vianna v. Doctors' Mgmt. Co.*, 27 Cal. App. 4th 1186, 1189 (1994) (citation omitted). Any "[d]oubts as to whether an arbitration clause applies to a particular dispute are to be resolved in favor of sending the parties to arbitration." *Id.* Plaintiff bears the burden of proving the Arbitration Agreement is not valid and enforceable. Plaintiff cannot meet his burden here.

Here, Smith-Washington agreed to the binding Arbitration Agreement for every tax year in question. He did so when he visited TaxAct's website, created a TaxAct account, accessed his account, prepared his tax returns on the TaxAct website, and filed his state and federal tax returns through TaxAct. In every pertinent tax year, the Terms were publicly available on every page of the TaxAct website; the Terms provided that use of TaxAct's Services constituted acceptance; the Terms contained the Arbitration Agreement; accepting the Terms was required at account creation; and acknowledgment of acceptance of the Terms was required throughout the user experience, either on the account sign in page or on the filing page. Jaeger Decl., Exs. D–H. Moreover, at no point did Plaintiff ever opt-out of the Arbitration Agreement, despite having a clear avenue to do so. *Id.* ¶ 10.

Courts consistently enforce arbitration provisions when consumers register an account or complete a purchase knowing the transaction is subject to terms and conditions. *See Snow v. Eventbrite, Inc.*, No. 3:20-cv-03698-WHO, 2021 WL 3931995, at *4 (N.D. Cal. Sept. 2, 2021); *Lee v. Ticketmaster L.L.C.*, 817 F. App'x. 393, 394–95 (9th Cir. 2020) (enforcing agreement where website provided "sufficient notice for constructive assent" by displaying the advisory, "[b]y continuing past this page, you agree to our Terms of Use") (citations omitted); *cf. Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 587, 593–95 (1991) (enforcing forum selection clause consumers would not have seen unless the consumer obtained a copy of terms and conditions referenced on the back of tickets); *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379 F.3d 159, 164 (5th Cir. 2004) (enforcing arbitration provisions contained in "its Terms and Conditions in the box with the handset that the customer purchases"); *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148–51 (7th Cir.

1997) (enforcing arbitration terms contained within product packaging); *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 989 (N.D. Cal. 2010) (enforcing terms of an agreement contained within product packaging). Here, at all relevant times, a hyperlink to the Terms has been listed at the footer of every page on the website and software. Moreover, TaxAct's business practice of requiring acknowledgment of acceptance of the Terms upon account creation indicates that Smith-Washington would have acknowledged that he accepted the terms when he created his account on January 21, 2016. Jaeger Decl. ¶ 7.b.

Thus, regardless of the particular tax year at issue, case law makes clear that Plaintiff entered into a binding arbitration agreement. As to tax years 2018–2021, Plaintiff affirmatively indicated his assent to the Terms through a "clickwrap" agreement.[10] Such agreements have been routinely enforced. *See In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1164-65 (N.D. Cal. 2016); *Savetsky v. Pre–Paid Legal Servs., Inc.*, Case No. 14–03514 SC, 2015 WL 604767, at *3 (N.D. Cal. Feb. 12, 2015). And as to the first tax year during the relevant period, TY 2017, TaxAct employed a "browsewrap" agreement, through which users are automatically deemed to have accepted an agreement by using the website. Jaeger Decl., Ex. E at 3 ("By clicking 'Sign In' you agree to our License Agreement [hyperlinked] and consent to our Privacy Statement [hyperlinked]."). Such agreements are valid and enforceable. For instance, the Ninth Circuit upheld an agreement where three lines below the "Sign In" button, a website displayed the phrase, "[b]y continuing past this page, you agree to our Terms of Use" and where a similar advisory appeared above the "Place Order" button at checkout. *See Ticketmaster*, 817 F. App'x. at 394–95. Thus, where customers are notified that they are agreeing to terms of service by creating an account or completing a purchase, they are bound to the terms of service, even without clicking on an "I agree" or similar button. *Id., see also Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 990 (N.D. Cal.

