Sheila A.G. Armbrust (SBN 265998)
sarmbrust@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200
Facsimile: (415) 772-7400

James W. Ducayet (*pro hac vice*)
jducayet@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853 7000
Facsimile: (312) 853 7036

Michele L. Aronson (*pro hac vice*)
maronson@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
Telephone: (202) 736 8000
Facsimile: (202) 736 8711

*Attorneys for Defendant TaxAct, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

NICOLAS C. SMITH-WASHINGTON, JOYCE MAHONEY, JONATHAN AMES, and JENNY LEWIS, on behalf of himself and all others similarly situated,

Plaintiffs,

v.

TAXACT, INC.,

Defendant.

Case No. 3:23-CV-00830-VC

Assigned to Hon. Vince Chhabria

**DEFENDANT TAXACT, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

Date: September 21, 2023
Time: 10:00 a.m.
Place: Courtroom 4, 17th Floor

TO PLAINTIFF NICOLAS C. SMITH-WASHINGTON AND HIS COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on September 21, 2023, at 10:00 a.m., or as soon thereafter as it may be heard, Defendant TaxAct, Inc. ("TaxAct") hereby moves to compel arbitration and stay this litigation pending arbitration and then during the pendency of the arbitration. TaxAct's motion will be heard before the Honorable Vince Chhabria of the United States District Court for the Northern District of California in Courtroom 4, located at 450 Golden Gate Avenue, San Francisco, California 94102.

TaxAct moves this Court for an order compelling arbitration and staying this case both immediately, except as it may pertain to the issue of contract formation, pursuant to the Supreme Court's June 23, 2023 decision in *Coinbase, Inc. v. Bielski*, No. 22-105, 2023 WL 4138983, at *7 (U.S. June 23, 2023), and then pending the outcome of the arbitration proceedings. This motion is brought pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3 *et seq*., and well-settled law on the grounds that Plaintiffs and TaxAct entered contracts that contain the Arbitration Agreements, which, in turn, incorporate delegation provisions requiring that any question of arbitrability be resolved by an arbitrator—not by courts. Thus, this Court should grant TaxAct's motion to compel arbitration. Further, even if the contracts lacked delegation provisions, the motion to compel arbitration still should be granted because Plaintiffs' claims fall within the scope of the Arbitration Agreements (although because the contracts do contain delegation provisions, this arbitrability question is for the arbitrator to decide).

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, and the Declaration of Mark Jaeger filed concurrently herewith, the record in this action, and any oral argument permitted by the Court.

Date: July 12, 2023

Respectfully submitted,

By: */s/ Sheila A.G. Armbrust*

Sheila A.G. Armbrust (SBN 265998)
sarmbrust@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772 1200
Facsimile: (415) 772 7400

*Attorney for Defendant TaxAct, Inc.*

# TABLE OF CONTENTS


Page

INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 1

**A.** Plaintiffs Bring This Case as a Putative Class Action. ........ 1

**B.** All TaxAct Customers Must Accept the Terms to Use TaxAct's Services. ........ 2

**C.** The Terms Include Arbitration Agreements with an Opt-Out Provision. ........ 3

**D.** TaxAct Adopted Arbitration Agreements in Its Terms Before It Configured the Auxiliary Service Provider Technologies at Issue, and Then Repeatedly and Prominently Reminded Customers That They Were Accepting the Terms by Using the Service. ........ 4

**E.** Multiple TaxAct Records Demonstrate Plaintiffs' Acceptance of the Terms and Arbitration Agreements ........ 5

**1.** Nicolas Smith-Washington (Jaeger Decl., Exs. I, J) ........ 5

**2.** Joyce Mahoney (Jaeger Decl., Exs. K, L) ........ 6

**3.** Jonathan Ames (Jaeger Decl., Exs. M, N) ........ 6

**4.** Jenny Lewis ("Plaintiff Lewis") (Jaeger Decl., Exs. O, P) ........ 6

**F.** Plaintiffs Did Not Exercise Their Right to Opt-Out of Arbitration at Any Time During the Use of TaxAct's Services. ........ 6

ARGUMENT ........ 7

**A.** Based on the Delegation Clauses in the Terms, This Court's Review Is Limited. ........ 7

**B.** Arbitration Must Be Compelled Because Plaintiffs Entered into a Delegation Clause-Containing Contract with TaxAct—and Agreed to the Terms—Every Tax Year from 2017 through 2021. ........ 9

**1.** Plaintiffs Smith-Washington, Mahoney, and Ames each agreed to be bound by the Terms—including the Arbitration Agreements—the last time they used the Services, as well as numerous times every year after January 2017. ........ 9

**2.** Plaintiff Lewis is likewise bound by the Terms based on her husband's use of TaxAct's Services on her behalf. ........ 10

**C.** The Existence of the Arbitration And Delegation Clauses in the 2017 and 2020 Terms Must End the Court's Inquiry and Require a Stay of Discovery. ....12

**D.** Alternatively, Even If There Were No Delegation Provision, Arbitration Would Still Be Required Because Plaintiffs' Claims Fall Within the Scope of the Arbitration Agreements. ....13

CONCLUSION....15

## TABLE OF AUTHORITIES


Page(s)

**CASES**

*Ahlstrom v. DHI Mortg. Co.*,
21 F.4th 631 (9th Cir. 2021) .......... 7, 8, 9

*Anderson v. Credit One Bank, Nat'l Ass'n*,
No. 16-cv-3125-MMA, 2018 WL 2287329 (S.D. Cal. May 18, 2018) .......... 8, 12

