**HAMMONDLAW, P.C.**
Julian Hammond (SBN 268489)
 *jhammond@hammondlawpc.com*
Christina Tusan (SBN 192203)
 *ctusan@hammondlawpc.com*
Adrian Barnes (SBN 253131)
 *abarnes@hammondlawpc.com*
Ari Cherniak (SBN 290071)
 *acherniak@hammondlawpc.com*
Polina Brandler (SBN 269086)
 *pbrandler@hammondlawpc.com*
1201 Pacific Avenue, 6th Floor
Tacoma, WA 98402
Telephone:  (310) 601-6766
Facsimile:  (310) 295-2385

*Attorneys for Plaintiffs and the Putative Classes*
[*Additional counsel listed on next page*]

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **NICHOLAS C. SMITH-WASHINGTON, JOYCE MAHONEY, JONATHAN AMES, MATTHEW HARTZ, and JENNY LEWIS,** on behalf of themselves and all others similarly situated,<br><br>          **Plaintiffs,**<br><br>     **v.**<br><br>**TAXACT, INC., an Iowa corporation,**<br><br>          **Defendant.** | Case No. 3:23-CV-830-VC<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>1.  **Invasion of Privacy;**<br>2.  **Invasion of Privacy (Cal. Const. art. 1, § 1);**<br>3.  **Violation of Cal. Bus. & Prof. Code § 17530.5;**<br>4.  **Violation of Cal. Bus. & Prof. Code §§ 22250 *et seq*. (TPA);**<br>5.  **Violation of Cal. Civ. Code §§ 1799 *et seq*.;**<br>6.  **Violation of 18 U.S.C. §§ 2510 *et seq*. (ECPA);**<br>7.  **Violation of Cal. Penal Code §§ 630 *et seq*. (CIPA);**<br>8.  **Violation of Cal. Penal Code § 502 (CCDAFA);**<br>9.  **Violation of Cal. Penal Code §§ 484, 496;**<br>10. **Breach of Contract; and**<br>11. **Violation of Cal. Bus. & Prof. Code §§ 17200 *et seq*. (UCL)**<br><br>**DEMAND FOR JURY TRIAL** |

**KELLER POSTMAN LLC**
Warren D. Postman (SBN 330869)
 *wdp@kellerpostman.com*
1101 Connecticut Avenue, N.W., Suite 1100
Washington, D.C. 20036
Telephone:  (312) 741-5220
Facsimile:  (312) 971-3502

Ethan H. Ames (SBN 339027)
 *ethan.ames@kellerpostman.com*
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Telephone:  (312) 741-5220
Facsimile:  (312) 971-3502

*Attorneys for Plaintiffs and the Putative Classes*

Plaintiffs Nicholas C. Smith-Washington, Joyce Mahoney, Jonathan Ames, Matthew Hartz, and Jenny Lewis (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated ("Class Members"), by and through their attorneys of record, HammondLaw, P.C., file this Class Action Complaint against Defendant TaxAct, Inc. ("TaxAct" and "Defendant") alleging the following, based upon personal knowledge, where applicable, information and belief, and the investigation of counsel:

## I.    INTRODUCTION

1.      This case is about Defendant's egregious and unlawful disclosure of Plaintiffs' and Class Members' confidential and private tax return information—including but not limited to each taxpayer's name, phone number, Adjusted Gross Income ("AGI"), refund amount, filing status, type of return, age range, tax year, employment status, and names of dependents[1] (collectively "Confidential Tax Return Information")—and personal identifiers to unauthorized third-party advertising platforms.

2.      During the Class Period, Defendant TaxAct was one of the largest tax preparation software companies in the United States. TaxAct maintained and operated, and continues to maintain and operate, a website – https://www.taxact.com – through which its customers and other visitors can, among other things, learn about TaxAct's services, learn about tax law developments, file federal taxes, file state taxes, receive tax filing advice and help, and otherwise interact with TaxAct.

3.      Since 1998, TaxAct customers have e-filed over 90 million tax returns.[2] In the most recent reported year, 2021, TaxAct "powered approximately 3.2 million consumer e-files [of tax returns] directly through [consumers] and another 2.4 million professional e-files through approximately 21,000 tax professionals who used TaxAct to prepare and file their taxes or those of their clients."[3] In that same year, TaxAct's total revenue was $227 million.[4]

---

[1] Dependent information was sent in an obfuscated but generally reversible format.

[2] TaxAct About Us Page, https://www.taxact.com/company/about-us (last visited June 19, 2023).

[3] Blucora, Inc., 2021 Annual Report to Stockholders, Form 10-K, p. 6 (2022) (https://www.blucora.com/static-files/478e03bd-5255-4fd7-8d3a-d9e8224320a5).

[4] *Id*. at Form 10-K, p. 50.

4.     The millions of consumers who signed up for TaxAct's Services entrusted TaxAct with their Confidential Tax Return Information as well as their IP addresses, social security numbers, and all of the detailed personal and financial information the IRS and California Franchise Tax Board require them to include in their tax filings.

5.     Unbeknownst to Plaintiffs, information about Plaintiffs' and Class Members' respective activities on TaxAct's website, including Confidential Tax Return Information that they shared with TaxAct while filling out their tax returns on TaxAct's website, was, until on or about December 31, 2022, secretly transmitted to and intercepted by, at least, Meta Platforms, Inc. (formerly known as Facebook) ("Meta" or "Facebook"), Google, and Google Double Click, who were all unauthorized third parties.

6.     Recognizing the sensitivity of this information and its legal obligation not to disclose tax information, TaxAct promised Plaintiffs and Class Members in its privacy policy that it would only use their tax information for limited purposes and that it would not disclose any of their information unless lawfully allowed to do so.

7.     TaxAct repeatedly violated those promises and representations, however, by unlawfully sharing and allowing the interception of sensitive and confidential information with third-party advertising companies and platforms including at least: Meta, Google, and Google Double Click (collectively "Advertising Platforms"). The information shared included Plaintiffs' and Class Members' respective activities on TaxAct's website, including Confidential Tax Return Information that they shared with TaxAct in connection with the filing of their tax returns. TaxAct shared this information, until on or about December 31, 2022, without providing notice to Plaintiffs or Class Members and without seeking their consent. TaxAct also permitted the third parties that received users' Confidential Tax Return Information to use and profit from the information for their own business purposes.

8.     To capitalize on Plaintiffs' and Class Members' Confidential Tax Return Information, TaxAct disclosed this information by allowing the interception of this information by numerous Advertising Platforms including Meta, Google, and Google Double Click.

9.    Through the use of the Meta Pixel, a tracking tool that TaxAct intentionally incorporated into its website source code or otherwise affirmatively permitted on its website, TaxAct disclosed to Meta, and aided and abetted Meta in the interception of, personal identifiers, including Plaintiffs' and Class Members' IP addresses and Facebook IDs, in combination with their Confidential Tax Return Information, including names, phone numbers, AGI (rounded to the nearest thousand dollars), filing status, and the amount of any refund (rounded to the nearest hundred dollars), all without Plaintiffs' and Class Members' knowledge and/or consent.

10.    In addition to using the Meta Pixel, TaxAct also used other tracking pixels, including Google and Google Double Click tracking pixels – as well as numerous other third-party tracking pixels, which TaxAct intentionally incorporated into TaxAct's website source code or otherwise affirmatively permitted on TaxAct's website. TaxAct used these tracking pixels to disclose and aid and abet Google and Google Double Click in the interception of Plaintiffs' and Class Members' personal identifiers in combination with their Confidential Tax Return Information all without Plaintiffs' and Class Members' knowledge and/or consent.

11.    Defendant has disclosed, released, and aided and abetted third parties (including at least: Meta, Google, and Google Double Click) in the interception of Plaintiffs' and Class Members' Confidential Tax Return Information. This massive and extreme breach of confidentiality and privacy has, on information and belief, affected hundreds of thousands, if not millions, of Class Members in the state of California and across the nation.

## II.    PARTIES

**A. Plaintiffs**

12.    Plaintiff Nicholas C. Smith-Washington is a citizen of California, residing in Citrus Heights, in Sacramento County, California. Plaintiff is a customer of TaxAct and used TaxAct's website to prepare and file his federal and state income taxes from approximately 2005 to 2022.

13.    Plaintiff Joyce Mahoney is a citizen of California, residing in Quartz Hill, in Los Angeles County, California. Plaintiff is a customer of TaxAct and used TaxAct's website to prepare and file her taxes from approximately 2005 through tax year 2020.

14.     Plaintiff Jonathan Ames is a citizen of California, residing in Quartz Hill, in Los Angeles County, California. Plaintiff is a customer of TaxAct and used TaxAct's website to prepare and file his taxes from approximately 2005 through tax year 2020.

15.     Plaintiff Matthew Hartz is a citizen of Illinois, residing in Chicago, in Cook County, Illinois. Plaintiff is a customer of TaxAct and used TaxAct's website to prepare and file his taxes from approximately tax year 2009 through approximately tax year 2021.

16.     Plaintiff Jenny Lewis is a citizen of California, residing in Clovis, in Fresno County, California (together with Plaintiffs Smith-Washington, Mahoney, and Ames, the "California Plaintiffs"). Ms. Lewis' husband used TaxAct's website to prepare and file joint returns with Ms. Lewis from approximately 2015 through tax year 2022.

**B. Defendant TaxAct**

17.     Defendant TaxAct, Inc., is an Iowa corporation. TaxAct's principal place of business is 3200 Olympus Blvd, Suite 150, Dallas, Texas 75019.

### III.     JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d) because the amount in controversy for both the Nationwide Class and the Nationwide Married Filing Jointly Class (as defined below) exceeds $5,000,000 exclusive of interest and costs, there are more than 100 members of each putative class, and minimal diversity exists because a significant portion of putative class members are citizens of a state that is not one of the states of which Defendant is a citizen.

19.     This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 since this suit is brought under the laws of the United States, *i.e.*, the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2510 et seq., and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the remaining state common law and statutory claims as these state law claims are part of the same case or controversy as the federal statutory claim over which the Court has original jurisdiction.

20.     This Court has personal jurisdiction over TaxAct because a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in this state. TaxAct offers and markets

1   its services to California residents, including Plaintiffs, and permits customers to prepare and file

2   California state tax returns.

3          21.    Venue is proper in the United States District Court for the Northern District of

4   California pursuant to 28 U.S.C. §§ 1441 and 1446.

5                          **IV.    GENERAL ALLEGATIONS**

6   **A. Defendant TaxAct Provided Tax Preparation Services Throughout the Class Period**

7          22.    Throughout the Class Period, Defendant TaxAct maintained, offered, and operated

8   websites (including www.taxact.com), mobile applications, online and offline tax preparation

9   products, and related services, and electronic filing services (collectively, referred to as the

10  "Services") through which TaxAct, for a fee or other consideration, assisted Plaintiffs and Class

11  Members in preparing federal and state income tax returns, and e-filing federal and state tax returns.

12         23.    TaxAct has stated that its mission is: "to help our filers, no matter the complexity of

13  their situation, file their taxes with confidence, helping them get the best possible tax outcome and

14  guiding them on specific, personalized actions to improve their outcome in the future."[5]

15         24.    During the Class Period, TaxAct offered to the general public, including Plaintiffs and

16  Class Members, through its website, www.taxact.com, various "online tax filing solutions." For

17  example, a Class Member visiting TaxAct's website could select the "Deluxe" option, which costs

18  $24.95 to assist users to prepare and file their federal and state tax returns online. If a Class Member

19  selected that option, the Class Member was given the option to sign in to their TaxAct account or to

20  create a new account. Creating a new account required the Class Member to provide their email,

21  phone number, and to create a username and password.

22         25.    Once an account was created, the Class Member had the option to use TaxAct's

23  website to prepare and file their federal and state income taxes. Throughout the Class Period, once

24  Plaintiffs and Class Members signed into their TaxAct accounts, and elected to start preparing a tax

25  return, various pages would be displayed with prepopulated questions and informational requests,

26  which Plaintiffs and Class Members were directed and/or requested to answer. In order to complete

27  ────────────────

28  [5] TaxAct, TaxAct Helps Americans File for Less and Get More with its Tax Software, Jan. 14, 2021,
    https://www.taxact.com/press/2021/press-releases/taxact-helps-americans-file-for-less-and-get-more.

and file their taxes using TaxAct's website or other platforms, Plaintiffs and Class Members were required to provide the information sought by federal and/or state tax forms. The information requested of Plaintiffs and Class Members included, but was not limited to annual income, number of dependents, and the types and amounts of deductions requested. Thus, in order to use TaxAct's online services to prepare and/or file federal or state tax returns, Plaintiffs and Class Members were prompted and required by TaxAct's website to enter confidential, private, and sensitive personal and financial information into the website.

26.     Upon Plaintiffs or a Class Member answering and/or responding to TaxAct's prepopulated questions and/or information requests within TaxAct's online tax preparation portal, TaxAct caused to be prepared, through its online tax preparation portal, a draft federal and/or state tax return, for review by Plaintiffs or the respective Class Member.

27.     Once the tax returns were prepared and ready to file, TaxAct offered, through its website, the option to Plaintiffs and Class Members to e-file their respective returns with the Internal Revenue Service and/or their respective state tax authorities, like the Franchise Tax Board in California and the Department of Revenue in Illinois. Plaintiffs and Class Members also were given the option of printing the returns they had electronically prepared on TaxAct's website and filing them by mail.

28.     During the Class Period, TaxAct held itself out to the general public as being a tax preparer. Throughout its website, TaxAct referred to itself as being a provider of "tax return preparation products," and as providing services that would permit Class Members to "print or electronically file a tax return *prepared using the Services*" (which are defined as including TaxAct's websites, mobile applications, and online tax return preparation products) (emphasis added). TaxAct referred to a "registered user" as "a user from whom TaxAct has received the information necessary to permit such person to print or electronically file a tax return *prepared using the Services* and who complies with the terms and conditions of this agreement." (emphasis added).

29.     TaxAct's Privacy Policy also stated, throughout the Class Period, that TaxAct would use a customer's "Tax Return Information . . . to prepare, assist in preparing, or obtain or provide services in connection with preparing your tax return."

30.     In addition, in referring to the limited license to its Services, TaxAct stated: "You may use the TaxAct tax preparation software (whether online, downloaded, or via mobile application) to prepare one valid and complete tax return per applicable service fee paid and, after proper registration and any applicable payment, to file electronically and/or print such tax return."

31.     In addition, the annual reports of Blucora, Inc. ("Blucora"), the owner of Defendant during the Class Period, refer to TaxAct as being a "provider of digital tax preparation services," a "leading provider of digital tax preparation solutions," and as having enabled the filing of more than 90 million federal tax returns since 1998.

32.     In sum, Defendant is engaged in the business of preparing federal and state income tax returns or assisting taxpayers in the preparation of those returns for the purposes of California Business & Professions Code § 17530.5; is engaged in the business of preparing, or providing services in connection with the preparation of, income tax returns and for compensation prepares such returns for Class Members for the purposes of 26 U.S.C. § 7216; and, is a tax preparer for the purposes of California Business & Professions Code § 22251.

**B. Defendant Had Specific Statutory Obligations Under California and Federal Law Not to Disclose Plaintiffs' and Class Members' Tax Information**

### *1. Duties Imposed on Defendant by Business & Professions Code § 17530.5*

33.     As stated above, Defendant is engaged in the business of preparing federal or state income tax returns or assisting taxpayers in preparing those returns. Pursuant to California Business & Professions Code § 17530.5, the California legislature has made it unlawful for any person to "disclose any information obtained in the business of preparing federal or state income tax returns or assisting taxpayers in preparing those returns, including any instance in which this information is obtained through an electronic medium," unless the disclosure falls within certain specified exclusions. None of the specified exclusions apply in this case.

### *2. Duties Imposed on Defendant by 26 U.S.C. § 7216*

34.     As stated above, Defendant is engaged in the business of preparing or providing services in connection with the preparation of income tax returns and for compensation prepared such returns for Plaintiffs and Class Members, and, pursuant to 26 U.S.C. § 7216, it is unlawful for any

such person to: "(1) disclose[] any information furnished to him for, or in connection with, the preparation of any such return, or (2) use[] any such information for any purpose other than to prepare, or assist in preparing, any such return," unless the disclosure or use falls within certain specified exclusions.

