1  JULIAN HAMMOND (SBN 268489)
   jhammond@hammondlawpc.com
2  CHRISTINA TUSAN (SBN 192203)
   ctusan@hammondlawpc.com
3  ADRIAN BARNES (SBN 253131)
   abarnes@hammondlawpc.com
4  ARI CHERNIAK (SBN 290071)
   acherniak@hammondlawpc.com
5  POLINA BRANDLER (SBN 269086)
   pbrandler@hammondlawpc.com
6  HAMMONDLAW, P.C.
   1201 Pacific Ave, 6th Floor
7  Tacoma, WA 98402
   (310) 601-6766 (Office)
8  (310) 295-2385 (Fax)

9  *Attorneys for Plaintiffs and the Putative Classes*

10 *Additional Counsel listed on the next page*

11              **UNITED STATES DISTRICT COURT**

12           **NORTHERN DISTRICT OF CALIFORNIA**

13 **NICHOLAS C. SMITH-WASHINGTON,** ) Case No. 3:23-CV-830-VC
   **JOYCE MAHONEY, JONATHAN AMES,** )
14 **MATTHEW HARTZ, and JENNY LEWIS** ) Assigned for all purposes to Hon. Vince
   on behalf of themselves and all others similarly ) Chhabria
15 situated,                          )
                                      )
16        Plaintiffs,                 ) **PLAINTIFFS' NOTICE OF MOTION**
                                      ) **AND MOTION FOR PRELIMINARY**
17     vs.                            ) **APPROVAL OF CLASS ACTION**
                                      ) **SETTLEMENT**
18 **TAXACT, INC.**, an Iowa corporation, )
                                      ) Courtroom: 4, 17th Floor
19        Defendant.                  ) Hearing Date: April 4, 2024
                                      ) Hearing Time: 2:00 p.m.
20                                    )
                                      )
21 _____ )

22

23

24

25

26

27

28

WARREN D. POSTMAN (SBN 330869)
wdp@kellerpostman.com
KELLER POSTMAN LLC
1101 Connecticut Avenue, N.W., Suite 1100
Washington, DC 20036
(312) 741-5220 (Office)
(312) 971-3502 (Fax)

ETHAN H. AMES (SBN 339027)
ethan.ames@kellerpostman.com
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
(312) 741-5220 (Office)
(312) 971-3502 (Fax)

## TABLE OF CONTENTS

NORTHERN DISTRICT OF CALIFORNIA PROCEDURAL GUIDANCE FOR CLASS ACTION SETTLEMENTS: REFERENCE TABLE .................................................................................i

NOTICE OF MOTION ............................................................................................................i

STATEMENT OF THE ISSUES TO BE DECIDED ........................................................iii

MEMORANDUM OF POINTS AND AUTHORITIES .................................................. 1

I.    INTRODUCTION ......................................................................................................... 1

II.   RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ............................ 2

    A.    BRIEF SUMMARY OF THE LITIGATION ................................................................ 2

    B.    SUMMARY OF THE MEDIATION EFFORTS AND AGREEMENT TO SETTLE ................. 5

    C.    SUMMARY OF CHANGED PRACTICES ................................................................... 6

III.  SUMMARY OF THE PROPOSED SETTLEMENT ................................................... 6

    A.    THE SETTLEMENT PROVIDES SUBSTANTIAL RELIEF TO THE CLASS MEMBERS ....... 6

    B.    THE ALLOCATION OF RELIEF AMONG SETTLEMENT CLASS MEMBERS ................... 8

    C.    THE SETTLEMENT CLASS DEFINITIONS DIFFER ONLY SLIGHTLY FROM THE CLASSES DEFINED IN THE OPERATIVE COMPLAINT ............................................. 9

    D.    THE SETTLEMENT'S RELEASE IS COEXTENSIVE WITH THE NINTH CIRCUIT'S "IDENTICAL FACTUAL PREDICATE" REQUIREMENT ........................................... 10

    E.    THE SETTLEMENT AGREEMENT ALLOWS COUNSEL TO SEEK FEES AND COSTS AND THE SETTLEMENT CLASS REPRESENTATIVES TO SEEK SERVICE AWARDS ................... 11

IV.   THE COURT SHOULD CERTIFY THE SETTLEMENT CLASSES......................... 12

    A.    THE SETTLEMENT CLASSES SATISFY THE RULE 23(A) PREREQUISITES.................. 12

        1.    Numerosity.............................................................................................. 13

        2.    Commonality............................................................................................ 13

        3.    Typicality................................................................................................. 13

        4.    Adequacy ................................................................................................. 14

    B.    THE REQUIREMENTS OF RULE 23(B)(3) ARE SATISFIED ..................................... 16

        1.    Common issues of law and fact predominate ......................................... 16

2. Class treatment of Plaintiffs' claims is superior .......................................... 16

V. SETTLEMENT APPROVAL IS WARRANTED .................................................. 18

    A. THE STRENGTHS AND RISKS OF PLAINTIFFS' CASE ............................................... 18

    B. FURTHER LITIGATION WOULD BE RISKY, EXPENSIVE, COMPLEX, AND LENGTHY ............... 33

    C. THE RISKS ASSOCIATED WITH CERTIFYING THE CLASSES AND MAINTAINING THE CASE AS A CLASS ACTION THROUGH TRIAL ................................................................................ 34

    D. THE RELIEF OFFERED IN THE SETTLEMENT IS MORE THAN ADEQUATE ................................ 34

        1. The Relief is Fair, Adequate, and Reasonable ............................................ 34

        2. The Plan of Allocation is Reasonable .......................................................... 36

    E. THE SETTLEMENT IS INFORMED BY EXTENSIVE DISCOVERY .................................... 37

    F. COUNSEL BELIEVE THE SETTLEMENT IS AN OUTSTANDING RESULT ........................... 38

    G. GOVERNMENTAL PARTICIPATION IS NOT A FACTOR AT ISSUE HERE ......................... 39

    H. THE SETTLEMENT ALSO SATISFIES THE BLUETOOTH FACTORS ............................... 39

VI. THE PROPOSED NOTICE PROGRAM, SETTLEMENT ADMINISTRATOR, AND PROCESS FOR CLAIMS, OPT-OUTS, AND OBJECTIONS SHOULD BE APPROVED ................................ 40

    A. THE PROPOSED NOTICE PLAN .......................................................................... 40

        1. Class Notice .......................................................................................... 40

        2. CAFA Notice ....................................................................................... 41

    B. THE SETTLEMENT ADMINISTRATOR .................................................................. 41

    C. OPT-OUTS AND OBJECTIONS: TIMELINE, INSTRUCTIONS, AND FORMS ..................... 42

    D. THE CLAIMS PROCESS .................................................................................... 43

        1. The Claim Form .................................................................................... 43

        2. The Estimated Claim Rate ..................................................................... 44

VII. OTHER CASES AFFECTED ...................................................................... 45

VIII. THE PROPOSED FINAL APPROVAL HEARING SCHEDULE ............................... 46

IX. CONCLUSION ...................................................................................... 47

# TABLE OF AUTHORITIES

**Federal Cases**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) .................................................. 13, 16

*Betorina v. Randstad US, L.P.*, No. 15-cv-03646-EMC, 2017 WL 1278758 (N.D. Cal. Apr. 6, 2017) 39

*Briseno v. Henderson*, 998 F.3d 1014 (9th Cir. 2021) ........................................................ 40

*Campbell v. Facebook, Inc.*, No. 13-cv-05996-PJH, 2017 WL 3581179 (N.D. Cal. Aug. 18, 2017) .... 36

*Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) ......................................... 19

Class Pls. v. City of Seattle, 955 F.2d 1268 (9th Cir. 1992) ........................................... 8, 11

*Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1037 (N.D. Cal. 2016) ..................................... 2, 18

*Doe v. Meta Platforms, Inc.*, No. 22-CV-03580-WHO, 2023 WL 5837443 (N.D. Cal. Sept. 7, 2023) . 31

*Eddings v. D.S. Services of America, Inc.*, No. 15-cv-02576-VC, 2016 WL 3390477 (N.D. Cal. May 20, 2016) ........................................................................................................ 2

*Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15 (N.D. Cal. 1980), aff'd, 661 F.2d 939 (9th Cir. 1981) ........................................................................................................ 39

*Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939 (N.D. Cal. 2013), *aff'd sub nom. Fraley v. Batman*, 638 F. App'x 594 (9th Cir. 2016) ........................................................................ 27

*Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147 (1982) .................................................. 18

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ........................................ 14, 16, 17

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992) ............................................. 14

*Hesse v. Sprint Corp.*, 598 F.3d 581 (9th Cir. 2010) ....................................................... 11

*Hunt v. VEP Healthcare, Inc.*, No. 16-cv-04790-VC, 2017 WL 3608297 (N.D. Cal. Aug. 22, 2017) .... 2

*In re Bluetooth Headset Prod. Liab. Litig.*, 654 F. 3d 935 (9th Cir. 2011) ........................ 12, 39, 40

*In re Facebook Internet Tracking Litig.*, 263 F. Supp. 3d 836 (N.D. Cal. 2017) ...................... 22

*In re Facebook, Inc. Internet Tracking Litigation*, No. 22-16903, 2024 WL 700985 (9th Cir. Feb. 21, 2024) ......................................................................................................... 26

*In re Google LLC St. View Elec. Commc'ns Litig.*, No. 10-MD-02184-CRB, 2020 WL 1288377 (N.D. Cal. Mar. 18, 2020) ................................................................................ 36

*In re Google Plus Profile, Litig.*, No. 18-CV-06164-EJD-VKD, 2021 WL 242887 (N.D. Cal. Jan. 25, 2021) ......................................................................................................... 23

*In re HighTech Emp. Antitrust Litig.*, 985 F.Supp.2d 1167 (N.D. Cal. 2013) ........................ 18

*In re Hyundai & Kia Fuel Economy Litig.*, 926 F.3d 539 (9th Cir. 2019) (en banc) .................. 35

*In re Mercury Interactive Corp. Sec. Litig.*, 618 F. 3d 988 (9th Cir. 2010) ........................... 11

*In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112 (E.D. La. 2013) ..................... 19

*In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008) ............................ 8, 36

*In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934 (9th Cir. 2015) .............................. 19

*In re Oracle Sec. Litig.*, No. C-90-0931-VRW, 1994 WL 502054 (N.D. Cal. June 18, 1994) ......... 8, 37

*In re Portal Software Sec. Litig.*, No. C-03-5138-VRW, 2007 WL 4171201 (N.D. Cal. Nov. 26, 2007) ...................................................................................................................................... 38

*In re Vizio, Inc., Consumer Privacy Litig.,* 16-ml-02693-JLS-KES, 2019 WL 12966639 (C.D. Cal. July 31, 2019) ............................................................................................................................ 23

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, No. 15-md-02672-CRB, 2017 WL 2212783 (N.D. Cal. May 17, 2017) ............................................... 19, 38

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2020 WL 4212811 (N.D. Cal. July 22, 2020), *aff'd*, No. 20-16633, 2022 WL 2304236 (9th Cir. July 27, 2022)............ 15

*In re Zynga Priv. Litig.*, 750 F. 3d 1098 (9th Cir. 2014) ........................................................ 27

*Jabbari v. Farmer*, 965 F.3d 1001 (2020) .............................................................................. 35

*Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 WL 1744107 (9th Cir. May 31, 2022) .................. 28

*Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672 (N.D. Cal. 2021) ........................................................ 22

*Martin v. Sysco Corp.*, No. 16-cv-00990-DAD-SAB, 2019 WL 3253878 (E.D. Cal. July 19, 2019) ... 39

*McDonald, et al. v. Kiloo A/S, et al.,* No. 3:17-cv-04344-JD (N.D. Cal. Apr. 12, 2021), ECF No. 406 36

*McKenzie v. Fed. Exp. Corp.*, 275 F.R.D. 290 (C.D. Cal. 2011)................................................... 18

*Newton v. AM. Debt. Servs.,* 854 F. Supp. 2d 712 (N.D. Cal. 2012).............................................. 21

*Reade v. New York Times Co.*, No. 22-cv-00543-WBS-KJN, 2022 WL 2396083 (E.D. Cal. July 1, 2022) .......................................................................................................................... 22

*Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009) ..................................................... 19

*Slaven v. BP Am., Inc.*, 190 F.R.D. 649 (C.D. Cal. 2000) ......................................................... 13

*Smith v. Cardinal Logistics Mgmt. Corp.,* No. 07-cv-02104-SC, 2008 WL 4156364 (N.D. Cal. Sept. 5, 2008) .......................................................................................................................... 17

*St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63 (1919) ................................................... 26

*Staton v. Boeing Co.*, 327 F.3d 938 (2003)........................................................................... 14

*Valliere v. Tesoro Refin. & Mktg. Co. LLC*, No. 17-cv-00123-JST, 2020 WL 13505042 (N.D. Cal. June 26, 2020) ...................................................................................................................... 14

*Wakefield v. ViSalus, Inc.,* 51 F. 4th 1109 (9th Cir. 2022) ...................................................... 26

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .............................................................. 13

*Williams v. Boeing Co.*, 517 F.3d 1120 (9th Cir. 2008) ............................................................ 11

*Wolf v. Permanente Medical Group, Inc.*, No. 17-cv-05345-VC, 2018 WL 5619801 (N.D. Cal. Sept 14, 2018) .......................................................................................................................... 12

*Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168 (9th Cir. 2010)..................................... 17

**State Cases**

*Capehart v. Heady*, 206 Cal. App. 2d 386 (1962) ................................................................... 20

*Cortez v. Purolator Air Filtration Products Co.*, 23 Cal. 4th 163 (2000) ...................................... 25

*Coulter v. Bank of America*, 28 Cal. App. 4th 923 (1994) ......................................................... 28

*Fisher v. MoneyGram International, Inc.,* 66 Cal. App. 5th 1084 (2021).......................................... 20

*Gill v. Hearst Pub. Co.*, 40 Cal. 2d 224 (1953) ................................................................22

*Hernandez v. Hillsdale*, 47 Cal. 4th 272 (2009) ...............................................................22

*Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1 (1994) ............................................22

*People v. Miller,* 81 Cal. App. 4th 1427 (2000), as modified on denial of reh'g (July 6, 2000) ...........31

*Schauer v. Mandarin Gems of Cal., Inc.*, 125 Cal. App. 4th 949 (2005) .........................32

*Sofias v. Bank of America*, 172 Cal. App. 3d 583 (1985) ................................................32

**Federal Statutes**

15 U.S.C. § 15(a) ...............................................................................................................19

18 U.S.C. § 2510(4) ...........................................................................................................27

18 U.S.C. § 2511 ................................................................................................................27

18 U.S.C. § 2520 ................................................................................................................28

26 C.F.R. § 303.7216-2 ......................................................................................................24

Fed. R. Civ. P. 23(b) ............................................................................................13, 16, 17

Fed. R. Civ. P. 23(e) ...................................................................................................2, 18, 39

Internal Revenue Code § 7216 ..............................................................................24, 25, 26

**State Statutes**

Cal. Bus. & Prof. Code § 22257 ........................................................................................26

Cal. Bus. & Prof. Code § 17535 ............................................................................25, 32, 33

Cal. Bus. & Prof. Code § 22251.1 .....................................................................................25

Cal. Bus. & Prof. Code §§ 22250, *et seq.* ............................................................................9

Cal. Penal Code § 496 ...............................................................................................19, 31

Cal. Penal Code § 502 ........................................................................................................30

Cal. Penal Code § 502(e) ............................................................................................19, 30

Cal. Penal Code § 631 .................................................................................................28, 29

Cal. Penal Code § 637.2 .....................................................................................................29

**Treatises**

7AA Charles Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure, § 1779 (3d ed. 2005) ...............................................................................................17

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97 (2009) ...................................................................................................................13

