IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| Nicholas C. Smith-Washington, Joyce Mahoney, Jonathan Ames, Matthew Hartz, and Jenny Lewis, | : : : : | Civil Action No. 3:23-CV-830-VC |
| Plaintiffs, | : : | Hon. Vince Chhabria, U.S.D.J. |
| v. | : : | Jury Trial Demanded |
| TAXACT, INC., | : : | |
| Defendant. | : | |

---

**MEMORANDUM OF LAW IN IN SUPPORT OF
JAMES KIRKHAM AND MATTHEW SESSOM'S
OBJECTIONS TO THE PROPOSED CLASS ACTION SETTLEMENT**

---

COHEN, PLACITELLA & ROTH, P.C.
James P. Goslee (CA No. 267579)
2001 Market St., Suite 2900
Philadelphia, PA 19103
(215) 567-3500
jgoslee@cprlaw.com

***Counsel to James Kirkham and Matthew Sessoms***

# TABLE OF CONTENTS

**Page(s)**

I.     Introduction ............................................................................................................... 1

II.    Background .................................................................................................................. 2

A.    TaxAct intentionally used pixels to share confidential tax return information with third parties without obtaining its users' "knowing and voluntary" consent. ............................. 2

1. None of the exceptions to the "knowing and voluntary" consent requirement apply. .... 3

2. TaxAct did not obtain "knowing and voluntary consent." ............................................... 5

3. TaxAct's use of pixels is worse than it seems given its failure to perform any due diligence to ensure the safety of its users' confidential tax return information. ............. 8

4. TaxAct has not reformed any of its practices despite its Stipulated Consent Judgment with the Missouri Attorney General ................................................................................. 9

B.    The *Kirkham* Action. ................................................................................................. 10

III.   Argument .................................................................................................................... 11

A.    The proposed settlement's monetary payments fall well below the range of reasonableness. ........................................................................................................ 12

1. The *Smith-Washington* Plaintiffs have exaggerated the risk of a due process challenge. ................................................................................................................................... 12

2. In valuing the class members' damages at just $5.00 per tax return, the *Smith-Washington* Plaintiffs either made a mathematical miscalculation or discounted the damages for litigation risks twice. ............................................................................. 15

B.    Given the extent of TaxAct's records, there is no justification for making this a claims-made settlement. .................................................................................................... 17

C.    The proposed settlement undervalues the claims in the *Kirkham* Action. ......................... 18

D.    The proposed Plan of Allocation is not fair or reasonable. ............................................. 20

1. The POA inappropriately favors class members from California. ............................... 20

2. The proposed settlement also inappropriately favors the "Nationwide Class" over the "Nationwide Married Filing Jointly Class." ...................................................................22

E.   The omission of any injunctive relief in proposed settlement means that class members and their confidential tax return information are still at risk. ...........................................23

IV.   Conclusion ...................................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Allen v. Bedolla*,
    787 F.3d 1218 (9th Cir. 2015) ............................................................... 11

*Cotter v. Lyft, Inc.*,
    176 F. Supp.3d 930 (N.D. Cal. 2016) ............................................... 11, 16

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ......................................................... 11, 14

*In re AdvancePCS Health L.P.*,
    172 S.W.3d 603 (Tex. 2005) .................................................................. 19

*In re: Facebook, Inc. Internet Tracking Litig.*,
    No. 22-16903,
    2024 WL 700984 (9th Cir. Feb. 21, 2024) ............................................ 17

*Kim v. Allison*,
    8 F.4th 1170 (9th Cir. 2021) ..................................................... 12, 18, 19

*Nelson v. Watch House Int'l, LLC*,
    815 F.3d 190 (5th Cir. 2016) .......................................................... 11, 20

*Rodriguez v. W. Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ................................................................ 17

*Royston, Rayzor, Vickery, & Williams, LLP*,
    467 S.W.3d 494 (Tex. 2015) ........................................................... 11, 20

*Wakefield v. ViSalus, Inc.*,
    51 F.4th 1109 (9th Cir. 2022) ................................................... 12, 13, 14

## Statutes

18 Pa. C.S. § 5725(a) ..................................................................................... 12

18 Pa. C.S.A. § 5701, *et seq.* ........................................................................ 10

26 U.S.C.A. § 6103 .................................................................... 10, 12, 21, 22

26 U.S.C.A. § 7431(a)(2) ................................................................ 10, 12, 21

Cal. Bus. & Prof. § 22251(a)(1)(B) ............................................................ 2, 21

iv

Cal. Bus. & Prof. Code § 22250 ...........................................................................................20

Cal. Bus. and Prof. Code § 17530.5 ...............................................................................20, 21

**Treatises**

Manual for Complex Litig. (4th ed.), § 21.11 (Fed. Judicial Ctr. 2004) ......................................19

**Regulations**

26 C.F.R. § 301.6103(c)–1(d) ...........................................................................................22

26 C.F.R. § 301.7216–2 .....................................................................................................5

26 C.F.R. § 301.7216–2(d) ................................................................................................3

26 C.F.R. § 301.7216–2(d)(2) ...........................................................................................4

26 C.F.R. § 301.7216–2(n) ................................................................................................4

26 C.F.R. § 301.7216–2(o) ................................................................................................4

26 C.F.R. § 301.7216–3 .................................................................................................3, 25

26 C.F.R. § 301.7216–3(a) ................................................................................................5

26 C.F.R. § 301.7216–3(a) ................................................................................................5

26 C.F.R. § 301.7216–3(a)(3)(B) ......................................................................................6

26 C.F.R. § 301.7216-3(a)(3)(C) .......................................................................................5

26 C.F.R. § 301.7216-3(b) ................................................................................................7

26 C.F.R. § 301.7216-3(c) .............................................................................................5, 7

26 C.F.R. § 301.7216–3(E) ...............................................................................................5

Rev. Proc. Code 2013-14 ...................................................................................................7

## I.      Introduction

The Plaintiffs in *Kirkham v. TaxAct, Inc.*, No. 23-3303 (E.D. Pa.), James Kirkham and

Matthew Sessoms, object to the proposed settlement. The *Kirkham* Action is a putative class

action that seeks redress for a putative class of Pennsylvanians harmed by TaxAct's use of

pixels. Based on their assessment of the proposed settlement and the investigation and discovery

taken by their counsel, Plaintiffs Kirkham and Sessoms ask this Court to deny the settlement

final approval as it is unfair, inadequate, and unreasonable

First, payment to class members of **$5** per tax return is woefully inadequate as

Pennsylvanians (and others) are entitled to mandatory statutory damages of at least $1,000 per

violation. To land on **$5** per tax return, the *Smith-Washington* Plaintiffs discounted the damages

based on their views of the litigation risks not once but twice for an overall discount of **98.95%**.