[10] A clickwrap agreement is one in which the website user is "presented with a list of terms and conditions of use" before being asked to agree to them. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014). Users are "required to click on an 'I agree' box"; they must expressly manifest assent to the terms and conditions. *Id.* at 1175–76.

2017) (compelling arbitration where the mobile application displayed the notice, "[b]y creating an Uber account, you agree to the Terms & Conditions and Privacy Policy").[11]

**b) Plaintiff's Claims Fall Within the Scope of the Arbitration Agreement.**

Where a valid and enforceable arbitration agreement exists, as here, the Court must next determine whether the dispute at issue falls within the scope of that agreement. Here, Plaintiff's claims fall squarely within the scope of the Arbitration Agreement.

The Complaint alleges that TaxAct's alleged practice of sharing confidential tax return information was unlawful pursuant to California common law, the California Constitution, and various California statutes; and Plaintiff seeks monetary remedies in the form of compensatory damages, disgorgement of profits, restitution, punitive damages, attorneys' fees, and statutory civil penalties. Pursuant to the Arbitration Agreement, Plaintiff agreed that, except for small claims individual actions or disputes regarding the alleged unlawful use of intellectual property, "any dispute will be resolved solely through individual arbitration and will not be brought as a class arbitration, class action or any other type of representative proceeding." Jaeger Decl., Ex. B at 5, Ex. C at 4. None of Plaintiff's claims fall into the categories of a small claims dispute or disputes in which Plaintiff or TaxAct "seek[] injunctive or other equitable relief for the alleged unlawful use of intellectual property." Indeed, Plaintiff set forth no argument on this front in his prior briefing.

As such, each of Plaintiff's claims squarely falls within the scope of the Arbitration Agreement. *See, e.g.*, *Estrella v. Freedom Fin.*, No. C 09-03156 SI, 2011 WL 2633643, at *5 (N.D. Cal. July 5, 2011) (ordering plaintiffs to arbitrate their UCL and CLRA claims where the arbitration clause covered "any controversy, claim or dispute . . . arising out of or relating to" the contract) (citation omitted). Moreover, any doubt on this point must be resolved in favor of arbitration. *AT&T*

[11] *Accord Kim v. Tinder, Inc.*, No. 18-cv-03093-JFW, 2018 WL 6694923, *2–3 (C.D. Cal. July 12, 2018) (compelling arbitration where "Plaintiff logged into her Tinder account through a login screen on her phone which stated that tapping the Log In button would constitute consent to the [terms of use]"), *appeal dismissed*, No. 21-55951, 2022 WL 1087824 (9th Cir. Mar. 9, 2022); *Graf v. Match.com, LLC*, No. 15-cv-3911-PA, 2015 WL 4263957, at *4 (C.D. Cal. July 10, 2015) (compelling arbitration where user was "required to affirmatively agree to the Terms of Use when they clicked on a 'Continue' or other similar button" and where it was explained that "by clicking on that button, the user was affirming that they would be bound" by the terms).

*Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (holding that doubts as to whether an asserted dispute is covered by an arbitration clause "should be resolved in favor of coverage") (citation omitted); *accord Moses*, 460 U.S. at 24–25.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that this Court grant its Motion to Compel Arbitration and Stay Proceedings.

Date: June 8, 2023

Respectfully submitted,

By: */s/ Sheila A.G. Armbrust*

Sheila A.G. Armbrust (SBN 265998)
sarmbrust@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772 1200
Facsimile: (415) 772 7400

James W. Ducayet *(pro hac vice)*
jducayet@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853 7000
Facsimile: (312) 853 7036

Michele L. Aronson (*pro hac vice*)
maronson@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
Telephone: (202) 736 8000
Facsimile: (202) 736 8711

*Attorneys for Defendant TaxAct, Inc.*