*Arthur Anderson LLP v. Carlisle*,
556 U.S. 624 (2009) .......... 10

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
475 U.S. 643 (1986) .......... 14

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) .......... 7

*Caremark, LLC v. Chickasaw Nation*,
43 F.4th 1021 (9th Cir. 2022) .......... 7, 8, 13

*Coinbase, Inc. v. Bielski*,
No. 22-105, 2023 WL 4138983 (U.S. June 23, 2023) .......... 1, 13

*Comer v. Micor, Inc.*,
436 F.3d 1098 (9th Cir. 2006) .......... 10

*Cox v. Ocean View Hotel Corp.*,
533 F.3d 1114 (9th Cir. 2008) .......... 3

*Cty. of Contra Costa v. Kaiser Found. Health Plan, Inc.*,
47 Cal. App. 4th 237 (1996) .......... 12

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985) .......... 13

*Desuza v. Andersack*,
63 Cal. App. 3d 694 (1976) .......... 11

*Edwards v. Doordash, Inc.*,
888 F.3d 738 (5th Cir. 2018) .......... 8, 12

*Estrella v. Freedom Fin.*,
No. C 09-03156 SI, 2011 WL 2633643 (N.D. Cal. July 5, 2011) .......... 14

*Farrow v. Fujitsu Am., Inc.*,
37 F. Supp. 3d 1115 (N.D. Cal. 2014) .......... 13

*Flores v. Evergreen at San Diego, LLC*, 148 Cal. App. 4th 581 (2007) ..... 11

*Hellmich v. Mastiff Contracting LLC*, No. SACV 14-1354 (DOC(ANx), 2015 WL 391989 (C.D. Cal. Jan. 27, 2015) ..... 11

*Javier v. Assurance IQ, LLC.*, No. 20-CV-02860-CRB, 2023 WL 114225 (N.D. Cal. Jan. 5, 2023) ..... 15

*Johnson v. Oracle Am., Inc.*, 764 F. App'x 607 (9th Cir. 2019) ..... 7

*Kubala v. Supreme Prod. Servs.*, 830 F.3d 199 (5th Cir. 2016) ..... 8, 9, 12

*Lee v. Ticketmaster L.L.C.*, 817 F. App'x 393 (9th Cir. 2020) ..... 9

*Letizia v. Prudential Bache Sec., Inc.*, 802 F.2d 1185 (9th Cir. 1986) ..... 10

*Luckert v. Tesla Energy Operations, Inc.*, No. 21-CV-03027-VC, 2021 WL 3721967 (N.D. Cal. Aug. 5, 2021) ..... 7

*Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63 (2010) ..... 7, 8, 9, 13

*Sherwood Mktg. Grp., LLC v. Intertek Testing Servs., N.A.*, No. 3:17-cv-00782-BEN-NLS, 2018 WL 672515 (S.D. Cal. Jan. 31, 2018) ..... 11

*Snow v. Eventbrite, Inc.*, No. 3:20-CV-03698-WHO, 2021 WL 3931995 (N.D. Cal. Sept. 2, 2021) ..... 9

*Tice v. Amazon.com, Inc.*, 845 F. App'x 535 (9th Cir. 2021) ..... 10

*Tradeline Enters. Pvt. Ltd. v. Jess Smith & Sons Cotton, LLC*, No. LA CV15-08048, 2016 WL 7444857 (C.D. Cal. July 29, 2016) ..... 10

*Unite Here Local 30 v. Sycuan Band of the Kumeyaay Nation*, 35 F.4th 695 (9th Cir. 2022) ..... 8

**STATUTES & RULES**

Fed. Arb. Act, 9 U.S.C. § 3 *et seq.* ..... 1, 13

JAMS Rule 11 ..... 7

JAMS Rule 11(a) ..... 4

JAMS Rule 11(b) ..... 3, 13

Defendant TaxAct, Inc. ("TaxAct" or "Defendant") respectfully moves to compel arbitration and for an immediate stay while the motion to compel and any appeal therefrom are pending, and assuming arbitration is granted, a stay during the pendency of arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3 *et seq.* and the Supreme Court's recent decision in *Coinbase, Inc. v. Bielski*, No. 22-105, 2023 WL 4138983, at *7 (U.S. June 23, 2023).

## INTRODUCTION

This is a putative class action against TaxAct, a tax preparation software company that offers software to individual taxpayers and businesses. Plaintiffs assert that TaxAct improperly disclosed their confidential tax return information and seek relief under a variety of statutory and common law causes of action.

Plaintiffs cannot litigate these claims in this Court. That is because when Plaintiffs used TaxAct's tax preparation products and services, they agreed to do so pursuant to TaxAct's standard terms and conditions of service (the "Terms"). These Terms—discussed in detail below—require that any disputes—including those at issue here—must be resolved by confidential binding arbitration, which is to be conducted on an individual (and not class-wide) basis. As such, the Court should compel Plaintiffs to arbitrate their claims and should stay all proceedings pursuant to Section 3 *et seq* of the FAA until that arbitration has been completed.

## FACTUAL BACKGROUND

### A. Plaintiffs Bring This Case as a Putative Class Action.

Plaintiffs are all TaxAct customers who allege that TaxAct "disclosed, released, and aided and abetted third parties (including at least: Meta, Google, and Google Double Click) in the interception of Plaintiffs' and Class Members' Confidential Tax Return Information." Am. Compl. ¶ 11. They purport to bring this action on behalf of themselves and multiple classes of individuals who used TaxAct's services to prepare tax returns on or prior to November 23, 2022. *Id.* ¶¶ 168-71.