### 3. Duties Imposed on Defendant by the Tax Preparation Act, Business & Professions Code §§ 22250 et seq.

35.     As stated above, Defendant is a tax preparer within the meaning of California Business & Professions Code § 22251, and, thus, the California Tax Preparation Act ("TPA"), Cal. Bus. & Prof. Code §§ 22250 *et seq.*, specifically imposes certain duties upon TaxAct including, but not limited to, the following: (i) "No confidential information obtained by a tax preparer, in his or her professional capacity, concerning a client or a prospective client shall be disclosed by the tax preparer without the written permission of the client or prospective client," with certain limited exceptions, § 22252.1(a); (ii) no tax preparer may "Make, or authorize the making of, any statement or representation, oral or written or recorded by any means, which is intended to induce persons to use the tax preparation service of the tax preparer, which statement or representation is fraudulent, untrue, or misleading," § 22253(a)(2); (iii) no tax preparer may "[v]iolate Section 17530.5," § 22253(a)(7); and (iv) no tax preparer may "[v]iolate Section 7216 of Title 26 of the United States Code," § 22253(a)(8).

## C. Defendant Had a Privacy Policy that Represented it Would Not Unlawfully Disclose Plaintiffs' or Class Members' Tax Information

36.     Defendant's Privacy Policy, which was posted on its website and was substantively identical in pertinent parts throughout the Class Period, stated that: "If you decide to prepare or file a tax return using the Services, we collect all the information you provide, including your Name, Social Security Number, Driver's License number, and information about your employment, income, deductions, and any other information included in your return. We refer to this information as 'Tax Return Information.'" Defendant's Privacy Policy further stated: "The use and disclosure of Tax Return Information is governed by Section 301-7216 of the Internal Revenue Code and many state codes and regulations. We use your Tax Return Information only in accordance with applicable laws,

1    such as to prepare, assist in preparing, or obtain or provide services in connection with preparing your

2    tax return; to provide you with the products and services you specifically request or consent to and

3    other uses or disclosures as you expressly consent to from time to time; to allow tax professionals to

4    assist you with questions or tax preparation; or as required by law."

5          37.    Throughout the Class Period, Defendant also posted to its website a "Privacy Notice

6    for California Residents – Supplement to TaxAct's Privacy Policy." This Notice stated: "This Privacy

7    Notice for California Residents . . . supplements the information contained in the Privacy Policy,

8    located on our Website (the 'Site'), of TaxAct, Inc. and its subsidiaries (collectively, 'TaxAct,' 'we,'

9    'us,' or 'our'), and applies solely to visitors, users, and others who reside in the State of California

10   ('residents,' 'consumers,' or 'you'). In the event of any conflict between this notice and our privacy

11   policy, this privacy notice shall govern."

12         38.    With respect to Confidential Tax Return Information, Defendant's "Privacy Notice for

13   California Residents – Supplement to TaxAct's Privacy Policy" was, throughout the Class Period,

14   substantively identical in pertinent parts to Defendant's Privacy Policy. Defendant's Privacy Notice

15   for California Residents stated that: "If you decide to prepare or file a tax return using the Services,

16   we collect all the information you provide, including your Name, Social Security Number, Driver's

17   License number, and information about your employment, income, deductions, and any other

18   information included in your return. We refer to this information as 'Tax Return Information.'" It

19   further stated that: "The use and disclosure of Tax Return Information is governed by Section 301-

20   7216 of the Internal Revenue Code and many state codes and regulations. We use your Tax Return

21   Information only in accordance with applicable laws, such as to prepare, assist in preparing, or obtain

22   or provide services in connection with preparing your tax return; to provide you with the products and

23   services you specifically request or consent to and other uses or disclosures as you expressly consent

24   to from time to time; to allow tax professionals to assist you with questions or tax preparation; or as

25   required by law."

26

27

28

**D. Defendant Secretly Disclosed and/or Released Plaintiffs' and Class Members' Confidential Tax Return Information to Third Parties, Including but not Limited to Meta, Google Double Click, and Google**

39.     Completely unbeknownst to Plaintiffs and other Class Members, until approximately December 31, 2022, Defendant disclosed and aided and abetted unauthorized third parties including Meta, Google Double Click and Google – and numerous others – in intercepting some of the Confidential Tax Return Information that Plaintiffs and other Class Members communicated to TaxAct through TaxAct's website.

40.     As the FTC has stated, companies who use pixels, like the ones used by Defendant in this case, have numerous options to monetize their use of these pixels.  According to the FTC:

> Pixel tracking can be monetized in several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns. The data can be used to target more specific audiences with ads and other marketing messages. Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[6]

*1.  Advertising Platforms' Cookies and Tracking Devices that Defendant Installed on Its Website to Allow them to Intercept and Disclose Plaintiffs' and Class Members' Confidential Tax Return Information*

*a.  Meta's Platform and the Meta Pixel*

**1.  Meta's Advertising Business**

41.     Meta, which operates Facebook and was called Facebook, Inc., until changing its name in January 2022, is the world's largest social media company and is ranked number 71 on the list of Fortune 500 Companies. Meta reported having 2.04 billion daily active users as of March 2023[7] and reported $116.61 billion in revenue in fiscal year 2022.[8]

---

[6] https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (citing M. Eddy. "How Companies Turn Your Data Into Money". PC Mag. October 10, 2018. https://www.pcmag.com/news/how-companies-turn-your-data-into-money) (last visited June 13, 2023.)

[7] Meta Reports First Quarter 2023 Results, https://s21.q4cdn.com/399680738/files/doc_news/Meta-Reports-First-Quarter-2023-Results-2023.pdf

42.     Meta's current revenue, as well as its revenue when the company was called Facebook, Inc., has been derived almost entirely from selling targeted advertising to Facebook users, users of its family of apps including Instagram, and internet users on non-Facebook sites that integrate Meta marketing source code on their websites. Meta reported in Fiscal Year 2022 that its revenue from advertising was over $113 billion and Meta stated that it "generated substantially all of our revenue from selling advertising placements on our family of apps to marketers."[9] In its 10k filing covering the fiscal year 2018, Facebook similarly admitted that, "We generate substantially all of our revenue from selling advertising placements to marketers."[10]

43.     Meta explains that it generates ad revenue by providing advertisers with relevant leads that can be delivered through ad placement in a number of different locations. Meta states that it "provides advertising on its own platforms, such as Facebook and Instagram, as well as through the Facebook Audience Network . . . Ads on our platforms enable marketers to reach people across a range of marketing objectives, such as generating leads or driving awareness. Marketers purchase ads that can appear in multiple places including on Facebook, Instagram, Messenger, and third-party applications and websites."[11]

44.     Meta currently, and historically, sells and has sold advertising space by highlighting its ability to target users. In 2019, Facebook stated, "Our ads enable marketers to reach people based on a variety of factors including age, gender, location, interests, and behaviors. Marketers purchase ads that can appear in multiple places including on Facebook, Instagram, Messenger, and third-party applications and websites."[12]  Facebook has also boasted in a sales pitch for its digital advertising that

_____

[8] Meta Reports Fourth Quarter and Full Year 2022 Results, 2/1/23,
https://s21.q4cdn.com/399680738/files/doc_financials/2022/q4/Meta-12.31.2022-Exhibit-99.1-FINAL.pdf
(last visited 6/6/2023).

[9] Meta, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2022,
https://www.sec.gov/Archives/edgar/data/1326801/000132680123000013/meta-20221231.htm (last visited
June 19, 2022).s

[10] Facebook, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2018.
https://www.sec.gov/Archives/edgar/data/1326801/000132680119000009/fb-12312018x10k.htm

[11] Meta Platforms, Inc., Annual Report 10-K, p. 7, 70 (Feb. 2, 2023).

[12] Facebook, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2018.
https://www.sec.gov/Archives/edgar/data/1326801/000132680119000009/fb-12312018x10k.htm

1    its advanced targeting is better than the limited options offered by other platforms because "people on

2    Facebook share their true identities, interests, life events and more."[13]

3          45.    Meta can target users so effectively because it tracks Facebook's users' activity both

4    on and off its site, including through the use of Pixels that companies like Defendant voluntarily add

5    to their sites. This allows Meta to draw inferences about users beyond what they explicitly disclose on

6    their Facebook accounts. Meta also tracks non-users across the web through its widespread Internet

7    marketing products and source code.

8          46.    Meta and Facebook collect and have collected vast amounts of personal data for the

9    purpose of identifying individuals like Plaintiffs and Class Members and aggregating their many

10   identifiers—the result of which is the creation of essentially cradle-to-grave profiles of Plaintiffs and

11   Class Members.[14]

12         47.    FTC Commissioner Rohit Chopra addressed the harms that can be caused by sharing

13   information with Facebook when he stated in 2019, "Because behavioral advertising allows

14   advertisers to use mass surveillance as a means to their undisclosed and potentially nefarious ends,

15   Facebook users are exposed to propaganda, manipulation, discrimination, and other harms.  . . .

16   Facebook's massive, private, and generally unsupervised network of advertisers has virtually free rein

17   to microtarget its ads based on every aspect of a user's profile and activity. The company's detailed

18   dossiers of private information includes things like a user's location and personal connections, but it

19

20

21   [13] Dissenting Statement of FTC Commissioner Rohit Chopra, In re Facebook, Inc., Commission File No,
     1823109, July 24, 2019,
22   https://www.ftc.gov/system/files/documents/public_statements/1536911/chopra_dissenting_statement_on_face
     book_7-24-19.pdf (citing to Your Guide to Digital Advertising, FACEBOOK BUSINESS
23   https://www.facebook.com/business/help/1029863103720320?helpref=page_content (last visited July 22,
     2019).
24   https://www.ftc.gov/system/files/documents/public_statements/1536911/chopra_dissenting_statement_on_face
     book_7-24-19.pdf (citing to Your Guide to Digital Advertising, FACEBOOK BUSINESS
25   https://www.facebook.com/business/help/1029863103720320?helpref=page_content (last visited July 22,
     2019).
26   [14] Dissenting Statement of FTC Commissioner Rohit Chopra, In re Facebook, Inc., Commission File No,
     1823109, July 24, 2019
27   https://www.ftc.gov/system/files/documents/public_statements/1536911/chopra_dissenting_statement on
     facebook_7-24-19.pdf
28

1   also includes the history of everything a user has ever done wherever Facebook is embedded in the

2   digital world."[15]

3       48.     The Electronic Privacy Information Center also addressed the harm that this type of

4   microtargeted advertising can cause when it stated, "Social media companies—and in particular,

5   Facebook—collect vast quantities of personal data in order to 'microtarget' advertisements to users.

6   This practice, also known as surveillance advertising or behavioral advertising, is deeply harmful to

7   privacy, the flow of information, and the psychological health of social media users."[16]

8                        **2.  The Meta Pixel**

9       49.     The "Meta Pixel," which was formerly known as the Facebook Pixel[17], is a snippet of

10  code that companies can integrate into their website, which allows them to track their website users'

11  activities as those users navigate through the website. It can track, for example, each page an

12  individual visits on the website, what buttons the user clicks, as well as specific information she may

13  input into the website.[18]

14      50.     The Meta Pixel is offered to advertisers, like TaxAct, to integrate into their websites.

15  Once installed on a website, "the [P]ixel will log when someone takes an action on [that] website."[19]

16  As Facebook explains, "[t]he Meta Pixel receives information about the actions, or events, that take

17  place on [an advertiser's] website."[20]

18      51.     Automatic events are a category of actions that the Meta Pixel collects and transmits

19  from the website where it is installed without the advertiser being required to add any additional

20

21  [15] *Id.*

22  [16] Electronic Privacy Information Center, https://epic.org/issues/consumer-privacy/social-media-privacy/ (last visited 6/6/2023).

23  [17] Facebook first offered its "Facebook Pixel" in 2013.

24  [18] *See* Meta, About Meta Pixel,
25  https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited June 6, 2023).

26  [19] Facebook, About Meta Pixel,
    https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Jan. 18, 2023).

27  [20] Facebook, About Automatic Events,
28  https://www.facebook.com/business/help/1292598407460746?id=1205376682832142 (last visited Jan. 18, 2023).

code.[21] The collection and transmission of automatic events is sufficient for an Advertiser to use "customer lists, website or app traffic, or engagement across Facebook technologies, to create Custom Audiences of people who already know [their] business."[22] Moreover, Advertisers, like TaxAct are able to use their Custom Audience to create a Lookalike Audience. Facebook "leverages information such as demographics, interests and behaviors from [the advertiser's source Custom Audience] to find new people who share similar qualities." Using a Lookalike Audience allows an advertiser to deliver its advertisements to an "audience of people who are similar to (or 'look like') [its] existing customers."[23]

52.    Advertisers are also able to select from a set of Standard events, predefined by Facebook, which can also be collected and transmitted by the Meta Pixel, including, for example, what content a visitor views, subscribes to, or purchases.[24] Finally, Advertisers are able to create their own "custom events" to be tracked and transmitted to Facebook by the Meta Pixel.[25]

53.    As soon as a user takes an action on a webpage that includes the Meta Pixel, the code embedded in the page re-directs the content of the user's communication to Meta while the exchange of the communication between the user and website provider is still occurring. In this manner, the Meta Pixel intercepts actions taken by the user and transmits that information to Meta.

54.    When a user accesses a website hosting a Meta Pixel like Defendant's website, Facebook's software script surreptitiously directs the user's computing device to simultaneously send a separate message to Facebook's servers. This second transmission, completely invisible and unknown to the user, contains the content of the original request sent to the host website ("GET request"), along with the data that the Meta Pixel was configured to collect ("POST request"). GET

---

[21] *Id.*
[22] Facebook, About Customer Audiences, https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last visited Jan. 18, 2023).
[23] Facebook, About Lookalike Audiences, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last visited Jan. 18, 2023).
[24] Facebook, Specifications for Meta Pixel Standard Events, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Jan. 18, 2023).
[25] Facebook, About Standard and Custom Website Events, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (last visited Jan. 18, 2023).

and POST requests are communications that contain contents from both the user and from servers associated with the website they are visiting. These transmissions are initiated by Meta code and concurrent with the communications to and from the host website. While these transmissions are initiated by Meta, they are facilitated by Defendant based on its installation of the Meta Pixel on its website and its configuration of the Meta Pixel in a manner that allows for Meta to intercept this information.  Defendant's installation of the Meta Pixel allows Meta to intercept, obtain and use Plaintiffs' and Class Members' Confidential Tax Return Information including obtaining a header containing the URL information of what the user has been viewing and requesting from websites online.

55.     The Meta Pixel acts as a conduit of information, sending the information it collects to Meta through scripts running in the user's web browser. The information is sent in data packets labeled with personally identifiable information, including the user's IP address.

56.     Meta allows those who install the Pixel to select what actions it tracks and shares with Meta. Meta's website states, "When you implement Meta Business Tools, such as installing the code into your websites and/or apps or integrating with applicable APIs, you have choices about how to configure the tools and the data that you wish to share."[26]

57.     The range of events that can be tracked by the Meta Pixel is vast. Certain information is automatically shared with Meta including:

> a.      HTTP headers – "Anything that is generally present in HTTP headers, a standard web protocol sent between any browser request and any server on the internet. This information may include data like IP addresses, information about the web browser, page location, document, referrer and person using the website."[27]

---

[26] Meta Best Practices for privacy and data use for Meta Business Tools, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited June 2, 2023); Meta, How to set up and install a Meta Pixel, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited June 6, 2023) (after creating a Meta Pixel, "Set up events on your website to measure the actions you care about . . . .").

[27] Meta, Meta for Developers, Meta Pixel, https://developers.facebook.com/docs/meta-pixel (last visited June 6, 2023).

1

2

b.      Pixel-specific Data – which "[i]ncludes Pixel ID and the Facebook Cookie";[28] and

3

4

c.      Button Click Data – which "[i]ncludes any buttons clicked by site visitors, the labels of those buttons and any pages visited as a result of the button clicks."[29]

5

6

7

8

58.     Companies and website developers can also choose to configure the Meta Pixel to send additional optional information to Meta by, for example, identifying "custom events" that they wish for the Pixel to track or by enabling "advanced matching" which causes the Meta Pixel to track and share information inputted by a website visitor.[30]

9

10

11

12

13

59.     Meta has multiple means of associating the data it intercepts through the Meta Pixel with a particular user. As it explains in its guide for developers seeking to install and configure the Meta Pixel, the Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts."[31] Meta also receives each user's IP address and, depending on the website and the configuration of the Meta Pixel, may receive other personal identifiers that permit Meta to associate the actions tracked by the Meta Pixel with a specific individual.