# NORTHERN DISTRICT OF CALIFORNIA PROCEDURAL GUIDANCE FOR CLASS ACTION SETTLEMENTS: REFERENCE TABLE

| Guidance Section | Guidance Topic | Page(s) Where Guidance Topic is Discussed |
|---|---|---|
| 1(a) | Differences between Settlement Classes and classes in complaint | 9-10 |
| 1(b) | Differences between released claims and claims in complaint | 10-11 |
| 1(c) | Recovery under settlement; potential exposure; discount | 7-8, 18-34 |
| 1(d) | Other cases, if any, affected by settlement | 45-46 |
| 1(e) | Proposed allocation plan | 8-9; Ex. 2 to Hammond Decl. |
| 1(f) | Claims rate | 44-45 |
| 1(g) | Reversion, if any | 1, 7, 40 |
| 2(a) | Settlement Administrator | 41-42 |
| 2(b) | Class member data; costs of administration | Settlement Agreement ¶ 70; Hammond Decl. ¶ 5; Kroll Decl. ¶ 38 |
| 3 | Notice | 40-41; Ex. C, D to the Settlement Agreement |
| 4 | Opt-outs | 42-43; see also Ex. F to the Settlement Agreement |
| 5 | Objections | 42-43; Ex. C, D to the Settlement Agreement |
| 6 | Fees and Costs | 11-12 |
| 7 | Service awards | 11-12 |
| 8 | *Cy Pres* | 11 |
| 9 | Timeline | 46-47 |
| 10 | CAFA notice | 41 |
| 11 | Comparable outcomes | 35-36; Ex. 6 to Hammond Decl. |

## NOTICE OF MOTION

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on April 4, 2024, at 2:00 p.m., or as soon thereafter as this matter may be heard, before the Honorable Vince Chhabria, in Courtroom 4, United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California 94102, Plaintiffs Nicholas C. Smith-Washington, Joyce Mahoney, Jonathan Ames, Matthew Hartz, and Jenny Lewis ("Plaintiffs"), on behalf of themselves and the putative Classes, by and through their Counsel, shall and hereby do, respectfully move the Court for entry of an Order, pursuant to Federal Rule of Civil Procedure 23(e), in the above-captioned action (the "Action"):

1.      Certifying the proposed Nationwide Class, California Subclass, Nationwide Married Filing Jointly Class, and California Married Filing Jointly Subclass for purposes of settlement;

2.      Provisionally appointing Plaintiffs Nicholas C. Smith-Washington, Joyce Mahoney, and Jonathan Ames as Settlement Class Representatives of the Nationwide Class and the California Subclass, Plaintiff Matthew Hartz as an additional Settlement Class Representative of the Nationwide Class, Plaintiff Jenny Lewis as Settlement Class Representative of the Nationwide Married Filing Jointly Class and the California Married Filing Jointly Subclass, and HammondLaw, P.C., and Keller Postman LLC, as Class Counsel for purposes of settlement;

3.      Granting preliminary approval of the proposed class action settlement between Plaintiffs and Defendant TaxAct, Inc. ("Defendant") as fair, adequate, and reasonable, based upon the terms set forth in the Parties' Class Action Settlement Agreement and Release ("Settlement Agreement"),[1] including payment by Defendant of a cash settlement of **$17,450,000** for the benefit of the Settlement

---

[1] Capitalized terms shall have the same meaning as set forth in the Class Action Settlement Agreement and Release dated February 21, 2024, attached as **Exhibit 1** to the Declaration of Julian Hammond in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement ("Hammond Decl."). In addition, these terms have the following meaning as used herein: (1) "Postman Decl." means the Declaration of Warren D. Postman in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement; (2) "Hughes Decl." means the Declaration of Hunter Hughes in Support of Motion for Preliminary Approval of Class Action Settlement; (3) "Smith-Washington Decl.," "Mahoney Decl.," "Ames Decl.," "Hartz Decl.," and Lewis Decl.," mean the respective declarations of Plaintiffs in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement; and (4) "Kroll Decl." means the Declaration of Jeanne C. Finegan, APR of Kroll Settlement Administration LLC in Connection with Preliminary Approval of Settlement (which is attached as Exhibit B to the Settlement Agreement).

Classes, comprising a $14,950,000 non-reversionary cash settlement common fund plus up to $2,500,000 of additional funds set aside to be used towards Notice and Administration Costs with any remainder of that amount to be distributed to the Settlement Classes (the "Total Cash Settlement Amount"), and the provision of an In-Kind Payment to all Settlement Class Members who file a valid claim, with an estimated total redeemable valuation, assuming a 5% claims rate, of $31 million with a minimum redeemed value of **$5.8 million** – resulting in a conservatively estimated total settlement value of **$23,250,000**;

4.      Approving the Plan of Allocation for the Net Settlement Fund and the In-Kind Payment;

5.      Approving the form and substance of the proposed Notice of Proposed Settlement of Class Action ("Long-Form Class Notice"), Short-Form Notice ("Short-Form Notice"), Claim Form ("Claim Form"), and Opt-Out Form; the manner and timing of disseminating notice to the Class (the "Notice Plan"); and the selection of Kroll Settlement Administration LLC as the Settlement Administrator;

6.      Setting deadlines for Class Members to exercise their rights in connection with the proposed Settlement; and

7.      Scheduling a hearing date for final approval of the Settlement and Plan of Allocation and application for attorneys' fees and expenses.

This Motion is based on the Memorandum of Points and Authorities below and the exhibits thereto, the Declaration of Julian Hammond, the Declaration of Warren D. Postman, the Declaration of Hunter Hughes, the Settlement Agreement and exhibits thereto, the declarations of Plaintiffs, the Court's record in this matter, and such oral and documentary evidence as may be presented at or before the hearing on this matter.

## STATEMENT OF THE ISSUES TO BE DECIDED

The issues to be decided on this Motion are:

1.      Whether the proposed Settlement on the terms and conditions set forth in the Settlement Agreement warrants preliminary approval;

2.      Whether to certify this Action as a class action for purposes of settlement;

3.      Whether the Court should approve the form and substance of the proposed Class Notice, Short-Form Notice, Claim Form, and Opt-Out Form;

4.      Whether the Court should approve the deadlines proposed for Class Members to exercise their rights under the proposed Settlement; and

5.      Whether the Court should schedule a Final Approval Hearing to determine whether the Settlement, Plan of Allocation, and the forthcoming application for attorneys' fees and expenses and Service Awards for the Class Representatives should be finally approved.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

After a year of litigation, extensive motion practice, substantial discovery, an expert-led review of pixels and tracking tools on Defendant TaxAct's website, a full-day mediation guided by renowned mediator Hunter Hughes, Esq., and subsequent intense arm's-length negotiations, Plaintiffs have achieved a $17,450,000 cash settlement for the benefit of the Settlement Classes (which comprises a $14,950,000 non-reversionary common fund plus $2,500,000 for notice and case administration costs, any unused portion of which will be distributed to the Settlement Classes), and substantial in-kind relief with a conservatively-estimated expected redeemed value of $5,800,000; for a total estimated settlement value of at least $23,250,000. Assuming a claims rate of 5%, Plaintiffs estimate that the gross share of the cash settlement available to each Settlement Class Member submitting a valid claim will be $33.86, their net share of the cash settlement (after the payment of court-approved attorneys' fees and costs, Class Representative Service Awards, and Settlement Administration Costs) will be $18.65, and the average total gross and net relief available to them (including in-kind relief) will total $93.85 and $78.64, respectively. Hammond Decl. ¶ 77. In addition to the monetary and in-kind relief obtained by Plaintiffs, TaxAct has entered into an injunction with the Missouri Attorney General that prohibits TaxAct from engaging in the practices challenged by Plaintiffs in the instant case. *Id.* ¶ 25, Ex. 3.

The proposed Settlement is an excellent result, reached while a motion to compel Plaintiffs' claims to individual arbitration was pending. The pending motion likely would have resulted in Plaintiffs being compelled to individual arbitration of their claims, which would have precluded class-wide relief on any claim. The amount of the recovery is particularly impressive given that TaxAct argued that their website's Terms of Service, which Class Members allegedly agreed to: (i) limit the time in which Class Members can bring claims arising out of or related to TaxAct's services to one-year after such claims arose; and, (ii) limit damages recoverable by Class Members to the amounts they paid to TaxAct. These risks are in addition to TaxAct's merits-based arguments, including Defendant's claim that its users consented to the practices at issue, that its conduct was permissible under IRS regulations, that taxpayer information was not actually disclosed, and that the class suffered no actual damages. Plaintiffs dispute these characterizations, but acknowledge the substantial risks in this complex case, which is facing a

serious threat of being compelled to arbitration.

The Settlement is a product of informed, arm's-length negotiations. Plaintiffs reviewed and analyzed more than 7,300 pages of documents, and over 100 pages of written discovery responses, prepared for and conducted a deposition of TaxAct's Marketing Technology Manager and a deposition of TaxAct's Vice President of Tax Operations, and were preparing for a 30(b)(6) deposition and depositions of several former employees, when the parties reached an agreement in principle to settle. This discovery, and the risks discussed in the paragraph immediately above, allowed Plaintiffs to form a clear view of the strengths and weaknesses of their case. Hammond Decl. ¶¶ 9, 30-32, 36, 39.

In exchange for the cash settlement and in-kind relief, described above, Plaintiffs, on behalf of the proposed Settlement Classes, agreed to release the claims alleged in their Second Amended Complaint and potential claims based on the identical factual predicate underlying those claims.

In reviewing the proposed Settlement, the Court must determine "whether the settlement is 'fair, reasonable, and adequate,' under Rule 23(e) , based on any information the district court receives from the parties or can obtain through its own research." *Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1037 (N.D. Cal. 2016); *see also Hunt v. VEP Healthcare, Inc.*, No. 16-cv-04790-VC, 2017 WL 3608297 (N.D. Cal. Aug. 22, 2017); *Eddings v. D.S. Services of America, Inc.*, No. 15-cv-02576-VC, 2016 WL 3390477 (N.D. Cal. May 20, 2016). Balancing the risks against the substantial attendant benefits, the Court should find that the Settlement Agreement more than meets the applicable standard. In Plaintiffs' view, it represents an outstanding result for the Settlement Classes. Hunter Hughes, the mediator, concluded:

> "Based upon my experience as a mediator, my knowledge of the issues in dispute, my review of the materials presented before and during mediation, the rigor of the Parties' negotiations during the mediation session, and the benefits achieved by the Settlement, I believe the Settlement represents a reasoned and sound resolution of this litigation."

Hughes Decl. ¶ 17. Accordingly, Plaintiffs respectfully request that the Court preliminarily approve the proposed Settlement.

## II.      RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.      Brief Summary of the Litigation

On January 24, 2023, Plaintiff Smith-Washington filed this putative class action lawsuit in the

Superior Court of Alameda, California alleging that Defendant secretly disclosed its California customers' confidential taxpayer information to Meta Platforms, Inc. ("Meta" or "Facebook"), an unauthorized third party. Defendant removed this case on February 23, 2023. Dkt. 1. On March 2, 2023, Defendant filed a Motion to Stay Pending Arbitration Under 9 U.S.C. § 3. Dkt. 12. On May 25, 2023, the Court heard argument on Defendant's Motion, denying it without prejudice and opening discovery. Dkt. 44. On June 8, 2023, Defendant filed a Renewed Motion to Compel Arbitration and Stay Proceedings. Dkt. 50. On June 12, 2023, because of information discovered by Plaintiff as part of Counsel's continuing investigation into the case, Plaintiff informed Defendant that he intended to file an amended complaint. On June 20, 2023, Plaintiff filed the First Amended Complaint: adding Plaintiffs Mahoney, Ames, and Lewis; alleging that Defendant also disclosed its customers' confidential information to Google, Google Double Click (collectively "Google"), and other unauthorized third parties; expanding the class definition to cover all persons nationwide who used TaxAct's website's tax preparation services to prepare a tax return, with a California subclass; and, adding a second putative class of "Married Filers," whose spouses used TaxAct's website's tax preparation services to prepare a joint tax return with them. Dkt. 56. On June 29, 2023, pursuant to a stipulation of the Parties, the Court recognized that the additional Plaintiffs in the First Amended Complaint as well as the newly pled facts and causes of action rendered Defendant's pending Motion moot. Dkt. 62. Accordingly, the Court set a deadline and briefing and hearing schedule for a Renewed Motion to Compel Arbitration and Stay Proceedings from Defendant ("Renewed Motion"). *Id.*

Thereafter, the parties entered into a Stipulated Protective Order. Dkt. 74. On June 23 and July 10, 2023, respectively, Plaintiffs served their first sets of Requests for Production and Interrogatories. Hammond Decl. ¶ 26. On July 12, 2023, Defendant filed its Renewed Motion. On July 20 and 21, 2023, Plaintiffs served third-party subpoena on Google and Meta, respectively for the production of documents and information. *Id.* ¶ 27. On July 24, 2023, Defendant served its responses to Plaintiffs' First Set of Requests for Production. *Id.* ¶ 28. The Parties met and conferred on numerous occasions over the following several weeks regarding Defendant's responses. *Id.* ¶ 30. Defendant served supplemental responses to Plaintiff's Request for Production on August 4, 2023. *Id.* On August 9, 2023, Defendant served its responses to Plaintiffs' First Set of Interrogatories. *Id.* ¶ 29. Also in August 2023, Plaintiffs took the depositions of two of TaxAct's high-level employees, including its Manager of Marketing

Technology & Website. *Id.* ¶ 32.

Plaintiffs filed their opposition papers to Defendant's Renewed Motion on August 29, 2023, which consisted of a 22-page brief, over 500 pages of supporting documents including deposition transcripts from the above-mentioned depositions and declarations from all four named Plaintiffs at the time, and a 34-page evidentiary objection to TaxAct's supporting declaration. Dkts. 79-80. On September 7, 2023, Defendant filed its reply brief and its response to Plaintiffs' evidentiary objections. Dkt. 82.

After Plaintiffs had filed their Opposition papers, in September 2023, the parties agreed to attend mediation and stipulated to continue the hearing on Defendant's Motion to Compel Arbitration until November 30, 2023. Dkt. 88. The parties attended a full-day mediation with Hunter Hughes on November 20, 2023, but were unable to reach a settlement. Hammond Decl. ¶ 36. On November 27, 2023, as requested in Plaintiffs' unopposed Administrative Motion, and in light of Plaintiffs' intent to seek leave to file a Second Amended Complaint, the Court continued the hearing date for Defendant's Renewed Motion to January 18, 2024. Dkt. 94. On November 28, 2023, Plaintiffs filed a Motion for Leave to File a Second Amended Complaint. Dkt. 95. With Plaintiffs' Motion for Leave to File a Second Amended Complaint fully briefed, on December 22, 2023, the Court set the hearing date for January 11, 2024. Hammond Decl. ¶ 20.

On December 5, 2023, Plaintiffs served their Second Set of Requests for Production. Hammond Decl. ¶ 33. In late December 2023, Counsel for Plaintiffs, as part of their continuing investigation of the case, discovered that, on or about December 22, 2023, Defendant had changed the Terms of Service applicable to customers using its website. *Id.* ¶ 21. On January 3, 2024, Plaintiffs filed a Motion for Protective Order and Corrective Notice asking the Court, *inter alia*, to enjoin Defendant from enforcing §§ 9, 13, and 14 of the Updated Terms of Service against putative Class Members with respect to claims arising during the Class Period in this litigation and/or in arbitration and to require Defendant to issue a corrective notice to putative Class Members by mail, email, and by posting that notice on its website. Dkt. 103.[2] On that same day, Plaintiffs also filed a motion to shorten time for the briefing and hearing of

---

[2] On or about January 2, 2024, Plaintiffs' Counsel obtained an agreement from TaxAct that it would not seek to enforce the Updated TOS against any of the Plaintiffs and any members of the Classes that Plaintiffs seek to represent, should such Classes be certified. Hammond Decl. ¶ 23.

their motion. Dkt. 104. The Court set the hearing for the Motion for Protective Order and Corrective Order for January 11, 2024, at the same time as the hearing on Plaintiffs' Motion for Leave to File a Second Amended Complaint. Dkt. 105. In response to Plaintiffs' Counsel's request, Defendant did stipulate that it would not seek to enforce the new Updated TOS against the Plaintiffs or any of the class members they seek to represent, should the class be certified. Hammond Decl. ¶ 23.