Though their methodology undervalues the claims here, were it faithfully applied, it would still

yield damages of **$60** per tax return. On top of discounting the damages for each tax return from

**$60** to **$5,** they gave TaxAct another discount by reducing their estimate from **$118,451,075** ($5

x 23,690,215 tax returns) to just **$14,950,000**, contrary to their own methodology.

Second, to inflate the benefits that each "qualifying" class member will receive under the

proposed settlement, the *Smith-Washington* Plaintiffs have agreed to make this a claims-made

settlement. While claims-made settlements are justified in many cases, they are not here because

TaxAct's records contain all the information necessary to identify and qualify class members.

Third, the proposed settlement fails to properly evaluate the strengths and risks of the

claims of Pennsylvanians given the rulings and discovery in the *Kirkham* Action.

Fourth, the Plan of Allocation ("POA") unduly favors Californians on the claimed basis

that they have stronger causes of action. That however misses (1) the strength of Plaintiffs'

1

Pennsylvania Wiretap Act claims, and (2) that TaxAct is not a "tax preparer" as the California Tax Preparation Act, Cal. Bus. & Prof. § 22251(a)(1)(B), defines that term. The POA also unfairly disadvantages the "Nationwide Married Filing Jointly Subclass" even though, as Plaintiff Sessoms has shown, the members of that subclass are not subject to TaxAct's Terms of Service and License Agreement ("Terms" or "Terms of Service"). Those class members consequently do not face the same risks that others do as they have not agreed to arbitration, shortened statutes of limitations, or caps on damages.

Finally, the *Smith-Washington* Plaintiffs have overvalued the proposed settlement's "in-kind" relief, a year of complimentary use of TaxAct's TaxAct® Xpert Assist service ("Xpert Assist"), which TaxAct has in past years offered to users for free as part of sales promotions. To benefit from this key component of the proposed settlement, the class members would have to continue using TaxAct's services. However, the proposed settlement does nothing to ensure that the class members can safely avail themselves of the Xpert Assist service without further jeopardizing the security of their confidential tax return information even though the *Smith-Washington* Plaintiffs once regarded monetary relief alone as insufficient.

Individually and together, the proposed settlement is not fair, adequate, or reasonable for these reasons and it should therefore be denied final approval.

## II.     Background

### A.  TaxAct intentionally used pixels to share confidential tax return information with third parties without obtaining its users' "knowing and voluntary" consent.

In late 2022, the investigative journalism website The Markup published a report on its discovery that several prominent online tax preparation companies, TaxAct among them, had been "been quietly transmitting sensitive financial information to" to third parties, including

Meta, "when Americans file their taxes online." [1] TaxAct shared this data through a type of computer code installed on its website known as "pixels." [2] The exposé led to a Congressional investigation. And in response to that, TaxAct's President and its Chairman of the Board of Directors took the position that TaxAct's use of pixels "'was and is permitted under the law' and that they did not feel it was necessary to inform taxpayers about its implementation on their website." [3] But that is not true. Under the IRS Code, TaxAct cannot share its users' tax return information without their "knowing and voluntary" consent except under limited circumstances, none of which allowed TaxAct's use of pixels. 26 C.F.R. § 301.7216–3.

1.  **None of the exceptions to the "knowing and voluntary" consent requirement apply.**

**Auxiliary Services** – Responding to an interrogatory in the Pennsylvania litigation on its use of "pixels," TaxAct states that it "first configured the auxiliary services provider technologies at issue to access values associated with data input into a tax return form on January 4, 2018." [4] Under 26 C.F.R. § 301.7216–2(d), a tax return preparer can share tax return information to auxiliary service providers "in connection with the programming, maintenance, repair, testing, or procurement of equipment or software used for purposes of tax return preparation only to the extent necessary for the person to provide the contracted services, and only if the tax return preparer ensures that all individuals who are to receive disclosures of tax return information receive a written notice that informs them of the applicability of sections 6713

---

[1] This brief does not cite any materials TaxAct designated as confidential in *Kirkham*.

[2] https://themarkup.org/pixel-hunt/2022/11/22/tax-filing-websites-have-been-sending-users-financial-information-to-facebook (last accessed August 4, 2024).

[3] https://www.warren.senate.gov/imo/media/doc/Attacks%20on%20Tax%20Privacy%20Report_7.12.2023.pdf (last accessed August 4, 2024).

[4] Exhibit I, Response to Interrogatory No. 2.

and 7216 to them." *Id.*, –2(d)(2). TaxAct's corporate designees, however, admitted that neither Facebook nor Google provided TaxAct with any of these services."[5] Even if they been though, there is no evidence that TaxAct ever supplied them with the required written notices.[6]

**Statistical Compilations** – TaxAct claims it was allowed to share tax return information without its user's consent under Section 301.7216–2(o)'s statistical compilation exception. That exception allows tax return preparers to provide statistical compilations of data to third parties provided that the statistical compilations are "anonymous as to taxpayer identity" and do not "identify dollar amounts of refunds, credits, or deductions associated with tax returns, or percentages relating thereto, whether or not the data are statistical, averaged, aggregated, or anonymous." *Id.* This exception does not apply for three reasons: (1) TaxAct did not provide third parties with statistical compilations but rather sent each taxpayers' information as they clicked through TaxAct's website;[7] (2) TaxAct provided dollar amounts;[8] and (3) the information sent was not anonymous.[9]

**Lists for solicitation of tax return preparation business** – Section 301.7216–2(n) allows tax return preparers to compile and maintain lists of certain tax return information, limited

---

[5] Exhibit F, 3/13/2024 Tr. of Dep. of Mark Jaeger, T63:21 to T70:9.