On May 25, 2023, the Court heard arguments on TaxAct's original motion to stay pending arbitration which related only to Plaintiff Smith-Washington. The Court denied the motion without prejudice and invited TaxAct to file a new motion including additional facts regarding Smith-Washington's agreement to arbitrate his claims. TaxAct again filed a motion to compel arbitration,

elaborating and specifying Smith-Washington's repeated and express acknowledgment of his acceptance of TaxAct's terms and arbitration provision. ECF No. 50. Instead of responding, Plaintiffs filed the operative Amended Complaint, adding three new named Plaintiffs and new allegations. TaxAct again moves to compel arbitration and demonstrates here that all four named Plaintiffs accepted and provided express acknowledgment of their acceptance of TaxAct's Terms.

**B. All TaxAct Customers Must Accept the Terms to Use TaxAct's Services.**

Every visitor to or user of TaxAct's websites, mobile applications, online and offline tax return preparation products, and filing services (collectively, the "Services") is subject to the Terms—a set of contractual terms and conditions of service—that are publicly available on TaxAct's website at https://www.taxact.com/legal-notice. *See* Declaration of Mark Jaeger in Support of Defendant TaxAct, Inc.'s Motion to Compel Arbitration and Stay Proceedings ("Jaeger Decl.") ¶ 4.a. From January 4, 2018, when TaxAct first configured the auxiliary services provider technologies at issue[1] (specifically, Google Tag Manager), through the last date in which Plaintiffs printed or e-filed a tax return using TaxAct Services on April 19, 2023, a hyperlink to the Terms has been listed at the footer of every page on TaxAct's website and software, as well as in the emails that TaxAct sent to its customers regarding updates to TaxAct's privacy notice in calendar years 2019, 2020, and 2022. *Id.* ¶ 4.b.

The two most significant versions of the Terms for contract formation and delegation purposes are: (1) Terms that became effective January 5, 2017 (the "2017 Terms"), *id.* Ex. B; and (2) Terms that became effective November 17, 2020 and are in place today (the "2020 Terms"), *id.* Ex. C. The 2020 Terms—and the 2017 Terms, which use similar language—provide: "You may not use the Services until you have read and agreed to this Agreement. By using the Services, you indicate your unconditional acceptance of this Agreement. If you do not accept this Agreement, you must terminate your use of the Services." *Id.* Ex. B at 1, Ex. C at 1. Both Terms also provide that they set forth "TaxAct's and the Participating Parties' entire liability and your exclusive remedy with respect

[1] Each reference to "auxiliary services provider technologies" refers to all Pixel and third-party technology tools alleged in this dispute to have unlawfully captured certain information from a user's tax return form, including all tools identified and contemplated by Plaintiffs' amended complaint.

to the services, [and comprise] a complete statement of the agreement between you and TaxAct." *Id.* Ex. B at 4, Ex. C at 3. The 2020 Terms further provide that they "supersede any prior understandings" of subject matter contained therein. *Id.*[2]

**C. The Terms Include Arbitration Agreements with an Opt-Out Provision.**

The Terms have included Arbitration Agreements since January 2017—*i.e.*, prior to TaxAct's configuring auxiliary service provider technologies, including use of Google and the Meta Pixel, on January 4, 2018. *See infra*, Factual Background §§ D, E (discussing the relevant configuration of Google Tag Manager and customers' acceptance of the Terms). The 2017 and 2020 Terms each include a section titled "Dispute Resolution; Binding Arbitration" (the "Arbitration Agreements") that contain detailed information regarding binding arbitration, including the following language in bold font: "**You and TaxAct agree that any dispute arising out of or related to these Terms or our Services is personal to you and TaxAct and that any dispute will be resolved solely through individual arbitration and will not be brought as a class arbitration, class action or any other type of representative proceeding.**" *Id.* Ex. B at 5, Ex. C at 4. The only material difference between the two versions of the Terms is the arbitral forum: Linn County, Iowa, under the 2017 Terms and Dallas County, Texas, under the 2020 Terms. *Id.* Ex. B at 5, Ex. C at 4.

The Arbitration Agreements require that disputes with TaxAct be resolved through individual arbitration in accordance with the Streamlined Arbitration Rules & Procedures of the Judicial Arbitration and Mediation Services ("JAMS Rules"). *Id.* Ex. B at 5, Ex. C at 4. The Arbitration Agreements further (and in underlining) provided that the JAMS Rules were "hereby incorporated by reference." *Id*. The JAMS Rules have a delegation provision (i.e., a provision mandating that the arbitrator decide various threshold issues—such as whether a dispute falls within the scope of an arbitration provision—that courts ordinarily would decide) that the Ninth Circuit has held is enforceable. *Id.* Ex. R at 8 (JAMS Rule 11(a)). Specifically, JAMS Rule 11(b) provides: "Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, *interpretation or scope of the agreement* under which Arbitration is sought, and who are proper

[2] As TaxAct's Terms expressly supersede prior agreements, they subject all claims to arbitration, regardless of the time period of the allegations. *See infra*, Argument § D.

Parties to the Arbitration, *shall be submitted to and ruled on by the Arbitrator*. The Arbitrator has the authority to determine jurisdiction *and arbitrability issues* as a preliminary matter." *Id.* Ex. R at 8 (emphases added).

The Arbitration Agreements also include an opt-out provision, which provides clear instructions on how to opt out: "You have the right to opt out of binding arbitration within thirty (30) days of the date you first accepted the terms of this Section by sending an email to arbitration@taxact.com." *Id.* Ex. B at 5, Ex. C at 4. Opting out of arbitration does not result in account termination or termination without a refund, or in any other penalty. *Id.* ¶ 5.e.