14

15

16

17

18

19

60.     The Meta Pixel permits advertisers like TaxAct, to "measure, optimize and build audiences for [their] ad campaigns."[32] It is also represented as a product that can help companies who install the Meta Pixel "make sure your ads are shown to the right people" by allowing them to "find people who have visited a specific page or taken desired actions on your website"; to "drive up more sales"; and to "measure the results of your ads by measuring what happens when people see them."[33]

20

21

61.     Using the example of automotive ads, Meta claims to advertisers that the "Pixel . . . let[s] Meta know who to deliver your ads to based on the actions they've taken, like viewing a

22

23

[28] *Id.*

24

[29] *Id.*

25

[30] *Id.*

26

[31] Meta, Meta for Developers, Meta Pixel: Get Started, https://developers.facebook.com/docs/meta-pixel/get-started (last visited June 6, 2023).

27

[32] Meta, Meta Pixel, https://www.facebook.com/business/tools/meta-pixel (May 7, 2023).

28

[33] Meta, About Meta Pixel, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited May 7, 2023)

specific car or entering payment information. Without this data, automotive ads would not be able to make good recommendations to the potential customers with high probability to convert."[34]

62.    Meta warns companies that choose to incorporate the Meta Pixel into their websites – like TaxAct – that the data sent to Meta from that Pixel can be directly associated with a real person's actual name and Facebook account. Meta states that the Meta Pixel, "relies on Facebook cookies, which enables us to match your website visitors to the respective Facebook User accounts."[35]

71.    On information and belief, the Meta Pixel is designed for the very purpose of intercepting communications on third-party websites by surreptitiously and contemporaneously redirecting these communications to Meta. This interception, however, could not be accomplished in this case without the aid and assistance of Defendant who facilitated the installation of the Meta Pixel on its website.

72.    Aside from aiding the marketing and advertising efforts of each company that incorporates the Meta Pixel into its website, the Meta Pixel permits Meta to surreptitiously intercept and collect data regarding the actions of each specific user across multiple websites. Meta retains and uses the data it obtains through its Meta Pixel on both users and non-users in its analytics and advertising services.[36] Facebook explained this practice in its written Congressional testimony when it stated:

> Advertisers, app developers, and publishers can send us information through Facebook Business Tools they use, including our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Facebook pixel. These partners provide information about users' activities off Facebook—including information about a user's device,

---

[34] Implement the Meta Pixel and/or mobile SDK for automotive ads
https://www.facebook.com/business/help/1989760861301766?id=378777162599537 (last visited June 7, 2023).

[35] Facebook, Get Started, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Jan. 18, 2023).

[36] Written Facebook Testimony Regarding the April 11, 2018 Hearing titled Facebook: Transparency and Use of Consumer Data. 112-13, 672 (June 29, 2019),
https://docs.house.gov/meetings/IF/IF00/20180411/108090/HHRG-115-IF00-Wstate-ZuckerbergM-20180411.pdf; Vox, This is How Facebook collects data on you even if you don't have an account (April 20, 2018), https://www.vox.com/2018/4/20/17254312/facebook-shadow-profiles-data-collection-non-users-mark-zuckerberg; Dell Cameron, Facebook is Dodging Questions About Surveillance of Users Seeking Abortions, Gizmodo (June 15, 2022), https://gizmodo.com/facebook-abortion-surveillance-data-privacy-meta-1849066802.

websites users visit, purchases users make, the ads they see, and how they use their services—whether or not they have a Facebook account or are logged into Facebook. . . . . We also receive information about a user's online and offline actions and purchases from third-party data providers who have the rights to provide us with their information.

73.     Facebook further explained how it stores data collected through the pixel:

Facebook receives log data when websites and advertisers use our technologies such as our social plug-in and the Facebook pixel. The amount of time we retain this information depends on the specific data. For example, logs relating to social plug-ins on third-party websites can be from registered users or from non-registered people without a Facebook account. Logs for social plug-ins visited by users is retained for 90 days before they are aggregated. For non-users, these individual logs are stored for 10 days. **Advertiser data sent to us through the Facebook pixel is retained for 180 days**.[37]

74.     On information and belief, a leaked 2021 internal document regarding Facebook's practices included admissions that it had little control over where data collected from users goes or what it is used for, describing it like "ink flowing into water." An executive summary in the leaked document explains:

We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as "we will not use X data for Y purpose." And yet, this is exactly what regulators expect us to do, increasing our risk of mistakes and misrepresentation.

The document adds: "Addressing these challenges will require additional multi-year investment in Ads and our infrastructure teams to gain control over how our systems ingest, process and egest data."[38]

75.     Meta associates the information it obtains via Meta Pixel with other information regarding the user, using additional personal identifiers that are transmitted concurrently with other personal information the Pixel is configured to collect. If the user has a Facebook account, these

---

[37] Written Facebook Testimony Regarding the April 11, 2018 Hearing titled Facebook: Transparency and Use of Consumer Data, pp. 112-13, 672 (June 29, 2019), https://docs.house.gov/meetings/IF/IF00/20180411/108090/HHRG-115-IF00-Wstate-ZuckerbergM-20180411.pdf (emphasis added).

[38] Vice News, Facebook Doesn't Know What It Does With Your Data, Or Where It Goes: Leaked Document (April 22, 2022), https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes; Facebook Data Lineage Internal Document https://www.documentcloud.org/documents/21716382-facebook-data-lineage-internal-document

identifiers include cookies called c_user cookies that allow Meta to link data to a consumer's particular Facebook account and include a number of string of numbers that can be easily connected to a user's real name by searching for that user number on Facebook. It also includes a cookie, which is called a _datr cookie that Facebook records and uses to identify a customer's unique web browser from which they are sending the communication; this cookie can be used to identify both non-Facebook users and Facebook users. There are also "xs" cookies associated with a particular browsing session. Facebook also has a cookie, which is called the _fr cookie that is an encrypted combination of the c_user (which identifies the user's Facebook account number) and the _datr cookies, which identify the consumer's web browsers.

76.     For both Facebook account-holders and users who do not have a Facebook account, these identifiers also include cookies that Meta ties to their browser, such as "datr" and "fr" cookies.[39]

77.     Meta warns developers and those who incorporate the Meta Pixel into their website that the Meta Pixel is a personal identifier because it "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts."[40]

78.     The Meta Pixel Defendant installed on its website also automatically captures and discloses the IP address of the user. IP addresses are used to identify and route communications on the Internet. IP addresses of individual Internet users are used by websites and tracking companies to facilitate and track Internet communications. Individual homes and their occupants can be, and are, tracked and targeted with advertising using IP addresses. Thus, IP addresses are personally identifiable, particularly in combination with other information disclosed through the Meta Pixel.

**E. Defendant Disclosed Plaintiffs' and Class Members' Confidential Tax Return Information to Meta and Used Plaintiffs' and Class Members' Confidential Tax Return Information for its Own Purposes**

79.     Starting on date unknown and until approximately December 31, 2022, Defendant embedded the Meta Pixel on and throughout its website—www.taxact.com—and transmitted

---

[39] Meta, *Cookies Policy* (Oct. 5, 2022), https://www.facebook.com/policy/cookies.
[40] Facebook, Get Started, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Jan. 18, 2023).

Confidential Tax Return Information shared by Plaintiffs and Class Members, and their personal identifiers, without their consent, to Meta in accordance with the Meta Pixel's configuration.

80.    When Plaintiffs or another Class Member visited www.taxact.com, the Meta Pixel automatically caused the Plaintiff's or the Class Member's personal identifiers, including IP addresses and the c_user, _fr, _datr, and _fbp cookies, to be transmitted to Meta, attached to the fact that the Plaintiff or the Class Member had visited the website and the titles of the webpages the Plaintiff or the Class Member visited.

81.    The cookies that were transmitted as a result of the Meta Pixel Defendant installed on its website conveyed Plaintiffs' and Class Members' Facebook Id number (the c_user cookie) which can be used by Facebook and others to find the user's real name, the specific and unique web browser from which the customer is sending the communication (_datr cookie), and an encrypted combination of the information contained in those two cookies (fr cookie). Additionally, on information and belief the Meta Pixel also transferred Plaintiffs' and Class Members' names and phone numbers in a hashed format.

82.    The Meta Pixel that Defendant placed on its website also automatically captured and disclosed the IP addresses of Plaintiffs and other Class Members to Meta.

83.    Rather than merely transmit the "automatic events" that the Meta Pixel collects and transmits from a website without the website owner or developer being required to add any additional code, on information and belief, Defendant intentionally configured the Meta Pixel on its website to track, collect, disclose, and allow for the interception of "custom events" such as Plaintiffs' or Class Members' adjusted gross income, filing status, number of dependents, and refund amounts, all entered into or submitted to TaxAct's website as Plaintiffs and Class Members used TaxAct's website to prepare and/or file their taxes.

84.    Moreover, the Meta Pixel on TaxAct's website was also intentionally configured or authorized to use a feature called "automatic advanced matching." That feature scans forms on a website looking for fields that may contain personally identifiable information like a first name, last name, or phone number, and then causes that information to be disclosed to Meta. On Defendant's

website this feature collected the names and phone numbers of filers, including Plaintiffs and Nationwide Class Members, and the names of dependents claimed by Plaintiffs and Class Members.

85.     The data collected by the automatic advanced matching feature is disclosed to Meta in an obfuscated form know as a "hash." But Meta is able to determine the pre-obfuscated version of the data. Indeed, Meta uses the hashed information to link other data collected and disclosed by the Meta Pixel to Plaintiffs' and Class Members' Facebook and Instagram profiles.

86.     Thus, on information and belief, when Plaintiffs and Class Members used Defendant's website to prepare and/or assist them in the preparation of their respective tax returns and/or to file their respective tax returns, the Meta Pixel on TaxAct's website caused the Plaintiffs' and Class Member's personal identifiers, including IP addresses and the c_user, fr, and datr cookies, to be disclosed to Meta along with Confidential Tax Return Information, including, but not limited to, their names, phone numbers, adjusted gross income, refund amounts, number of dependents, names of dependents, employment status, and filing status.

87.     Put simply, TaxAct disclosed to Meta and allowed Meta to intercept Plaintiffs' and Class Members' Confidential Tax Return Information and their personal identifiers.

88.     On information and belief, some of the Confidential Tax Return Information disclosed to Meta was disclosed after Plaintiffs' and Class Members' respective tax returns had been prepared by TaxAct's software. This Confidential Tax Return Information, which was disclosed to Meta, was obtained from Plaintiffs' and Class Members' prepared tax returns.

89.     On information and belief, Defendant disclosed Plaintiffs' and Class Members' Confidential Tax Return Information to Meta in order to permit Defendant to improve its marketing and advertising. Thus, Defendant used Plaintiffs' and Class Members' Confidential Tax Return Information for their own marketing, advertising, and business purposes.

**F. By Using the Meta Pixel, Defendant Entered into a Binding Contract with Meta Regarding Defendant's Use of the Meta Pixel and Meta's Other Business Tools**

90.     Throughout the Class Period, Meta maintained "Business Tools Terms" which are binding on those who use Meta's Business Tools, including its Meta Pixel. As the Business Tools

Terms explain: "When you use the [Meta] Business Tools to send us or otherwise enable the collection of Business Tool Data . . . , these terms govern the use of that data."

91.     Business Tool Data is "Contact Information" (e.g., "names, email addresses, and phone numbers") and "Event Data" (e.g., information shared with Meta by an entity "about people and the actions they take on [that entity's] websites and apps or in [its] shops, such as visits to [its] sites, installations of [its] apps, and purchases of [its] products.").

92.     Pursuant to the Business Tools Terms, any entity, including TaxAct, using one of Meta's Business Tools, including the Meta Pixel, agreed to certain terms and conditions, including:

   a.     "You represent and warrant that you . . . have all of the necessary rights and permissions and a lawful basis (in compliance with all applicable laws, regulations and industry guidelines) for the disclosure of Business Tool Data."

   b.     "You will not share Business Tool Data with us that you know or reasonably should know is from or about children under the age of 13 or that includes health, financial information or other categories of sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)." And,

   c.     "You represent and warrant that you have provided robust and sufficiently prominent notice to users regarding the Business Tool Data collection, sharing and usage that includes, at a minimum:

      i.      For websites, a clear and prominent notice on each web page where our pixels are used that links to a clear explanation (a) that third parties, including Facebook, may use cookies, web beacons, and other storage technologies to collect or receive information from your websites and elsewhere on the Internet and use that information to provide measurement services and target ads, (b) how users can opt-out of the collection and use of information for ad targeting, and (c) where a user can access a mechanism for exercising such choice (e.g., providing links to: http://www.aboutads.info/choices and http://www.youronlinechoices.eu/)."

93.     TaxAct entered into a contract with Meta – Meta's Business Tools Terms – when it installed the Meta Pixel on its website and/or used the Meta Pixel.

94.     On information and belief, Meta did all, or substantially all, of the significant things that the contract required it to do.

95.     As detailed throughout this Complaint, Defendant did not perform in accordance with essential terms of the Business Tools Terms. It did not have the right, permission, or a lawful basis for disclosing Plaintiffs' and Class Members' Confidential Tax Return Information; it knew or reasonably should have known that the Confidential Tax Return Information it shared with Meta included sensitive and financial information; and, it failed to provide the required notice to users regarding data collection, sharing, and usage. Accordingly, Defendant breached its contract with Meta.

96.     On information and belief, Meta intended to benefit consumers, including Plaintiffs and Class Members, by protecting their privacy rights, when it created the Business Tools Terms.

97.     On information and belief, Meta and Defendant intended to benefit consumers, including Plaintiffs and Class Members, by protecting their privacy rights, when they entered into a contract - Meta's Business Tools Terms.

98.     Because the contract between Meta and Defendant was made expressly for the benefit of consumers, Plaintiffs and Class Members were third-party beneficiaries of the contract and entitled to enforce it under applicable state law, including Cal. Civ. Code § 1559.

**G. Defendant Disclosed Plaintiffs' and Class Members' Confidential Tax Return Information to Google and Google Double Click and Used Plaintiffs' and Class Members' Confidential Tax Return Information for its Own Purposes**

### 1. *Google Double Click and Google's Tracking Pixels*

99.     According to the US DOJ, "Google now controls the digital tool that nearly every major website publisher uses to sell ads on their websites (publisher ad server); it controls the dominant advertiser tool that helps millions of large and small advertisers buy ad inventory

1  (advertiser ad network); and it controls the largest advertising exchange (ad exchange), a technology

2  that runs real-time auctions to match buyers and sellers of online advertising."[41]

3      100.    Google is "one of the wealthiest companies on the planet, with a market value of $1

4  trillion and annual revenue exceeding $160 billion." [42] Google's global network business also

5  generated approximately $31.7 billion in revenues in 2021.[43]

6      101.    DoubleClick, Inc. was an online advertising company that developed and provided

7  internet ad-serving technology and services from 1995 until its acquisition by Google in March 2008.

8  Since that time, Double Click (referred to herein as "Google Double Click") has been owned by

9  Google. Throughout the Class Period, both Google pixels and Google Double Click pixels have been

10  present on a substantial percentage of consumer websites.

11      102.    On information and belief, Defendant installed tracking pixels from Google Double

12  Click and Google, including adding trackers that allowed it to participate in the Google Marketing

13  Platform, on TaxAct's website. Defendant, through the installation of Google tracking pixels on its

14  website, aided and abetted Google in intercepting Plaintiffs' and Class Members' Confidential Tax

15  Return Information.

16      103.    Google discussed some of the options that businesses like Defendant could use to track

17  consumers in a 2016 blog where it stated:

18          "The Google Analytics 360 Suite offers integrations with many third
            party data providers and platforms. It also plugs right into Google
19          AdWords and DoubleClick Digital Marketing, our core ad technology.
            That means marketers can turn analytics into action by combining their
20          own data from multiple sources — website data, audience data, and
            customer data (e.g., CRM) and more — and using it to make ads more
21          relevant for people."[44]

22      104.    On July 24, 2018, Google unified its DoubleClick Advertiser Products and the Google

23  Analytics 360 suite under a single brand called the Google Marketing Platform. Google describes its

24

---

25  [41] Justice Department Sues Google for Monopolizing Digital Advertising Technologies, Jan. 23, 2023,
    https://www.justice.gov/opa/pr/justice-department-sues-google-monopolizing-digital-advertising-technologies

26  [42] Id.