On January 4, 2024, Defendant served its objections and responses to Plaintiffs' Second Set of Requests for Production. Hammond Decl. ¶ 33. In combination, Defendant's responses to Plaintiffs' First and Second Sets of Requests for Production resulted in Defendant producing more than 7,300 pages of documents. *Id.* ¶ 31. Plaintiffs also prepared notices of depositions for three former TaxAct employees and a 30(b)(6) witness and were actively negotiating with Defendant in early January to find mutually agreeable dates to take those depositions. *Id.* ¶ 33.

On January 10, 2024, the Parties informed the Court that they had reached a settlement in principle. That same day, the Court stayed all current deadlines and took the scheduled hearings off calendar pending the submission of Plaintiffs' Motion for Preliminary Approval. Dkt. 107.

On February 20, 2024, pursuant to a stipulation of the Parties, Plaintiffs filed a Second Amended Complaint ("Operative Complaint" or "SAC") which, *inter alia*, added Plaintiff Matthew Hartz, made minor revisions to the class definitions and the classes covered by certain causes of action, and added a cause of action for breach of contract. Dkt. 117.

### B. Summary of the Mediation Efforts and Agreement to Settle

The negotiations that ultimately led to the Settlement Agreement were protracted and complex.[3] They involved dozens of video conferences, telephone calls, and emails regarding the documents and information to be informally produced by Defendant in order to ensure that Plaintiffs were able to fully assess the realistic value of each of their claims; substantial briefing submitted by both sides to the mediator; a full-day mediation session with respected mediator Hunter Hughes, Esq.; and numerous subsequent video conferences and telephone calls as the Parties continued to explore whether a settlement was possible. Hammond Decl. ¶¶ 35-40.

---

[3] No counsel from any other case participated in the settlement negotiations on behalf of Plaintiffs.

On January 10, 2024, the Parties executed a Memorandum of Understanding which set out the principal terms of the Settlement. Hammond Decl. ¶ 40. Since January 10, 2024, the Parties have made considerable efforts, with yet more video conferences, phone calls, and emails, in order to resolve the details associated with finalizing this Settlement, which included the Notice Plan, selecting the Settlement Administrator, agreeing on the Plan of Allocation, and determining the best method to provide the In-Kind Payment to Class Members. *Id*. Ultimately, on February 21, 2024, the Parties executed the Settlement Agreement. *Id.* ¶ 42.

### C.    Summary of Changed Practices

During the pendency of this litigation, and prior to reaching final terms on the Settlement Agreement, Defendant entered into a Stipulated Consent Judgment with the Missouri Attorney General entered by the Circuit Court of St. Louis City, State of Missouri, on October 31, 2023. Hammond Decl. ¶ 25, Ex. 3, ¶ 13 (Stipulated Consent Judgment). And, the practices challenged by Plaintiffs, in the instant case, are enjoined by that same Stipulated Consent Judgment. *Id.* ¶ 25, Ex. 3, ¶¶ 5-7. The Stipulated Consent Judgment provides, *inter alia*, that (1) TaxAct shall not disclose to third parties any consumer personal or tax information[4] collected through tracking tools, unless TaxAct has obtained express consent from consumers or it is permitted by law, (2) TaxAct shall maintain an information security program that complies with state and federal laws and industry norms and practices, and which is designed to protect the security, integrity and confidentiality of consumer personal or tax information that is collected, stored, and/or transmitted by TaxAct, and (3) that the information security program maintained by TaxAct shall contain administrative, technical, and/or physical safeguards. *Id.* ¶ 25, Ex. 3, ¶¶ 5-7.

### III.    SUMMARY OF THE PROPOSED SETTLEMENT

### A.    The Settlement Provides Substantial Relief to the Class Members

---

[4] Consumer tax information is defined in the Stipulated Consent Judgment as "a Unique Identifier in combination with *any* specific items from a tax return (including but not limited to names of dependents, filing status, or the amounts of the following: adjusted gross income, tax refunds, investment income, mortgage interest, standard deductions, student loan interest, and/or charitable contributions), …" Exhibit 3 to Hammond Decl., at p. 2.

The Settlement Agreement creates a cash settlement for the benefit of the Settlement Classes in the amount of **$17,450,000**, which comprises a non-reversionary $14,950,000 common fund plus $2,500,000 set aside to be used towards Notice and Administration Costs with any unused remainder of that amount to be distributed to the Settlement Classes ("Qualified Settlement Fund" or "QSF," also referred to as the "Total Cash Settlement Amount" or "TCSA"). Settlement Agreement ¶¶ 49, 63. The QSF, less a court-approved Attorneys' Fees and Expenses Award, court-approved Service Awards to the Settlement Class Representatives, and Notice and Administration Costs, will be allocated among Settlement Class Members who submit a valid claim form in accordance with the Plan of Allocation attached as Exhibit 2 to the Hammond Declaration, and discussed below in Part III.B. Settlement Agreement, ¶¶ 40, 115-16. Assuming a claims rate of 5%, Plaintiffs estimate that the average Authorized Claimant's gross share of the QSF will be $33.86, and the average Authorized Claimant's share of the Net Settlement Fund will be $18.65. Hammond Decl. ¶ 74.

In addition to the cash payment to be made by Defendant, the Settlement Agreement requires Defendant to provide an In-Kind Payment, in an easy-to-redeem format, in the form of TaxAct® Xpert Assist ("Xpert Assist") to all Settlement Class Members who file a valid claim form. Settlement Agreement, ¶ 72. Xpert Assist is an add-on feature that TaxAct offers to its customers that provides live advice and assistance from tax experts to customers completing a tax return through TaxAct. *Id.* TaxAct will provide complimentary TaxAct® Xpert Assist to Authorized Claimants to use in connection with preparing a tax return using any TaxAct online do-it-yourself consumer Form 1040 tax return filing product (including TaxAct's free product), applied to tax year 2024. *Id.* Specifically, upon entering their Social Security number into the TaxAct platform, which occurs at the beginning of the tax return form process, Authorized Claimants will receive a pop-up alerting them to their complimentary Xpert Assist and be able to add and use Xpert Assist immediately. *Id.* TaxAct currently offers Xpert Assist to customers at the price of $59.99. *Id.* The estimated potential redeemable value of the In-Kind Payment, based on a 5% claims rate, is $31 million. Hammond Decl. ¶¶ 4, 75. Recognizing that not every Settlement Class Member will return to use TaxAct to file their taxes, Plaintiffs conservatively estimate the minimum expected redeemed value of the In-Kind Payment will be $5.8 million. *Id.* ¶ 75.

The combined size of the QSF and the In-Kind Payment represents an excellent result for Plaintiffs and the Settlement Classes. Plaintiffs conservatively estimate that the average gross and net

relief available to Authorized Claimants (including in-kind relief) will be $93.85 and $78.64, respectively. Hammond Decl. ¶ 77.

**B.      The Allocation of Relief Among Settlement Class Members**

The Net Settlement Fund will be allocated according to the Plan of Allocation among those Settlement Class Members who complete and submit a simple claim form. Hammond Decl. ¶¶ 71, 78, Exhibit 2 (Plan of Allocation). Authorized Claimants – i.e., Settlement Class Members who submit valid claims – are assigned allocation points according to the Settlement Class or Subclass of which they are a member. If an Authorized Claimant was a member of one Class or a Subclass during a portion of the Class Period and was a member of a different Class or Subclass during a different portion of the Class Period, the Authorized Claimant will be assigned allocation points for the Class or Subclass to which the Authorized Claimant belonged that has the highest number of allocation points. Allocation points shall be assigned as follows: Members of the Nationwide Class are assigned 3 allocation points; Members of the California Subclass are assigned 6 allocation points; Members of the Nationwide Married Filing Jointly Class are assigned 1 allocation point; and Members of the California Married Filing Jointly Subclass are assigned 2 allocation points. Hammond Decl. ¶ 78.

"Approval of a plan of allocation of settlement proceeds in a class action ... is governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable and adequate." *In re Oracle Sec. Litig.,* No. C-90-0931-VRW, 1994 WL 502054, at *1-2 (N.D. Cal. June 18, 1994) (citing *Class Pls. v. City of Seattle,* 955 F.2d 1268, 1284-85 (9th Cir. 1992)). Here, Plaintiffs' proposed Plan of Allocation is fair, reasonable, and adequate because it attempts to "allocate the settlement funds to class members based on . . . the strength of their claims on the merits." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008) (citing *In re Oracle Sec. Litig.,* 1994 WL 502054, *1-2  (other internal citation omitted)). Plaintiffs have attempted to achieve the appropriate ratio between each respective group such that the allocation points assigned to them, relative to other Settlement Class Members, reflect the strength of the claims that Plaintiffs have pursued on their behalf.

As described in more detail below, *see infra* Parts V.A.11 & V.D.2, Plaintiffs have brought three claims on behalf of the nationwide classes, with eight on behalf of the two California subclasses. Given the strength of the California-specific claims, particularly, those based on Business & Professions Code

§ 17530.5 and the Tax Preparation Act (Bus. & Prof. Code §§ 22250, *et seq.*), Plaintiffs believe it is appropriate that members of the California subclasses receive more than members of the nationwide classes. Similarly, because there are substantial challenges and risks for the Nationwide Married Filing Jointly Class's claims as compared to the Nationwide Class's claims, Plaintiffs believe it is appropriate that Nationwide Married Filing Jointly Class Members, whose interactions with Defendant differ materially from those of their spouses, should receive fewer allocation points than their Nationwide Class counterparts, as discussed more fully below.

### C. The Settlement Class Definitions Differ Only Slightly from the Classes Defined in the Operative Complaint

The Settlement Agreement defines two Settlement Classes, each with a Subclass. The Nationwide Class is defined as "all natural persons who used a TaxAct online do-it-yourself consumer Form 1040 tax filing product and filed a tax return using the TaxAct online product during the Class Period, and whose postal address listed on such tax return was in the United States." Settlement Agreement, ¶ 55.a. The Nationwide Class includes the California Subclass which is defined as "all natural persons who used a TaxAct online do-it-yourself consumer Form 1040 tax filing product and filed a tax return using the TaxAct online product during the Class Period, and whose postal address listed on such tax return was in California." *Id.*, ¶ 55.a.i. The Nationwide Married Filing Jointly Class is defined as: "all natural persons whose spouse used a TaxAct online do-it-yourself consumer Form 1040 tax filing product and filed a joint tax return using the TaxAct online product during the Class Period, and whose postal address listed on such joint tax return was in the United States." *Id.*, ¶ 55.b.  The Nationwide Married Filing Jointly Class includes the California Married Filing Jointly Subclass which is defined as "all natural persons residing in California during the Class Period whose spouse used a TaxAct online do-it-yourself consumer Form 1040 tax filing product and filed a joint tax return using the TaxAct online product during the Class Period, and whose postal address listed on such joint tax return was in California." *Id.*, ¶ 55.b.i. The Class Period, for settlement purposes, is defined as "the time period from January 1, 2018, through December 31, 2022[.]" *Id.* ¶ 30.

The differences between these definitions and the Classes and Subclasses proposed in the Operative Complaint are minimal. First, the Class and Subclass definitions in the Operative Complaint refer to persons who "used Defendant TaxAct's website's tax preparation services to prepare a tax return," Dkt. 117, ¶ 184, but the Settlement Class and Subclass definitions refer to persons who "used a

TaxAct online do-it-yourself consumer Form 1040 tax filing product and filed a tax return using the TaxAct online product." Settlement Agreement, ¶ 55.a-b. This difference stems from the fact that the definitions in the Operative Complaint could include TaxAct customers who used TaxAct's website to file business tax returns, who used TaxAct's Professional products, or who used TaxAct's download do-it-yourself consumer Form 1040 tax return filing product. Plaintiffs never intended to include these groups of people in the Classes they sought to represent and for each of these groups TaxAct asserts that the allegations in the Operative Complaint are entirely inapplicable because their use of TaxAct's website and products cannot have resulted in the collection and/or disclosure of any confidential taxpayer information and/or is not covered by the consumer-focused allegations and causes of action set out in the Operative Complaint.

Second, the Class and Subclass definitions in the Operative Complaint refer to "natural persons residing in the United States" or "natural persons residing in California," respectively. Dkt. 117, ¶ 184. The Settlement Class and Subclass definitions refer to persons "whose postal address listed on such tax return was in the United States" or "whose postal address listed on such tax return was in California." Settlement Agreement, ¶ 55.a-b. This is because it is not possible for TaxAct to determine who was "resident" in California or the United States, and the best information available to the parties to determine who was most likely to be resident in California and/or the United States in any year in which they used TaxAct's online do-it-yourself consumer Form 1040 tax filing product and filed a tax return using the Tax Act online product is the postal address that they listed on that tax return.

### D. The Settlement's Release is Coextensive with the Ninth Circuit's "identical factual predicate" Requirement

In exchange for the benefits to be provided to the Settlement Classes, the Settlement Agreement proposes to release specific parties, including TaxAct and its current, former and/or future parents, subsidiaries, divisions, affiliates and/or departments, from all claims asserted in Plaintiffs' Second Amended Complaint as well as claims that have not been asserted but "could have been pled based on, relating to, or arising out of the identical factual predicate in the Operative Complaint . . . ." Settlement Agreement, ¶ 83. Thus, to be clear, the claims released by the Settlement Agreement are the same as the claims in the Second Amended Complaint (i.e., the Operative Complaint), except that claims which could have been pled based on the identical factual predicate in the Operative Complaint, but were not pled, are also released. *See Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) (quoting *Williams*

*v. Boeing Co.*, 517 F.3d 1120, 1133 (9th Cir. 2008); *Class Plaintiffs*, 955 F.2d at 1287). The release is to be "construed as broadly as possible under Ninth Circuit law to effect complete finality over this Action." Settlement Agreement, ¶ 84.

> **E.    The Settlement Agreement Allows Counsel to Seek Fees and Costs and the Settlement Class Representatives to Seek Service Awards**

As provided for in the Settlement Agreement, and as required by this Court, Plaintiffs will submit their motion for attorneys' fees and expenses at least 14 days before the deadline for objecting to the settlement. Standing Order, pp. 15-16 (citing *In re Mercury Interactive Corp. Sec. Litig.*, 618 F. 3d 988 (9th Cir. 2010)). Plaintiffs will seek fees for their Counsel in an amount not exceeding a total of 25% of the Total Cash Settlement Amount and 25% of the redeemed value of the In-Kind Payment (up to a maximum redeemed value of $5,800,000); the total fees Counsel may request is $5,812,500 ($4,362,500 from the Total Cash Settlement Amount and $1,450,000 from the In-Kind Payment). Settlement Agreement, ¶ 93. The portion of the Attorneys' Fees and Expenses Award awarded based on the In-Kind Payment will be paid at a later date, no earlier than May 2025, once a reasonable valuation of the redeemed value of the Xpert Assist service is possible. *Id.*[5] This portion of the Attorneys' Fees and Expenses Award will be held by the Settlement Administrator until the amount of attorneys' fees owing can be calculated. If any portion of the amount held by the Settlement Administrator is not owed as attorneys' fees (i.e., if the total redeemed value of the In-Kind Payment is less than $5,800,000) it will be distributed to the National Consumer Law Center as a *cy pres* recipient in accordance with the Plan of Allocation. *Id.* at ¶ 94; *see also*, Hammond Decl., Ex. 2 (Plan of Allocation), ¶ 8.