[6] *Id.*, T70:10 to T71:23; *see also* Exhibit H, 3/6/2024 Dep. Tr. of Rebecca Snider, T56:15-18.

[7] Exhibit E; Exhibit A, Expert Report of Michael Levy, pg. 3-4.

[8] TaxAct reportedly rounds the dollar amounts transmitted. As one of its corporate designees testified, the difference between sharing that someone's adjusted gross income is $100,400 is no different than stating that it is $100,000. As he explained, that difference is not "significant." Exhibit E, T97:6-21.

[9] As TaxAct's corporate designee admitted, by configuring its pixels to have Meta's advanced matching feature activated, Meta could scrape the tax forms "looking at the information within them," including "first name, last name." Exhibit H, 3/6/2024 Dep. Tr. of Rebecca Snider, T39:2-12, T104:16-25, T105:2-25. *See also* Exhibit A, Expert Report of Michael Levy, pgs. 4-5.

to "names, mailing addresses, email addresses, phone numbers, taxpayer entity classification (including "individual" or the specific type of business entity), and income tax return form number (for example, Form 1040–EZ) of taxpayers whose tax returns the tax return preparer has prepared or processed." This exception does not apply because the information shared went well beyond that permitted and TaxAct did not share the information in connection "with the sale or other disposition" of its business.[10]

### 2. TaxAct did not obtain "knowing and voluntary consent."

Because none of Section 301.7216–2's exceptions apply, TaxAct had to obtain "knowing and voluntary consent" to share its users' tax return information with third parties. 26 C.F.R. § 301.7216–3(a). To do that, TaxAct had to obtain consent before sharing the information. *Id.* It also had to identify the "specific purpose" and "the specific recipient (or recipients) of the tax return information," as well as the specific "tax return information to be disclosed or used." *Id.*, -3(a)(3)(B), (C), (E). TaxAct also had to obtain separate consents for disclosures and uses. *Id.*, -3(b), -3(c). TaxAct satisfied none of these requirements.

**Voluntary Consent** – According to TaxAct's corporate designee, TaxAct conditions the provision of its services on its user's consent to the Privacy Notice.[11] That invalidates the users' consent under § 301.7216–3(a).

**Specific Purpose** – In its Privacy Notice, TaxAct states that it uses "your ***Tax Return Information*** only in accordance with applicable laws, such as to prepare, assist in preparing, or obtain or provide services in connection with preparing your tax return or provide you with the

---

[10] Exhibit A, pg. 3.

[11] Exhibit F, 3/13/2024 Tr. of Dep. of Mark Jaeger, T99:6 to T108:7. In contrast, TaxAct specifically allows its professional users to opt-out of the Privacy Notice. *Id.*, T149:12-19.

products and services you specifically request or consent to and other uses or disclosures as you expressly consent from time to time; to allow tax professionals to assist you with questions or tax preparation; or as required by law."[12] In a separate paragraph, the Privacy Notices states that TaxAct uses "***registration information and other information you provide***" for various purposes such as to complete orders, address questions or problems submitted through its technical support and customer services systems, and send users technical notices, updates, and security alerts.[13] One paragraph down, TaxAct states that it may "also share ***limited information*** with companies that provide services that help us market our products."[14] None of these provisions refer to "tax return information."[15] TaxAct's corporate designee moreover could not even define what "limited information" means,[16] which in turn invites the question: "How could a user?"

Specific Recipients – The Privacy Notice states that it may share "***information***" with "vendors, consultants and other service providers who are required to use and disclose such information only to perform services on our behalf."[17] This statement neither refers to tax return information nor identifies specific recipients, as required. 26 C.F.R. § 301.7216–3(a)(3)(B). The Notice also states that TaxAct uses "third party tools, such as Google Analytics and Crazy Egg, to obtain information on how visitors are interacting with our Services" and that these "tools collect information about the performance of our site and how visitors navigate around our web

---

[12] Exhibit J, KTA28-29 (emphasis added).

[13] *Id.*, KTA29 (emphasis added).

[14] *Id.*, KTA 29 (emphasis added).

[15] Exhibit F, 3/13/2024 Tr. of Dep. of Mark Jaeger, T138:16 to T139:5.

[16] *Id.*, T139:6 to T145:15.

[17] Exhibit J, KTA30 (emphasis added).

pages, which allows us to evaluate and further improve or optimize our web pages."[18] In the next paragraph, the Notice states that "TaxAct may monitor and collect information posted on our accounts or linked to us on third party operated social networks or other web offerings such as Twitter, LinkedIn, Facebook, Instagram or Google."[19]  TaxAct nowhere identified any of these companies as recipients of tax return information.

**Signed and Dated by the Taxpayer** – As to class members such as Plaintiff Sessoms who did not personally use TaxAct's services, TaxAct cannot satisfy the requirement that it obtain signed and dated consent from taxpayer as required under Section 301.7216-3(b), -3(c). But even if a user personally and directly uses TaxAct's services, TaxAct still cannot satisfy the IRS's requirements. To obtain valid consent, TaxAct must obtain separate consents for uses and for disclosures, meaning that the consent for uses must be on one screen and the consents for disclosures on another, separate screen. *Id.*, -3(b), -3(c). The design of TaxAct's webpage and the Privacy Notice did not enable TaxAct to obtain "separate consents" as required.[20]

**Revenue Procedure Code 2013-14** – In addition to the above requirements, TaxAct also had to satisfy the requirements of Revenue Procedure Code 2013-14.[21] In addition to clarifying how a tax return preparers operating websites must present the separate disclosures,[22] the

---

[18] *Id.*, KTA28.

[19] *Id.*

[20] Exhibit K; Exhibit F, 3/13/2024 Tr. of Dep. of Mark Jaeger, T173:13 to T174:9,T178:13-22.

[21] Exhibit L.

[22] *Id.*, Rev. Proc. Code 2013-14, § 5.03.

Revenue Procedure Code also requires that certain mandatory information statements appear in the requests.[23] Yet as TaxAct's designee admitted, the Privacy Notice included none.[24]

### 3. TaxAct's use of pixels is worse than it seems given its failure to perform any due diligence to ensure the safety of its users' confidential tax return information.