**D. TaxAct Adopted Arbitration Agreements in Its Terms Before It Configured the Auxiliary Service Provider Technologies at Issue, and Then Repeatedly and Prominently Reminded Customers That They Were Accepting the Terms by Using the Service.**

As noted *supra* in Factual Background § C, TaxAct adopted arbitration provisions in its Terms in January 2017—*i.e.*, before January 4, 2018, when TaxAct first configured Google Tag Manager. TaxAct uses Google Tag Manager to manage auxiliary service technologies on its website. *See* Jaeger Decl. ¶ 7 (describing how TaxAct uses Google Tag Manager).

After adopting the Terms containing the Arbitration Agreements, beginning in the tax year ("TY") 2017 filing season, TaxAct required individuals who created an account on the TaxAct website to acknowledge acceptance of the Terms to complete account creation. *Id.* Ex. D at 5, 7.[3] For TY 2017 and TY 2018, these acknowledgments instructed an individual creating an account to "Scroll to review our Privacy Policy [hyperlinked], and Terms of Service/License Agreement [hyperlinked]. By clicking accept, you are agreeing to these policies" in order to "Accept and Continue" to create an account. *Id.* Ex. D at 5, 7. For TY 2019, TY 2020, and TY 2021, these acknowledgments included a required checkbox that read: "I agree to the TaxAct Terms of Service & Terms of Use [hyperlinked], and have read and acknowledge the Privacy Statement [hyperlinked]." *Id.* Ex. D at 8-10.

[3] TaxAct's source code for the account creation pages prior to the TY 2017 filing season was stored on a server that has since been decommissioned and the history of the changes for that time frame is not in the current source code repository. While the account creation code for years prior to the TY 2017 filing season is not available, TaxAct's practice has been to require acceptance of the Terms upon account creation throughout and before the relevant time period. Jaeger Decl. ¶ 8.b.

Users were also required to acknowledge the Terms each time they used the Services. *Id.* ¶ 8.j-o. During the relevant period up to October 2018, the account sign-in page provided an additional notice and acknowledgment of the Terms by stating, directly below the "Sign In" button: "By clicking 'Sign In' you agree to our License Agreement [hyperlinked] and consent to our Privacy Statement [hyperlinked]. You also consent to receive periodic promotional materials." *Id.* Ex. E at 3-4. In 2018, TaxAct introduced an *additional* notice and acknowledgment within the in-product experience that rendered the sign in page notice and acknowledgment a secondary, supplemental acknowledgment. *Id.* ¶ 8.r. Specifically, TaxAct updated its software to create a Basic Information Worksheet record for TaxAct's use to strengthen its records regarding consent to the Terms; from then on, users were required to affirmatively check a checkbox to create a record of their acknowledgment of their acceptance of the Terms in order to e-file or paper file their tax returns, and the Basic Information Worksheet saves a record of this action specific to the user's profile. *Id.* ¶ 8.r.[4] Thus, e-filing and paper filing pages from TY 2018 and later include a required checkbox that reads: "I agree to the terms and conditions [hyperlinked]" and users were required to check the checkbox acknowledging their acceptance of the Terms in order to continue to the filing step. *Id.* ¶ 8.r-jj (describing and evidencing in exhibits the user experience in the Services, which required that a user affirmatively check a checkbox before e-filing or printing a completed tax return and also describing and evidencing back-end code to the same for TYs 2017 to 2022).

### E. Multiple TaxAct Records Demonstrate Plaintiffs' Acceptance of the Terms and Arbitration Agreements.

Each of the Plaintiffs repeatedly accepted the Terms and Arbitration Agreements, as set forth below and in Exhibit A to the Jaeger Declaration:

#### 1. Nicolas Smith-Washington (Jaeger Decl., Exs. I, J)

- **Created Online Account:** January 21, 2016
- **Used Services:** TY 2015 through TY 2021

[4] During the TY 2017 filing season but before the Basic Information Worksheet was implemented, TaxAct used a temporary indicator to record whether someone logged into the User Account associated with a taxpayer affirmatively checked a checkbox to consent to the Terms prior to the customer e-filing or printing a return for paper filing. Jaeger Decl. ¶ 8.q.

- **Acknowledged Acceptance of Terms at Sign-In:** TY 2015 through TY 2017
- **Acknowledged Acceptance of Terms at Filing:** TY 2019 through TY 2021[5]

**2. Joyce Mahoney (Jaeger Decl., Exs. K, L)**

- **Created Online Account:** October 10, 2014
- **Used Services:** TY 2015 through TY 2021
- **Acknowledged Acceptance of Terms at Sign-In:** TY 2015 through TY 2017
- **Acknowledged Acceptance of Terms at Filing:** TY 2017 through TY 2021

**3. Jonathan Ames (Jaeger Decl., Exs. M, N)**

- **Created Online Account:** October 16, 2014
- **Used Services:** TY 2015 through TY 2021
- **Acknowledged Acceptance of Terms at Sign-In:** TY 2015 through TY 2017
- **Acknowledged Acceptance of Terms at Filing:** TY 2017 through TY 2021

**4. Jenny Lewis ("Plaintiff Lewis") (Jaeger Decl., Exs. O, P)**

- **Created Online Account:**[6] April 10, 2015
- **Used Services:** TY 2015 through TY 2022
- **Acknowledged Acceptance of Terms at Sign-In:** TY 2015 through TY 2017
- **Acknowledged Acceptance of Terms at Filing:** TY 2017 through TY 2022[7]

### F. Plaintiffs Did Not Exercise Their Right to Opt-Out of Arbitration at Any Time During the Use of TaxAct's Services.