    [43] Id.
27

28  [44] Double Click Advertisers Blog, https://doubleclick-advertisers.googleblog.com/2016/03/introducing-google-
    analytics-360-suite.html

Marketing Platform as "a unified advertising and analytics platform that enables stronger collaboration for your marketing teams by building on existing integrations between DoubleClick and the Google Analytics 360 Suite."[45]

105.    Google represented that its Google Marketing Platform could help advertisers understand their audiences on a "deeper level" by allowing them to "[i]ntegrate and access your data to gain a more complete view of your customers, and connect your data with Google cross-device and intent signals to identify the most valuable audiences."[46]

106.    Google also offers a program called Google Analytics, which initially was called Urchin in 2005, later called Universal Analytics in 2013, called Global Site Tag in 2017, and called Google Analytics in 2020.  Universal Analytics is described as a product that "offered new tracking codes for websites and tools that gave more in-depth information about user behavior. . .  As users began to use 2-3 devices to navigate the web, a key goal of Universal Analytics was tracking the same user across different devices."[47]

107.    Google Double Click also advised advertisers that its Marketing Platform "allows users to configure a separate tracking activity for each event they would like to track."[48]

108.    Google explained that its personalized advertising "is a powerful tool that improves advertising relevance for users and increases ROI for advertisers. Because it works by employing online user data to target users with more relevant advertising content . . ."[49]

109.    Defendant's installation of the Google and Google Double Click tracking pixels on its website—www.taxact.com—resulted in it disclosing and allowing these third parties to intercept

---

[45] Google Support, Introducing Google Marketing Platform, https://support.google.com/campaignmanager/answer/9015629?hl=en&sjid=389729629729548039-NA (last visited June 12, 2023).

[46] Google Support, Introducing Google Marketing Platform, https://support.google.com/campaignmanager/answer/9015629?hl=en&sjid=389729629729548039-NA (last visited June 12, 2023).

[47] History of Google Analytics, February 23, 2032, https://onward.justia.com/history-of-google-analytics/ (last visited 6/19/23).

[48] Double Click Digital Marketing Suite, https://developers.google.com/app-conversion-tracking/third-party-trackers/doubleclick (last visited June 8, 2023).

[49] Personalized Advertising, https://support.google.com/adspolicy/answer/143465#sensitive (last visited June 8, 2023).

Class Members' Confidential Tax Return Information including but not limited to whether they were filing as a single or joint filer, the type of form filed, whether they were submitting a state or federal tax return, their income, and the available refund amount. On information and belief, Google's tracking pixels collected this confidential information from Plaintiffs and Class Members as they were entering that information on TaxAct's website. As a result, on information and belief, Google obtained this confidential information on Plaintiffs and Class Members both when they filed their returns electronically through the website and when they printed out their returns from the website and mailed them to the IRS and/or Franchise Tax Board.

110.    Thus, on information and belief, when Plaintiffs and Class Members used Defendant's website to prepare and/or assist them in the preparation of their respective tax returns and/or to file their respective tax returns, the Google and Google Double Click tracking pixels on TaxAct's website caused the disclosure and interception of Plaintiffs' and Class Members' Confidential Tax Return Information and their personal identifiers.

111.    Put simply, TaxAct disclosed to Google and Google Double Click and aided and abetted and assisted them in intercepting Plaintiffs' and Class Members' Confidential Tax Return Information. The information shared included Plaintiffs' and Class Members' respective activities on TaxAct's website, including confidential personal and financial information that they shared with TaxAct in connection with the filing of their tax returns. TaxAct unlawfully shared this information without providing notice to Plaintiffs or Class Members and without seeking their consent. TaxAct also permitted these third parties that received users' personal tax information to use and profit from the information for their own business purposes.

112.    On information and belief, pixels from Google Analytics (including under this product's previous names), which has been described as the most used web analytics platform on the internet, were on TaxAct's website continuously from 2010-2013 and from 2015-2022.

113.    On information and belief, Google Double Click tracking pixels were on TaxAct's website during the periods 2010, 2012-2015, and 2017-2022.

**H. Defendant's Unlawful Use of Pixels was Reported by the Markup Following an Investigation it Conducted**

114.    The Markup is a nonprofit newsroom that investigates how powerful institutions are using technology to change society.

115.    On or about November 21, 2022, having been contacted by the Markup for comment on a soon-to-be-published article regarding the use of tracking tools by tax preparation software websites, Defendant modified or reconfigured the Meta Pixel on TaxAct's site to no longer send to Meta certain financial details such as refund amounts and adjusted gross income. At that time, however, the Meta Pixel on TaxAct's website continued to disclose the names of Class Members' dependents to Meta.

116.    On or about November 22, 2022, the Markup published its article titled: "Tax Filing Websites Have Been Sending Users' Financial Information to Facebook."[50] The article disclosed that the Markup had investigated the use of tracking tools by tax preparation software websites including TaxAct's.

117.    On or about December 31, 2022, Defendant fully disabled the Meta Pixel on its website.

**I.  Defendant Used and Disclosed Plaintiffs' and Class Members' Confidential Tax Return Information Without Plaintiffs' or Class Members' Knowledge, Consent, Authorization, or Further Action**

118.    The tracking tools incorporated into, embedded in, or otherwise permitted on Defendant's website were invisible to Plaintiffs and Class Members while using that website. The Meta Pixels and other tracking devices from Google and Google Double Click on Defendant's website were seamlessly integrated into the website such that there was no reason for Plaintiffs or any Class Member to be aware of or to discover their presence.

---

[50] Simon Fondrie-Teitler, Angie Waller, & Colin Lecher, *Tax Filing Websites Have Been Sending Users' Financial Information to Facebook*, THE MARKUP (Nov. 22, 2022, 8.00 AM) https://themarkup.org/pixel-hunt/2022/11/22/tax-filing-websites-have-been-sending-users-financial-information-to-facebook.

119.   Plaintiffs and Class Members were shown no disclaimer or warning that their Confidential Tax Return Information would be disclosed to any unauthorized third party without their express consent.

120.   Plaintiffs and Class Members had no idea that their Confidential Tax Return Information was being collected and transmitted to an unauthorized third party.

121.   Because Plaintiffs and Class Members had no idea of the presence of Meta Pixels or other tracking devices from Google and Google Double Click on TaxAct's website, or that their Confidential Tax Return Information would be collected and transmitted to third parties including, at least, Meta, Google and/or Google Double Click, they could not and did not consent to TaxAct's conduct.

122.   Plaintiffs and Class Members did not give consent or authorization for Defendant to disclose their Confidential Tax Return Information to any third party other than government entities necessary for Defendant to file Plaintiffs' and Class Members' taxes.

123.   This conduct is particularly egregious given the extremely sensitive nature of the financial and personal information involved and Defendant's representations that it would only use customers' Tax Return Information "in accordance with applicable laws, such as to prepare, assist in preparing, or obtain or provide services in connection with preparing your tax return; to provide you with the products and services you specifically request or consent to and other uses or disclosures as you expressly consent to from time to time; to allow tax professionals to assist you with questions or tax preparation; or as required by law."

124.   Moreover, Defendant's Privacy Policy and Defendant's Privacy Notice for California Residents – Supplement to TaxAct's Privacy Policy, as described above, provided no indication to Plaintiffs or Class Members that their Confidential Tax Return Information would be disclosed to Meta, Google, Google Double Click or any unauthorized third party and, in fact, represented that such information would not be unlawfully disclosed to third parties and would only be used for the purpose of providing the requested services (or other disclosures required by law or expressly consented to).

125.   Defendant allowed Meta, Google and Google Double Click to intercept Plaintiffs' and Class Members' extremely personal financial and information which invaded Plaintiffs' privacy by allowing Meta, Google, and Google Double Click to learn intimate details of Plaintiffs' and Class Members' finances and other tax related information to target them for advertising, political or other purposes.[51]   Defendant's sharing of this private information with Meta and other third parties has assisted Meta and those other third parties in creating much more robust dossiers about Plaintiffs and Class Members that can be used to subject them to targeted advertising.

**J.   Plaintiffs and Class Members Had a Reasonable Expectation of Privacy**

126.   Plaintiffs and Class Members had a reasonable expectation of privacy in their Confidential Tax Return Information.

127.   Confidential information submitted in order to prepare taxes is protected by California law under the Tax Preparation Act. Cal. Bus. & Prof. Code §§ 22250 *et seq*.

128.   26 U.S.C. § 7431 provides for civil damages for the unauthorized inspection or disclosure of tax returns or tax return information by, *inter alia*, officers and employees of the United States.

129.   26 U.S.C. § 7216 imposes criminal liability on any person "engaged in the business or preparing or providing services in connection with the preparation of [income tax returns]" who knowingly or recklessly discloses "any information furnished to him for, or in connection with, the preparation of any such return, or . . . uses any such information for any purposes other than to prepare, or assist in preparing, any such return."

130.   The National Society of Tax Professionals ("NSTP") is a non-profit organization dedicated to serving tax professionals. The NSTP's Code of Ethics and Rules explicitly states that its members shall not: "**violate the confidential relationship** between client and practitioner and shall not **disclose confidential information** without the consent of the client or pursuant to a court subpoena."[52]

---

[51] *Id.*

[52] *Code of Ethics and Rules*, NATIONAL SOCIETY OF TAX PROFESSIONALS, https://www.nstp.org/about/code-of-ethics (emphasis added).

131.     Thus, state and federal laws, and general standards in the industry, reinforce the social norm and general expectation that financial information associated with the preparation of tax returns is to be kept private and confidential.

132.     Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares that individual's data.

133.     For example, a recent study by *Consumer Reports* shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[53] Moreover, according to a study by *Pew Research Center*, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.[54]

134.     Accordingly, Plaintiffs and Class Members had a reasonable expectation of privacy regarding their Confidential Tax Return Information.

**K. The Confidential Tax Return Information that Defendant Disclosed to Meta, Google, and Google Double Click is Plaintiffs' and Class Members' Property, Has Economic Value, there is a Market for this Private Data, and its Unauthorized Disclosure Caused Economic Harm and Limited the Value of the Data**

135.     It is common knowledge that there is an economic market for consumers' personal data – including the financial information that was disclosed by Defendant to Meta, Google and Google Double Click.

136.     Indeed, within the tax preparation software industry, some relatively recent market entrants, including Credit Karma and Cash App Taxes, offer or offered free tax preparation to all of

---

[53] Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumerreports/ consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

[54] Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information, PEW RESEARCH CENTER, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-and-concerned-confusedand-feeling-lack-of-control-over-their-personal-information/.

their users in exchange for the ability to use the details of their tax returns to target them with financial advertising.[55]

137.   As the Department of Justice explained, with respect to Credit Karma: "Through Credit Karma's personal finance platform, Credit Karma offers its more than 100 million members free personal finance tools, such as free credit scores and monitoring, and tailored, third-party financial offers, including credit card, personal loan, and refinancing opportunities. Credit Karma is paid only by the third parties, and only when consumers take advantage of these customized offers. Credit Karma can take the data gathered from tax filings, with the filers' consent, to improve Credit Karma's offerings to its members. This, in turn, improves the likelihood that a consumer will take advantage of the offer. This process enables Credit Karma to provide a DDIY tax preparation product for free regardless of the U.S. federal or state tax forms used and complexity of the tax return."[56]

138.   Plaintiffs and other members of the Classes and Subclasses did not willingly provide their tax information to a company like Credit Karma or Cash App Taxes in exchange for free tax filing and other related and potentially beneficial services like free credit scores. Instead, they, either directly or through a spouse, provided their Confidential Tax Return Information to TaxAct for the sole purpose of completing their taxes, a service for which Plaintiffs or their spouses paid TaxAct. This confirms that Plaintiffs', Class Members', and Subclass Members' Confidential Tax Return Information has a clear monetary value and that Defendant took this information without their authorization and without any payment for the theft of their information.

139.   Thus, the right to disclose Confidential Tax Return Information and/or use it for purposes other than the preparation and filing of taxes has a determinable value that is sufficiently high that certain tax preparation software companies have forgone all fees associated with preparing and filing tax returns in order to secure that right.

140.   Given the existence of a market for the financial data disclosed by Defendant, Defendant has deprived Plaintiffs and Class Members of the economic value of their Confidential

---

[55] Geoffrey A. Fowler, <u>When tax prep is free, you may be paying with your privacy</u>, Washington Post (Mar. 7, 2019, 11:37 a.m.), https://www.washingtonpost.com/technology/2019/03/07/when-tax-prep-is-free-you-may-be-paying-with-your-privacy/.

[56] *United States of America v. Intuit, Inc. and Credit Karma, Inc.*, No. 1:20-cv-03441, Complaint, ¶ 3 (D.D.C. Nov. 25, 2020), (available at https://www.justice.gov/opa/press-release/file/1339846/download).

Tax Return Information by disclosing such data without authorization and without providing proper consideration for Plaintiffs' and Class Members' property.

141.    Because Plaintiffs' and Class Members' Confidential Tax Return Information has already been disclosed to major third-party Advertising Platforms, including at least Meta, Google, and Google Double Click, their information has lost value because it has already been disclosed, and therefore Defendant's actions have impaired Plaintiffs' and Class Members' ability to participate in that market. This is compounded by the fact that these entities also often engage in a practice called "Cookie syncing," which "allows trackers to link their identifying cookies to other companies' cookies, giving a tracker's customers greater insights into a user's activity from more sources." In 2017, the Princeton Web Transparency report found that "85 of the top 100 most common third parties sync their cookies with at least one other party."[57]

## V.    TOLLING OF THE STATUTE OF LIMITATIONS, CONCEALMENT, AND ESTOPPEL

142.    Each unauthorized transmission of Plaintiffs' and Class Members' Confidential Tax Return Information by Defendant is a separate unlawful act that triggers anew the relevant statute of limitations.

143.    Additionally, any applicable statutes of limitation have been tolled by: (1) the fraudulent concealment doctrine based on Defendant's knowing and active concealment and denial of the facts alleged herein including but not limited to its incorporation of the tracking pixels and devices; and (2) the delayed discovery doctrine, as Plaintiffs and Class Members did not and could not reasonably have discovered Defendant's conduct alleged herein until shortly before the filing of this Complaint. Plaintiffs and Class Members did not discover and could not reasonably have discovered that Defendant was intercepting, collecting, saving, and using their Confidential Tax Return Information in the ways set forth in this Complaint until shortly before the lawsuit was filed in consultation with counsel.

---

[57] Arvind Narayanan and Dillon Reisman, The Princeton Web Transparency and Accountability Project, Spring 2017,

https://www.cs.princeton.edu/~arvindn/publications/webtap-chapter.pdf (last visited June 14, 2023).

144.    The Meta Pixel, Google and Google Double Click tracking pixels, and other tracking tools on TaxAct's website were and are entirely invisible to a website visitor.

145.    Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

146.    Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

147.    Defendant had exclusive knowledge that TaxAct's website incorporated the Meta Pixel, Google and Google Double Click tracking pixels, and other tracking tools and yet Defendant failed to disclose to website visitors, including Plaintiffs and Class Members, that by interacting with TaxAct's website their Confidential Tax Return Information would be disclosed to, released to, or intercepted by Meta, Google, or Google Double Click.

148.    Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of visitor's and customer's Confidential Tax Return Information. In fact, to the present Defendant has not conceded, acknowledged, or otherwise indicated to TaxAct's customers and other website visitors that they have disclosed or released their Confidential Tax Return Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

149.    Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

150.    The earliest that Plaintiffs and Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been on November 22, 2022, following the publication of the article describing the Markup's investigation.

## VI.    NAMED PLAINTIFFS' ALLEGATIONS

### A.    Plaintiff Smith-Washington

151.    Between approximately 2005 and 2022, Plaintiff Smith-Washington repeatedly visited TaxAct's website while in California in order to prepare and file his federal and state of California taxes.

1    152.    From approximately August 15, 2017, onwards, Plaintiff Smith-Washington has been

2    resident in California. During that time, Plaintiff accessed TaxAct's website, while in California, in

3    order to file his federal and state tax returns for the tax years 2017, 2018, 2019, 2020, and 2021.

4    153.    Plaintiff Smith-Washington initially set up his account with TaxAct in 2005 on the

5    www.taxact.com website and continued to log into the TaxAct website in each of the subsequent

6    years when he filed his taxes with TaxAct. Throughout the time period, he sometimes filed his taxes

7    jointly and sometimes filed them as a single filer.

8    154.    At the time Plaintiff Smith-Washington set up his account in 2005, TaxAct's terms of

9    service on its website contained no agreement to arbitrate.  Plaintiff, therefore, could not have been

10   subject to an arbitration agreement when he signed up with TaxAct in 2005 because no such

11   agreement was part of TaxAct's terms or conditions.

12   155.    Plaintiff Smith-Washington has had a Facebook account throughout the relevant

13   period.

14   **B.    Plaintiffs Mahoney and Ames**

15   156.    Plaintiff Mahoney initially set up an account with TaxAct in 2005 and continued to log

16   into the TaxAct website, www.taxact.com, from California in the subsequent years when she filed her

17   taxes with TaxAct.