Given the substantial amount of work performed by Plaintiffs' Counsel and associated counsel in litigating this Action – 3,395.8 hours thus far, resulting in a lodestar of more than $2,765,267.75, and with additional work expected to increase that lodestar to a minimum of $3,041,833 – the maximum fee request represents a multiplier of approximately 1.91. Hammond Decl. ¶¶ 101-105; Postman Decl. ¶¶ 7-9. This is at the low end of the range of multipliers commonly awarded. *See Wolf v. Permanente Medical Group, Inc.*, No. 17-cv-05345-VC, 2018 WL 5619801, at *2 (N.D. Cal. Sept 14, 2018) (approving

---

[5] The redeemed value of the In-Kind Payment will be determined by multiplying the number of Settlement Class Members who redeem their offer of Xpert Assist by the then-current price for that service. As of the filing of this motion, TaxAct currently offers Xpert Assist to customers at $59.99.

multiplier of 2.75-3.0 and citing cases). Moreover, 25% of the settlement amount is the benchmark percentage for a reasonable fee in this Circuit. *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F. 3d 935, 942 (9th Cir. 2011). Thus, the fee request is eminently reasonable under either a "percentage of the common fund method," or the "lodestar method." *Wolf*, 2018 WL 5619801, at *2. In addition, there is no clear sailing agreement. Settlement Agreement, ¶ 93. Approval of the Settlement Agreement is not contingent upon approval of Plaintiffs' fee request, and Defendant has reserved the right to oppose Plaintiffs' fee request. *Id.* ¶¶ 93, 95.

The Settlement Agreement also provides that Settlement Class Counsel may apply to the Court for up to $75,000 for reimbursement of litigation costs and expenses. Settlement Agreement, ¶ 93. Currently, proposed Settlement Class Counsel have incurred a total of $58,493.79 in litigation costs and expenses, including: $10,000 in mediation fees; $20,400 in fees paid to consulting experts who were central to Counsel's investigation, review, and analysis of the pixels and tracking tools on Defendant TaxAct's website; and, $8,491 for court reporting and videographic services for depositions and Court hearings. Hammond Decl. ¶ 106.

Finally, as set forth in the Settlement Agreement, the five Plaintiffs, who have each devoted substantial time and effort reviewing documents in this action, meeting with their Counsel, and reviewing the Settlement Agreement, will ask for appointment as Settlement Class Representatives and seek approval of Service Awards of up to $10,000 each. Settlement Agreement, ¶ 97; Smith-Washington Decl. ¶¶ 6-17; Mahoney Decl. ¶¶ 6-16 Ames Decl. ¶¶ 4-15; Lewis Decl. ¶¶ 3-16; Hartz Decl. ¶¶ 4-14. As with Plaintiffs' fee request, approval of the Settlement Agreement is not contingent upon the amount of the Service Awards paid to the Plaintiffs. Settlement Agreement, ¶ 97.

## IV.     THE COURT SHOULD CERTIFY THE SETTLEMENT CLASSES

### A.     The Settlement Classes Satisfy the Rule 23(a) Prerequisites

Although the parties have settled, the Court must nevertheless certify that the proposed Settlement Classes satisfy Rule 23. Rule 23(a) requires: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a). In addition, the Classes must satisfy one of the three subsections of Rule 23(b). However, when "[c]onfronted with a request for a settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable

management problems . . . for the proposal is that there [will] be no trial." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

### 1. Numerosity

Here, numerosity is met. The Nationwide Class consists of an estimated 8,263,789 individuals dispersed throughout the United States, with the California Subclass comprising an estimated 519,060 individuals. The Nationwide Married Filing Jointly Class consists of an estimated 2,042,940 individuals, with the California Married Filing Jointly Subclass comprising an estimated 109,096 members. Settlement Agreement, ¶ 70. Numerosity is generally satisfied when a class exceeds forty members. *See, e.g., Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 654 (C.D. Cal. 2000).

### 2. Commonality

Here, commonality is met. The commonality requirement is satisfied where a plaintiff asserts claims that "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 389-90 (2011).

In the instant case, the class claims derive from Plaintiffs' allegations that when Plaintiffs and other Class Members, or, in the case of the Nationwide Married Filing Jointly Class, their spouses filing jointly, used TaxAct's online consumer tax return preparation products to prepare and file their tax returns, their privacy was invaded and their personal and confidential tax return information was disclosed to, shared with, and intercepted by unauthorized third-parties through pixels and other tracking tools placed on TaxAct's website. Operative Complaint, ¶¶ 1-11, 22-182. This common conduct raises common questions, resolution of which will generate common answers "apt to drive the resolution of the litigation" for the Class as a whole. *Dukes*, 564 U.S. at 350 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

### 3. Typicality

Typicality is also met. Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted).

In the instant case, the experiences of the Settlement Class Representatives match the experiences of the millions of other Settlement Class Members in the respective Classes that each Settlement Class Representative seeks to represent. The proposed Settlement Class Representatives for the Nationwide Class and the California Subclass experienced the same alleged privacy violations, and allegedly had their confidential tax return information shared in the same manner as Members of that Class and Subclass. While Mr. Smith-Washington, Ms. Mahoney, and Mr. Ames, are Members of both the Nationwide Class and the California Subclass, Mr. Hartz is an Illinois resident and is a member of only the Nationwide Class.

Similarly, the proposed Settlement Class Representative for the Nationwide Married Filing Jointly Class and the California Married Filing Jointly Subclass, Ms. Lewis, just as the Members of that Class and Subclass, allegedly had her privacy invaded and her confidential tax return information shared when her husband used TaxAct's consumer online tax preparation products to prepare and file his joint tax return with Ms. Lewis.

Because the Settlement Class Representatives' allegations involve the "same course of conduct," which is "not unique to the named plaintiffs," typicality is satisfied here. *Valliere v. Tesoro Refin. & Mktg. Co. LLC*, No. 17-cv-00123-JST, 2020 WL 13505042, at *5 (N.D. Cal. June 26, 2020) (citing *Hanon*, 976 F.2d at 508). Moreover, Plaintiffs and the putative Class Members they seek to represent all seek the same remedies. Accordingly, the typicality requirement of Rule 23(a) is satisfied.

### 4. Adequacy

Finally, adequacy too, is met. The fourth and final Rule 23(a) requirement is "adequacy of representation," Fed. R. Civ. P. 23(a)(4), which has two components: "(1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton v. Boeing Co.*, 327 F.3d 938, 957 (2003) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).

The proposed Settlement Class Representatives' interests in this case are aligned with, and not antagonistic to, the respective Classes and Subclasses they seek to represent. *See, e.g., In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2020 WL 4212811, at *4-5 (N.D. Cal. July 22, 2020), *aff'd*, No. 20-16633, 2022 WL 2304236 (9th Cir. July 27, 2022); Hammond Decl. ¶¶ 107-108; Smith-Washington Decl. ¶¶ 8; Mahoney Decl. ¶¶ 9-10; Ames Decl. ¶¶ 13-14; Lewis Decl. ¶¶ 8-9;

Hartz Decl. ¶¶ 12-13. For the Nationwide Class, the proposed Settlement Class Representatives and Settlement Class Members all used TaxAct's consumer online tax preparation products, and for the Nationwide Married Filing Jointly Class, the proposed Settlement Class Representative and Class Members all had spouses who used TaxAct's consumer online tax preparation products to prepare and file their joint tax returns. All of the proposed Settlement Class Representatives and Settlement Class Members, in both Classes, share the same interest in seeking relief based on TaxAct's alleged sharing and disclosure of their confidential and private tax return information and in protecting their privacy.

The proposed Settlement Class Representatives also fully understand their duties as class representatives, will protect the interest of absent Settlement Class Members, and have actively participated in this Action and the Parties' efforts in reaching this Settlement. Smith-Washington Decl. ¶¶ 7-8, 10-15; Mahoney Decl. ¶¶ 7-14; Ames Decl. ¶¶ 5-15; Lewis Decl. ¶¶ 4-14. They have provided their counsel with necessary factual information, have been available to discuss Defendant's numerous motions and Plaintiffs' responses thereto, have reviewed and approved the Settlement Agreement, and have communicated with counsel regarding various issues pertaining to this case, and will continue to do so until this case closes. Smith-Washington Decl. ¶¶ 10-17; Mahoney Decl. ¶¶ 6-16; Ames Decl. ¶¶ 4-15; Lewis Decl. ¶¶ 3-16.

Plaintiff Hartz was the sole Plaintiff in *Hartz v. TaxAct, Inc.*, No. 1:23-cv-04591, in the Northern District of Illinois, which made similar allegations against TaxAct and which was dismissed on February 22, 2024, on the basis that the Settlement Agreement reached in the instant action will resolve the claims in *Hartz v. TaxAct, Inc.* Hammond Decl. ¶ 41. Mr. Hartz was an active and important participant in *Hartz v. TaxAct, Inc.* and he has continued that active role, and will continue that active role, in the instant Action as a Settlement Class Representative of the Nationwide Class. Hartz Decl. ¶¶ 4-14.

With respect to Class Counsel, Plaintiffs are represented by qualified and competent counsel who are highly experienced in class actions generally and in consumer privacy litigation, in particular. Proposed Class Counsel have successfully investigated, commenced, and prosecuted many complex class actions, including the instant action. *See* Hammond Decl. ¶¶ 87-100; Postman Decl. ¶¶ 3-5 and Ex. A. Despite a significant risk of no recovery, they have devoted substantial time and resources to this case. Hammond Decl. ¶ 10. And their capable representation has been critical in driving this litigation towards settlement.

1    Accordingly, the adequacy of representation requirement of Rule 23(a) is satisfied.

2    **B.    The requirements of Rule 23(b)(3) are satisfied**

3    Plaintiffs seek certification of the Settlement Classes under Rule 23(b)(3). Accordingly, they

4    must also show: (1) that common questions of law or fact predominate over questions affecting only

5    individual class members; and (2) that a class action is superior to other methods of resolving the

6    controversy. Fed. R. Civ. P. 23(b)(3). Both requirements are easily satisfied by the proposed Classes.

7    *1.    Common issues of law and fact predominate*

8    The predominance requirement of Rule 23(b)(3) "tests whether proposed classes are sufficiently

9    cohesive to warrant adjudication by representation." *Amchem Prods., Inc.*, 521 U.S. at 623. This

10   requirement is satisfied in the instant case because the numerous common questions "present a

11   significant aspect of the case and . . . can be resolved for all members of the class in a single

12   adjudication," and, thus, "there is clear justification for handling the dispute on a representative rather

13   than on an individual basis." *Hanlon*, 150 F. 3d at 1022 (citations and quotations omitted).

14   Here, common issues unquestionably predominate. Because each claim alleged comes from a

15   core set of factual allegations that do not differ between Class Members, the most important issues in

16   this case can all be resolved on a classwide basis. In addition, the Court need not concern itself with

17   questions of the manageability of a trial because the settlement disposes of the need for a trial. The

18   Supreme Court has explained that the "predominance" inquiry is relaxed in the settlement context:

19   "Confronted with a request for settlement-only class certification, a district court need not inquire

20   whether the case, if tried, would present intractable management problems . . . for the proposal is that

21   there be no trial." *Amchem Prods., Inc.*, 521 U.S. at 620 (discussing manageability, which is a subpart

22   of Rule 23(b)(3) predominance).

23   *2.    Class treatment of Plaintiffs' claims is superior*

24   "The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives

25   of the particular class action procedure will be achieved in the particular case." *Hanlon,* 150 F.3d at

26   1023. Rule 23(b)(3) provides four factors that a court must consider in determining whether a class action

27   is superior to other methods of adjudication. These factors are:

28   (A) the class members' interests in individually controlling the prosecution or defense of
     separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). "'[T]he purpose of the superiority requirement is to assure that the class is the most efficient and effective means of resolving the controversy.'" *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting 7AA Charles Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure, § 1779 at p. 174 (3d ed. 2005)).

In the instant case, there is no question that class treatment is superior to the litigation of millions of individual claims. First, "[f]rom either a judicial or litigant viewpoint, there is no advantage in individual members controlling the prosecution of separate actions. There would be less litigation or settlement leverage, significantly reduced resources and no greater prospect for recovery." *Hanlon,* 150 F.3d at 1023.[6] The damages sought by each Settlement Class Member, when weighed against their risks, are not so large as to counsel against certification. *See Smith v. Cardinal Logistics Mgmt. Corp.,* No. 07-cv-02104-SC, 2008 WL 4156364, at *11 (N.D. Cal. Sept. 5, 2008).

Second, as described below in Part VII, there remains only one pending action against Defendant related to the claims at issue in the instant case; *Kirkham et al. v. TaxAct, Inc.*, No. 2:23-cv-03303-WB (E.D. Pa.). *Kirkham* was filed six months after the instant case. Hammond Decl. ¶¶ 110-114. The existence of that case does not mean that treatment of the instant case as a class action is not superior to individual adjudication of all Class Members' claims.

Third, concentrating litigation in this district is desirable because eight of the eleven claims are brought under California law on behalf of Subclasses composed of California residents. *See McKenzie v. Fed. Exp. Corp.*, 275 F.R.D. 290, 302 (C.D. Cal. 2011) ("Here, there is no reason to believe that concentrating this action in this Court is undesirable, especially considering that the challenge is under California law, and the proposed class is composed of only hourly employees in California.").

---

[6] Plaintiffs further note, their Settlement Class definitions exclude those individuals who would otherwise be Class Members but who have chosen to pursue their claims through individual arbitration. Settlement Agreement, ¶ 55; *see also* Operative Complaint, ¶ 185. Thus, those Class Members who have indicated an interest in controlling their own claims, by filing an arbitration, are able to proceed with that arbitration if they so wish.

Finally, the fourth factor, which concerns the difficulty of managing a class action, depends largely on whether Plaintiffs' case "rises and falls [on] common evidence." *In re HighTech Emp. Antitrust Litig.*, 985 F.Supp.2d 1167, 1228 (N.D. Cal. 2013). This factor overlaps with the requirements of commonality, typicality, and predominance, discussed above. Because Plaintiffs easily satisfy those three requirements, the fourth superiority factor weighs in favor of certification.

The resolution of all claims of all Settlement Class Members in a single proceeding also promotes judicial efficiency and avoids inconsistent decisions. *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 155 (1982) (noting "the class-action device saves the resources of both the courts and the parties be permitting an issue potentially affecting every class member to be litigated in an economical fashion under Rule 23."). Accordingly, the superiority requirement is satisfied, and the Court should provisionally certify the Settlement Classes and Subclasses for purposes of settlement.

## V.   SETTLEMENT APPROVAL IS WARRANTED

Rule 23 requires the Court to determine whether the Settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). And, this Court has made clear that it "review[s] class action settlements just as carefully at the initial stage as [it] do[es] at the final stage . . . rather than kicking the can down the road." *Cotter*, 193 F. Supp. 3d at 1037; *see also* Standing Order ¶ 57 (citing cases). To assess the fairness of a class settlement, Ninth Circuit courts consider factors including:

> (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of future litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of class members to the proposed settlement.[7]

*In re Online DVD-Rental Antitrust Litig.,* 779 F.3d 934, 944 (9th Cir. 2015) (quoting *Churchill Vill., LLC v. Gen. Elec.,* 361 F.3d 566, 575 (9th Cir. 2004)). As explained below, these factors strongly favor preliminary approval.

### A.   The Strengths and Risks of Plaintiffs' Case

Plaintiffs believe their claims are meritorious and have pursued them aggressively. Nevertheless, Plaintiffs acknowledge that they face a number of procedural and merits-based risks which threaten their

---

[7] This final factor cannot be addressed now because Class Members have not yet had the chance to react.

ability to recover. Plaintiffs address each of these risks below, starting with a number of risks which apply to many or all of their claims. Plaintiffs then proceed to separate analyses for each category of claim in which Plaintiffs detail the substantive strengths and risks of each category, provide an estimate of potential realistic exposure on each claim, where possible, and explain the discounts they have applied to that exposure for settlement purposes.[8]

### 1. Defendant's Affirmative Defenses

Defendant has raised a number of affirmative defenses which, if successful, could preclude Plaintiffs from bringing their claims in Court, could preclude Plaintiffs and Class Members from bringing claims arising more than one year prior to the filing of Plaintiffs' initial complaint, could limit Plaintiffs' ability to recover more than the amounts actually paid by Plaintiffs and Class Members to Defendant, and could preclude Plaintiffs from bringing their claims on a class basis. Success on even one of these defenses would dramatically reduce Plaintiffs' potential recovery.