According to TaxAct's corporate designee, TaxAct intentionally configured the pixels on its website to share information with third parties, including Meta and Google.[25] Yet it did nothing to ensure the security of that information. One would expect that before employing the pixels on its website, TaxAct would have done at least some due diligence. But TaxAct's designee could not identify any steps TaxAct took before 2018 to investigate Facebook or Google's security practices or how they would use such information.[26]

Left unable to identify any steps taken by TaxAct to protect the confidentiality of its users' tax return information, TaxAct's corporate designee explained that TaxAct has "contracts with each of our partners with whom we have pixels" and that "those contracts include language around keeping the information confidential."[27] That claim however does not stand up to scrutiny. For example, the version of Google's Privacy Policy in effect on May 25, 2018, states:

> We provide personal information to our affiliates and other trusted businesses or persons to process it for us, based on our instructions and in compliance with our Privacy Policy and other appropriate confidentiality and security measures. For example, we use service providers to help us with customer support.[28]

---

[23] *Id.*, Rev. Proc. Code 2013-14, § 5.04.

[24] Exhibit F, 3/13/2024 Tr. of Dep. of Mark Jaeger, T166:5 to T173:13.

[25] Exhibit E, 3/7/2024 Dep. Tr. of DJ Gaker, T111:18 to T112:9.

[26] Exhibit H, 3/6/2024 Dep. Tr. of Rebecca Snider, T56:21-23, T58:2-8, T58:17-24, T59:4-23.

[27] Exhibit E, 3/7/2024 Dep. Tr. of DJ Gaker, T79:13-20.

[28] *Id.*, T81:25 to T82:6.

8

When asked about this provision of Google's Privacy Policy, TaxAct's designee could not say whether TaxAct ever investigated what became of the information it shared, including whether it had been shared with others for external processing.[29] He could not even say whether TaxAct ever requested that the information not be shared in the first place or be deleted.[30] So even if the contracts were sufficient, and they were not, TaxAct has failed to do anything to ensure that Meta, Google, and others have actually complied with those agreements.[31]

### 4. TaxAct has not reformed any of its practices despite its Stipulated Consent Judgment with the Missouri Attorney General.

Since the public disclosure of TaxAct's use of pixels and sharing confidential tax return information with various third parties, TaxAct has continued to act irresponsibly. To rebut that perception, the *Smith-Washington* Plaintiffs hold up the October 23, 2023, Stipulated Consent Judgment between TaxAct and the Missouri Attorney General as evidence that TaxAct has reformed its practices.[32] That portrayal is contrary to the evidence revealed during discovery in *Kirkham*, which shows that the Consent Judgment has had no effect on TaxAct's practices. It has not implemented a new security program as required under the Consent Judgment or made any other changes, such as requiring verifiable user consent.[33] Two of its corporate designees, in fact, did not even know that there was a Stipulated Consent Judgment.[34]

---

[29] *Id.*, T82:9-14.

[30] *Id.*, T82:15-19, T83:20 to T84:3-11.

[31] *Id.*, T89:10-15 ("Q. So has TaxAct done anything to ensure that Google, Facebook or any of the other third parties that received tax return information are abiding by the contracts you're discussing? A. I don't know of any efforts to ensure compliance with those contracts.").

[32] Exhibit R.

[33] Exhibit H, 3/6/2024 Dep. Tr. of Rebecca Snider, T109:3-15; Exhibit G, 3/25/2024 Padgett Tr., T148:5 to T153:17; Exhibit E, 3/7/2024 Dep. Tr. of DJ Gaker, T110:21 to T111:17.

[34] Exhibit G, 3/25/2024 Padgett Tr., T144:18-21; Exhibit E, 3/7/2024 Dep. Tr. of DJ Gaker, T109:16 to T110:8.

B. **The *Kirkham* Action.**

Plaintiffs Kirkham and Sessoms brought a putative class action lawsuit on behalf of a putative class of TaxAct's Pennsylvania users—both direct and indirect—and assert claims under the Pennsylvania Wiretap Act, 18 Pa. C.S.A. § 5701, *et seq*., and Sections 6103 and 7431(a)(2) of the Internal Revenue Code. Setting the *Kirkham* Action apart from the one at hand, the parties in *Kirkham* exchanged written discovery responses, produced thousands of pages of documents, and conducted five depositions, four of TaxAct's corporate designees and one of Plaintiff Kirkham. The *Kirkham* Plaintiffs also prevailed over TaxAct on several key issues, including their motion to appoint their counsel as interim class counsel, their motion for a protective order to protect the interests of the putative class members, and as to Plaintiff Sessoms, TaxAct's motion to compel arbitration.[35] Judge Beetlestone found that Plaintiff Sessoms is not bound to TaxAct's Terms of Service and License Agreement ("Terms" or "Terms of Service") because he did not personally use TaxAct's services.

While Judge Beetlestone found that Plaintiff Kirkham had agreed to the Terms and was therefore subject to arbitration, there is substantial reason to believe that in considering TaxAct's appeal of the decision, the Third Circuit will find that TaxAct's Terms are illusory under Texas law in which case, Plaintiff Kirkham would not be bound to them. Judge Beetlestone had found that the arbitration was mutually binding because the rest of the parties' agreement could provide the requisite consideration. That however reflects a misapprehension of Texas law given that the Texas Supreme Court has held that even when an arbitration provision is part of a larger underlying contract, the "arbitration provision remains illusory if the contract permits one party to legitimately avoid its promise to arbitrate, such as by unilaterally amending or terminating the

---

[35] Exhibits B, C, D.

arbitration provision and completely escaping arbitration." *Royston, Rayzor, Vickery, & Williams, LLP*, 467 S.W.3d 494, 505 (Tex. 2015). Under Texas law then, TaxAct's Terms are illusory because they lack a saving clause that requires advance notice and bars retroactive amendments. *Nelson v. Watch House Int'l, LLC*, 815 F.3d 190, 193-94 (5th Cir. 2016). So while Judge Beetlestone granted TaxAct's motion to compel arbitration as to Plaintiff Kirkham, Plaintiff Sessoms has argued before the Third Circuit that TaxAct's Terms lacked consideration and are unenforceable.[36] If the Third Circuit agrees, Plaintiff Kirkham's claims can be revived.