None of the Plaintiffs exercised their right to opt-out of arbitration. *Id.* ¶ 15. TaxAct has no record of communication from any of the Plaintiffs (or, in the case of Plaintiff Lewis, from her filing

[5] For one of the tax years at issue, TY 2018, Smith-Washington did not navigate to either the e-filing page or to the paper filing page of TaxAct's website. As such, his use of the TaxAct's Services for TY 2018 did not trigger the auxiliary service technologies, such as the Meta Pixel or Google Campaign Manager, which were not placed on the Print Center page used by Smith-Washington that year. *See* Jaeger Decl. ¶ 11.

[6] Plaintiff Lewis's spouse, Thomas Lewis, created the account and filed their tax returns jointly.

[7] As with any spouse filing a joint tax return on behalf of a non-filing spouse, Thomas Lewis was required to input Plaintiff Lewis's date of birth and self-created PIN before being able to file.

spouse) about arbitration, let alone an intent to opt-out of binding arbitration. *Id.* ¶ 15. Plaintiffs do not allege that they opted-out of the Arbitration Agreements for any given tax year.

## ARGUMENT

### A. Based on the Delegation Clauses in the Terms, This Court's Review Is Limited.

Every Plaintiff entered into contracts, *i.e.*, the Terms, with TaxAct on or after January 5, 2017. *See supra*, Factual Background § D; Jaeger Decl. ¶¶ 10-14, Ex. A. Every version of the TaxAct Terms from then onward contains the Arbitration Agreements, *see* Jaeger Decl., Ex. B at 5, Ex. C at 4. Every Arbitration Agreement expressly incorporates JAMS rules, which in turn have a delegation clause, *see id.*, Ex. R at 8 (JAMS Rule 11). The Ninth Circuit has made clear that incorporation of an arbitral body's rules "constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (citation omitted); *Johnson v. Oracle Am., Inc.*, 764 F. App'x 607, 608 (9th Cir. 2019) (enforcing delegation provision contained in JAMS rules); *see also Luckert v. Tesla Energy Operations, Inc.*, No. 21-CV-03027-VC, 2021 WL 3721967 (N.D. Cal. Aug. 5, 2021). Under those rules, issues concerning arbitrability can be delegated to the arbitrator so long as the delegation is clear. *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010) ("The delegation provision is an agreement to arbitrate threshold issues concerning the arbitration agreement.").[8] That is the case here: the JAMS Rules clearly delegate all "disputes over the formation, existence, validity, interpretation or scope of the [arbitration]" to the Arbitrator. Jaeger Decl., Ex. R at 8 (JAMS Rule 11(b)).

Under controlling authority, those facts substantially narrow the scope of this Court's review. *See*, *e.g.*, *Rent-A-Center*, 561 U.S. at 71-72; *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1029 (9th Cir. 2022) ("The presence of a delegation clause further limits the issues that a court may decide.").[9] Specifically, all this Court is permitted to do is "determine whether an agreement

[8] *See also Ahlstrom v. DHI Mortg. Co.*, 21 F.4th 631, 634-35 (9th Cir. 2021) (applying, *inter alia*, *Rent-A-Center* and calling it "well-established that some 'gateway' issues pertaining to an arbitration agreement, such as issues of validity and arbitrability can be delegated to an arbitrator by agreement"); *Johnson*, 764 F. App'x at 608 (discussing delegation).

[9] *Ahlstrom*, 21 F.4th at 635 ("'Arguments that an agreement to arbitrate was never formed, though, are to be heard by the court even where a delegation clause exists. This test is limited to contract

existed" as to each Plaintiff, *i.e.*, whether each *formed* a contract containing an arbitration provision. *Ahlstrom*, 21 F.4th at 635.[10] "'Although challenges to the *validity* of the contract with an arbitration clause are to be decided by the arbitrator, challenges to the very *existence* of the contract are, in general, properly directed to the court.'" *Id.* (emphasis in original, citation omitted).[11] Thus, "the only question [for the court], after finding that there is in fact a valid agreement, is whether the purported delegation clause is in fact a delegation clause.… *If there is a delegation clause, the motion to compel arbitration should be granted in almost all cases*." *Kubala*, 830 F.3d at 202 (emphasis added); *Edwards*, 888 F.3d at 744.

Put simply, under the delegation provision, this Court may not determine whether any aspects of the Arbitration Agreements are unenforceable as to any particular Plaintiff (including arguments regarding unconscionability, which Plaintiffs raised in prior briefing), let alone to determine what scope of claims are subject to arbitration. Those matters, by virtue of the delegation provision, are for the arbitrator alone to decide. As the Ninth Circuit has summarized, "if the parties [formed] an agreement to arbitrate containing an enforceable delegation clause, *all arguments* going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance." *Caremark*, 43 F.4th at 1030 (emphasis added); *id.* at 1029 (delegation clause prevents the court from deciding "gateway questions of arbitrability, such as whether the agreement covers a particular controversy or whether the arbitration provision is enforceable at all").[12]

---

formation.'") (quoting *Edwards v. Doordash, Inc.*, 888 F.3d 738, 744 (5th Cir. 2018), citing *Kubala v. Supreme Prod. Servs.*, 830 F.3d 199, 202 (5th Cir. 2016) (internal citations omitted)); *Kubala*, 830 F.3d at 203 ("[i]f we determine that the agreement does contain such a [delegation] clause, the role of the federal courts is strictly limited").