18   157.    Plaintiff Ames initially set up an account with TaxAct in 2005 and continued to log

19   into the TaxAct website, www.taxact.com, from California in each of the subsequent years when he

20   filed his taxes with TaxAct.

21   158.    Plaintiffs Mahoney and Ames repeatedly visited TaxAct's website in order to prepare

22   and file their respective federal and state of California taxes starting in 2005. They both filed their

23   taxes for at least tax years 2005 through 2020 using the www.taxact.com website.  Plaintiffs Ames

24   and Mahoney also visited TaxAct's website to prepare their respective taxes for the tax years 2021

25   and 2022. They printed out and filed their return for tax year 2021. They plan to print out and file

26   their return for tax year 2022 in the near future.

27   159.    Plaintiffs Mahoney and Ames have lived in California during the entire time they

28   accessed Defendant's website, www.taxact.com, and each one of them filed each of their respective

1    tax returns on TaxAct's website for the tax years of 2005-2020 while in California. They also each
2    prepared their 2021 and 2022 taxes using TaxAct's website.

3         160.    At the time Plaintiffs Ames and Mahoney set up their respective accounts in 2005,
4    TaxAct's terms of service on its website contained no agreement to arbitrate.  Plaintiffs Ames and
5    Mahoney, therefore, could not have been subject to an arbitration agreement when they each signed
6    up with their own TaxAct accounts in 2005 because no such agreement was part of TaxAct's terms or
7    conditions.

8         161.    Plaintiffs Mahoney and Ames both have had Facebook accounts for 15 years or more.
9    Plaintiff Mahoney also has an Instagram account.

10        162.    Plaintiffs Mahoney and Ames both have received targeted ads following their use of
11   the TaxAct website. These ads have included ads for TaxAct itself, as well as other tax preparation
12   companies, like TurboTax and H&R Block.

13   **C.    Plaintiff Matthew Hartz**

14        163.    Plaintiff Hartz initially set up an account with TaxAct in 2010 to file his taxes for tax
15   year 2009, and he continued to log into TaxAct's website, www.taxact.com, from Illinois in each of
16   the subsequent years when he filed his taxes with TaxAct.

17        164.    Plaintiff Hartz repeatedly visited TaxAct's website in order to prepare and file his
18   federal and state taxes starting in 2010 for tax year 2009. He filed his taxes for at least tax years 2009
19   through 2021 using TaxAct's website. Plaintiff Hartz last used TaxAct's website to prepare and file
20   his federal and state taxes in 2022 for tax year 2021.

21        165.    Plaintiff Hartz has lived in Illinois during the entire time he accessed TaxAct's
22   website, and he filed his federal and state tax returns on TaxAct's website for tax years 2009 through
23   2021 while in Illinois.

24        166.    At the time Plaintiff Hartz set up his account with TaxAct in 2010, TaxAct's terms of
25   service on its website contained no agreement to arbitrate. Plaintiff Hartz, therefore, could not have
26   been subject to an arbitration agreement when he signed up for his account with TaxAct in 2010
27   because no such agreement was part of TaxAct's terms.

28

167.    Plaintiff Hartz has had a Facebook account for 15 years or more. Plaintiff Hartz has also had an Instagram account for 5 years or more.

168.    Plaintiff Hartz has received tarted ads following his use of TaxAct's website. These ads have included ads for TaxAct itself, as well as other tax preparation companies, like TurboTax and H&R Block.

**D.    Plaintiffs Smith-Washington, Mahoney, Ames, and Hartz**

169.    In the years following Plaintiffs Smith-Washington, Mahoney, and Ames setting up their accounts in 2005, and Plaintiff Hartz setting up his account in 2010, TaxAct did not specifically advise them that it had materially modified its terms and conditions to include a forced arbitration agreement. TaxAct also did not clearly advise Plaintiffs that it had an arbitration provision that would require them to pay the substantial costs of arbitration, that they would only be entitled to collect $100 if they had a dispute, that the maximum amount they could collect if they prevailed ($100) was less than the amount they would be required to pay for arbitration, that the arbitration would be conducted with arbitrators in Texas, that it potentially could require them to pay legal fees as part of that arbitration, and that they would be giving up substantial rights to a substantial amount of money in redress that they would otherwise have under the new terms and conditions that were later created.

170.    On information and belief, Plaintiffs' Confidential Tax Return Information, including their names, phone numbers, adjusted gross income, filing status, the type of tax forms they filed, number of dependents, names of dependents, and the amount of any refunds they received, was disclosed to Meta, Google and Google Double Click.  On information and belief, in addition to sharing Plaintiffs' Confidential Tax Return Information with Meta, Defendant also shared their personal identifiers, including their IP addresses and Facebook cookies.  On information and belief, in addition to sharing Plaintiffs' Confidential Tax Return Information, when users were signed onto their Gmail accounts, the information collected could be associated with those accounts.

171.    Plaintiffs would not have used TaxAct's website had they known that their Confidential Tax Return Information would be disclosed to unauthorized third parties.

172.    Plaintiffs believed that because they were on the website of a tax preparer and provider of tax filing services, their personal and financial data would be protected and kept confidential.

173. Plaintiffs did not see anything on TaxAct's website that suggested to them that their Confidential Tax Return Information would be disclosed or released to an unauthorized third party.

174. Plaintiffs did not authorize, consent to, or otherwise encourage or permit the release of their Confidential Tax Return Information to Meta, Google, Google Double Click, or any other third party.

**E.     Plaintiff Jenny Lewis**

175. Plaintiff Jenny Lewis' husband set up his own account with TaxAct in or about 2015, if not earlier, to file joint federal and state of California tax returns for himself and Ms. Lewis for the tax year 2014. Plaintiff Lewis' husband continued to file joint federal and state taxes on behalf of himself and Plaintiff Lewis for each subsequent year up to and including filing taxes for the tax year 2022.

176. On information and belief, when Mr. Lewis filed a joint tax return for himself and Plaintiff Lewis, Plaintiff Lewis' Confidential Tax Return Information, including her adjusted gross income, filing status, the type of tax forms filed on her behalf, number of dependents, names of dependents, and the amount of any refunds she received, was disclosed to Meta, Google and Google Double Click.

177. Plaintiff did not access TaxAct's website and did not see anything on that website or receive any other notice or warning that suggested to her that her Confidential Tax Return Information inputted by her husband into TaxAct's website would be disclosed or released to an unauthorized third party.

178. Plaintiff did not access TaxAct's website, did not have any understanding of the terms or conditions on TaxAct's website, did not see, understand or agree to any arbitration agreement, and did not agree to any of the terms or conditions on TaxAct's website.

179. Plaintiff would have told her husband not to use TaxAct's website to file their joint tax returns had she known that their Confidential Tax Return Information would be disclosed to unauthorized third parties.

180.    Plaintiff did not authorize, consent to, or otherwise encourage or permit the release of her Confidential Tax Return Information to Meta, Google, Google Double Click, or any other third party.

181.    Plaintiff has lived in California during the entire time her husband has accessed TaxAct's website, www.taxact.com, to file their joint tax returns.

182.    Plaintiff had a Facebook Account during the entire time period in which her husband used TaxAct's website to file their taxes. Plaintiff has had an Instagram account for several months.

## VII.    CLASS ACTION ALLEGATIONS

183.    Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action pursuant to Federal Rules of Civil Procedure, Rule 23 ("Rule 23").

184.    Pursuant to Rule 23, Plaintiffs seek to represent two Classes composed of and defined as:

**The Nationwide Class:** All natural persons residing in the United States who used Defendant's website's tax preparation services to prepare a tax return (hereinafter, "Nationwide Class Members") on or prior to December 31, 2022 (the "Class Period").

**The California Subclass:** All natural persons residing in California who used Defendant's website's tax preparation services to prepare a tax return (hereinafter, "California Subclass Members") during the Class Period.

**The Nationwide Married Filing Jointly Class:** All natural persons residing in the United States when their spouse used Defendant's website's tax preparation services to prepare a joint tax return with them (hereinafter, "Nationwide Married Filing Jointly Class Members") during the Class Period.

**The California Married Filing Jointly Subclass:** All natural persons residing in California when their spouse used Defendant's website's tax preparation services to prepare a joint tax return with them (hereinafter, "California Married Filing Jointly Subclass") during the Class Period.

185.    Excluded from both Classes are Defendant and its officers, directors, management, employees, subsidiaries, and affiliates. Also excluded from the Classes are any district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members,

judicial officers and their personnel, and all governmental entities. Further excluded from the Classes are all individuals who seek to arbitrate their claims against Defendant, notify Defendant of their intention to do so prior to the date on which the Court certifies the Classes in this action, and do not withdraw that notice prior to that same date.

186.    Plaintiffs reserve the right to revise or amend the above Class definitions and to add additional Subclasses based on the discovery of new information.

187.    This action has been brought and may be properly maintained as a class action under Federal Rule 23 because there is a well-defined community of interest in the litigation, the proposed Classes are easily ascertainable, and Plaintiffs are proper representatives of the Classes:

188.    **Numerosity (Rule 23(a)(1)):** The potential members of the proposed Nationwide Class and California Subclass, as defined and identified herein, are more than two hundred thousand, and so numerous that joinder of all members of the Class and Subclass is impracticable. The potential members of the Nationwide Married Filing Jointly Class and California Married Filing Jointly Subclass, as defined and identified herein, are more than twenty thousand, and so numerous that joinder of all members of the Class and Subclass is impracticable.

189.    **Typicality (Rule 23(a)(3)):** Plaintiffs Smith-Washington, Mahoney, and Ames' claims are typical of the claims of the Nationwide Class and California Subclass. Plaintiff Hartz's claims are typical of the claims of the Nationwide Class. These Plaintiffs are each a customer of Defendant who used Defendant's website's tax preparation services to prepare a tax return prior to December 31, 2022, and, on information and belief, whose Confidential Tax Return Information was, as a result, disclosed to an unauthorized third party or unauthorized third parties. Plaintiff Lewis' claims are typical of the claims of the Nationwide Married Filing Jointly Class and the California Married Filing Jointly Subclass. Plaintiff Lewis' spouse used Defendant TaxAct's website's tax preparation services to prepare a joint tax return with her prior to December 31, 2022, and, on information and belief, Plaintiff Lewis' Confidential Tax Return Information was, as a result, disclosed to an unauthorized third party or unauthorized third parties.

190.    **Commonality: (Rule 23(a)(2)):** Common questions of fact and law exist as to all members of the Nationwide Class and California Subclass Members and predominate over the

questions affecting only individual members of the Class and Subclass members of the Class. These common questions include but are not limited to:

a.    Whether Defendant's acts and practices violated Plaintiffs' and Class Members' privacy rights;

b.    Whether Defendant's acts and practices violated California's Constitution, Art. 1, § 1;

c.    Whether Plaintiffs and Class Members had a reasonable expectation that their Confidential Tax Return Information would not be disclosed to third parties without authorization;

d.    Whether TaxAct's acts and practices violated the Tax Preparation Act, Cal. Bus. & Prof. Code §§ 22250 *et seq.*;

e.    Whether the Confidential Tax Return Information disclosed by Defendant constitutes "confidential information" within the meaning of Cal. Bus. & Prof. Code § 22252.1;

f.    Whether Defendant obtained written consent to or permission for its conduct;

g.    Whether Defendant's acts and practices violated the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 630 *et seq.*;

h.    Whether Defendant obtained express consent to or authorization for its conduct;

i.    Whether the Confidential Tax Return Information disclosed by Defendant constitutes "information obtained in the business of preparing federal or state income tax returns or assisting taxpayers in preparing those returns" within the meaning of Cal. Bus. & Prof. Code § 17530.5;

j.    Whether Defendant's act and practices constituted larceny in violation of Cal. Penal Code §§ 486 and 496;

k.    Whether Defendant breached its contract with Meta, which covered Defendant's use of the Meta Pixel on TaxAct's website;

l.      Whether Plaintiffs' and Class Members' are third-party beneficiaries of the contract between Defendant and Meta, which covered Defendant's use of the Meta Pixel on TaxAct's website;

m.      Whether Defendant's acts and practices violated Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

n.      Whether Defendant's acts and practices harmed Plaintiffs and Class Members;

o.      Whether Plaintiffs and the Class Members are entitled to an injunction and equitable relief, including but not limited to, restitution and disgorgement;

p.      Whether Plaintiffs and the Class Members are entitled to damages and other monetary relief, and if so, what is the appropriate amount of damages or other monetary relief; and

q.      Whether Plaintiffs and Class Members are entitled to reasonable attorneys' fees and costs.

191.    Common questions of fact and law also exist as to all members of the Nationwide Married Filing Jointly Class and the California Married Filing Jointly Subclass and predominate over the questions affecting only individual members of the Class and Subclass. These common questions include but are not limited to:

a.      Whether Defendant's acts and practices violated Plaintiff Lewis' and Class Members' privacy rights;

b.      Whether Defendant's acts and practices violated California's Constitution, Art. 1, § 1;

c.      Whether Plaintiff Lewis and Class Members had a reasonable expectation that their Confidential Tax Return Information would not be disclosed to third parties without authorization;

d.      Whether TaxAct's acts and practices violated the TPA, Cal. Bus. & Prof. Code §§ 22250 *et seq.*;

e.      Whether the Confidential Tax Return Information disclosed by Defendant constitutes "confidential information" within the meaning of Cal. Bus. & Prof. Code § 22252.1;

f.      Whether Defendant obtained written consent to or permission for their conduct;

g.      Whether Defendant's acts and practices violated CIPA, Cal. Penal Code §§ 630 *et seq.*;

h.      Whether Defendant obtained express consent to or authorization for their conduct;

i.      Whether the Confidential Tax Return Information disclosed by Defendant constitutes "information obtained in the business of preparing federal or state income tax returns or assisting taxpayers in preparing those returns" within the meaning of Cal. Bus. & Prof. Code § 17530.5;

j.      Whether Defendant's act and practices violated the California Comprehensive Computer Data Access and Fraud Act ("CCDAFA"), Cal. Penal Code § 502;

k.      Whether Defendant breached its contract with Meta, which covered Defendant's use of the Meta Pixel on TaxAct's website;

l.      Whether Plaintiffs and Class Members are third-party beneficiaries of the contract between Defendant and Meta, which covered Defendant's use of the Meta Pixel on TaxAct's website;

m.      Whether Defendant's acts and practices violated Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

n.      Whether Defendant's acts and practices harmed Plaintiff Lewis and Class Members;

o.      Whether Plaintiff Lewis and the Class Members are entitled to an injunction and equitable relief, including but not limited to, restitution and disgorgement;

p.      Whether Plaintiff Lewis and the Class Members are entitled to damages and other monetary relief, and if so, what is the appropriate amount of damages or other monetary relief; and

q.      Whether Plaintiff Lewis and Class Members are entitled to reasonable attorneys' fees and costs.

192.    **Adequacy of Representation (Rule 23(a)(4))**: Plaintiffs will fairly and adequately protect the interests of the Classes and Subclasses. Plaintiffs' interests do not conflict with those of Class Members, they have no conflict of interest with other Class Members, are not subject to any unique defenses, and have retained competent and experienced counsel that has experience in complex consumer protection class action and cases, as well as sufficient financial and legal resources to prosecute this case on behalf of the class. Plaintiffs and their counsel have no interest that is in conflict with or otherwise antagonistic to the interests of other class members. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes and Subclasses. Plaintiffs and counsel anticipate no difficulty in managing the litigation of this as a class action.

193.    **Predominance and Superiority (Rule 23(b)(3))**: In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual members of the Classes and Subclasses, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. Here, common issues predominate because liability can be determined on a class-wide basis, for both classes, even if some individualized damages determination may be required. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by complex legal and factual issues of the case to all parties and the court system. Furthermore, the expense and burden of individual litigation make it impossible for Class and Subclass members to individually redress the wrongs done to them and individual Class Members do not have a significant interest in controlling the prosecution of separate actions. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court. If this action is not certified as a class action, it will be impossible as a practical matter for many or most Class Members to bring individual actions to recover money from Defendant, due to the relatively small amounts of

1   such individual recoveries relative to the costs and burdens of litigation. Plaintiffs anticipate no
2   difficulty in the management of this action which would preclude its maintenance as a class action.

3   194.   Plaintiffs reserve the right to add representatives for the Classes and Subclasses,
4   provided Defendant is afforded an opportunity to conduct discovery as to those representatives.

5   **FIRST CAUSE OF ACTION**

6   **Common Law Invasion of Privacy – Intrusion into Private Matters**

7   **[On Behalf of all Plaintiffs, the Nationwide Class, and the Nationwide Married Filing Jointly**
8   **Class]**

9   195.   Plaintiffs, individually, and on behalf of the Nationwide Class, and the Nationwide
10  Married Filing Jointly Class, incorporate the foregoing allegations as if fully set forth herein.