### a. Risk that Plaintiffs are Compelled to Arbitrate their Claims on an Individual Basis

The most significant risk faced by Plaintiffs and the Settlement Class Members in this litigation is Defendant's pending motion to compel individual arbitration of Plaintiffs' claims. If Defendant prevailed on its pending Renewed Motion to Compel Arbitration, Plaintiffs would be left with five individual arbitrations and no means of obtaining relief for the Settlement Classes. This Renewed Motion has been fully briefed.  Hammond Decl. ¶ 44.

Plaintiffs consider it a substantial, concrete, and material risk that Defendant would be able to compel individual arbitration of the claims of Plaintiffs Smith-Washington, Mahoney, Ames, and Hartz

---

[8] Plaintiffs do not analyze punitive damages here, even though some of the claims allow their recovery. *See, e.g.,* Cal. Penal Code § 496; CCDAFA, Cal. Penal Code § 502(e)(4). Plaintiffs would seek such damages, where available, at trial. However, even in an antitrust class action, where treble damages are automatic, see 15 U.S.C. § 15(a), "courts generally determine fairness . . . based on how it compensates the class for past injuries, without giving much, if any, consideration to treble damages." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 964 (9th Cir. 2009). Unlike treble antitrust damages, punitive damages are inherently unpredictable and discretionary. For that reason, they typically play a limited role in determining the fairness of a settlement. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, No. 15-md-02672-CRB, 2017 WL 2212783, at *24 (N.D. Cal. May 17, 2017) (explaining that, because "any award of punitive damages is inherently speculative and discretionary, courts regularly approve settlements that offer no or little compensation representing the risk of a punitive damages award" (quoting *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 155 (E.D. La. 2013)).

and of all members of the Nationwide Class and California Subclass. Plaintiffs also believe that there is a substantial, albeit lower, risk of Defendant successfully compelling arbitration of Plaintiff Lewis' claims. Plaintiffs believe that a large discount is required for all claims based on TaxAct's arbitration defense. Hammond Decl. ¶ 45.

### b.  Risk that the Majority of Class Members' Claims May be Time-Barred

Another risk is that a substantial number of Plaintiffs' and Class Members' claims would be found to be time barred. Throughout the Class Period, Defendant maintained a Terms of Service and License Agreement ("Terms of Service" or "TOS") that purported to bar claims asserted by users "arising out of or related to this agreement or [TaxAct's] services or content" unless they were "filed within one year after such claim arose." Hammond Decl. ¶ 47, Ex. 4.

Courts have routinely found provisions like this one, which seeks to create an end-run around a limitations period, to be substantively unconscionable and Plaintiffs believe that the Court would find that this provision is unenforceable. *See, e.g., Fisher v. MoneyGram International, Inc.,* 66 Cal. App. 5th 1084, 1105 (2021) (finding substantively unconscionable an arbitration provision's one-year limitations periods, which was "considerably shorter than the otherwise applicable four-year limitations period [for plaintiff's UCL claim] and wa[s] inherently one-sided against complaining consumers."). There is, however, authority to the contrary, and, thus, there is a risk that the Court could find it appropriate to enforce this provision. *See Capehart v. Heady*, 206 Cal. App. 2d 386, 388 (1962).

Here, the Complaint was filed on January 24, 2023. If the Terms of Service's one-year limitations period was held to be enforceable, the liability period would begin in January 2022; the potential liability period could be reduced from five years (starting in 2018, the year the pixel was placed on the website), down to one year. Plaintiffs have applied a discount based on the litigation risk that a court might decide to allow for this provision to be enforced.

### c.  Risk That Damages Are Limited to the Amounts Paid by Class Members

An additional litigation risk is that the Court may enforce the damages limitation clause contained in the TOS that limits Plaintiffs' and Class Members' recovery to the amount they paid. That clause, addressed to the user, provides: "to the fullest extent permitted by applicable law, the entire liability of TaxAct and the participating parties (jointly) for any reason shall be limited to the amount paid by you for the services and content." Hammond Decl. ¶ 48, Ex. 4.

Plaintiffs believe that the Court or Arbitrator (if a claim was to be arbitrated) would find such a limitation substantively unconscionable and, thus, liable to be severed or otherwise unenforceable as part of an unconscionable contract, because it deprives Plaintiffs and Class Members of the relief to which they are entitled. *See Newton v. AM. Debt. Servs.,* 854 F. Supp. 2d 712, 725 (N.D. Cal. 2012) (finding substantively unconscionable a provision limiting plaintiff to amount of fees paid for the service under the agreement because a customer, like plaintiff, was entitled to greater recovery under relevant statutes). Hammond Decl. ¶ 48.

Nevertheless, Plaintiffs acknowledge that there is a litigation risk that the Court might find that Plaintiffs' and Class Members' recovery is limited as Defendant argues. Were Defendant to prevail on this argument, it would, most importantly, preclude recovery of statutory damages, and would, thus, dramatically reduce Defendant's potential exposure. Plaintiffs, therefore, have applied a discount based on this risk. Hammond Decl. ¶ 46.

### d.   The Risk that Defendant May Be Able to Defeat Class Certification

The Court has not certified the classes proposed in Plaintiffs' Second Amended Complaint. Plaintiffs believe that both the Nationwide Class and the Nationwide Married Filing Jointly Class, and their respective Subclasses, should be certified, nevertheless, as discussed in detail below there are litigation risks associated with certifying these classes for litigation purposes. *See infra* Part V.C.

### 2.   *Comparing the Strengths and Risks of the Invasion of Privacy Claims*

#### a.   Strengths and Weaknesses

To state a claim for intrusion into private matters, a plaintiff must allege "(1) that the defendant intentionally intruded into a place, conversation, or matter as to which the plaintiff had a reasonable expectation of privacy and (2) that intrusion was 'highly offensive' to a reasonable person." *In re Facebook Internet Tracking Litig.*, 263 F. Supp. 3d 836, 846 (N.D. Cal. 2017) (citing *Hernandez v. Hillsdale*, 47 Cal. 4th 272, 285 (2009)). To state a claim for invasion of privacy under the California Constitution, a plaintiff must allege "(1) a specific, legally protected privacy interest, (2) a reasonable expectation of privacy, and (3) a 'sufficiently serious' intrusion by the defendant." *Id.* (quoting *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 26 (1994)). We address Plaintiffs' two invasion of privacy claims (counts one and two in the Second Amended Complaint) together because "the California Supreme Court has moved toward treating the tort and constitutional privacy inquiries as functionally

identical, although the claims do continue to exist as separate claims with technically distinct elements." *Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 689 (N.D. Cal. 2021). When they are brought together, courts conduct a combined inquiry, considering "(1) the nature of any intrusion upon reasonable expectations of privacy, and (2) the offensiveness or seriousness of the intrusion, including any justification and other relevant interests." *Hernandez*, 47 Cal. 4th at 288.

Plaintiffs believe the evidence supports their allegations that TaxAct's customers had a reasonable expectation of privacy both in light of the numerous state and federal statutory provisions that protect the confidentiality of information provided in order to complete a tax return, and in light of TaxAct's representations to its customers that their taxpayer information would be kept private. Defendant contended, however, that Nationwide Class Members and California Subclass Members consented to the use of tracking tools on Defendant's website. And, for all Settlement Class Members, Plaintiffs would be required to prove that the disclosure of users' information was highly offensive or serious, i.e., so offensive as to "shock the ordinary sense of decency or privacy." *Gill v. Hearst Pub. Co.*, 40 Cal. 2d 224, 231 (1953); *see Reade v. New York Times Co.*, No. 22-cv-00543-WBS-KJN, 2022 WL 2396083, at *6 (E.D. Cal. July 1, 2022) (requiring the private facts to be "embarrassing, uncomplimentary, discreditable, indecent, derogatory, or reprehensible"). Defendant contended that none of the information disclosed meets that threshold. Finally, for Nationwide Married Filing Jointly Subclass Members and California Married Filing Jointly Subclass Members, Plaintiffs faced the additional challenge of establishing that they had a reasonable expectation of privacy in information they had provided to their spouse, who then provided it to TaxAct. This could raise issues both on the merits and for class certification purposes.

### b.   Realistic Exposure and Discounts Applied

For Defendant's common law invasion of privacy (first cause of action), Plaintiffs seek on behalf of the Nationwide Class and the Nationwide Married Filing Jointly Class, compensatory damages, disgorgement of profits, and punitive damages. For Defendant's violation of California Constitution, Article 1, Section 1 (second cause of action), Plaintiffs seek the same remedies on behalf of the California Subclass and the California Married Filing Jointly Subclass.

For settlement purposes, Plaintiffs valued Defendant's exposure using the value Class Members place on the information disclosed by Defendant to unauthorized third parties. In a paper presented to

PrivacyCon 2020, hosted by the Federal Trade Commission, the authors reported that U.S. consumers they surveyed would require, on average, $5 per month in order for a financial institution to have the right to share information on their respective account balances with any company or individual willing to pay for it.[9] Hammond Decl. ¶ 50, and Ex. 5.

During the Class Period (between 2018 and 2022), approximately 23,690,215 tax returns were filed by Nationwide Class Members or on behalf of Nationwide Married Filing Jointly Class Members. Hammond Decl. ¶ 50. Thus, we estimate the Defendant's realistic exposure under Plaintiffs' first cause of action as $118,451,075. *Id.* During the Class Period, there were approximately 1,276,490 tax returns filed by California Subclass Members or on behalf of California Married Filing Jointly Subclass Members. Thus, we estimate the Defendant's exposure under Plaintiffs' second cause of action as $6,382,450. *Id.*

These figures are then appropriately subject to discounts for the risks of being compelled to arbitration, the risk of recovery being limited to claims arising after January 24, 2022, the risk of recovery being limited to the amounts paid by Class Members (with none paid by Nationwide Married Filing Jointly Class Members or California Married Filing Jointly Subclass Members), the risk of no class being certified on this claim, and further discounts based on the merits-risks discussed immediately above. There is also a risk that only nominal damages would be awarded. If this occurred, and assuming a nominal damages award of $1 per Class Member, the aggregate damages award available to Nationwide Class Members and Nationwide Married Filing Jointly Class Members would be approximately $10 million, and for California Subclass Members and California Married Filing Jointly Subclass Members it would be approximately $630,000. Hammond Decl. ¶ 51.

### 3. Comparing the Strengths and Risks of Plaintiffs' Claim Under Business & Professions Code §§ 17530.5 et seq.

---

[9] We note that this figure is also consistent with other estimates for the value of personally identifiable confidential information in order cases. *See In re Vizio, Inc., Consumer Privacy Litig.,* 16-ml-02693-JLS-KES, 2019 WL 12966639, at *9 (C.D. Cal. July 31, 2019) (citing expert opinion valuing personally identifiable viewing data as worth approximately $4.76 per individual); *In re Google Plus Profile, Litig.,* No. 18-CV-06164-EJD-VKD, 2021 WL 242887, at *5 (N.D. Cal. Jan. 25, 2021) (final approval order) (citing to expert opinion valuing exposed personal information of Google+ users, including users' profile information, including users' names, genders, and email addresses, as well as additional profile fields, such as occupation and places lived, at between $0.20 to $29.60, depending on the information type disclosed, with an average of $2.50 per individual).

1

a.  <u>Strengths and Weaknesses</u>

2

Because it is "engaged in the business of preparing federal or state income tax returns or assisting

3

taxpayers in preparing those returns," Cal. Bus. & Prof. Code § 17530.5(b), Defendant is prohibited from

4

disclosing the information it obtains while preparing Class Members' tax returns, unless that disclosure

5

is: (i) consented to in writing by the taxpayer in a separate document which states to whom the disclosure

6

will be made and how the information will be used; (ii) expressly authorized by state or federal law; (iii)

7

necessary to the preparation of the return; or (iv) pursuant to court order, § 17530.5(a). Plaintiffs believe

8

that evidence indicates that Defendant made impermissible disclosures without the written consent of

9

Class Members, without any potential authorization in state or federal law, that were not necessary for

10

the preparation of tax returns and were not pursuant to court order.

11

Defendant contended the uses and disclosure of the information at issue, or part of that

12

information, was authorized by the Treasury Regulations promulgated under the Internal Revenue Code

13

§ 7216. These regulations permit disclosure of Tax Return Information to third parties, without taxpayer

14

consent, for a limited number of purposes including: if they are made to contractors performing auxiliary

15

services in connection with tax return preparation, 26 C.F.R. § 303.7216-2(d)(2); to produce statistical

16

information in connection with tax preparation, 26 C.F.R. § 303.7216-2(o); and, to prepare and maintain

17

lists for solicitation of tax return preparation business, 26 C.F.R. § 303.7216-2(n). Defendant contended

18

as described above, that California Subclass Members consented to the use of tracking tools on

19

Defendant's website. Defendant also contended, as described above, that no taxpayer information was

20

actually disclosed.

21

Plaintiffs feel they have the better of this argument, but assign a discount based on a general

22

litigation risk associated with the litigation of each claim as well as the risks associated with arbitration.

23

b.  <u>Realistic Exposure and Discounts Applied</u>

24

Pursuant to Bus. & Prof. Code § 17535, Plaintiffs, on behalf of the California Subclass and the

25

California Married Filing Jointly Subclass, seek restitution and disgorgement of all earnings, profits,

26

compensation, and benefit obtained by Defendant as a result of the unlawful practices described herein

27

in violation of Bus. & Prof. Code § 17530.5. Restitution is subject to offsets for the value of services

28

received by Subclass Members. *See Cortez v. Purolator Air Filtration Products Co.*, 23 Cal. 4th 163,

174 (2000) ("The difference between what the plaintiff paid and the value of what the plaintiff received is a proper measure of restitution.").

For settlement purposes, Plaintiffs estimated the appropriate measure of restitution to be $5 per tax return, as it arguably represents a usable estimate of the difference between the amount a Class Member paid for TaxAct's services in a given year and the amount a Class Member would have paid had they known that their information would be disclosed to third parties. Accordingly, we estimate Defendant's exposure under this cause of action to be $6,382,450. *See* Hammond Decl. ¶ 52.

This figure is subject to appropriate discounts for the risks of being compelled to arbitration, the risk of recovery being limited to claims arising after January 24, 2022, the risk of no class being certified on this claim, and further discounts based on the merits-risks discussed immediately above.

### 4.   *Comparing the Strengths and Risks of Plaintiffs' Tax Preparation Act Claim*

#### a.   Strengths and Weaknesses

The Tax Preparation Act ("TPA") is intended, *inter alia*, "to ensure tax preparers . . . treat confidential information appropriately, [and] to prohibit tax preparers from making fraudulent, untrue, or misleading representations." Bus. & Prof. Code § 22251.1. The TPA specifically imposes several duties on tax preparers, such as Defendant, including the following: (1) not to disclose confidential information obtained by it regarding its client or prospective clients without written permission; (2) not to violate 26 U.S.C. § 7216; and (3) not to violate Bus. & Prof. Code §17530.5. Plaintiffs are confident that they can prove that Defendant failed to perform each of these duties. Plaintiffs believe the evidence supports the allegation that Defendant disclosed Class Members' confidential tax return information to third parties, including Meta and Google, without permission.

Defendant contended that Plaintiffs' claim under the TPA is subject to similar risks to Plaintiffs' claim under Bus. & Prof. Code § 17530.5: that the claims under the TPA were preempted by the Treasury Regulations promulgated under the Internal Revenue Code § 7216; that California Subclass Members did, in fact, consent to the use of tracking tools on Defendant's website; and, that Defendant did not actually disclose any "taxpayer information." Hammond Decl. ¶ 54.

Moreover, even if Plaintiffs overcame the Motion to Compel Arbitration and prevailed at trial on their TPA claim, an award of statutory damages could face a due process challenge—based on the size of the award—and might be reduced.

b. Realistic Exposure and Discounts Applied

Pursuant to Bus. & Prof. § 22257, for each time TaxAct failed to perform a duty "specifically imposed on [it] pursuant to [the Tax Preparation Act]," "any person may maintain an action . . . to recover a civil penalty in the amount of one thousand ($1,000)."