Because TaxAct appealed that decision, the *Kirkham* Action was stayed pending appeal. Once the Third Circuit issues its decision, the *Kirkham* Plaintiffs stand ready to complete discovery, produce expert reports and move for class certification. To preview what will come, Plaintiffs Kirkham and Sessoms are producing an report from Michael Levy, an expert in information security and auditing, who has examined TaxAct's code and its use of pixels to share confidential tax return information to third parties, without user consent.[37]

## III.   Argument

Because the *Smith-Washington* Plaintiffs have sought approval of a nationwide class action settlement before class certification, the proposed settlement is subject to "a high procedural standard." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015). "Additional scrutiny" of the proposed settlement is "needed to ensure that the interests of the class are adequately protected, because the agreement has 'not been negotiated by a court-designated class representative.'" *Cotter v. Lyft, Inc.*, 176 F. Supp.3d 930, 936 (N.D. Cal. 2016) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)). To the contrary, counsel in *Kirkham*,

---

[36] Exhibit M, pgs. 18-20.

[37] Exhibit A.

who have been appointed interim class counsel, were boxed out of the settlement discussions. As a "fiduciary," this Court must therefore "scrutinize" the settlement to look for "subtle signs" "that the class representative and class counsel's self-interest won out over the class's interest." *Kim v. Allison*, 8 F.4th 1170, 1178-80 (9th Cir. 2021). The proposed settlement here cannot withstand such scrutiny and final approval should be denied, as a result.

### A. The proposed settlement's monetary payments fall well below the range of reasonableness.

This case involves (and so the settlement should reflect) statutory damages. *See* 18 Pa. C.S. § 5725(a); 26 U.S.C. §§ 6103 and 7431(a)(2). In enacting statutes with mandatory minimum damages of $1,000 per violation, *id.*, Congress and the Pennsylvania Legislature "set a statutory floor for damages, as opposed to a range[.]" *See Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1123 (9th Cir. 2022). Yet in seeking approval of their nationwide settlement, the *Smith-Washington* Plaintiffs substitute their own judgment for that of the legislatures in contending that damages should be valued at just **$5** per tax return. As a percentage, that is just *0.5%* of the minimum statutorily mandated damages under federal law available not just to Pennsylvanians, but all class members under the IRS Code. That is not even pennies on the dollar. And while the *Smith-Washington* Plaintiffs offer several justifications for so heavily discounting the damages to nearly zero, none can withstand the heightened scrutiny required by the Ninth Circuit.

### 1. The *Smith-Washington* Plaintiffs have exaggerated the risk of a due process challenge.

To justify paying less than a penny on the dollar of the statutory damages available, the *Smith-Washington* Plaintiffs raise the specter that TaxAct could assert a due process challenge based on the scale of the damages in the aggregate. This fear is overblown and premature. The Ninth Circuit has indeed "stress[ed] that only very rarely will an aggregated statutory damages award . . . exceed constitutional limitations where the per-violation amount does not." *Wakefield*,

51 F.4th at 1123. As the Ninth Circuit explained, "Constitutional limits on aggregate statutory damages awards . . . must be reserved for circumstances in which a largely punitive per-violation amount results in an aggregate award that is gravely disproportionate to and unreasonably related to the legal violation committed." *Id.* at 1124. For an award to exceed constitutional limits under this test, the award must be "'so severe and oppressive' as to no longer bear any reasonable or proportioned relationship to the 'offense.'" *Id.* at 1122.

In arguing that an aggregate award here based on statutorily mandated damages might exceed constitutional limits, the *Smith-Washington* Plaintiffs overlook that the Ninth Circuit did not find that the $925,000,000 award in *Wakefield* violated the defendant's due process rights. *Wakefield*, 51 F.4th at 1125. It rather remanded the matter for consideration under the *Six Mexican Workers* factors. *Id.* (citing *Six Mexican Workers*, 904 F.2d at 1309). Given the fact-specific nature of those factors, the *Smith-Washington* Plaintiffs' due process concerns are premature. After all, they do not claim that the per-violation amounts violate due process but rather only that they are constitutionally untenable in the aggregate. That concern is overstated.

**First**, this case involves the disclosure of confidential and highly sensitive tax return information. TaxAct not only transmitted that information to several third parties but did so without proper encryption and regard to the security of the information. TaxAct does not know whether the third parties that received the tax return information transmitted it to others, let alone kept that information secure. And perhaps worse still, discovery in the *Kirkham* Action has revealed that TaxAct has taken no action to determine the status and location of the information and protect it. As the harm caused by these disclosures is latent and difficult to discern, statutory damages are a better measure of damages here.

13

**Second**, the IRS Code and certain state wiretap statutes, like the Pennsylvania Wiretap Act, include floors for damages. As the Ninth Circuit has observed, courts "are constrained by a statute's language and interpret statutes with awareness that Congress could have enacted limits as to damages, including in large class action litigation, provided to discretion to courts to award damages within a given range, or limited liability in any number of ways." *Wakefield*, 51 F.4th at 1124. This is not to say that the payments to class members can never fall below such statutory floors in settling class actions. Of course they can. Settlements are, after all, the "offspring of compromise." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998). But the discounts that the *Smith-Washington* Plaintiffs have granted TaxAct are far too generous given the circumstances here.

**Third**, in arguing that the size of any aggregate award here would violate due process, the *Smith-Washington* Plaintiffs try to have it both ways. They estimate that there would only be 5% claims participation rate. Yet when calculating the potential aggregate awards, they assume that there would not be a 5% participation rate but a 100% participation rate. This inconsistency skews the proposed settlement in TaxAct's favor at the expense of the class members' interests.[38] The *Smith-Washington* Plaintiffs have acted prematurely in deciding that it is necessary to reduce the individual awards to avoid the need for a post-judgment determination of whether the award violates due process. It rather seems that this argument is merely cover for paying the class members' pennies on the dollar.

---

[38] On remand in *Wakefield*, the district court deferred ruling on whether the aggregate award exceeds constitutional limits so that claims process proceed and the number of participating class members could be determined as that number would impact the size of the final aggregate award. Exhibit N, Civil Action No. 15-1857, ECF No. 467, pg. 2.