[10] *See Caremark*, 43 F.4th at 1030 (court could decide formation regardless of delegation clause); *Unite Here Local 30 v. Sycuan Band of the Kumeyaay Nation*, 35 F.4th 695, 702 (9th Cir. 2022) (similar).

[11] *See also*, *e.g.*, *Rent-A-Center*, 561 U.S. at 70-72 (delegation clause meant that arbitrator had to decide unconscionability); *Unite Here*, 35 F.4th at 703 ("A defense that a law invalidates a contract with an arbitration provision is an issue for the arbitrator to decide."); *Anderson v. Credit One Bank, Nat'l Ass'n*, No. 16-cv-3125-MMA, 2018 WL 2287329, at *10 (S.D. Cal. May 18, 2018) (holding, after finding agreement existed, that delegation clause prevented court from reaching unconscionability argument).

[12] *Accord Rent-A-Center*, 561 U.S. at 66, 68-69 (delegation clause required that the arbitrator, not a court, must decide whether a given claim by plaintiff is arbitrable); *Caremark*, 43 F.4th at 1029 (a "delegation clause commits to the arbitrator nearly all challenges to an arbitration provision");

**B. Arbitration Must Be Compelled Because Plaintiffs Entered into a Delegation Clause-Containing Contract with TaxAct—and Agreed to the Terms—Every Tax Year from 2017 through 2021.**

As noted, while nearly all issues regarding the Arbitration Agreements must be delegated to the arbitrator, the Ninth Circuit has held that formation of an agreement to arbitrate must be addressed by the Court. *Ahlstrom*, 21 F.4th at 635.

**1. Plaintiffs Smith-Washington, Mahoney, and Ames Each Agreed to be Bound By the Terms—including the Arbitration Agreements—the Last Time They Used the Services, As Well As Numerous Times Every Year After January 2017.**

As discussed above, each of the Plaintiffs agreed to the Terms and the Arbitration clause the last time they used the Services (*i.e.*, 2022 or 2023). Moreover, TaxAct first configured Google Tag Manager to utilize auxiliary service provider technologies on January 4, 2018. Jaeger Decl. ¶ 7.e. Plaintiffs Smith-Washington, Mahoney, and Ames continued to use TaxAct's Services after that date, agreeing to the Terms with each use of the Service. They had numerous opportunities to review the Terms (which, starting in January 2017, included the Arbitration Agreements), object to them, or opt-out of them if they had wished. *See id.* ¶¶ 4, 8, 10-14 (describing that the Terms are publicly available on the website and linked in the footer on every webpage, that users were repeatedly reminded and required to acknowledge the Terms at various interactions with the Services, and that each named Plaintiff did on numerous occasions affirmatively acknowledge the Terms). Thus, they assented to the Terms and the Arbitration Agreements within them. *Snow v. Eventbrite, Inc.*, No. 3:20-CV-03698-WHO, 2021 WL 3931995 (N.D. Cal. Sept. 2, 2021); *Lee v. Ticketmaster L.L.C.*, 817 F. App'x 393, 394-95 (9th Cir. 2020) (noting that the fact that plaintiff used his account roughly twenty times during the relevant period "only reinforces that he had many such opportunities" to read the Terms of Use).

In addition, as noted above, Plaintiffs also affirmatively acknowledged their assent to the Terms each time they signed into their online accounts to use the Services from TY 2014 to

---

*Kubala*, 830 F.3d at 204 ("Because there is a valid delegation clause, we do not reach the arbitrability dispute and instead remand with direction to the district court to refer it to arbitration.").

TY 2016, and each time they e-filed or printed their tax returns for paper filing from TY 2017 to TY 2022, Jaeger Decl., ¶ 8.s-jj, with one exception in TY 2018 for Plaintiff Smith-Washington.[13]

**2. Plaintiff Lewis Is Likewise Bound by the Terms Based on Her Husband's Use of TaxAct's Services on Her Behalf.**

Plaintiff Lewis, who alleges that her husband used the Services to file "joint returns," also became bound to the Terms after January 2017. Am. Compl. ¶¶ 160-67; Jaeger Decl., ¶ 14.c-k. Plaintiff Lewis claims that she herself did not access the Services and that she did not have any understanding of the Terms. Am. Compl. ¶ 163. But neither of those allegations permits her to escape the contracts with TaxAct. There is no doubt that she received the benefits of the Services, most notably, the filing of her tax returns. Her receipt of all of the fruits of the contract between her husband and TaxAct means that she is likewise bound by the Terms under three separate legal principles: equitable estoppel, agency, and third-party beneficiary theory.[14]

Estoppel. The equitable estoppel doctrine recognizes that "[i]t is unfair for a party to rely on a contract when it works to its advantage, and repudiate it when it works to its disadvantage." *Tradeline Enters. Pvt. Ltd. v. Jess Smith & Sons Cotton, LLC*, No. LA CV15-08048, 2016 WL 7444857, at *9 (C.D. Cal. July 29, 2016). The Ninth Circuit has established that the doctrine of equitable estoppel applies to spousal relationships. *Tice v. Amazon.com, Inc.*, 845 F. App'x 535, 537 (9th Cir. 2021). Here, Plaintiff Lewis's claims are intertwined with the obligations in the Terms—indeed, her husband could not even access the Services, much less use them, without acknowledging his acceptance of the Terms—and she received the benefits of her husband using TaxAct's Services to file their *joint* tax returns. Jaeger Decl., ¶ 14.b-c (describing that Plaintiff Lewis's husband filed their tax returns as married and joint returns and that he was required to input

[13] *See* Jaeger Decl., ¶ 11 (describing that Smith-Washington did not navigate to the relevant webpages in TY 2018).