11  196.   Defendant's secret disclosure of Plaintiffs' and Class Members' Confidential Tax
12  Return Information, such as each respective user's adjusted gross income, filing status, number of
13  dependents, and refund amounts – constitutes an intentional intrusion upon Plaintiffs' and Class
14  Members' private matters that were intended to stay private from third parties.

15  197.   Plaintiffs, Nationwide Class Members, and Nationwide Married Filing Jointly Class
16  Members had a reasonable expectation of privacy in their Confidential Tax Return Information.
17  Plaintiffs, Nationwide Class Members, and the Nationwide Married Filing Jointly Class Members did
18  not consent to, authorize, or have any reason to know about TaxAct's intrusion into their privacy at
19  the time it occurred.

20  198.   Defendant's intrusion into Plaintiffs', Nationwide Class Members', and Nationwide
21  Married Filing Jointly Class Members' private affairs, seclusion, and solitude, would be highly
22  offensive to a reasonable person.

23  199.   Plaintiffs, Nationwide Class Members, and Nationwide Married Filing Jointly Class
24  Members  expected that the Confidential Tax Return Information they shared with a tax preparer,
25  either directly or through their spouse, would not be disclosed to an unauthorized third party. Social
26  norms and industry standards inform the understanding that private personal and financial
27  information, and tax return information in particular, is highly protected and that disclosure of that

28

information to third parties requires consent and authorization. The secret disclosure of Confidential Tax Return Information would be highly offensive to a reasonable person.

200.    Plaintiffs, Nationwide Class Members, and Nationwide Married Filing Jointly Class Members have been harmed as a result of Defendant's actions, including by, but not limited to, an invasion of their privacy rights.

201.    Plaintiffs, Nationwide Class Members, and Nationwide Married Filing Jointly Class Members seek appropriate relief for their injuries, including, but not limited to, monetary damages to compensate for the harm to their privacy interests and disgorgement of profits made by TaxAct as a result of its intrusions into Plaintiffs' and Class Members' private matters.

202.    Plaintiffs, Nationwide Class Members, and Nationwide Married Filing Jointly Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions which were directed at invading Plaintiffs' and Class Members' privacy rights in conscious disregard of those rights. Such damages are necessary to deter TaxAct from engaging in such conduct in the future.

203.    This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on a large class of persons and/or the general public. Private enforcement is necessary and places a disproportionate financial burden on Plaintiffs in relation to Plaintiffs' stake in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiffs also seek the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Cal. Civ. Proc. Code § 1021.5, and other applicable federal and state laws.

204.    Plaintiffs, on behalf of themselves, the Nationwide Class, and the Nationwide Married Filing Jointly Class request relief as further described below.

## SECOND CAUSE OF ACTION

### Invasion of Privacy and Violation of California Constitution art. 1, § 1

### [On Behalf of California Plaintiffs, the California Subclass, and the California Married Filing Jointly Subclass]

205.    California Plaintiffs, individually, and on behalf of the California Subclass and the California Married Filing Jointly Subclass, incorporate the foregoing allegations as if fully set forth herein.

206.    The right to privacy is enshrined in the California Constitution Article 1, Section 1, provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

207.    California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members did not consent to or authorize TaxAct or Blucora to disclose their Confidential Tax Return Information to unauthorized third parties. Indeed, California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members had no knowledge that such information was being so disclosed and, consequently, had no opportunity to deny consent or authorization.

208.    California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members had a reasonable expectation of privacy in their personal information, identities, and financial information pursuant to Article 1, Section 1, of the California Constitution, social norms, and the expectations of privacy that attach to relationships and communications with tax preparers.

209.    Defendant's disclosure of Plaintiffs' and Class Members' Confidential Tax Return Information constitutes an intentional invasion of private communications, information, and matters, and an egregious breach of social norms.

210.    Defendant's conduct would be highly offensive to a reasonable person because the data disclosed was highly sensitive and personal, as protected by the California Constitution, and TaxAct lacked consent or authorization to disclose such information.

211.    Defendant's violation of the privacy rights of thousands of California Subclass Members and California Married Filing Jointly Subclass Members, including California Plaintiffs, without authorization or consent, constitutes an egregious breach of social norms.

212.    California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members have sustained damages and will continue to suffer damages as a result of Defendant's invasion of their privacy.

213.    California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members seek appropriate relief for their injuries, including, but not limited to, monetary damages to compensate for the harm to their privacy interests and disgorgement of profits made by TaxAct as a result of its intrusions into Plaintiffs' and Class Members' private matters.

214.    California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions which were directed at invading Plaintiffs' and Class Members' privacy rights in conscious disregard of those rights. Such damages are necessary to deter TaxAct from engaging in such conduct in the future.

215.    This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on a large class of persons and/or the general public. Private enforcement is necessary and places a disproportionate financial burden on California Plaintiffs in relation to California Plaintiffs' stake in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, California Plaintiffs also seek the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Cal. Civ. Proc. Code § 1021.5, and other applicable law.

216.    California Plaintiffs, on behalf of themselves and the California Subclass, and the California Married Filing Jointly Subclass seek relief as further described below.

**THIRD CAUSE OF ACTION**

**Violation of Cal. Bus. & Prof. Code §§ 17530.5 *et seq*.**

**[On Behalf of California Plaintiffs, the California Subclass, and the California Married Filing**

**Jointly Subclass]**

217.     California Plaintiffs, individually, and on behalf of the California Subclass and the California Married Filing Jointly Subclass, re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

218.     Cal. Bus. & Prof. Code § 17530.5(a) provides:

> It is a misdemeanor for any person, including an individual, firm, corporation, association, partnership, or joint venture, or any employee or agent thereof, to disclose any information obtained in the business of preparing federal or state income tax returns or assisting taxpayers in preparing those returns, including any instance in which this information is obtained through an electronic medium, unless the disclosure is within any of the following:
>
> (1) Consented to in writing by the taxpayer in a separate document that states to whom the disclosure will be made and how the information will be used. If the taxpayer agrees, this separate consent document may be in the form of an electronic record, executed by an electronic signature as provided by Title 2.5 (commencing with Section 1633.1) of Part 2 of Division 3 of the Civil Code.
>
> (2) Expressly authorized by state or federal law.
>
> (3) Necessary to the preparation of the return.
>
> (4) Pursuant to court order.

219.     Section 17530.5(b) further provides:

> For the purposes of this section, a person is engaged in the business of preparing federal or state income tax returns or assisting taxpayers in preparing those returns if the person does any of the following:
>
> (1) Advertises or gives publicity to the effect that the person prepares or assists others in the preparation of state or federal income tax returns.
>
> (2) Prepares or assists others in the preparation of state or federal income tax returns for compensation.
>
> (3) Files a state or federal income tax return by electronic transmittal of return data directly to the Franchise Tax Board or to the Internal Revenue Service.

220.    TaxAct is, and at all relevant times has been, a "person . . . engaged in the business of preparing federal or state income tax returns or assisting taxpayers in preparing those returns" within the meaning of § 17530.5(b).

221.    TaxAct has, as alleged above, routinely disclosed information obtained in the business of preparing federal or state income tax returns or assisting taxpayers in preparing those returns to Meta, Google and Google Double Click without written consent to that disclosure from its customers, without that disclosure being expressly authorized by state or federal law, without that disclosure being necessary to the preparation of any tax return, and without that disclosure being made pursuant to court order. As a result, Defendant has violated a provision of Cal. Bus. & Prof. Code ch.1, pt. 3, div. 7.

222.    As a result of Defendant's unlawful conduct alleged herein, California Plaintiffs suffered injury in fact and have lost money and/or property. Had California Plaintiffs known of Defendant's unlawful conduct they would not have paid money to Defendant and used its website to prepare their tax returns or agreed that their spouse could use Defendant's website to prepare their joint tax returns.

223.    As a direct and proximate result of Defendant's conduct, Defendant has received and continue to hold unlawfully obtained property and money, and have profited from their unlawful acts as alleged herein.

224.    Pursuant to Cal. Bus. & Prof. Code § 17535, California Plaintiffs, on behalf of themselves, the California Subclass, and the California Married Filing Jointly Subclass, seek restitution and disgorgement of all earnings, profits, compensation, and benefit obtained by Defendant as a result of the unlawful practices described herein in violation of Cal. Bus. & Prof. Code § 17530.5.

225.    California Plaintiffs have assumed the responsibility of enforcing the laws and public policies specified herein by suing on their own behalf and on behalf of other similarly-situated class members. California Plaintiffs' action will enforce important rights affecting the public interest, including the Legislature's express intent in enacting Cal. Bus. & Prof. Code §§ 17530.5 and 17535. California Plaintiffs will incur a financial burden in pursuing this action in furtherance of the public

1  interest. Thus, an award of attorneys' fees to California Plaintiffs is appropriate pursuant to Cal. Civ.
2  Proc. Code § 1021.5.

3  226. California Plaintiffs, on behalf of themselves, the California Subclass, and the
4  California California Married Filing Jointly Subclass seek relief as further described below.

5  **FOURTH CAUSE OF ACTION**

6  **Violation of Tax Preparation Act, Cal. Bus. & Prof. Code §§ 22250 *et seq.***

7  **[On Behalf of California Plaintiffs, the California Subclass, and the California Married Filing**
8  **Jointly Subclass]**

9  227. California Plaintiffs, individually, and on behalf of the California Subclass and the
10  California Married Joint Filers Subclass, incorporate the foregoing allegations as if fully set forth
11  herein.

12  228. Cal. Bus. & Prof. Code § 22252.1(a) provides, in pertinent part: "No confidential
13  information obtained by a tax preparer, in his or her professional capacity, concerning a client or a
14  prospective client shall be disclosed by the tax preparer without the written permission of the client or
15  prospective client. . ."

16  229. Defendant is a "tax preparer" within the meaning of Cal. Bus. & Prof. Code
17  § 22251(a)(1).

18  230. Despite not having written permission from California Plaintiffs, California Subclass
19  Members, and California Married Filing Jointly Subclass Members, Defendant disclosed California
20  Plaintiffs', California Subclass Members', and California Married Filing Jointly Subclass Members'
21  Confidential Tax Return Information – including, on information and belief, each respective user's
22  adjusted gross income, filing status, number of dependents, and refund amounts – to Meta, Google
23  and Double Click, in violation of Cal. Bus. & Prof. Code § 22252.1.

24  231. Cal. Bus & Prof. Code § 22253(a) provides, in pertinent part: "It is a violation of this
25  chapter for a tax preparer to do or commit . . . any of the following: . . . (2) Make, or authorize the
26  making of, any statement or representation, oral or written or recorded by any means, which is
27  intended to induce persons to use the tax preparation service of the tax preparer, which statement or
28  representation is fraudulent, untrue, or misleading."

232. As alleged above, throughout the Class Period, Defendant's Privacy Policy, as supplemented by its Privacy Notice for California Residents, assured California Plaintiffs, California Subclass Members, and other users and prospective users of Defendant's tax preparation software and other Services that the "use and disclosure" of their Confidential Tax Return Information would be "governed by Section 301-7216 of the Internal Revenue Code and many state codes and regulations." And, that: "We use your Tax Return Information only in accordance with applicable laws, such as to prepare, assist in preparing, or obtain or provide services in connection with preparing your tax return; to provide you with the products and services you specifically request or consent to and other uses or disclosures as you expressly consent to from time to time; to allow tax professionals to assist you with questions or tax preparation; or as required by law."

233. As alleged above, consumers consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares that individual's data.

234. Defendant's statements and representations regarding restrictions on its use and disclosure of its customers' Confidential Tax Return Information were clearly intended to assure potential customers that their Confidential Tax Return Information would be protected and that their express consent would be required for any other use or disclosure of their information, and, thus, to induce them to use Defendant's tax preparation service.

235. Defendant's statements and representations were, however, fraudulent, untrue, and/or misleading. As detailed above, Defendant did not use Plaintiffs' and Class Members' Confidential Tax Return Information "in accordance with applicable laws." Rather, its use of Plaintiffs' and Class Members' Confidential Tax Return Information violated, *inter alia*, as described above, the California Constitution, Cal. Bus. & Prof. Code §§ 17530.5 *et seq*, Cal. Bus. & Prof. Code § 22252.1, and, as described below, Cal. Bus & Prof. Code § 22253(a)(7) & (8), and 26 U.S.C. § 7216.

236. Moreover, rather than limiting its uses and disclosures of Plaintiffs' and Class Members' Confidential Tax Return Information to those set out in the statements and representations in its Privacy Policy, Defendant disclosed Plaintiffs' and Class Members' Confidential Tax Return Information to Meta, Google and Google Double Click for TaxAct's own purposes. Defendant

represented in its Privacy Policy that this "other use[] or disclosure[]" of Plaintiffs' and Class Members' Confidential Tax Return Information required "express[] consent." But Defendant disclosed the information without seeking or receiving any express consent from Plaintiffs or Class Members.

237.     Accordingly, Defendant violated Cal. Bus. & Prof. Code § 22253(a).

238.     Cal. Bus & Prof. Code § 22253(a) also provides, in pertinent part: "It is a violation of this chapter for a tax preparer to do or commit . . . any of the following: . . . (7) Violate Section 17530.5."

239.     Thus, each time Defendant violated Cal. Bus. & Prof. Code § 17530.5, as alleged above, it also violated § 22253(a).

240.     Cal. Bus & Prof. Code § 22253(a) further provides, in pertinent part: "It is a violation of this chapter for a tax preparer to . . . (8) Violate Section 7216 of Title 26 of the United States Code." That section of the United States Code is titled "Disclosure or use of information by preparers of returns" and provides, in pertinent part:

> (a) General rule. Any person who is engaged in the business of preparing, or providing services in connection with the preparation of, [income tax returns], or any person who for compensation prepares any such return for any other person, and who knowingly or recklessly—
>
> (1) discloses any information furnished to him for, or in connection with, the preparation of any such return, or
>
> (2) uses any such information for any purpose other than to prepare, or assist in preparing, any such return, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined not more than $1,000 ($100,000 in the case of a disclosure or use to which section 6713(b) [26 USCS § 6713(b)] applies), or imprisoned not more than 1 year, or both together with the costs of prosecution.
>
> (b) Exceptions.
>
> (1) Disclosure. Subsection (a) shall not apply to a disclosure of information if such disclosure is made –
>
> (A) pursuant to any other provision of this title, or
>
> (B) pursuant to an order of a court.
>
> (2) Use. Subsection (a) shall not apply to the use of information in the preparation of, or in connection with the preparation of, State and local

tax returns and declarations of estimated tax of the person to whom the information relates.

241.    Defendant is a person engaged in the business of preparing, or providing services in connection with the preparation of, income tax returns, within the meaning of 26 U.S.C. § 7216.

242.    Defendant violated 27 U.S.C. § 7216, because, as alleged above, it disclosed information furnished to it in connection with the preparation of tax returns and because it used such information for purposes other than the preparation of, or to assist in the preparation of, an income tax return.

243.    Each time Defendant disclosed Confidential Tax Return Information to Meta, Google and/or Google Double Click or it used Confidential Tax Return Information for a purpose other than to prepare or assist in preparing a tax return it violated 27 U.S.C. § 7216. And, each time Defendant violated 27 U.S.C. § 7216, it also violated Cal. Bus & Prof. Code § 22253.

244.    Pursuant to Cal. Bus. & Prof. Code § 22257, California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members seek civil penalties of $1,000 for each violation of § 22252.1 or § 22253, injunctive relief, and attorneys' fees and costs.

245.    California Plaintiffs, on behalf of themselves, the California Subclass, and the California Married Filing Jointly Subclass seek relief as further described below.

## FIFTH CAUSE OF ACTION

### Violation of Cal. Civ. Code §§ 1799.1a *et seq.*

**[On Behalf of California Plaintiffs, the California Subclass, and the California Married Filing Jointly Subclass]**

246.    California Plaintiffs, individually, and on behalf of the California Subclass and the California Married Filing Jointly Subclass, incorporate the foregoing allegations as if fully set forth herein.

247.    Cal. Civ. Code § 1799.1a(f) provides that: "The treatment of tax returns by tax preparers, as defined in Section 22251 of the Business and Professions Code, shall be governed by Section 17530.5 of the Business and Professions Code." Accordingly, because Defendant is a tax

preparer within the meaning of Cal. Bus. & Prof. Code § 22251, Cal. Civ. Code § 1799.1a is inapplicable.