Based on the approximately 628,156 members of the California subclasses, the total exposure on this claim is close to $630 million.[10] Hammond Decl. ¶ 53. Defendant contends that such a figure would be subject to a due process challenge.[11] The Ninth Circuit recently held in *Wakefield v. ViSalus, Inc.* that "aggregated statutory damages . . . are subject to constitutional limitation in extreme situations – that is, when they are 'wholly disproportioned' and 'obviously unreasonable' in relation to the goals of the statute and the conduct the statute prohibits." 51 F. 4th 1109, 1123 (9th Cir. 2022) (quoting *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 67 (1919)); *see also In re Facebook, Inc. Internet Tracking Litigation*, No. 22-16903, 2024 WL 700985, *1 (9th Cir. Feb. 21, 2024) ("With 124 million potentially affected Facebook users in the United States, the district court properly rejected the $1.24 trillion in statutory damages proposed by Objectors as an unreasonable baseline that would violate due process. *See Wakefield*, 51 F.4th at 1121–22). As a court in this district concluded in another class settlement involving statutory damages, "[g]iven the class size, it is not plausible that class members could recover the full amount of the statutory penalties in any event." *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 944 (N.D. Cal. 2013), *aff'd sub nom. Fraley v. Batman*, 638 F. App'x 594 (9th Cir. 2016).

For settlement purposes only, Plaintiffs use $5 per tax return, as discussed above, placing Defendant's exposure on this claim at $6,382,450. Hammond Decl. ¶ 53. And, again, this would be subject to reduction on the basis of the various procedural and merits-based risks discussed above. *Id.*

**5.   *Comparing the Strengths and Risks of Plaintiffs' Electronic Communications Privacy Act Claim***

a. Strengths and Weaknesses

---

[10] This figure is calculated by multiplying 519,060 members of the California Subclass and 109,096 members of the California Married Filing Jointly Subclass by $1,000. Hammond Decl. ¶ 53.

[11] Defendant, as a corporate entity, was sold for $720 million in November 2022. Hammond Decl. ¶ 53. And Defendant's reported revenue (not profit) for the most recent report year, 2021, was $227 million. *Id.*

1   The ECPA makes it unlawful for an entity such as TaxAct to "intentionally intercept[],

2   endeavor[] to intercept, or procure[] any other person to intercept or endeavor to intercept, any wire,

3   oral, or electronic communications." 18 U.S.C. § 2511(1)(a). "Intercept" is defined as "the aural or other

4   acquisition of the contents of any wire, electronic, or oral communication through the use of any

5   electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

6   Defendant contended that information intercepted by the third-party tracking tools on

7   Defendant's website was not the contents of an electronic communication – i.e., "the intended message

8   conveyed by the communication." *In re Zynga Priv. Litig.*, 750 F. 3d 1098, 1106 (9th Cir. 2014).

9   Defendant also contended that the ECPA's party exception to liability applied. However, the ECPA's

10  party exception does not apply when a "communication is intercepted for the purpose of committing any

11  criminal or tortious act in violation of the Constitution or laws of the United States or of any State." *Id.*

12  And, in the instant case, Class Members' electronic communications were intercepted as part of TaxAct's

13  alleged practice of divulging confidential personal and financial information to unauthorized third parties

14  in violation of numerous federal and state laws as described elsewhere in this memorandum and as

15  alleged in Plaintiffs' Second Amended Complaint. Finally, with respect to Nationwide Married Filing

16  Jointly Class Members, the Court may find that they are not covered by the ECPA because the

17  intercepted communications were between their spouses and TaxAct. Although Plaintiffs are confident

18  of their position, these merits arguments warrant a discount.

19              b.  Realistic Exposure and Discounts Applied

20  Pursuant to 18 U.S.C. § 2520, Nationwide Class Members and Nationwide Married Filing Jointly

21  Class Members can recover damages assessed as the greater of the sum of actual damages suffered and

22  any profits made by TaxAct as a result of its violations of the ECPA or statutory damages of whichever

23  is the greater of $100 per day per violation or $10,000. Defendant's exposure based on $10,000 per

24  violation generates a figure of greater than $100 billion.[12] This figure raises due process concerns. For

25  settlement purposes, Plaintiffs estimate  Defendant's exposure on this claim by applying the figure of $5

26  to each tax return filed by or on behalf of Nationwide Class Members and Nationwide Married Filing

27

28

[12] $10,000 x (8,263,789 Nationwide Class Members + 2,042,940 Nationwide Married Filing Jointly Class Members).

Jointly Class Members. Defendant's exposure is $118,451,075, which is based on multiplying the 23,690,215 tax returns that were filed by Class Members during the relevant time period (18,748,659 by Nationwide Class Members plus 4,941,556 by Married Joint Filers Class Members) by $5 per Class Member. Hammond Decl. ¶ 55.

Plaintiffs also note that Defendant's realistic exposure is subject to discounts for the likelihood that this claim is compelled to arbitration, for the possibility that recovery is limited to claims arising in the year preceding the filing of the initial Complaint, for the possibility that recovery is limited only to the amounts paid by Class Members (with none paid by members of the Nationwide Married Filing Jointly Class), for the possibility that no class is certified on this claim, and further discounts based on the merits-risks discussed immediately above. Hammond Decl. ¶ 56.

### 6.   *Comparing the Strengths and Risks of Plaintiffs' California Invasion of Privacy Act Claim*

#### a.   Strengths and Weaknesses

The analysis of the strengths and weaknesses of Plaintiffs' CIPA claim is similar to that of the ECPA, except that, importantly, CIPA is a two-party consent statute. *See Coulter v. Bank of America*, 28 Cal. App. 4th 923, 928-29 (1994); *Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 WL 1744107 (9th Cir. May 31, 2022) (Section 631(a) requires "the prior consent of all parties to a communication."). Thus, CIPA prohibits one party to a communication from aiding another party in intercepting it without the consent of all parties to the communication. *See* Cal. Penal Code § 631(a).

Accordingly, one of the merits-based risks to Plaintiffs' ECPA claim, the question of whether the party exception applies, does not pertain to Plaintiffs' CIPA claim. The remaining risks do, however, still apply. Under § 631(a), unlawful conduct requires that a person, such as Defendant, "aids, agrees with, employs, or conspires with any person" who "intentionally . . . reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable." Thus, Defendant has available to it similar arguments regarding whether Defendant and/or any third party, such as Meta and Google, intended to intercept Class Members' communications and whether the information intercepted constituted the "contents" of any message or communication.

#### b.   Realistic Exposure and Discounts Applied

Pursuant to Penal Code § 637.2, California Subclass Members and California Married Filing Jointly Subclass Members are entitled to the greater of $5,000 per violation or three times the amount of actual damages suffered. Even assuming that each Class Member can recover only $5,000 (rather than $5,000 per tax year, or even $5,000 per website visit), Defendant's theoretical exposure is $3.14 billion.[13] As discussed above, Defendant contended this amount raises due process concerns. Thus, Defendant's exposure, applying the figure of $5 to each tax return filed by or on behalf of California Subclass Members and California Married Filing Jointly Subclass Members, is $6,382,450. Hammond Decl. ¶ 57.

And, this amount is subject to discounts for the risk of being compelled to arbitration, the risk of recovery being limited to claims arising after January 24, 2022, the risk of recovery being limited to the amounts paid by Class Members (with none paid by California Married Filing Jointly Subclass Members), the risk of no class being certified on this claim, and further discounts based on the merits-risks discussed immediately above. In addition, a discount is warranted because the Court might not permit a substantial recovery under both the ECPA and CIPA.

### 7. Comparing the Strengths and Risks of Plaintiffs' Comprehensive Computer Data Access and Fraud Act Claim

#### a. Strengths and Weaknesses

CDAFA prohibits certain computer-based actions such as "[k]nowingly and without permission access[ing] or caus[ing] to be accessed any computer, computer system, or computer network," and "[k]nowingly and without permission provid[ing] or assist[ing] in providing a means of accessing a computer, computer system, or computer network in violation of this section." Penal Code §§ 502(c)(6)-(7). CDAFA also makes it an offense when a person: "Knowingly introduces any computer contaminant into any computer, computer system, or computer network." Pen. Code § 502(c)(8).

There is a paucity of case law interpreting CDAFA. There is authority and there are arguments available to both sides on the key issues, raised by Defendant, of whether the tracking tools introduced by Defendant onto its website constitute computer contaminants because they "usurp[ed] the normal operation of [Class Members'] computer[s]," Pen. Code § 502(b)(12), and whether California Subclass

_____

[13] $5,000 x (519,060 California Subclass Members + 109,096 California Married Filing Jointly Subclass Members).

Members and California Married Filing Jointly Subclass Members are owners of "data who suffer[ed] <u>damage or loss</u> by reason of a violation of [CDAFA]," § 502(e)(1). Plaintiffs believe there is better authority on their side. Nevertheless, there are litigation risks associated with Defendant's arguments on these key issues that warrant a discount.

b. <u>Realistic Exposure and Discounts Applied</u>

Pursuant to Penal Code § 502(e)(1), Plaintiffs will seek to recover compensatory damages on behalf of California Subclass Members and California Married Filing Jointly Subclass Members. Plaintiffs estimate compensatory damages based on the value of the data disclosed, i.e., $5 per tax return. During the Class Period, there were approximately 1,276,490 tax returns filed by California Subclass Members or on behalf of California Married Filing Jointly Subclass Members. Thus, we estimate the Defendant's exposure as $6,382,450. Hammond Decl. ¶ 58. There is also a risk that only nominal damages would be awarded. If this occurred, and assuming a nominal damages award of $1 per Class Member, the aggregate damages award would be approximately $630,000. *Id.* Defendant's realistic exposure is then subject to appropriate discounts; based on both the merits-based risks described immediately above, and the risks generally applicable to all of Plaintiffs' claims.

### 8. *Comparing the Strengths and Risks of Plaintiffs' Claim Under California Penal Code §§ 484, 496*

a. <u>Strengths and Weaknesses</u>

Plaintiffs' claim under California Penal Code §§ 484 and 496 alleges that Defendant feloniously took Class Members' property when it obtained it through the Meta Pixel. Because Defendant concealed, withheld, and/or sold that property to Meta, Google, and other third parties, Plaintiffs allege that they, and Class Members, are entitled to recover under § 496.

"To plausibly state a theft by false pretenses claim, plaintiffs must allege not only that [defendant] made specific false representations to them, but also that plaintiffs transferred their property to [defendant] 'in reliance on the representation.'" *Doe v. Meta Platforms, Inc.*, No. 22-CV-03580-WHO, 2023 WL 5837443, at *15 (N.D. Cal. Sept. 7, 2023) (quoting *People v. Miller*, 81 Cal. App. 4th 1427, 1440 (2000), as modified on denial of reh'g (July 6, 2000)). Defendant contends that Plaintiffs cannot establish either of these factual predicates. Plaintiffs strongly disagree, but do consider this a litigation risk that warrants a discount.

b.   Realistic Exposure and Discounts Applied

Pursuant to Penal Code § 496(c), California Subclass Members and California Married Filing Jointly Subclass Members are entitled to recover "three times the amount of actual damages, if any, sustained . . . costs of suit, and reasonable attorney's fees." As discussed above, we use the figure of $5 per tax return as an estimate of the actual damages suffered by Subclass members. There were approximately 1,276,490 tax returns filed by California Subclass Members or on behalf of California Married Filing Jointly Subclass Members. Thus, we estimate the Defendant's exposure under Plaintiffs' second cause of action as $6,382,450 x 3 = $19,147,350. Hammond Decl. ¶ 60. There is also a risk that only nominal damages would be awarded. If this occurred, and assuming a nominal damages award of $1 per Class Member, the aggregate damages award would be approximately $630,000. *Id*. Defendant's exposure would then be subject to appropriate discounts; based on both the merits-based risks described immediately above, and the risks generally applicable to all of Plaintiffs' claims.

### 9.   *Comparing the Strengths and Risks of Plaintiffs' Breach of Contract Claim*

a.   Strengths and Weaknesses

Plaintiffs' breach of contract claim, on behalf of the Nationwide Class and the Nationwide Married Filing Jointly Class, rests on a third-party beneficiary theory. Central to this theory, and this claim, is the issue of whether Plaintiffs and Class Members were intended beneficiaries of the alleged contract between Meta and Defendant – the Facebook Business Tools Terms. Third-party beneficiary status is a matter of contract interpretation, a party seeking to enforce a contract under such a theory "must plead [that the contract] was made expressly for his [or her] benefit and one in which it clearly appears that he [or she] was a beneficiary." *Schauer v. Mandarin Gems of Cal., Inc.*, 125 Cal. App. 4th 949, 957 (2005) (citation omitted). In making this determination, courts must determine whether an intent to extend third-party beneficiary rights was "clearly manifested by the contracting parties." *Sofias v. Bank of America*, 172 Cal. App. 3d 583, 587 (1985) (citation omitted).

Plaintiffs believe that the evidence supports their claim, but they are mindful of the risk that the Court would find that the requisite intent is not apparent from the Facebook Business Tools Terms themselves. Those Terms expressly provide that they "supplement and amend" the Facebook Commercial Terms of Service which, themselves, in all versions in effect during the Class Period, have expressly provided that they "do not confer any third party beneficiary rights." Hammond Decl. ¶ 61.

While Plaintiff disagree with this interpretation of the contract terms, Defendant's argument in this regard warrants a discount.

### b. Realistic Exposure and Discounts Applied

Pursuant to Plaintiffs' claim, they seek compensatory and consequential damages on behalf of Nationwide Class Members and Nationwide Married Filing Jointly Class Members. Plaintiffs estimate such damages, for settlement purposes, by applying $5 to each tax return filed. Thus, Defendant's exposure is $118,451,075.[14] Hammond Decl. ¶ 61. There is also a risk that only nominal damages would be awarded. If this occurred, and assuming a nominal damages award of $1 per Class Member, the aggregate damages award would be approximately $10 million. Defendant's exposure would then be subject to appropriate discounts; based on both the merits-based risks described immediately above, and the risks generally applicable to all of Plaintiffs' claims.

### 10. Plaintiffs' UCL Claim

Plaintiffs' UCL claim is derivative of their other claims. Moreover, the restitution sought by Plaintiffs under the UCL is also available to them under their § 17535 claim. Given the strength of that claim, Plaintiffs' UCL claim would likely only entitle them to the same or similar monetary relief that they would obtain pursuant to § 17535. Accordingly, Plaintiffs ascribe *de minimus* value to this claim.

### 11. Summary of Plaintiffs' Realistic Exposure Analysis

Plaintiffs bring three claims on behalf of the Nationwide Class and Nationwide Married Filing Jointly Class: (i) violation of the ECPA; (ii) common law invasion of privacy; and (iii) breach of contract. Plaintiffs estimate the Defendant's realistic exposure under each of these claims to be $118,451,075. This calculation is based on multiplying $5 times 23,690,215, representing the total number of tax returns filed by all Class Members during the relevant period. Hammond Decl. ¶¶ 50, 55, 61-62. However, because of the strength of the ECPA claim, and because the other two claims seek to recover on the basis of the same underlying conduct as the ECPA, and both seek the same remedy (compensatory damages),

---

[14] This is calculated by adding 18,748,659 total tax returns filed by Nationwide Class Members between 2018 and 2022 to 4,941,556 tax returns filed by Married Filing Jointly Filers During that same time period (for a total number of 23,690,215 tax returns filed by all Class Members) and multiplying that total number of tax returns filed by $5.

Plaintiffs consider Defendant's realistic aggregate exposure on all three claims to be $118,451,075 plus nominal damages of $20,000,000, for a total of $138,451,075. *Id.* ¶ 63.

Plaintiffs bring a further eight claims on behalf of Members of the California Subclass and the California Married Filing Jointly Subclass. For their TPA claim, Plaintiffs estimate that Defendant's exposure is approximately $6,382,450.[15] And, under their Bus. & Prof. Code § 17535, Plaintiffs estimate that Defendant's exposure is an additional $6,382,450. Hammond Decl. ¶ 52. Several of Plaintiffs' claims seek duplicative remedies and, for settlement purposes only, Plaintiffs do not include cumulative recovery of these remedies in their calculation of Defendant's realistic exposure. Accordingly, Plaintiffs' estimate of Defendant's exposure to the California subclasses (in addition to their portion of the nationwide recovery) is $12,764,900.