**2. In valuing the class members' damages at just $5.00 per tax return, the _Smith-Washington_ Plaintiffs either made a mathematical miscalculation or discounted the damages for litigation risks twice.**

Trying to avoid one extreme, the _Smith-Washington_ Plaintiffs have swung to the other by valuing the class members' damages at 0.5% of the statutory damages available to them. In defiance of the legislative determinations of the need for mandatory statutory damages, the _Smith-Washington_ Plaintiffs would have this Court approve a settlement based on their belief that **$5** would appropriately compensate the class members even though **$60** per yearly tax return is the actual measure according to the methodology they outline.

To value the claims, counsel for the _Smith-Washington_ Plaintiffs looked to a single paper presented at PrivacyCon2020, "How Much is Privacy Worth Around the World and Across Platforms?"[39] Citing that paper, counsel states that the "the authors reported that U.S. consumers they surveyed would require, on average, $5 **_per month_** in order for a financial institution to have the right to share information on their respective account balances with any company or individual willing to pay for it."[40] Counsel draw too much from this paper. First, whether the discrete-choice surveys conducted could adequately assess the value consumers accord to privacy is open to debate. Secondly, they assume, with zero evidence, that consumers would place the same value on the privacy of their bank account withdrawals as they would as to their confidential tax return information.

TaxAct has shared with third parties at least 19 data elements from its users' tax returns, including AGI and refund amounts.[41] This differs greatly in kind and number from the single

---

[39] Exhibit O.

[40] Dkt. 121-1, ¶ 49 (emphasis added).

[41] Exhibit A, pg. 3.

piece of data investigated in the PrivacyCon paper. At most, that single piece of information—a person's cash withdrawals from a single bank account—presents a limited snapshot of a person's finances. By contrast, the information from a person's tax returns reveals a far greater if not complete picture. It simply cannot be presumed that consumers would place the same value on their bank withdrawals from a single institution to all the intimate financial information TaxAct shared from its users' tax returns (including information on dependents) to not just one third-party but several.

That said, as counsel to the *Smith-Washington* Plaintiffs acknowledge, the PrivacyCon paper reported that consumers value the privacy of their bank account information at "$5 per month" or $60 a year.[42] While even $60 vastly undervalues the claims considering the mandatory statutory damages, the Plaintiffs' $55 discount from what their own methodology dictates confirms the inadequacy of the settlement. *Cf. Cotter*, 176 F. Supp. 3d at 940 (rejecting settlement because it shortchanged drivers using the methodology counsel devised).

Take for example their calculation that TaxAct's "realistic exposure" is **$118,451,075**. Correcting that calculation to use **$60**, the product is **$1,421,412,900**, for a difference of **$1,302,961,825.** Making this undervaluation worse, the *Smith-Washington* Plaintiffs assume that each class member could allege only one violation per tax return. Each pixel runs independently, meaning there can be several data transmissions to several recipients for each tax return, each of which is a separate violation.[43] In the *Kirkham* Action, TaxAct, in fact, admitted to using the pixels of several third parties, meaning that its exposure is a multiple of $1,421,412,900.

---

[42] Dkt. 121-1 ¶ 49 (emphasis added).

[43] Exhibit A, 3; Exhibit E, 3/7/2024 Dep. Tr. of DJ Gaker, T101:4-17.

Because of the sensitivity of the tax return information and the discovery in *Kirkham*, a stronger case for liability exists here than in many other privacy cases in which the Ninth Circuit has approved settlements that created funds of 10% of the "best-day-in-court" verdict. *See In re: Facebook, Inc. Internet Tracking Litig.*, No. 22-16903, 2024 WL 700984, *1 (9th Cir. Feb. 21, 2024); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009). Despite the strengths of this case, the *Smith-Washington* Plaintiffs have agreed to a settlement that falls several orders of magnitude below these benchmarks. Indeed, using their numbers for illustrative purposes, the "best-day-in-court" verdict would be **$1,421,412,900**, which makes the **$14,950,000** settlement fund just **1.05%** of TaxAct's exposure.

To improve the appearance of the proposed settlement, the *Smith-Washington* Plaintiffs discount the estimate of the damages each class member sustained not once but twice. It first discounted the damages by reducing the estimate from **$60** per tax return to just **$5** for a discount of **91.67%**. The *Smith-Washington* Plaintiffs then discounted the damages again by reducing the aggregated damages of **$118,451,075** to **$14,950,000**, for a second discount of **87.38%**, for a combined discount of **98.95%**. As there is no explanation for discounting damages twice, the settlement falls below the range of reasonableness and should be denied final approval.

**B. Given the extent of TaxAct's records, there is no justification for making this a claims-made settlement.**

The *Smith-Washington* Plaintiffs have not offered an adequate explanation for why this is a claims-made settlement. Counsel for the *Smith-Washington* Plaintiffs contend that using a claims form will make it "more likely that a greater proportion of the settlement funds distributed will actually be received." Dkt. 121, pg. 43. At the same time, counsel admit that "TaxAct has contact information for each Settlement Class Member given the nature of the business, which

Kroll will be able to update and validate." *Id.*, pg. 42. As these positions cannot be reconciled, none of the justifications for a claims-made process bear any relation to the facts of this case.

Counsel for the *Smith-Washington* Plaintiffs also speculate that requiring claim forms "will help reduce the likelihood of fraud in the receipt of settlement funds." Dkt. 121-1, ¶ 82. That however does not bear out. The claim form requires only a (1) name, (2) address, (3) phone number, (4) email address, (5) indication of whether the claimant filed a joint or individual tax return, and (6) signature.[44] Because that is information TaxAct already possesses a claims administrator could verify each claim without requiring any additional information.[45] The argument that the submission of a claims form will also reduce administrative costs because claimants could request electronic payment similarly falters. The claims administrator could pre-approve class members and in providing class notice, let them request electronic payment. Rather than serve any useful end here, the use of a claims made process seems designed to do one thing: suppress the number of class members to inflate the amount each class member is expected to receive under the proposed settlement.

## C. The proposed settlement undervalues the claims in the *Kirkham* Action.

In the rush to settle this matter, the *Smith-Washington* Plaintiffs agreed to a settlement based on assumptions that no longer apply given the advanced procedural posture of the *Kirkham* Action, including the law of that case which Plaintiff Sessoms and other Pennsylvanian's similarly situated to him stand to benefit from. *See Kim*, 8 F.4th at 1179.