[14] Where a written arbitration provision is made enforceable against a third party under state contract law, the FAA's terms are fulfilled. *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 630-31 (2009). "[N]onsignatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles." *Letizia v. Prudential Bache Sec., Inc.*, 802 F.2d 1185, 1187 (9th Cir. 1986). "Among these principles are: '(1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; (5) estoppel; and (6) third party beneficiary theory.'" *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) (identifying agency, estoppel, and third-party beneficiary as three such principles) (citation omitted).

a Social Security Number for both him and Plaintiff Lewis and enter a self-created PIN for each of them to e-file any returns). As such, she is equitably estopped from "claiming the benefits of a contract"—her husband's use of the Services to file her taxes—"while simultaneously attempting to avoid the burdens that contract imposes"—burdens that are detailed in the Terms, including the Arbitration Agreements and incorporated delegation clause. *Sherwood Mktg. Grp., LLC v. Intertek Testing Servs., N.A.*, No. 3:17-cv-00782-BEN-NLS, 2018 WL 672515, at *5 (S.D. Cal. Jan. 31, 2018) (citation omitted).

Agency. "An agent [is] one who acts 'on the principal's behalf and subject to his control." *Desuza v. Andersack*, 63 Cal. App. 3d 694, 699 (1976) (citations, emphasis in original omitted). "Words or conduct by both principal and agent are necessary to create the relationship" and courts recognized that "less evidence is required to establish a principal and agent relationship between husband and wife than between nonspouses." *Flores v. Evergreen at San Diego, LLC*, 148 Cal. App. 4th 581, 588-89 (2007) (citation omitted). A party to an arbitration agreement can compel a nonsignatory to arbitrate when "an agency relationship between the nonsignatory and one of the parties to the arbitration agreement, makes it equitable to impose the duty to arbitrate upon the nonsignatory." *Hellmich v. Mastiff Contracting*, *LLC*, No. SACV 14-1354 (DOC(ANx), 2015 WL 391989, at *7 (C.D. Cal. Jan. 27, 2015) (citation omitted). Here, Plaintiff Lewis's permitting her husband to file her taxes using TaxAct's Services, including by allowing him to input her information into the tax return form, established an agency relationship with her husband. *See* Am. Compl. ¶ 160. Plaintiff Lewis's husband would not have been able to successfully file joint federal and state tax returns without Plaintiff Lewis's approval and her providing to him her tax return information ("TRI"), such as her adjusted gross income, as well as her self-created PIN. *See id.* ¶ 161.

Third-party beneficiary. California authority requires a nonsignatory to "arbitrate a claim because a benefit was conferred on the nonsignatory as a result of the contract, making the nonsignatory a third party beneficiary of the arbitration agreement." *Cty. of Contra Costa v. Kaiser*

*Found. Health Plan, Inc.*, 47 Cal. App. 4th 237, 242 (1996). As already explained, it is clear that Plaintiff Lewis benefited from her husband's consent to the Terms.[15]

In addition to clearly accepting the Terms, Plaintiffs do not allege that they terminated their use of the Services, or opted-out of the Arbitration Agreements, as they were expressly permitted to do during the relevant period, nor is there any evidence of such termination, opt-out, or objection to the Terms.

### C. The Existence of the Arbitration And Delegation Clauses in the 2017 and 2020 Terms Must End the Court's Inquiry and Require a Stay of Discovery.

The only remaining question before the Court is whether the applicable Terms included an arbitration clause containing a delegation provision—and if yes, then all remaining questions fall within the arbitrator's purview. As discussed above, all of the Plaintiffs entered in contracts with TaxAct numerous times through their accessing and use of the Services after January 2017. *See supra*, Factual Background § E. Further, because both the 2017 and 2020 Terms—which apply to each year within the relevant period—indisputably contain the Arbitration Agreements, which in turn include the delegation clause, all issues aside from contract formation are for the arbitrator, not this Court. *See Kubala*, 830 F.3d at 202; *Edwards*, 888 F.3d at 744. As such, the Court's inquiry must end here, and it must refer all other questions to arbitration.

Plaintiffs' primary argument to date has been to claim that the Arbitration Agreements are unconscionable. *See* ECF No. 27 at 7–15. However, it is well-established that unconscionability, like any other validity arguments, is reserved for the arbitrator. *See, e.g. Anderson*, 2018 WL 2287329, at *10 (holding, after finding agreement existed, that delegation clause prevented court from reaching unconscionability argument). Plaintiffs may also attempt to argue that parts of their Amended Complaint are not captured by the delegation clause or are not subject to arbitration. But even if that were so (and it is not), such questions would go to the *scope* of the Arbitration Agreements, and

[15] Indeed, the Terms anticipated that users would use TaxAct's services on behalf of others, outlining a user's responsibilities for third-party data entered into TaxAct's Services. For instance, the Terms provide: "You acknowledge and agree that you are solely responsible for all content, data, and information submitted by your user identification into the Service, including, without limitation, content, data, and information relating to third parties." Jaeger Decl., Ex. C at 2. As such, there can be no doubt that the Terms contemplated a benefit to third parties such as Plaintiff Lewis, who did indeed benefit from the contractual relationship between her husband and TaxAct.

well-settled law reserves those questions for the arbitrator in the first instance. *See* JAMS Rule 11(b), Jaeger Decl., Ex. R at 8; *Rent-A-Center*, 561 U.S. at 71-72; *Caremark*, 43 F.4th at 1029.