248. Should this Court find that Defendant is not a tax preparer within the meaning of Cal. Bus. & Prof. Code § 22251, Cal. Civ. Code § 1799.1a would apply and, as described below, Defendant's disclosure of Plaintiffs' and Class Members' Confidential Tax Return Information constitutes a violation of that section.

249. Section 1799.1a provides, in pertinent part:

> (a) No person, including an individual, firm, corporation, association, partnership, or joint venture, or any employee or agent thereof, shall disclose information obtained from a federal or state income tax return or any information obtained from a tax schedule submitted with the return by a consumer in connection with a financial or other business-related transaction unless the disclosure is within any of the following:

> (1) Consented to in writing by the consumer in a separate document that states to whom the disclosure will be made and how the information will be used. If the consumer agrees, this separate consent document may be in the form of an electronic record, executed by an electronic signature as provided by Title 2.5 (commencing with Section 1633.1) of Part 2 of Division 3 of the Civil Code.

> (2) Authorized or required by state or federal law.

> (3) Necessary to complete or service the financial or business-related transaction or to effect, administer, or enforce a financial or business-related transaction requested by the consumer.

> (4) Pursuant to court order.

> (5) Required to complete any of the transactions described in subparagraphs (A) to (D), inclusive, by a person, including an individual, firm, corporation, association, partnership or joint venture, if the disclosure is made solely for that purpose. The provisions of this section apply to any person, including an individual, firm, corporation, association, partnership, or joint venture, and any employee or agent thereof, receiving information as a result of a disclosure authorized by this paragraph.

> (A) A proposed or actual sale, merger, transfer, or exchange of all or a portion of a business or operating unit.

> (B) A proposed or actual securitization or secondary market sale, including the sale of servicing rights.

> (C) To provide information to insurance rate advisory organizations, guaranty funds or agencies, rating agencies, and other persons assessing compliance with industry standards.

1

2

> (D) To protect against or to prevent actual or potential fraud and unauthorized transactions and claims and for institutional risk control activities.

3

4

5

6

7

> (b) No unrelated use shall be made of a federal or state tax return or any information obtained therefrom or any information submitted with the return by a consumer in connection with a financial or other business-related transaction. "Unrelated use" means any use that is not necessary to effect, administer, or enforce the financial or other business-related transaction with the consumer or that is beyond the scope of the stated purpose to which the consumer consented for the use of the return or any other information he or she submitted."

8    250.    Section 1799.1a(c)(1)(B) defines "Consumer" as "an individual who requests or

9    obtains financial or other business-related services."

10    251.    California Plaintiffs and California Subclass Members are consumers, within the

11    meaning of § 1799.1a(c)(1)(B) because they requested and obtained financial and business-related

12    services from Defendant when they provided information and/or paid money to Defendant so that

13    Defendant could use its tax preparation software to prepare their respective tax returns.

14    252.    California Plaintiffs and California Subclass Members entered into a "financial or

15    other business-related transaction" with Defendant when they used Defendant's tax preparation

16    software, entered their personal and financial information on Defendant's website, and/or paid money

17    for Defendant's tax preparation services.

18    253.    As alleged above, some of the Confidential Tax Return Information that Defendant

19    disclosed to Meta, Google and Google Double Click and, on information and belief, used for its own

20    purposes to improve its marketing and advertising, was obtained from California Plaintiffs' and

21    California Subclass Members' tax returns after those tax returns had been prepared by Defendant's

22    tax preparation software.

23    254.    When Defendant disclosed this Confidential Tax Return Information, obtained from

24    Plaintiffs' and Class Members' prepared tax returns, to Meta, Google and Google Double Click,

25    without written consent, it violated § 1799.1a(a) because that disclosure did not fall within the

26    specific exceptions set out in § 1799.1a(a)(1)-(5).

27    255.    When Defendant used this Confidential Tax Return Information, obtained from

28    Plaintiffs' and Class Members' prepared tax returns, for its own purposes to improve its marketing

1    and advertising, it violated § 1799.1a(b) because that use of information obtained from Plaintiffs' and

2    Class Members' tax returns was an "unrelated use" within the meaning of § 1799.1a(b).

3    256.    Pursuant to Cal. Civ. Code § 1799.2, California Plaintiffs, California Subclass

4    Members, and California Married Filing Jointly Subclass Members seek an amount equal to actual

5    damages sustained as a result of Defendant's violations of § 1799.1, but in no case less than $500 per

6    violation, and attorneys' fees and costs.

7    257.    Plaintiffs, on behalf of themselves, the Nationwide Class, and the Nationwide Married

8    Filing Jointly Class seek relief as further described below.

9                              **SIXTH CAUSE OF ACTION**

10    **Violation of the Electronic Communications Privacy Act , 18 U.S.C. §§ 2510 *et seq*.**

11    **[On Behalf of all Plaintiffs, the Nationwide Class, and the Nationwide Married Filing Jointly**

12                                       **Class]**

13    258.    Plaintiffs, individually, and on behalf of the Nationwide Class, and the Nationwide

14    Married Filing Jointly Class, incorporate the foregoing allegations as if fully set forth herein.

15    259.    The ECPA, 18 U.S.C. §§ 2510 *et seq*., makes it unlawful for a "person" to

16    "intentionally intercept[], endeavor[] to intercept, or procure[] any other person to intercept or

17    endeavor to intercept, any wire, oral, or electronic communications." 18 U.S.C. § 2511(1).

18    260.    "Intercept" is defined as "the aural or other acquisition of the contents of any wire,

19    electronic, or oral communication through the use of any electronic, mechanical, or other device." 18

20    U.S.C. § 2510(4).

21    261.    "Contents" is defined as "includ[ing] any information concerning the substance,

22    purport, or meaning of that communication." 18 U.S.C. § 2510(8).

23    262.    "Person" is defined as "any employee, or agent of the United States or any State or

24    political subdivision thereof, and any individual, partnership, association, joint stock company, trust,

25    or corporation." 18 U.S.C. § 2510(6).

26    263.    "Electronic communication" is defined as "any transfer of signs, signals, writing,

27    images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio,

28

1   electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce . .

2   . .” 18 U.S.C. § 2510(12).

3       264.    Plaintiffs', Nationwide Class Members', and Nationwide Married Filing Jointly Class

4   Members' electronic communications with TaxAct through TaxAct's website during which Plaintiffs,

5   Nationwide Class Members, and Nationwide Married Filing Jointly Class Members used Defendant's

6   tax preparation services to prepare a tax return and through which they communicated confidential

7   personal and financial information with TaxAct were electronic communications within the meaning

8   of the ECPA.

9       265.    Meta, Google, Google Double Click, and TaxAct are persons within the meaning of

10   the ECPA as they are corporations.

11       266.    The Meta Pixel tracker is a "device or apparatus" that is "used to intercept a wire, oral,

12   or electronic communication." 18 U.S.C. 2510(4).

13       267.    Google and Google Double Click's tracking pixels are each a "device or apparatus"

14   that is "used to intercept a wire, oral, or electronic communication." 18 U.S.C. 2510(4).

15       268.    By incorporating the Meta Pixel and Google and Google Double Click's tracking

16   pixels into TaxAct's website and permitting Meta, Google, Google Double Click, and other

17   unauthorized third parties to intercept Plaintiffs', Nationwide Class Members', and Nationwide

18   Married Filing Jointly Class Members' confidential personal and financial information, TaxAct

19   intercepted or endeavored to intercept Plaintiffs', Nationwide Class Members', and Nationwide

20   Married Filing Jointly Class Members' electronic communications and/or procured Meta, Google,

21   Google Double Click, and other unauthorized third parties to intercept or endeavor to intercept

22   Plaintiffs', Nationwide Class Members', and Nationwide Married Filing Jointly Class Members'

23   electronic communications, in violation of the ECPA.

24       269.    18 U.S.C. § 2511(2)(d) provides an exception to 18 U.S.C. § 2511(1), under which: "It

25   shall not be unlawful under this chapter [18 USCS §§ 2510 *et seq.*] for a person not acting under

26   color of law to intercept a wire, oral, or electronic communication where such person is a party to the

27   communication or where one of the parties to the communication has given prior consent to such

28   interception *<u>unless such communication is intercepted for the purpose of committing any criminal or</u>*

*tortious act in violation of the Constitution or laws of the United States or of any State*." (emphasis added).

270.    Neither Plaintiffs, Nationwide Class Members, or Nationwide Married Filing Jointly Class Members consented to TaxAct's interception of, or to TaxAct procuring Meta, Google, Google Double Click, and other unauthorized third parties to intercept, their electronic communications with Defendant through Defendant's website.

271.    TaxAct does not meet the requirements of the "party exception" to the ECPA because the electronic communications intercepted by TaxAct, or which TaxAct procured Meta, Google, Google Double Click, and other unauthorized third parties to intercept, were intercepted as part of TaxAct's practice of divulging confidential personal and financial information to unauthorized third parties in violation of numerous federal and state laws.

272.    As detailed above, TaxAct violated Cal. Bus. & Prof. Code §§ 17530.5 *et seq.*, the Tax Preparation Act, the California Constitution, and committed a tortious invasion of privacy, when it disclosed Plaintiffs', Nationwide Class Members', and Nationwide Married Filing Jointly Class Members' confidential personal and financial information to Meta through the Meta Pixel. As detailed below, by those same acts, Defendant violated the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*

273.    Moreover, as described below, TaxAct violated the Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502. TaxAct's violations of this Act constitute crimes punishable by fines and/or imprisonment. Cal. Penal Code § 502(d)(3), (4). Additionally, as described below, TaxAct committed larceny in violation of Cal. Penal Code §§ 484, 496.

274.    On information and belief, TaxAct violated numerous other federal and state statutes when it intercepted or endeavored to intercept Plaintiffs', Nationwide Class Members', and Nationwide Married Filing Jointly Class Members' electronic communications and/or procured Meta, Google, Google Double Click, and other unauthorized third parties to intercept or endeavor to intercept Plaintiffs', Nationwide Class Members', and Nationwide Married Filing Jointly Class Members' electronic communications.

275.    Accordingly, TaxAct violated the ECPA each time the Meta Pixel or Google and Google Double Click's tracking pixels incorporated into its website intercepted Plaintiffs', Nationwide Class Members', and Nationwide Married Filing Jointly Class Members' electronic communications.

276.    Pursuant to 18 U.S.C. § 2520, Plaintiffs, Nationwide Class Members, and Nationwide Married Filing Jointly Class Members have been damaged by the interception and disclosure of their electronic communications in violation of the ECPA and are entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Nationwide Class and any profits made by TaxAct as a result of its violations, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

277.    Plaintiffs, on behalf of themselves, the Nationwide Class, and the Nationwide Married Filing Jointly Class seek relief as further described below.

## SEVENTH CAUSE OF ACTION

### Violation of the California Invasion of Privacy Act,

### Cal. Penal Code §§ 630 *et seq.*

### [On Behalf of California Plaintiffs, the California Subclass, and the California Married Filing Jointly Subclass]

278.    California Plaintiffs, individually, and on behalf of the California Subclass and the California Married Filing Jointly Subclass, incorporate the foregoing allegations as if fully set forth herein.

279.    The California Invasion of Privacy Act begins with its statement of purpose: "The legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free

1  and civilized society. The Legislature by this chapter intends to protect the right of privacy of the
2  people of this state." Cal. Penal Code § 630.

3      280.    Cal. Penal Code § 631(a) provides, in pertinent part: "Any person who, by means of
4  any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any
5  unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise,
6  with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or
7  instrument of any internal telephonic communication system, or who willfully and without the
8  consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to
9  read, or to learn the contents or meaning of any message, report, or communication while the same is
10 in transit or passing over any wire, line, or cable, or is being sent from, or received at any place
11 within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to
12 communicate in any way, any information so obtained, or who aids, agrees with, employs, or
13 conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts
14 or things mentioned above in this section, is punishable by a fine not exceeding two thousand five
15 hundred dollars ($2,500) . . ."

16     281.    Defendant TaxAct is a "person" within the meaning of Cal. Penal Code § 631.

17     282.    California Plaintiffs' and California Subclass Members' communications of
18 Confidential Tax Return Information with TaxAct on and through TaxAct's website were intended to
19 be confined to the parties. California Plaintiffs and California Subclass Members were using what
20 they understood to be Defendant's secure website and no indication was given that their identities and
21 Confidential Tax Return Information would be shared with or viewed by any unauthorized third
22 party. The circumstances reasonably indicate that California Plaintiffs and California Subclass
23 Members desired their communications with Defendant to be confined to the parties thereto.

24     283.    Despite not having any authorization from California Plaintiffs, California Subclass
25 Members, or California Married Filing Jointly Subclass Members, Defendant aided, agreed with, or
26 conspired with Meta, Google, and Double Click, to permit them to intercept these communications
27 and to learn the content of those communications while in transit or in the process of being sent or
28 received.

284.    Defendant's conduct, as described above, violated Cal. Penal Code § 631. Under Cal. Penal Code § 637.2, California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members are entitled to recover the greater of: (1) five thousand dollars ($5,000) per violation; or (2) three times the amount of actual damages according to proof at trial.

285.    California Plaintiffs, on behalf of themselves, the California Subclass, and the California Married Filing Jointly Subclass seek relief as further described below.

### EIGHTH CAUSE OF ACTION

**Violation of the California Comprehensive Computer Data Access and Fraud Act,**

**Cal. Penal Code § 502**

**[On Behalf of California Plaintiffs, the California Subclass, and the California Married Filing Jointly Subclass]**

286.    California Plaintiffs, individually, and on behalf of the California Subclass and the California Married Filing Jointly Subclass, incorporate the foregoing allegations as if fully set forth herein.

287.    The California Legislature enacted the CCDAFA, Cal. Penal Code § 502 to "expand the degree of protection afforded to individuals . . . from tampering, interference, damage, and unauthorized access to . . . computer data and computer systems." The Legislature found and declared "that the proliferation of computer technology has resulted in a concomitant proliferation of computer crime and other forms of unauthorized access to computers, computer systems, and computer data," further finding and declaring that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals." Cal. Penal Code § 502(a).

288.    Cal. Penal Code § 502(c)(6) makes it an offense when a person: "Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section." Defendant violated § 502(c)(6) when it: (i) assisted Meta and other third parties in accessing, without permission, California Plaintiffs' and other California Subclass Members' computers, mobile phones, tablets, or other devices in order to wrongfully obtain and use their personal data, including their Confidential Tax Return Information, in

1  violation of California Plaintiffs' and other California Subclass Members' reasonable expectations of
2  privacy in their devices and data, in violation of § 502(c)(1)(B); and (ii) assisted Meta and other third
3  parties in accessing, taking, copying, and using California Plaintiffs' and other California Subclass
4  Members' personally identifiable information, including their Confidential Tax Return Information,
5  in violation of § 502(c)(2).

6       289.   Cal. Penal Code § 502(c)(7) makes it an offense when a person: "Knowingly and
7  without permission accesses or causes to be accessed any computer, computer system, or computer
8  network." Defendant violated this section when it incorporated the Meta Pixel and other tracking
9  devices into its website and when it configured the Meta Pixel and other third-party trackers to
10 disclose California Plaintiffs', California Subclass Members', and California Married Filing Jointly
11 Subclass Members' Confidential Tax Return Information and other personal information to Meta and
12 other third parties, as described above, thereby causing Meta and other third parties to access
13 California Plaintiffs', other California Subclass Members', and California Married Filing Jointly
14 Subclass Members' computers and other devices without permission.

15      290.   Cal. Penal Code § 502(c)(13) makes it an offense when a person: "Knowingly and
16 without permission provides or assists in providing a means of accessing a computer, computer
17 system, or public safety infrastructure computer system computer, computer system, or computer
18 network in violation of this section." Defendant violated this section when it incorporated the Meta
19 Pixel and other third-party trackers into its website and when it configured the Meta Pixel and other
20 third-party trackers to disclose California Plaintiffs' and other California Subclass Members' and
21 California Married Filing Jointly Subclass Members' Confidential Tax Return Information and other
22 personal information to Meta and other third parties, as described above, thereby providing or
23 assisting in providing a means for Meta and other third parties to access California Plaintiffs' and
24 other California Subclass Members' computers and other devices without permission.

25      291.   Under § 502(b)(12) of the CCDAFA a "Computer contaminant" is defined as "any set
26 of computer instructions that are designed to . . . record, or transmit information within a computer,
27 computer system, or computer network without the intent or permission of the owner of the
28 information." Section 502(c)(8) makes it an offense when a person: "Knowingly introduces any

computer contaminant into any computer, computer system, or computer network." Defendant violated § 502(c)(8) by knowingly introducing a computer contaminant into California Plaintiffs' and other California Subclass Members' devices when it incorporated the Meta Pixel and other trackers into its website, which intercepted, transmitted, and disclosed California Plaintiffs' and other Class Members' Confidential Tax Return Information without permission.