This assessment of Defendant's exposure to the nationwide classes and their California subclasses is consistent with the proposed Plan of Allocation. Under the Plan of Allocation, approximately $16.5 million (94.5%) of the $17.45 million QSF is assigned to the nationwide classes (including the portion of the nationwide recovery that will go to members of the California subclasses). As set out above, we estimate that, of the total aggregate realistic exposure ($151,179,975), $138,451,075 (91.6%) is based on the nationwide claims. Hammond Decl. ¶ 65.

**B.    Further Litigation Would be Risky, Expensive, Complex, and Lengthy**

As detailed above, there are a number of risks which, combined, mean that there is no certainty that Plaintiffs and Settlement Class Members would recover anything from this case should it proceed in litigation. Moreover, as discussed above, should litigation continue, this Court would rule on Defendant's Renewed Motion to Compel Arbitration. Should Defendant win, that would be the end of this Action, in this Court; should Defendant lose, it would likely appeal, and these proceedings would be stayed, pending the result of that appeal. Should this case proceed past a Motion to Compel Arbitration and subsequent appeal, the remaining proceedings would also be time consuming and expensive. In short, absent this Settlement, this Action could have taken many years to be finally resolved. Hammond Decl. ¶¶ 66-70.

---

[15] This figure is calculated by multiplying 1,276,490 x $5, which is the total number of tax returns filed by the California Subclass and the California Married Filing Jointly Subclass, by $5 per tax return filed. Hammond Decl. ¶ 53.

**C.     The Risks Associated with Certifying the Classes and Maintaining the Case as a Class Action Through Trial**

In assessing the likelihood that the Classes proposed in Plaintiffs' Second Amended Complaint would be certified by this Court and then upheld on appeal, Plaintiffs understand that Defendant is prepared to present arguments that individualized inquiries abound. For example, while some customers paid money to TaxAct to use its services, approximately a quarter of TaxAct's customer base have not. While Plaintiffs believe that they would have been able to certify all Settlement Classes, such issues, which could vary from Class Member to Class Member, would have resulted in a contested motion for class certification.

With respect to Plaintiffs' claims on behalf of the Nationwide Married Filing Jointly Class and the California Married Filing Jointly Subclass, Plaintiffs expect that Defendant would also argue that the following individualized issues would apply: (i) whether they consented to their spouse's use of the TaxAct website to prepare and file their joint tax return, and (ii) whether the third parties to whom information was disclosed received information sufficient to identify the Class Member. Plaintiffs consider that these additional issues would have made it more challenging to certify the Nationwide Married Filing Jointly Class and the California Married Filing Jointly Subclass.

Notably, however, while these individualized issues may have weighed against certifying one or more of the proposed Classes and/or some of Plaintiffs' claims for litigation purposes, they do not weigh against certification of the Classes and claims for settlement purposes. "A class that is certifiable for settlement may not be certifiable for litigation if the settlement obviates the need to litigate individualized issues that would make a trial unmanageable." *In re Hyundai & Kia Fuel Economy Litig.*, 926 F.3d 539, 558 (9th Cir. 2019) (en banc); *see also Jabbari v. Farmer*, 965 F.3d 1001, 1005–06 (2020).

**D.     The Relief Offered in the Settlement is More Than Adequate**

*1.     The Relief is Fair, Adequate, and Reasonable*

The Settlement Agreement creates a cash settlement of $17,450,000. The monetary settlement, alone, places this Settlement within the range of court-approved settlements in similar cases. *See* Hammond Decl. ¶ 86, Ex. 6. While this is a first of its kind settlement for a pixel case in the tax preparer software context and, accordingly, there is no apples-to-apples comparison, there are several pixel settlements that provide a useful comparison. For example, *In re Vizio, Inc., Consumer Privacy Litig.,*

No. 16-ml-02693-JLS-KES (C.D. Cal.), which involved the unauthorized collection and disclosure of information from VIZIO smart TVs, including content viewing histories, IP addresses, and device identifiers, settled for $17 million on behalf of 16 million class members, resulting in a gross per class member recovery of $1.06. *In re Plaid Inc. Privacy Litig.*, No. 20-cv-03056-DMR (N.D. Cal.), a case involving a fintech company using consumers' banking login credentials to harvest and sell detailed financial data, settled for $58 million on behalf of 98 million class members, a $0.59 gross, per class member recovery. And, notably, unlike in *In re Plaid Inc. Privacy Litig.*, there is, in the instant case, a pending motion to compel arbitration which could eliminate or, at best, eviscerate the potential class recovery. Finally, in *Hodges v. GoodRx Holdings, Inc.*, Case No. 23-cv-24127-BB (S.D. Fl.), defendant collected and disclosed personal and sensitive health information, such as a person's interest in certain drugs. The court granted preliminary approval of a $13 million settlement on behalf of 16.7 million class members, representing a $0.78 average per-class-member recovery. In the instant case, the cash settlement fund alone achieves a gross recovery of $1.69 per class member.

The settlement value in the instant case also compares favorably with the following additional settlements: *In re Facebook, Inc. Consumer Privacy User Profile Litig.*, No. 18-md-02843-VC (N.D. Cal.) (a $725 million data privacy settlement on behalf of approximately 250-280 million consumers, a $2.59 to $2.99 recovery, achieved after more than four years of contentious litigation and in a case with no arbitration risk), and *In re Google Plus Profile Litig.*, No. 18-cv-06614-EJD-VKD (N.D. Cal.), (involving disclosure of users' private profile data, that settled for $7.5 million on behalf of 10 million consumers, a $1.33 gross per class member recovery).

In addition, each Authorized Claimant, in the instant case, is entitled to in-kind relief in the form of Xpert Assist, which represents substantial additional available relief. Taken in combination, the monetary and in-kind relief offered to Settlement Class Members is more than fair, adequate, and reasonable and compares very favorably to the total relief available to claimants in comparable cases. Hammond Decl. ¶ 86.[16]

---

[16] Plaintiffs further note that privacy damages are particularly uncertain and numerous privacy class actions have been settled for non-monetary relief only. *See, e.g., Campbell v. Facebook, Inc.*, No. 13-cv-05996-PJH, 2017 WL 3581179, at *8 (N.D. Cal. Aug. 18, 2017) (granting final approval of declaratory and injunctive relief settlement in litigation alleging Facebook engaged in user privacy

### 2. The Plan of Allocation is Reasonable

The proposed Plan of Allocation, as described above in Part III.B, uses "allocation points" to divide the Net Settlement Fund – i.e., the Qualified Settlement Fund less any Attorneys' Fees and Expenses Award, Service Awards, and Notice and Administration Costs – among Authorized Claimants (i.e., Settlement Class Members who submit a valid claim form). The Net Settlement Fund is then allocated to each Authorized Claimant pro rata based on each Authorized Claimant's share of all allocation points assigned. In additional all Authorized Claimants are entitled to in-kind relief in the form of Xpert Assist.

The Plan of Allocation is fair, reasonable, and adequate because it attempts to achieve the appropriate ratio of allocation points between the respective Settlement Classes and Subclasses such that the allocation points assigned to each group reflect the strength of the claims that Plaintiffs have pursued on their behalf. *See In re Omnivision Techs., Inc.*, 559 F. Supp. 2d at 1045 (Plan of Allocation fair, reasonable, and adequate where it attempted to "allocate the settlement funds to class members based on . . . the strength of their claims on the merits." (citing *In re Oracle Sec. Litig.,* 1994 WL 502054, *1-2 (other citation omitted)).

Plaintiffs have brought three claims on behalf of all Settlement Class Members, and a further eight claims on behalf of only the California Subclass Members and California Married Filing Jointly Subclass Members. Among the California-only claims are the Tax Preparation Act claim and the Business and Professions Code § 17530.5 claim, both of which are particularly strong claims, and under the former of which Subclass Members are entitled to significant statutory damages. Because of the additional claims brought on their behalf, Plaintiffs believe it appropriate to allocate twice as many points to members of each California subclass as to the members of the respective nationwide classes. This results in approximately $16.5 million (94%) of the $17.45 million QSF being assigned to the nationwide

---

violations), *aff'd*, 951 F. 3d 1106 (9th Cir. 2020); *In re Google LLC St. View Elec. Commc'ns Litig.,* No. 10-MD-02184-CRB, 2020 WL 1288377, at *16 (N.D. Cal. Mar. 18, 2020) (granting final approval of settlement providing class with injunctive relief and creating a non-distributable *cy pres* settlement fund in litigation alleging Google violated privacy by illegally gathering Wi-Fi network data); *McDonald, et al. v. Kiloo A/S, et al.,* No. 3:17-cv-04344-JD (N.D. Cal. Apr. 12, 2021), ECF No. 406 (granting final approval of 16 injunctive relief-only settlements in related privacy class actions accusing defendants of violating child privacy protection laws by collecting and selling PII of children).

classes (including the portion of the nationwide recovery that will go to members of the California subclasses), and an additional $960,000 (6%) being assigned to the California subclasses solely based on California-only claims. Of course, the ultimate division of the Net Settlement Fund will depend on which Settlement Class Members file valid claims, but the availability of relief is proportionate to the relative size of Defendant's exposure on nationwide claims (roughly 92% of the total) and Defendant's exposure on California-only claims (roughly 8%). Hammond Decl. ¶¶ 65, 80.

With respect to members of the Nationwide Married Filing Jointly Class and the California Married Filing Jointly Subclass, there are substantial additional risks associated with certification of that Class and Subclass and with the merits of claims pursued on behalf of those members that justify allocating three times as many points to members of the Nationwide Class as to members of the Nationwide Married Filing Jointly Class and three times as many points to members of the California Subclass as to members of the California Married Filing Jointly Subclass. In particular, it is not certain that members of the Nationwide Married Filing Jointly Class could successfully pursue a claim under the ECPA given that it was their spouses' communications that were intercepted. A similar argument could be raised against the California Married Filing Jointly Subclass claim under CIPA. Given the prominence of these claims in Plaintiffs' estimate Defendant's exposure, members of the Married Filing Jointly class and subclass should recover less.

Finally, Counsel for Plaintiffs conducted a comprehensive survey of potential state claims and did not identify a statute in any other state akin to California Business & Professions Code § 17530.5 or California's Tax Preparation Act. Hammond Decl. ¶ 80. The handful of similar statutes that Counsel were able to find all lacked a private right of action. *Id.* Some states do have wiretapping statutes analogous to the California Invasion of Privacy Act, *id.*, but, as explained above, Plaintiffs assigned little value to CIPA in estimating the value of each claim because they did not believe that a court would permit a fulsome recovery under the ECPA <u>and</u> under CIPA. On that basis, Plaintiffs do not believe the release of potential state wiretapping claims by Settlement Class Members requires an adjustment to the ratios of allocation points provided for in the Plan of Allocation.

### E.     The Settlement is Informed by Extensive Discovery

The Settlement was informed by extensive discovery. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.,* 2016 WL 6248426, at *14 ("extensive review of discovery

materials indicates [Plaintiffs have] sufficient information to make an informed decision about the Settlement. As such, this factor favors approving the Settlement."); *see also In re Portal Software Sec. Litig.*, No. C-03-5138-VRW, 2007 WL 4171201, at *4 (N.D. Cal. Nov. 26, 2007).

As discussed above, Class Counsel engaged in extensive investigation, research, and analysis of the Settlements Classes' claims. Class Counsel pursued discovery through Requests for Production and Interrogatories, numerous intensive meet and confers, and by taking the depositions of two of Defendant's key employees. Hammond Decl. ¶¶ 26-33. In response, TaxAct produced 1,926 documents, totaling 7,336 pages of fact-related material for review. *Id.* ¶ 31. In addition, Class Counsel consulted with technical experts who were able to assist Class Counsel in investigating Defendant's conduct regarding the use of third-party tracking tools on its website and to assist Class Counsel in interpreting the voluminous technical documents produced by Defendant. *Id.* ¶¶ 24, 31. Class Counsel also served third-party subpoenas on Meta and Google. *Id.* ¶ 9. And, prior to reaching settlement, Class Counsel had identified and would have sought to depose three former TaxAct employees. *Id.* Class Counsel was also in the process of meeting and conferring with TaxAct regarding the scheduling of a Fed. R. Civ. P. 30(b)(6) deposition on numerous pertinent subjects. *Id.* ¶ 33.

### F.   Counsel Believe the Settlement is an Outstanding Result

Courts recognize that the opinion of experienced counsel supporting settlement after arm's length negotiations is entitled to considerable weight. *Ellis v. Naval Air Rework Facility,* 87 F.R.D. 15, 18 (N.D. Cal. 1980), aff'd, 661 F.2d 939 (9th Cir. 1981) ("[T]he fact that experienced counsel involved in the case approved the settlement after hard-fought negotiations is entitled to considerable weight.").

Here, as described above, Counsel for Plaintiffs conducted an extensive investigation into the Settlement Classes' claims, diligently and aggressively prosecuted the case, and faced a robust defense from litigators from two premier national firms. Through this challenging litigation, the comprehensive mediation before Hunter Hughes Esq. – which saw both Parties submit detailed mediation briefs, and numerous subsequent discussions between the Parties, Counsel for Plaintiffs have been able to form a complete picture of the merits of the Settlement Classes' claims and the quality of the Settlement reached. Counsel for Plaintiffs consider the Settlement to be an outstanding result. It is particularly so,

considering that no Class has been certified and a number of Plaintiffs' claims involve unsettled areas of law.[17]

### G.    Governmental Participation is Not a Factor at Issue Here

This factor is not at issue because there is no government participation in this case. *Betorina v. Randstad US, L.P.*, No. 15-cv-03646-EMC, 2017 WL 1278758, at *9 (N.D. Cal. Apr. 6, 2017); *see also Martin v. Sysco Corp.*, No. 16-cv-00990-DAD-SAB, 2019 WL 3253878, at *6 (E.D. Cal. July 19, 2019).

### H.    The Settlement Also Satisfies the Bluetooth Factors

Prior to class certification, class settlements must withstand a "higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *In re Bluetooth*, 654 F.3d at 946. The Court must be satisfied that "the settlement is not the product of collusion among the negotiating parties." Id. at 946-47. The Ninth Circuit has identified three "signs" of possible collusion:

> (1) "when counsel receive[s] a disproportionate distribution of the settlement"; (2) "when the parties negotiate a 'clear sailing arrangement,'" under which the defendant agrees not to challenge a request for an agreed-upon attorney's fee; and (3) when the agreement contains a "kicker" or "reverter" clause that returns unawarded fees to the defendant, rather than the class.

*Briseno v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021) (quoting *In re Bluetooth*, 654 F.3d at 947). Evaluation of the *Bluetooth* factors assists the Court in determining whether Plaintiffs' Counsel have "allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth*, 654 F. 3d at 947. Here, this evaluation militates strongly in favor of granting preliminary approval as none of the factors applies.

First, the settlement does not provide that Plaintiffs' Counsel should "receive a disproportionate distribution of the settlement." *In re Bluetooth*, 654 F. 3d at 947. Rather, as set forth in the Settlement Agreement, proposed Class Counsel may request no more than 25% of the Qualified Settlement Fund, no more than 25% of the amount (up to $2,500,000) paid separately by Defendant towards Notice and Administration Costs, and no more than 25% of the redeemed value of the In-Kind Payment (up to a

---

[17] In forming his opinion that "the Settlement represents a reasoned and sound resolution of this litigation," Mediator Hughes considered a number of factors, including "the risks, rewards and costs of litigation in this ever developing and evolving factual and legal landscape." Hughes Decl. ¶¶ 16-17.

maximum redeemed value of $5,800,000). Settlement Agreement, ¶ 93. Second, the Settlement Agreement does not include a "clear sailing" agreement. *Bluetooth*, 654 F. 3d at 947. Rather, all attorneys' fees will be determined by the Court and Defendant "reserves the right to oppose the application seeing an Attorneys' Fees and Expenses Award." Settlement Agreement, ¶¶ 93-95. And, third, there is no reversion of any amount of unawarded fees to the Defendant. *See Bluetooth*, 654 F. 3d at 947. The Settlement Agreement establishes that the Qualified Settlement Fund is a non-reversionary settlement fund whereby none of that amount, including any attorneys' fees and costs sought by Settlement Class Counsel but not awarded by the Court, will revert to Defendant. Settlement Agreement ¶¶ 49, 116.