In agreeing to the proposed settlement, counsel to the *Smith-Washington* Plaintiffs ignored that Judge Beetlestone appointed Plaintiff Kirkham and Sessoms' counsel as "interim

---

[44] Exhibit P.

[45] Exhibit Q; Exhibit G, 3/25/2024 Padgett Tr., T140:4 to T142:5.

class counsel,"[46] thereby making them responsible for "negotiating settlement." Manual for Complex Litig. (4th ed.), § 21.11 (Fed. Judicial Ctr. 2004). They also overlook Judge Beetlestone's decision denying TaxAct's motion to compel Plaintiff Sessoms to arbitration.[47] What's more, they tout this as an "excellent result" because the motion to compel arbitration in *Smith-Washington* is still pending.[48] In comparable circumstances, where there were competing class actions, the Ninth Circuit has found that a class action settlement should have been denied final approval. *See Kim*, 8 F.4th at 1179.

While TaxAct has appealed that decision to the Third Circuit, that is good reason for this Court to defer ruling on the Motion for Final Approval if it is not ready to deny final approval outright for the other reasons herein. Judge Beetlestone found that Plaintiff Sessoms was not bound by TaxAct's Terms as he did not personally use TaxAct's services and had never visited the website.[49] We are of course mindful that she rejected Plaintiff Kirkham and Sessoms' argument on the lack of consideration for the arbitration agreement under Texas law. But as Plaintiff Sessoms explained in his recently filed brief with the Third Circuit, Judge Bettlestone based her decision on the erroneous assumption that the Texas Supreme Court has not carved out an exception to the rule that "when an arbitration clause is part of an underlying contract," "the rest of the parties' agreement provides the consideration."[50] Since *AdvancePCS*, the Texas Supreme Court has clarified that even when an arbitration provision is part of a larger underlying contract, the "arbitration provision remains illusory if the contract permits one party to

---

[46] Exhibit B, No. 23-3303, ECF No. 49.

[47] Exhibit C, o. 23-3303, ECF Nos. 79, 80.

[48] Dkt. 121, pg. 1.

[49] Exhibit C, pgs. 12-13.

[50] *Id.* (quoting *In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 607 (Tex. 2005)).

legitimately avoid its promise to arbitrate, such as by unilaterally amending or terminating the arbitration provision and completely escaping arbitration." *Royston*, 467 S.W.3d at 505. TaxAct's Terms can therefore be found illusory under Texas law because they lack a saving clause that requires advance notice and bars retroactive amendments. *Nelson*, 815 F.3d at 194-95. Should the Third Circuit find that the absence of such a savings clause renders the arbitration agreement illusory, many of the risks of continuing this litigation will fall away. As a result, prudence counsels patience so that the Third Circuit can rule on TaxAct's appeal, which would clarify the strengths and weaknesses not just of Plaintiff Kirkham and Sessoms' claims, but those of all the putative class members.

### D. The proposed Plan of Allocation is not fair or reasonable.

#### 1. The POA inappropriately favors class members from California.

The settlement structure devised by the *Smith-Washington* Plaintiffs inappropriately favors Californians by awarding them "twice as many points . . . as their Nationwide counterparts."[51] They justify allocating the settlement funds this way on the belief that the "California-specific claims pursuant to the Business & Professions Code § 17530.5 and the Tax Preparation Act (Business & Prof. Code §§ 22250, *et seq.*)" are stronger than those held by others. That belief is unfounded.

The *Smith-Washington* Plaintiffs maintain that under the California Tax Preparation Act, TaxAct, as a "tax preparer," is liable to each California-subclass member for civil penalties of $1,000.[52] Key to this argument is that TaxAct is a "tax preparer" under the California Tax Preparation Act. It is not though. As defined, "tax preparer" means a "corporation, partnership,

---

[51] Dkt. 130, pg. 1.

[52] Dkt. 121, pg. 26 (citing Cal. Bus. & Prof. § 22257).

association, or other entity that has associated with it persons not exempted under Section 22258, which persons shall have as part of their responsibilities the preparation of data **and ultimate signatory authority on tax returns** or that holds itself out as offering those services or having that authority." Cal. Bus. & Prof. § 22251(a)(1)(B) (emphasis added). The *Smith-Washington* Plaintiffs overlook this critical aspect of the definition of "tax preparer" and simply presume that TaxAct qualifies for no reason other than that it provides a software platform that assists users in the preparation and filing of their tax returns.

The *Smith-Washington* Plaintiffs also justify preferential treatment for the California subclass based on Business and Professions Code § 17530.5, which allows for restitution. They estimate that California residents are entitled to restitution of $5 a year based on the supposition that $5 is the "difference between the amount a Class Member paid for TaxAct's services in a given year and the amount a Class Member would have paid."[53] That is not a measure of restitution. It is moreover unclear why class counsel believe this restitution claim, which they value at only $5 per year and would need to prove, is somehow stronger than claims featuring mandatory statutory damages.[54]

In their zeal to favor Californians, the *Smith-Washington* Plaintiffs have not only discounted causes of action such as those asserted based on the Pennsylvania Wiretap Act, but ignored a cause of action under the IRS Code that would accord all class members a federal cause of action featuring mandatory statutory damages. *See* 26 U.S.C. §§ 6103 and 7431(a)(2). They reason that this cause of action does not apply because "TaxAct has not received returns or

---

[53] Dkt. 121, pgs. 24-25

[54] *See* Dkt. 130, pgs. 4-6 (cataloguing states wiretapping laws with mandatory statutory damages).

return information from the Secretary, the I.R.S., or any other governmental entity[.]" Dkt. 125,

pg. 3. That argument barely scratches the surface of the IRS Code and its regulations.