Further, consistent with the Supreme Court's recent opinion in *Coinbase*, the Court should issue an immediate stay of all discovery while this motion and any appeal therefrom are pending, and assuming arbitration is granted, a stay during the pendency of arbitration pursuant to 9 U.S.C. § 3. In *Coinbase*, the Supreme Court held that allowing the merits of a case to move forward—including discovery—while the question of arbitration on appeal is pending "represents the 'worst possible outcome' for parties and the courts: litigating a dispute in the district court only for the court of appeals to 'reverse and order the dispute arbitrated.'" 2023 WL 4138983, at *5 (citation omitted). The rationale underlying the Supreme Court's concern applies equally to allowing unbounded merits discovery when a motion to arbitrate is pending before the district court.[16]

### D. Alternatively, Even If There Were No Delegation Provision, Arbitration Would Still Be Required Because Plaintiffs' Claims Fall Within the Scope of the Arbitration Agreements.

Even if there were no delegation provision in the Arbitration Agreements—which is not the case, as already discussed—then the Court would have to consider whether "the arbitration agreement encompasses the dispute at issue." *See Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008) (providing that a dispute is subject to arbitration when two conditions are satisfied: (1) there is a valid arbitration agreement; and (2) the arbitration agreement encompasses the dispute at issue) (citation omitted). If these conditions are satisfied, the FAA "leaves no place for the exercise of discretion by a district court," and arbitration is required per Section 4 of the FAA. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). Accordingly, if all of Plaintiffs' claims are within the scope of a valid arbitration agreement, the Court should compel arbitration. *Farrow v. Fujitsu Am., Inc.*, 37 F. Supp. 3d 1115, 1126 (N.D. Cal. 2014). Here, Plaintiffs' claims fall squarely within the scope of the Arbitration Agreements.

---

[16] TaxAct acknowledges the Court's prior rulings statements that discovery must go forward. However, in light of *Coinbase*, which has changed the state of the law, and to preserve the issue, TaxAct moves again for a stay of all discovery here.

The Amended Complaint alleges that TaxAct's alleged practice of sharing confidential tax return information was unlawful under California common law, the California Constitution, various California statutes, and the federal Electronics Communications Privacy Act. Plaintiffs accordingly seek monetary remedies in the form of compensatory damages, disgorgement of profits, restitution, punitive damages, attorneys' fees, and statutory civil penalties. Pursuant to the Arbitration Agreements, Plaintiffs agreed that, except for small claims individual actions or disputes regarding the alleged unlawful use of intellectual property, "any dispute will be resolved solely through individual arbitration and will not be brought as a class arbitration, class action or any other type of representative proceeding." Jaeger Decl., Ex. C at 4. None of Plaintiffs' claims fall into the categories of a small claims dispute or disputes in which Plaintiffs or TaxAct "seek[] injunctive or other equitable relief for the alleged unlawful use of intellectual property." *Id.* As such, each of Plaintiffs' claims squarely falls within the scope of the Arbitration Agreements. *See, e.g.*, *Estrella v. Freedom Fin*., No. C 09-03156 SI, 2011 WL 2633643, at *5 (N.D. Cal. July 5, 2011) (ordering plaintiffs to arbitrate their UCL and CLRA claims where the arbitration clause covered "any controversy, claim or dispute . . . arising out of or relating to" the contract). Importantly, any doubt on this point must be resolved in favor of arbitration. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (holding that doubts as to whether an asserted dispute is covered by an arbitration clause "should be resolved in favor of coverage") (citation omitted); *accord Moses*, 460 U.S. at 24–25. Not only do the Arbitration Agreements cover all of the alleged conduct at issue because, as noted above, they expressly supersede all prior understandings of the Terms, *see supra* Factual Background § B, but any claims by Plaintiffs that pre-date 2017 are time-barred and therefore cannot extend the relevant time period at issue.[17]

[17] The 2020 Terms unambiguously provide: "ANY CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT OR OUR SERVICES OR CONTENT MUST BE FILED WITHIN ONE YEAR AFTER SUCH CLAIM AROSE; OTHERWISE, THE CLAIM IS PERMANENTLY BARRED, WHICH MEANS THAT YOU AND TAXACT WILL NOT HAVE THE RIGHT TO ASSERT THE CLAIM." Jaeger Decl., Ex. C at 4. Furthermore, Plaintiffs were on notice that TaxAct may collect and disclose such information since at least 2005, when TaxAct's privacy notice disclosed that third parties deployed cookies for marketing purposes. Here, each of Plaintiffs' claims relate to the unauthorized collection and/or disclosure of confidential tax return information. Am. Compl. ¶¶ 179-307), and therefore arose well after TaxAct began issuing its privacy notices, making any claim related to conduct before January 5, 2017 time-barred under the policy. *See Javier v. Assurance IQ, LLC.*, No. 20-CV-02860-CRB, 2023 WL 114225, at *7 (N.D. Cal. Jan. 5, 2023)

**CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that this Court grant its Motion to Compel Arbitration and Stay Proceedings.

Date: July 12, 2023

Respectfully submitted,

By: */s/ Sheila A.G. Armbrust*

Sheila A.G. Armbrust (SBN 265998)
sarmbrust@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772 1200
Facsimile: (415) 772 7400

James W. Ducayet *(pro hac vice)*
jducayet@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853 7000
Facsimile: (312) 853 7036

Michele L. Aronson (*pro hac vice*)
maronson@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
Telephone: (202) 736 8000
Facsimile: (202) 736 8711

*Attorneys for Defendant TaxAct, Inc.*

(granting defendant's motion to dismiss in part because "under the delayed discovery doctrine, knowledge of injury, not knowledge of a particular defendant's role in the injury, triggers inquiry notice").