292.   California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members suffered damage and loss as a result of Defendant's conduct.  Defendant's practices have deprived California Plaintiffs and California Subclass Members and California Married Filing Jointly Subclass Members of control over their valuable property (namely, their Confidential Tax Return Information), the ability to receive compensation for that data, and the ability to withhold their data for sale.

293.   California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members seek compensatory damages in accordance with Cal. Penal Code § 502(e)(1), in an amount to be proven at trial, and injunctive or other equitable relief.

294.   California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members have also suffered irreparable and incalculable harm and injuries from Defendant's violations.  The harm will continue unless Defendant is enjoined from further violations of this section.  California Plaintiffs and Class members have no adequate remedy at law.

295.   California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members are entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Defendant's violations were willful and, upon information and belief, Defendant is guilty of oppression, fraud, or malice as defined in Cal. Civ. Code § 3294. California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members are also entitled to recover their reasonable attorneys' fees under § 502(e)(2).

296.   California Plaintiffs, on behalf of themselves, the California Subclass, and the California Married Filing Jointly Subclass request further relief as described below.

## NINTH CAUSE OF ACTION

**Violation of California Penal Code §§ 484 and 496 (Statutory Larceny)**

**[On Behalf of California Plaintiffs, the California Subclass, and the California Married Joint Filers Subclass]**

297.    California Plaintiffs, individually, and on behalf of the California Subclass and the California Married Filing Jointly Subclass, incorporate the foregoing allegations as if fully set forth herein.

298.    Cal. Penal Code § 496 imposes liability upon:

> [e]very person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained[.]

299.    Cal. Penal Code § 484, which defines "theft", states in pertinent part:

> Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft.

300.    Under California law, California Plaintiffs', California Subclass Members', and California Married Filing Jointly Subclass Members' private data constitutes property that can be the subject of theft.

301.    Defendant acted in a manner constituting theft by surreptitiously taking California Plaintiffs', California Subclass Members', and California Married Filing Jointly Subclass Members' Confidential Tax Return Information through Advertising Platform pixels and trackers on TaxAct's website, with the specific intent to deprive California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members of their property.

302.    California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members did not consent to any of Defendant's actions in taking California

Plaintiffs', California Subclass Members', and California Married Filing Jointly Subclass Members' private data.

303.     Pursuant to Cal. Penal Code § 496(c), California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members are entitled to treble damages, as well as attorneys' fees and costs, for injuries sustained as a result of Defendant's violations of Cal. Penal Code § 496(a).

304.     Plaintiffs, on behalf of themselves, the California Subclass, and the California Married Filing Jointly Subclass, request further relief as described below.

## TENTH CAUSE OF ACTION

### Breach of Contract

**[On Behalf of all Plaintiffs, the Nationwide Class, and the Nationwide Married Filing Jointly Class]**

305.     Plaintiffs, individually, and on behalf of the Nationwide Class, and the Nationwide Married Filing Jointly Class, incorporate the foregoing allegations as if fully set forth herein.

306.     TaxAct entered into a contract with Meta – Meta's Business Tools Terms – when it installed the Meta Pixel on its website and/or used the Meta Pixel.

307.     On information and belief, Meta performed in accordance with the terms of the Business Tools Terms.

308.     Pursuant to the Business Tools Terms, Defendant agreed and/or represented, *inter alia*: (i) that it had "the necessary rights and permissions and a lawful basis (in compliance with all applicable laws, regulations and industry guidelines) for the disclosure of" Plaintiffs', Nationwide Class Members', and Nationwide Married Filing Jointly Class Members' Confidential Tax Return Information; (ii) not to share information with Meta that Defendant knew or reasonably should have known was from or about children under the age of 13 or that included health, financial information or other categories of sensitive information (including any information defined as sensitive under applicable laws, regulations, and applicable industry guidelines); and, (iii) that Defendant provided robust and sufficient notice to users regarding data collection, sharing and usage, including, on TaxAct's website, "a clear and prominent notice on each web page where our pixels are used that

links to a clear explanation (a) that third parties, including Facebook, may use cookies, web beacons, and other storage technologies to collect or receive information from your websites and elsewhere on the Internet and use that information to provide measurement services and target ads, (b) how users can opt-out of the collection and use of information for ad targeting, and (c) where a user can access a mechanism for exercising such choice (e.g., providing links to: http://www.aboutads.info/choices and http://www.youronlinechoices.eu/)."

309.    As detailed above, Defendant did not perform in accordance with these essential terms of the Business Tools Terms. It did not have the right, permission, or a lawful basis for disclosing Plaintiffs', Nationwide Class Members', and Nationwide Married Filing Jointly Class Members' Confidential Tax Return Information; it knew or reasonably should have known that the Confidential Tax Return Information it shared with Meta included sensitive and financial information; and, it failed to provide the required notice to users regarding data collection, sharing, and usage.

310.    Accordingly, Defendant breached its contract with Meta.

311.    On information and belief, Meta intended to benefit consumers, including Plaintiffs and Class Members, by protecting their privacy rights, when it created the Business Tools Terms.

312.    On information and belief, Meta and Defendant intended to benefit consumers, including Plaintiffs and Class Members, by protecting their privacy rights, when they entered into a contract - Meta's Business Tools Terms.

313.    Because the contract between Meta and Defendant was made expressly for the benefit of consumers, Plaintiffs, Nationwide Class Members, and Nationwide Married Filing Jointly Class Members were third-party beneficiaries of the contract and entitled to enforce it under applicable state law, including Cal. Civ. Code § 1559.

314.    As a direct and proximate result of Defendant's breach of its contract with Meta, Plaintiffs, Nationwide Class Members, and Nationwide Married Filing Jointly Class Members have sustained damages as alleged herein, including the loss of control of their private information and the diminution in value of their private information.

315.    Defendant's breach of its contract with Meta was a substantial factor in causing Plaintiffs', Nationwide Class Members', and Nationwide Married Filing Jointly Class Members' harm.

316.    Plaintiffs, Nationwide Class Members, and Nationwide Married Filing Jointly Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of contract.

317.    Plaintiffs, on behalf of themselves, the Nationwide Class, and the Nationwide Married Filing Jointly Class, request further relief as described below.

## ELEVENTH CAUSE OF ACTION

**Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq*.**

**California Married Filing Jointly Subclass [On Behalf of California Plaintiffs, the California Subclass and the California Married Joint Filers Subclass]**

318.    California Plaintiffs, individually, and on behalf of the California Subclass and the California Married Filing Jointly Subclass, incorporate the foregoing allegations as if fully set forth herein.

319.    The UCL prohibits unfair competition in the form of any unlawful, unfair, or fraudulent business act or practice. Cal. Bus. & Prof. Code § 17204 allows "any person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Such a person may bring such an action on behalf of himself and others similarly situated, who are affected by the unlawful, unfair, or fraudulent business practice or practices.

320.    Defendant's acts, omissions, practices, and non-disclosures as alleged herein constituted unlawful, unfair, and fraudulent business acts and practices within the meaning of Cal. Bus. & Prof. Code §§ 17200 *et seq.*

321.    Defendant engaged in "unlawful" business acts and practices, as set forth above in paragraphs 195 through 317: including violations of the common law; violations of the California Constitution; violations of California statutes, including the TPA; Cal. Bus. & Prof. Code §§ 22250 *et seq.*, or Cal. Civ. Code §§ 1799 *et seq.* (in the alternative), and violations of CIPA, Cal. Penal Code §§ 630 *et seq.*, violations of Cal. Bus. & Prof. Code § 17530.5, violations of the CCDAFA, Cal. Penal

1   Code §§ 502 *et seq*., and violations of Cal. Penal Code §§ 484, 496; and violations of federal statutes,

2   including the ECPA, 18 U.S.C. §§ 2510 et seq., and 26 U.S.C. § 7216.

3       322.    California Plaintiffs reserve the right to allege other violations of law committed by

4   Defendant that constitute unlawful business acts or practices within the meaning of the UCL.

5       323.    Defendant has also engaged in "unfair" business acts and practices. California has a

6   strong public policy of protecting consumers' privacy interests, including consumers' personal data.

7   Defendant violated this strong public policy by, among other things, surreptitiously disclosing,

8   releasing, and otherwise misusing Plaintiffs' and Class Members' Confidential Tax Return

9   Information without Plaintiffs' and Class Members' consent. TaxAct's acts and practices violate the

10  policies underlying the statutes and the article of the California Constitution referenced herein.

11      324.    Defendant's acts and practices are also "unfair" in that they are immoral, unethical,

12  oppressive, unscrupulous, and/or substantially injurious to consumers. Defendant secretly disclosed,

13  released, and otherwise misused their Confidential Tax Return Information, with no corresponding

14  benefit to its customers and other website visitors. And, because consumers were unaware of

15  Defendant's incorporation of tracking tools into its website and that Defendant would disclose and

16  release their Confidential Tax Return Information to unauthorized third parties, they could not have

17  avoided the harm.

18      325.    Had California Plaintiffs and California Subclass Members known that their

19  Confidential Tax Return Information would be disclosed or released by Defendant to unauthorized

20  third parties, they would not have shared personal and financial information with Defendant's website

21  or would not have used Defendant's website. Had Plaintiff Lewis and California Married Filing

22  Jointly Subclass Members known that their Confidential Tax Return Information would be disclosed

23  or released by Defendant to unauthorized third parties, they would not have permitted their spouses to

24  share their personal and financial information with Defendant's website or would not have permitted

25  their spouses to use Defendant's website to complete jointly-filed tax returns.

26      326.    The UCL also prohibits any "fraudulent business act or practice." Defendant's above-

27  described nondisclosures and misleading statements were false, misleading, and likely to deceive the

28  consuming public in violation of the UCL.

327.    California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members suffered injury in fact and lost money or property as a result of Defendant's acts and practices in that a portion of any money California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members paid for Defendant's services went to fulfill Defendant's obligations with respect to the confidentiality and security of California Plaintiffs', California Subclass Members', and California Married Filing Jointly Subclass Members' Confidential Tax Return Information, and Defendant failed to fulfill those obligations. The loss of money and/or property includes the unauthorized collection of California Plaintiffs', California Subclass Members', and California Married Filing Jointly Subclass Members' private data, which has value in an amount to be proven at trial. Moreover, California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members have suffered harm in the form of diminution of the value of their Confidential Tax Return Information and other private data.

328.    Defendant's actions caused damage to and loss of California Plaintiffs', California Subclass Members', and California Married Filing Jointly Subclass Members' property right to control the dissemination and use of their Private Data.

329.    Defendant has taken property from California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members without providing just, or any, compensation.

330.    Defendant should be required to cease its unfair and/or illegal collection of user data and to retrieve and delete all unfairly and/or illegally obtained user data. Defendant reaped unjust profits and revenues in violation of the UCL.

331.    California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members also suffered injury in fact as a result of Defendant's acts and practices because they paid more for Defendant's services than they otherwise would have had they known Defendant was disclosing their Confidential Tax Return Information to unauthorized third parties in violation of its legal obligations, social norms, and reasonable consumer expectations.

332.    California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members have also suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) invasion of privacy; (ii) breach of the confidentiality of their Confidential Tax Return Information; and/or (iii) deprivation of the value of their Confidential Tax Return Information for which there is a well-established national and international market.

333.    California Plaintiffs also seek restitution on behalf of themselves, the California Subclass, and the California Married Filing Jointly Subclass.

334.    California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members lack an adequate remedy at law because the ongoing harms from Defendant's interception, collection, taking, possession, and use of Confidential Tax Return Information must be addressed by injunctive relief and, due to the ongoing and nature of the harm, the harm cannot be adequately addressed by monetary damages alone.

335.    This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on a large class of persons and/or the general public. Private enforcement is necessary and places a disproportionate financial burden on California Plaintiffs in relation to California Plaintiffs' stake in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, California Plaintiffs also seek the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Cal. Civ. Proc. Code § 1021.5 and other applicable law.

336.    California Plaintiffs, on behalf of themselves, the California Subclass, and the California Married Filing Jointly Subclass seek relief as further described below.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Classes and Subclasses pray for judgment against Defendant as follows:

337.    Certifying the proposed Classes and Subclasses as requested herein pursuant to Federal Rule of Civil Procedure 23;

338.    Entering an order appointing Plaintiffs Smith-Washington, Mahoney, and Ames as representatives of the Nationwide Class and California Subclass;

339.    Entering an order appointing Plaintiff Matthew Hartz as a representative of the Nationwide Class;

340.    Entering an order appointing Plaintiff Lewis as representative of the Nationwide Married Filing Jointly Class and the California Married Filing Jointly Subclass;

341.    Entering an order appointing undersigned counsel to represent the Classes and Subclasses;

342.    Awarding Plaintiffs, Nationwide Class Members, and Nationwide Married Filing Jointly Class Members compensatory damages, disgorgement of profits, and punitive damages for Defendant's intrusion into private matters;

343.    Awarding California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members compensatory damages, disgorgement of profits, and punitive damages for Defendant's invasion of privacy and violation of Article 1, Section 1 of the California Constitution;

344.    Awarding California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members restitution and disgorgement of profits, pursuant to Cal. Bus. & Prof. Code § 17535, for Defendant's violations of Cal. Bus. & Prof. Code § 17530.5;

345.    Awarding California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members statutory civil penalties of $1,000 per violation and attorneys' fees and costs, pursuant to Cal. Bus. & Prof. Code § 22257, for Defendant's violations of the TPA, Cal. Bus. & Prof. Code §§ 22250 *et seq*.;

346.    Awarding California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members actual damages, in no case less than $500 per violation, and attorneys' fees and costs, pursuant to Cal. Civ. Code § 1799.2, for Defendant's violations of Cal. Civ. Code § 1799.1a;

347.    Awarding Plaintiffs, Nationwide Class Members, and Nationwide Married Filing Jointly Class Members appropriate equitable or declaratory relief, the greater of the sum of the actual

damages suffered and any profits made by TaxAct as a result of its violations, or statutory damages of whichever is the greater of $100 per day per violation or $10,000, and reasonable attorneys' fees and other litigation costs reasonably incurred, for Defendant's violations of the ECPA, 18 U.S.C. §§ 2510 *et seq*.;

348.    Awarding California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members statutory damages of $5,000 per violation, or three times the amount of actual damages, for Defendant's violations of CIPA, Cal. Penal Code §§ 630 *et seq*.;

349.    Awarding California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members compensatory damages, injunctive relief, punitive or exemplary damages, and attorneys' fees for Defendant's violations of the CCDAFA, Cal. Penal Code §§ 502 *et seq.*;

350.    Awarding California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members treble damages pursuant to Cal. Penal Code § 496;

351.    Awarding California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members compensatory damages for Defendant's breach of its contract with Meta;

352.    Declaring that Defendant's conduct alleged herein constitutes a violation of the UCL, Bus. & Prof. Code §§ 17200 *et seq*., under the unlawful, unfair, and fraudulent prongs of the UCL;

353.    Awarding California Plaintiffs, California Subclass Members, and California Married Filing Jointly Subclass Members restitution for Defendant's violations of the UCL, Cal. Bus. & Prof. Code §§ 17200 *et seq*.;

354.    Awarding attorneys' fees and costs as authorized by statute and governing law, including Cal. Civ. Proc. Code § 1021.5;

355.    Ordering that Defendant demand that all third parties with whom Plaintiffs' and Class and Subclass Members' Confidential Tax Return Information was shared delete the information that they intercepted and collected from Plaintiffs, Class Members, and Subclass Members;

356.    Entering an order granting injunctive relief as permitted by law or equity, including enjoining Defendant from continuing any unlawful practices as set forth herein, and directing

Defendant to identify, with Court supervision, victims of its conduct and pay them all the money they are required to pay; and

357.    Awarding such other and further relief, at law and in equity, as the nature of this case may require or as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

358.    Plaintiffs, on behalf of themselves and members of the Classes and Subclasses, hereby demand a jury trial on all issues so triable.

Respectfully submitted,

**HAMMONDLAW, P.C.**

Dated:  February 20, 2024           By:     *s/ Julian Hammond*
                                                          Julian Hammond
                                                          Christina Tusan
                                                          Adrian Barnes
                                                          Ari Cherniak
                                                          Polina Brandler

**KELLER POSTMAN LLC**
Warren D. Postman
Ethan H. Ames

*Attorneys for Plaintiffs and the Putative Classes*