## VI.  THE PROPOSED NOTICE PROGRAM, SETTLEMENT ADMINISTRATOR, AND PROCESS FOR CLAIMS, OPT-OUTS, AND OBJECTIONS SHOULD BE APPROVED

### A.  The Proposed Notice Plan

#### 1.  *Class Notice*

The proposed notice plan is described in extensive detail by the Kroll Declaration at paragraphs 12-29. It will include direct email notice (followed, where necessary, by mail notice), a settlement website, and a toll-free telephone number. Kroll Decl. ¶¶ 12-29. The Settlement Administrator estimates that the email and mail notice program ("direct notice") will likely reach an estimated 91% of the Settlement Class Members. *Id.* ¶ 13. This is consistent with other court-approved, best-practicable notice programs and far exceeds the reach characterized as the "norm" and a "high percentage" by the Federal Judicial Center Guidelines. *Id*. Should the actual reach achieved by direct notice be unsatisfactory, the Parties may agree to use supplemental publication notice including targeted online display and keyword search on Google Ads in both English and Spanish and additional social media outreach through ads on Facebook and Instagram. *Id.* ¶ 26.

As this District's guidance recommends, the draft notices include contact information for class counsel; the address for the settlement website (which will contain a summary of the Settlement; enable online Claim Form filing; allow Settlement Class Members to contact the Settlement Administrator with any questions or changes of address; provide notice of important dates (such as the Final Approval Hearing, Claims Submission Deadline, Objection Deadline, Opt-Out Deadline); provide Settlement Class Members who file Claim Forms online the opportunity to select an electronic payment method

(including Venmo, Zelle, PayPal, e-Mastercard, ACH), or payment by check; and, contain relevant case documents including the Operative Complaint, the Settlement Agreement, the Long-Form Notice, Plaintiffs' motion for preliminary approval, and the Preliminary Approval Order); instructions on how to access the case docket via PACER or in person; the date and time of the final approval hearing, clearly stating that the date may change without further notices to the Classes; and a note to Class Members to check the settlement website or PACER to confirm the date. Settlement Agreement, Ex. C (Short-Form Notice), Ex. D (Long-Form Notice); Kroll Decl. ¶ 28.

### 2. CAFA Notice

The Settlement Administrator will provide notice pursuant to the Class Action Fairness Act within ten days of the filing of the Settlement Agreement. Settlement Agreement, ¶ 137; Kroll Decl. ¶ 15.

### B. The Settlement Administrator

The parties propose Kroll Settlement Administrations LLC, whose business address is 2000 Market Street, Suite 2700, Philadelphia, PA 19103, ("Kroll") as the settlement administrator. Settlement Agreement ¶ 54. The parties obtained competing bids from three prospective settlement administrators. Hammond Decl. ¶ 109. They each proposed generally similar notice and claims processes to the one the parties ultimately selected. *Id.* Counsel for both parties independently evaluated each proposal and then conferred with each other regarding the strengths and perceived weaknesses of each proposal and requested revised proposals from two of the prospective settlement administrators. *Id.* Counsel for both Parties jointly held virtual meetings with all three of the prospective settlement administrators. The proposals included various methods of identifying and validating contact information, direct and indirect notice, and securely administering claims and funds to the class (including through mailed checks or convenient and commonly used consumer electronic payment options). *Id.* At the end of the process, the parties agreed to choose Kroll. *Id.*

Kroll has experience as an appointed settlement administrator in large class-action settlements, including those involving data breach and online tracking technologies. Kroll Decl. ¶¶ 5-11, Ex. A. In addition, Kroll was responsive to a request to revise the scope of the proposal following the virtual meeting with Parties' counsel. Kroll's proposal also highlighted its robust data security standards, which comply with industry-recognized standards and include redundancies to ensure data integrity and

business continuity, and procedures for handling claimant data, which are of critical importance to the Parties. Kroll Decl. ¶¶ 32, 34, 35, 36 and 37. The contract with Kroll also includes privacy and information security requirements, standard professional representations, and Kroll maintains "standard business insurance, including professional liability insurance, cyber insurance and crime insurance". Kroll Decl. ¶ 33. The Parties would not have selected Kroll if they were not comfortable with its data handling practices.

Kroll has estimated the costs of issuing notice and administering the Settlement as between approximately $1.9 and $2.3 million. Kroll Decl. ¶ 38. Notice costs primarily relate to direct notice via email address or postal address, and subsequent direct notice reminders, Kroll Decl. ¶¶ 16-28—which should provide a higher claims rate, particularly given that TaxAct has contact information for each Settlement Class Member given the nature of the business, which Kroll will be able to update and validate.

These costs will be paid out of the Qualified Settlement Fund. Settlement Agreement ¶¶ 49, 72-73. The Parties have agreed that costs of issuing notice and administering the Settlement, up to $2,500,000, will be deducted from the Qualified Settlement Fund, and any additional and unanticipated costs for issuing notice and administering the Settlement will be deducted from the Net Settlement Fund. Settlement Agreement ¶¶ 40, 49, 73. The estimated costs of notice and administration are reasonable when compared to the value of the Settlement and in light of the size of the Settlement Classes. At the midpoint of the estimated range, costs are approximately 12.03% of the $17,450,000 Total Cash Settlement Amount.[18]

### C.    Opt-outs and Objections: Timeline, Instructions, and Forms

The proposed schedule ensures that Settlement Class Members have at least 119 days from the issuance of the order granting preliminary approval to opt out or object to the Settlement, and 35 days to opt out or object to the motion for attorneys' fees and costs. N.D. Cal. Procedural Guidance ¶ 9. The opt-out form and instructions for objecting are in plain language and clearly prompt those who wish to opt-out or to object to provide the specific information each action requires. Settlement Agreement, Exs. C,

---

[18] Calculated using the midrange value of $2,100,000, and $17,450,000 in the Total Cash Settlement Amount.

D, & F. The notice clearly informs class members of the opt-out deadline and how to opt out, and requires that they supply only the information needed to opt out of the settlement. *Id.* Exs. C, D. Similarly, the notice informs class members of the objection deadline and instructs them to send their written objections to the Court, tells them that the Court can only approve or deny the Settlement and cannot change its terms, and clearly identifies the objection deadline. *Id.*

### D.      The Claims Process

#### 1.   *The Claim Form*

It is necessary to require submission of a claim form in order for a Settlement Class Member to receive a monetary payment and Xpert Assist for several reasons. First, by allowing Settlement Class Members to choose a payment option, rather than simply mailing checks, the use of a claim form makes it more likely that a greater proportion of the settlement funds distributed will actually be received and redeemed by Class Members. Hammond Decl. ¶ 82. Second, and relatedly, the use of a claims form, and the corresponding expected use of electronic means of receiving payment by the majority of Authorized Claimants will help reduce the likelihood of fraud in the receipt of settlement funds. *Id.* Third, the use of a claim form allows monetary payments to be provided by means that are significantly less expensive than writing and mailing checks. The Settlement Administrator's estimates of Notice and Administration Costs assume that 80% of Settlement Class Members submitting valid claims will elect payment by electronic means. *Id.* The alternative of sending checks to the best available mailing address would dramatically increase the costs of notice and administration. *Id.* Fourth, it is necessary to confirm whether those Settlement Class Member who are part of the Nationwide Married Filing Jointly Class are also part of the California Married Filing Jointly Subclass. The information required by the claim form will allow the Settlement Administrator to make this determination. Fifth, requiring Settlement Class Members to confirm the address they used when filing a tax return through TaxAct's website will assist the Settlement Administrator in validating their claims (and membership in the Settlement Classes) and in resolving any disputes. *Id.* And sixth, requiring the submission of claim forms will assist TaxAct in understanding the staffing it will need in order to provide the In-Kind Payment (Xpert Assist). TaxAct will have to undertake a considerable amount of advance planning and hiring of tax experts in order to provide the In-Kind Payment in the manner contemplated in the Settlement Agreement and the use of

claim forms will assist TaxAct in forecasting how many individuals will likely avail themselves of complimentary Xpert Assist as part of the Settlement. *Id.*

### 2. *The Estimated Claim Rate*

Plaintiffs' Counsel estimate that the claims rate will be approximately 5%. One broad analysis of 149 consumer class actions conducted by the Federal Trade Commission concluded that "[a]cross all cases in our sample requiring a claims process, the median calculated claims rate was 9%, and the weighted mean (i.e., cases weighted by the number of notice recipients) was 4%." *See* Fed. Trade Comm'n, Consumers & Class Actions: A Retrospective & Analysis of Settlement Campaigns, p. 11 (Sept. 2019) ("FTC Report").[19] However, the weighted mean claims rate for class actions with two or more attempts to reach class members was 9%. FTC Report, pp. 26-27 ("cases that send multiple communications to class members have average and median claims rates that are more than twice as high as cases that attempt to reach class members just once."). And, in the instant case, the Settlement Administrator will send a "reminder notice via email to all Settlement Class Members for whom email addresses are available, and who have not already filed a Claim Form under the Settlement." Kroll Decl. ¶ 25. Because Defendant has email addresses for the substantial majority of Settlement Class Members, these reminder notices will be sent to the substantial majority of Settlement Class Members. Hammond Decl. ¶ 83. Thus, Plaintiffs' Counsel believe a slightly higher-than-average estimated claims rate is reasonable.

In *In re Facebook, Inc. Consumer Privacy User Profile Litig.,* No. 3:18-md-02843-VC (N.D. Cal.), plaintiffs secured a $725 million data privacy settlement on behalf of approximately 250-280 million consumers. In that case, the settlement also permitted class members to submit claims online or by mail. The notice plan, as in the instant case, used direct notice, a toll-free telephone number, and a settlement website. In *In re Facebook, Inc. Consumer Privacy User Profile Litig.*, the notice plan also provided for a media campaign, which, here, is an option if the Parties are not satisfied with the results of the direct notice. We note, however, that the expected 91% reach of the direct notice in the instant

---

[19] This report is available at https://www.ftc.gov/system/files/documents/reports/consumers-class-actions-retrospective-analysis-settlement-campaigns/class_action_fairness_report_0.pdf (last accessed February 23, 2024).

case,[20] is similar to the estimated 93.43% reach of the notice plan in *In re Facebook, Inc. Consumer Privacy User Profile Litig.* Given the similarity of the notice plans and claims process in the two cases, we think *In re Facebook, Inc. Consumer Privacy User Profile Litig.* is a useful comparator. The claims rate ultimately achieved in that case was approximately 7%.

*In re Vizio, Inc., Consumer Privacy Litig.,* No. 16-ml-02693-JLS-KES (C.D. Cal.), was a case involving the unauthorized collection and disclosure of information from VIZIO smart TVs, including content viewing histories, IP addresses, and device identifiers. That case settled for $17 million on behalf of 16 million class members. Following the conclusion of the claims process, the claims rate was 4.1%. In that case, unlike in the instant case, the settlement administrator could only provide direct notice to approximately 49% of the class, with a direct reminder notice only sent to approximately 34% of the class. The notice plan also involved notices sent directly to internet-connected Vizio Smart TVs, a digital media campaign, a settlement website, and a nationwide press release. But the estimated reach achieved by the notice program was only 74% of class members. In the instant case, with an expected reach of the direct notice program of 91% and the likelihood that a substantial majority of Settlement Class Members will receive an email reminder notice, Counsel for Plaintiffs believe that it is fair to estimate a higher claims rate.

The proposed Settlement Administrator stated in its declaration that courts have found that a claims rate of 4.6% in other cases it has handled was more than adequate. In this case, the administrator used a 5% claims rate in calculating its estimated notice and administration costs. Hammond Decl. ¶ 74; Kroll Decl. at Ex. A, p. 3.

## VII.   OTHER CASES AFFECTED

Plaintiffs are aware of one case filed during the pendency of the instant action that would be affected by the proposed Settlement. *Kirkham et al. v. TaxAct, Inc.*, No. 2:23-cv-03303-WB (E.D. Pa.), was initiated on July 25, 2023, in Pennsylvania state court, before being removed to District Court on August 24, 2023. The plaintiffs in *Kirkham* proposed a class defined as:

> All persons who used TaxAct's online tax preparation software from within Pennsylvania to prepare and/or file a tax return during the time that Meta Pixel or

---

[20] Kroll Decl. ¶ 13.

Google Analytics coding was present and active on TaxAct's website and/or its other online mobile and desktop applications up and until November 23, 2022.

And a second class, akin to the Nationwide Married Filing Jointly Class proposed in the instant case, defined as:

All persons whose spouses used TaxAct's online tax preparation software from within Pennsylvania to prepare and/or file a joint tax return during the time that Meta Pixel or Google Analytics coding was present and active on TaxAct's website and/or its other online mobile and desktop applications up and until November 23, 2022.

Plaintiffs' understanding is that all of the claims in *Kirkham* will be released if the proposed Settlement in the instant case is approved. No class has been certified in that case, thus is it only individual claims that would be released. Plaintiffs also understand that TaxAct has filed a motion to compel arbitration in *Kirkham* upon which the respective District Court has not, yet, ruled.

Counsel for Plaintiffs in the instant case have spoken with plaintiffs' counsel in *Kirkham* and sought to agree on how they could coordinate their actions or coordinate their settlement efforts or even reach joint settlement of both cases. No agreement was reached and plaintiffs' counsel in *Kirkham* did not participate in the settlement negotiations in the instant case, and there is no ongoing communication between Counsel for Plaintiffs in the instant case and plaintiffs' counsel in *Kirkham*, nor is there any arrangement or agreement between those two sets of attorneys. Hammond Decl. ¶ 113.

On or about January 22, 2024, plaintiffs' counsel in *Kirkham* filed a motion to be appointed as interim class counsel. On or about February 12, 2024, that Motion was granted.

## VIII.   THE PROPOSED FINAL APPROVAL HEARING SCHEDULE

Plaintiffs' [Proposed] Order Granting Preliminary Approval of Class Action Settlement filed herewith, includes the following proposed schedule for the approval process:

| EVENT | PROPOSED DEADLINE |
|---|---|
| **Preliminary Approval Order** | TBD |
| **Class List due to Administrator** | 14 days after Entry of the Preliminary Approval Order |
| **Notice Date** | 45 days after provision of the Class List (59 days after Entry of Preliminary Approval Order) |
| **Motion for Attorneys' Fees** | 84 days after Entry of Preliminary Approval Order |
| **Opposition to Motion for Attorneys' Fees** | 114 days after Entry of Preliminary Approval Order |

| | |
|---|---|
| **Objection Date** | 60 days after Notice Date (119 days after Entry of Preliminary Approval Order) |
| **Reply in Support of Motion for Attorneys' Fees** | 128 days after Entry of Preliminary Approval Order |
| **Opt-Out Date** | 90 days after Notice Date (149 days after Entry of Preliminary Approval Order) |
| **Claim Deadline** | 90 days after Notice Date (149 days after Entry of Preliminary Approval Order) |
| **Motion for Final Approval** | 120 days after Notice Date (179 days after Entry of Preliminary Approval Order) |
| **Reply in Support of Final Approval Motion and Update Regarding Notice Administration** | 134 days after Notice Date (193 days after Entry of Preliminary Approval Order) |
| **Final Approval Hearing** | TBD |

## IX.    CONCLUSION

For these reasons, Plaintiffs respectfully request that their motion for preliminary approval of the Parties' class action Settlement be granted.


DATED:   February 26, 2024                       Respectfully submitted,


/s/ Julian Hammond
Julian Hammond
*Attorneys for Plaintiffs and Proposed Class Counsel*