Section 6103 designates tax return information as confidential and prohibits any person "who has

or had access to returns or return information under subsection (c)" from disclosing "any return

or return information obtained by him in any manner[.]" The *Smith-Washington* Plaintiffs

overlook that TaxAct is regulated under Section 6103 given that TaxAct provides electronic

filing services and in connection therewith receives information from the IRS "necessary to

acknowledge that [a] electronic transmission was received and either accepted or rejected by the

Internal Revenue Service, the reason for any rejection, and such other information as the Internal

Revenue Service determines is necessary to the operation of the electronic filing program." 26

C.F.R. § 301.6103(c)–1(d). Because TaxAct provides confirmation of the IRS's receipt and

acceptance of tax returns electronically filed, Section 6103 applies and TaxAct can be found

liable for transmitting tax return information to third parties it received "in any manner." 26

U.S.C. § 6103(a). As all class members stand to benefit from this federal cause of action and the

$1,000 it provides for each violation, the settlement not only inappropriately favors Californians

but unduly discounts the claims of all class members.

### 2. The proposed settlement also inappropriately favors the "Nationwide Class" over the "Nationwide Married Filing Jointly Class."

The POA unfairly and unreasonably allocates members of the California Subclass 6

allocation points while allocating members of the Nationwide Married Filing Jointly Subclass

just 1. Even if allocating extra points to the California Subclass is disregarded, the Nationwide

Class is still allocated 3 points.[55] As a result, someone in the California Subclass would receive 6

---

[55] Dkt. 121-1, ¶ 78.

times the compensation Plaintiff Sessoms receives under the proposed settlement. As Plaintiff

Sessoms is not subject to TaxAct's Terms, he does not face the same risk that others face on

several issues, such as arbitration and whether the class members consented to the disclosure of

their confidential tax return information by agreeing to the Terms. Others similarly situated to

Plaintiff Sessoms likewise do not face these risks and others. To be sure, nearly all the defenses

that the *Smith-Washington* Plaintiffs cite in their assessment of the risks of continuing the

litigation stem entirely from the Terms.[56] The POA thus unfairly and unreasonably disadvantages

certain class members in allocating points.

### E. The omission of any injunctive relief in proposed settlement means that class members and their confidential tax return information are still at risk.

To obtain the full measure of compensation available under the proposed settlement,

class members would need continue their relationship with TaxAct. According to the *Smith-*

*Washington* Plaintiffs, "the Settlement provides for In-Kind relief in the form of complimentary

access to TaxAct® Xpert Assist to Class Members who submit a valid claim form ("Xpert

Assist")."[57] They value this relief at $59.99. The Xpert Assist service is however something

TaxAct has previously offered to its users for free.[58] Aside from how that in-kind relief should be

valued, its inclusion in the proposed settlement raises substantial questions about the fairness,

adequacy, and reasonableness of the settlement and whose interests it serves.

Even if the Xpert Assist component of the proposed settlement is valued at $59.99 per

valid claim, it is worth much more to TaxAct as it encourages class members to continue using

its services. As TaxAct's corporate designee admitted, TaxAct has offered the Xpert Assist

---

[56] Dkt. 121, pgs. 19-21.

[57] Dkt. 121-1, ¶ 72.

[58] Exhibit G, 3/25/2024 Padgett Tr., T86:15 to T87:5.

service for free "[b]ecause [they] believed it was a meaningful way for [TaxAct] to compete against other tax software [companies] and earn the right for customers to file their taxes with us."[59] At the same time, it presents a considerable risk for class members. To mitigate that risk, Smith-Washington's counsel represents that TaxAct "has already agreed to an injunction requiring it to have ceased engaging in the challenged practices."[60] But that agreement is not worth the paper it was written on.

As the Pennsylvania Plaintiffs learned during the depositions of TaxAct's four corporate designees, there are several fundamental problems with the Stipulated Consent Judgment with the Missouri Attorney General, both in its design and its effect. Under Paragraph 2 of the consent order, "TaxAct shall not disclose to Third Parties any Consumer Tax Information collected through use of Tracking Technologies in the Business, unless it has obtained Express Consumer Consent or it is permitted by Section 7216 or any other state or federal law."[61] At first blush, that seems significant. But on examining the Consent Judgment more closely, Paragraph 2 undermines the protections federal law affords taxpayers. As defined, "Express Consumer Consent" means "consent obtained through a discrete, verifiable written or electronically generated agreement, through which the consumer affirmatively agrees to the action, ***including via a banner*** that presents choices that allow the consumer to consent or not consent to the use of Tracking Technology to collect Consumer Tax Information with the default being not consenting." By defining "Express Consumer Consent" in this way, the Consent Judgment would

---

[59] *Id.*, T87:7-9.

[60] Dkt. 121-1, ¶¶ 84-85.

[61] Exhibit R.

allow TaxAct to obtain consent in ways prohibited by federal law as it does not require knowingly and voluntary consent.[62] *See* 26 C.F.R. § 301.7216–3.

In any event, the Stipulated Consent Judgment has had no effect on TaxAct. During discovery in *Kirkham*, TaxAct's corporate designees were questioned on TaxAct's compliance with the Consent Judgment. Two of TaxAct's corporate designees knew nothing about the Consent Judgment. And perhaps more damning, none could identify anything TaxAct has done to comply with the consent order or the federal regulations relating to the use and disclosure of confidential tax return information. So besides overvaluing the benefit of the Xpert Assist component of the proposed settlement, the *Smith-Washington* Plaintiffs have underestimated the risk that the class members would continue to face should they avail themselves of that in-kind benefit. And that is a risk the *Smith-Washington* Plaintiffs have recognized before as requiring injunctive relief as it could not "be adequately addressed by monetary damages alone."[63] That the *Smith-Washington* Plaintiff are now apparently content to forgo obtaining the injunctive relief necessary to protect the class members in exchange for a quick settlement only proves that the proposed settlement is neither fair, adequate, nor reasonable.

## IV.    Conclusion

For all these reasons, Plaintiffs Kirkham and Sessoms object to the proposed Settlement and respectfully ask this Court to deny it final approval.

---

[62] *See supra* pgs. 6-9.

[63] Dkt. 117, ¶ 334.

Respectfully submitted,

COHEN, PLACITELLA & ROTH, P.C.

By:    /s/ James P. Goslee
        James P. Goslee (#267579)
        2001 Market St., Suite 2900
        Philadelphia, PA 19103
        (215) 567-3500
        jGoslee@cprlaw.com

***Counsel to James Kirkham and Matthew Sessoms***

Dated: August 7, 2024

26