JULIAN HAMMOND (SBN 268489)
jhammond@hammondlawpc.com
CHRISTINA TUSAN (SBN 192203)
ctusan@hammondlawpc.com
ADRIAN BARNES (SBN 253131)
abarnes@hammondlawpc.com
ARI CHERNIAK (SBN 290071)
acherniak@hammondlawpc.com
POLINA BRANDLER (SBN 269086)
pbrandler@hammondlawpc.com
HAMMONDLAW, P.C.
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
(310) 601-6766 (Office)
(310) 295-2385 (Fax)

WARREN D. POSTMAN (SBN 330869)
wdp@kellerpostman.com
KELLER POSTMAN LLC
1101 Connecticut Avenue, N.W., Suite 1100
Washington, DC 20036
(312) 741-5220 (Office)
(312) 971-3502 (Fax)

ETHAN H. AMES (SBN 339027)
ethan.ames@kellerpostman.com
KELLER POSTMAN LLC
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
(312) 741-5220 (Office)
(312) 971-3502 (Fax)

*Attorneys for Plaintiffs and the Settlement Classes*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**NICHOLAS C. SMITH-WASHINGTON, JOYCE MAHONEY, JONATHAN AMES, MATTHEW HARTZ, and JENNY LEWIS** on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

**TAXACT, INC.**, an Iowa corporation,

Defendant.

Case No. 3:23-CV-830-VC

Assigned for all purposes to Hon. Vince Chhabria

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

Courtroom: 4, 17th Floor
Hearing Date: November 21, 2024
Hearing Time: 2:00 p.m.

## TABLE OF CONTENTS

NOTICE OF MOTION ..... I

STATEMENT OF ISSUES TO BE DECIDED ..... I

MEMORANDUM OF POINTS AND AUTHORITIES ..... 1

I. INTRODUCTION ..... 1

II. SUMMARY OF SETTLEMENT TERMS ..... 2

- A. DEFINITION OF SETTLEMENT CLASSES ..... 2
- B. SETTLEMENT BENEFITS NEGOTIATED FOR THE CLASSES ..... 3
- C. ALLOCATION OF RELIEF AMONG CLASS MEMBERS ..... 4
- D. RELEASED CLAIMS ..... 4
- E. ATTORNEYS' FEES AND COSTS, AND SERVICE AWARDS FOR CLASS REPRESENTATIVES ..... 4

III. NOTICE IMPLEMENTATION AND ADMINISTRATION ..... 5

- A. THE NOTICE PROGRAM ..... 5
- B. CLAIM FORM AND CLAIM PROCESS ..... 6
- C. NOTICE ADMINISTRATION ..... 7
- D. CLASS RESPONSE – CLAIMS, OPT-OUTS, OBJECTIONS ..... 8
- E. CAFA NOTICE ..... 9

IV. THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT ..... 9

- A. THE SETTLEMENT IS FUNDAMENTALLY FAIR, ADEQUATE, AND REASONABLE ..... 9
  1. The Settlement Satisfies the Bluetooth Factors ..... 10
  2. The Strengths and Risks of Plaintiffs' Case and Risks of Litigation ..... 11
  3. The Relief Offered in Settlement Weighs in Favor of Approval ..... 12
  4. Extent of Discovery and Stage of the Proceedings Support Final Approval ..... 14
  5. Experience and Views of Counsel ..... 14
  6. Presence of Governmental Participant ..... 14
  7. Reaction of the Class Members to the Proposed Settlement ..... 15

V. CONCLUSION ..... 25

## TABLE OF AUTHORITIES

**Cases**

*Briseno v. Henderson,* 998 F.3d 1014 (9th Cir. 2021)....................10

*Browning v. Yahoo! Inc*., No. C04-01463 HRL, 2007 WL 4105971 (N.D. Cal., Nov. 16, 2007) .........11

*Churchill Vill., LLC v. Gen. Elec.,* 361 F.3d 566 (9th Cir. 2004)....................10, 15

*Cortez v. Purolator Air Filtration Products Co.*, 23 Cal. 4th 163 (2000) ....................20

*Cotter v. Lyft, Inc.,* 193 F. Supp. 3d 1030 (N.D. Cal. 2016)....................9, 10

*In re Apple Inc. Device Performance Litig.,* No. 5:18-md-02827-EJD, 2023 WL 2090981 (N.D. Cal. Feb. 17, 2023) ....................8, 15

*In re Bluetooth Headset Products Liability Litig.,* 654 F.3d 935 (9th Cir. 2011)....................10

*In re Facebook Internet Tracking Litig.,* No. 5:12-md-02314-EJD, 2022 WL 16902426 (N.D. Cal. Nov. 10, 2022) ....................8, 15

*In re Linkedin User Priv. Litig.,* 309 F.R.D. 573 (N.D. Cal. Sept. 15, 2015)....................15

*In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008)....................19

*In re Online DVD–Rental Antitrust Litig.*, 779 F.3d 934, 944–45 (9th Cir. 2015)....................8, 15

*In re Oracle Sec. Litig.,* No. C-90-0931-VRW, 1994 WL 502054 (N.D. Cal. June 18, 1994) ....................19

*Johnson v. Quantum Learning Network, Inc.,* No. 15-CV-05013-LHK, 2017 WL 747462 (N.D. Cal., Feb. 27, 2017) ....................12

*Kirkham v. TaxAct, Inc.*, No. 23-cv-03303-WB, 2024 WL 1143481 (E.D. Pa. Mar. 25, 2024) ............23

*Lane v. Facebook, Inc.,* 696 F.3d 811 (9th Cir 2012)....................9

*Linney v. Cellular Alaska P'Ship*, 151 F.3d 1234 (9th Cir. 1998)....................21

*Natl. Rural Telecomm. Coop. v.* DIRECTV, Inc., 221 F.R.D. 523 (C.D. Cal. 2004)....................14

*Ramirez v. Merrill Gardens, LLC,* No. 1:22-cv-00542-SAB, 2024 WL 3011142 (June 11, 2024) .........9

*Rodriguez v. West Publishing Corp.,* 563 F. 3d 948 (9th Cir. 2009)....................12

*Sugarman v. Ducati N. Am., Inc.*, No. 10-CV-05246-JF, 2012 WL 113361 (N.D. Cal. Jan. 12, 2012).16

*Touhey v. United States*, No. 08-1418-VAP, 2011 WL 3179036 (C.D. Cal. July 25, 2011) .................15

///

**Statutes**


18 Pa. C.S.A § 5725 .......... 23

18 Pa. C.S.A. § 5701 et seq. .......... 23

26 U.S.C. § 6103 .......... 20, 23

26 U.S.C. § 6103(a)(3) .......... 21

26 U.S.C. § 6103(c) .......... 20

26 U.S.C. § 7431(a)(2) .......... 20

Cal. Bus. & Prof. Code § 17530.5 .......... 13, 19

Cal. Bus. & Prof. Code § 22250, et seq. .......... 13

Cal. Bus. & Prof. Code § 22251(a) .......... 19

Fed. R. Civ. P. 23(a) .......... 9

Fed. R. Civ. P. 23(b)(3) .......... 9

## NOTICE OF MOTION

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on November 21, 2024, at 2:00 p.m., or as soon thereafter as this matter may be heard, before the Honorable Vince Chhabria, in Courtroom 4, United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California 94102, Plaintiffs Nicholas C. Smith-Washington, Joyce Mahoney, Jonathan Ames, Matthew Hartz, and Jenny Lewis ("Plaintiffs" or "Settlement Class Representatives"), by and through their undersigned counsel, will and hereby do move the Court for an order, pursuant to Federal Rule of Civil Procedure ("Rule") 23(e) for an order granting final approval of the proposed Class Action Settlement Agreement and Release ("Settlement Agreement") entered into by the Plaintiffs/Class Representatives and Defendant TaxAct, Inc., on February 21, 2024. Specifically, Plaintiffs will seek an order from the Court (1) granting final certification of the Settlement Classes under Rule 23(a) and 23(b)(3); (2) finding that notice was the best notice practicable under the circumstances and that it fully complied with the requirements of Rule 23 and of due process; (3) finding that the Settlement is fair, reasonable, and adequate and in the best interest of the Settlement Class Members; and (4) dismissing with prejudice the claims of Plaintiffs and Settlement Class Members against Defendant.

Plaintiffs' motion is based upon this Notice and the Memorandum of Points and Authorities filed herewith; the Declaration of Scott M. Fenwick of Kroll Settlement Administration LLC in Connection With Final Approval of Settlement ("Kroll Decl.") filed herewith; the Declaration of Julian Hammond, ("Hammond Final Decl.") and exhibits thereto, filed herewith; the Declaration of Polina Brandler ("Brandler Decl."), filed herewith; the Declaration of Warren D. Postman, filed herewith ("Postman Final Decl."); the Declaration of James W. Ducayet, filed herewith ("Ducayet Final Decl."); the preliminary approval motion papers; all other papers and records on file in this matter; and such other oral and documentary evidence as may be presented in connection herewith.

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether the Court should grant final certification of the Settlement Classes under Rules 23(a) and 23(b)(3);

2. Whether the Court should grant final approval of the Settlement as fair, reasonable, and

adequate based on the requirements of Rule 23 and of due process; and

3. Whether the Court should enter judgment of dismissal of Plaintiffs' and Settlement Class Members' claims against Defendant.

Respectfully submitted,

HAMMONDLAW, PC.

/s/ Julian Hammond
Julian Hammond (SBN 268489)
jhammond@hammondlawpc.com
1201 Pacific Ave., Suite 600
Tacoma, WA 98402
Tel: (310) 601-1666
Fax: (310) 295-2385

*Counsel for Plaintiffs and the Settlement Classes*

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiffs Nicholas C. Smith-Washington, Joyce Mahoney, Jonathan Ames, Matthew Hartz, and Jenny Lewis ("Plaintiffs" or "Class Representatives") and HammondLaw, P.C. and Keller Postman LLC ("Class Counsel") respectfully seek final approval of the Settlement Agreement reached between Plaintiffs and Defendant TaxAct, Inc., and preliminarily approved by this Court on April 30, 2024, as fair, reasonable, and adequate. The proposed Settlement provides meaningful monetary and in-kind relief and is an excellent result when considering a very real and substantial risk that Plaintiffs' claims would be compelled to individual arbitrations and class recovery would be barred. Class Members will recover from the $17,450,000 cash benefit negotiated on their behalf (which comprises a $14,950,000 non-reversionary common fund plus $2,500,000 for notice and case administration costs, any unused portion of which will be distributed to the Settlement Classes), and will receive substantial in-kind relief with, at this stage, an expected redeemed value of approximately $5.8 million (assuming a 20-25% redemption rate by Authorized Claimants) and a potential value of $25.43 million (based on the current estimated 3.98% claims rate).[1] As discussed in the preliminary approval papers, Class Members in this case will also benefit from the Stipulated Consent Judgment entered into by TaxAct with the Missouri Attorney General which enjoins the practices challenged by Plaintiffs.

The notice campaign was successful. The Settlement Administrator has distributed direct email and/or mail notice to more than 10.6 million Class Members and has sent three reminder emails. Kroll Decl. ¶¶ 7, 11-13. The notice ultimately reached approximately 98.61% of the Class. *Id.* ¶¶ 4, 18. On June 13, 2024, the toll-free, 24-hour telephone number for Settlement Class Members to call to easily

[1] Expected and potential redeemed values based on a standard price of $59.99 for TaxAct® Xpert Assist ("Xpert Assist") during tax-filing season. Xpert Assis is currently discounted to $39.99 during the tax-filing offseason. The expected redeemed value of the in-kind relief assumes that between 20-25% of Authorized Claimants will take advantage of the in-kind relief (423,965 x $59.99 x 20-25% = $5.1-$6.4 million). Hammond Final Decl. ¶ 10. Plaintiffs' prior estimate for the redeemed value of in-kind relief, before the claims rate was known, assumed that 9-10% of all customers returning to file their taxes with TaxAct would redeem their in-kind relief. *See* Hammond Prelim. Decl. (Dkt. 121-1), ¶ 75, n.6. It is reasonable to assume that a significantly higher percentage of Authorized Claimants will take advantage of the in-kind relief; they are the Class Members who have chosen to file a claim form and have expressed an interest in obtaining relief negotiated for the Class. Hammond Final Decl. ¶ 10. The 20-25% rate is also supported by the fact that Authorized Claimants will receive a pop up alerting them to complimentary Xpert Assist when they go to file their 2024 taxes on TaxAct's website. *Id.* The potential value is based on total number of claims received (423,965 x $59.99 = $25.43 million).

access information about the Settlement, established by the Settlement Administrator, went live. *Id*. ¶ 8. Prior to August 26, 2024, Settlement Class Members were able to call the toll-free number and leave a voice message for a call back. *Id.* Beginning August 26, 2024, Settlement Class Members could choose to speak directly with a live operator without leaving a voice message. *Id.* The Settlement Administrator also created a Settlement website, which went live on June 13, 2024, and provided important information about the Settlement, including downloadable versions of the Settlement Agreement and other important documents, permitted Settlement Class Members to file claims, and provided contact information for the Settlement Administrator. *Id.* ¶ 7. Class Members were also provided with contact information for Class Counsel. Both the Settlement Administrator and Class Counsel promptly responded to any calls or emails from Class Members with questions regarding the Settlement. *Id*. ¶¶ 8, 13-14; Brandler Decl. ¶¶ 3-8. The claims process was straightforward and easy to complete. The deadline to submit claim forms or requests for exclusion, was September 11, 2024. As of October 10, 2024, the Settlement Administrator had received 423,965 claim forms (representing a 3.98% claims rate), of which 421,794 have been validated by the Settlement Administrator (a 3.96% validated claims rate),[2] Kroll Decl. ¶ 20 – a figure consistent with claims rates in similar cases. Hammond Prelim Decl. (Dkt. 121-1), ¶ 74.

Of the more than 10.6 million Class Members, only 1,384 Class Members (0.013%) opted out, and only three individuals (0.000028%) submitted objections to the Settlement. Kroll Decl. ¶ 25. One of the objections only takes issue with respect to the distribution of any residual amount remaining from the GSA, (Dkt. 133), and none of the objections is sufficient to prevent final approval as discussed below.

For the reasons discussed herein, and based on the Court's prior finding that the Settlement is fair, reasonable, and adequate, Plaintiffs respectfully request that the Court certify the Settlement Classes and grant final approval of the Settlement.

## II. SUMMARY OF SETTLEMENT TERMS

### A. <u>Definition of Settlement Classes</u>

The Court has preliminarily certified the following two Classes, for the purposes of settlement:

1. "Nationwide Class" is defined as "all natural persons who used a TaxAct online do-it-

[2] The Settlement Administrator is still in the process of reviewing and validating Claim Forms. Kroll Decl. ¶ 20. 194 late Claim Forms have also been received, which the Settlement Administrator intends to process as if timely, unless otherwise directed by the Court. *Id.* ¶ 25.

yourself consumer Form 1040 tax filing product and filed a tax return using the TaxAct online product during the Class Period, and whose postal address listed on such tax return was in the United States." Settlement Agreement ("SA") (Dkt. 121-2), ¶ 55.a; Dkt. 132 at p. 1. The Nationwide Class includes the California Subclass which is defined as "all natural persons who used a TaxAct online do-it-yourself consumer Form 1040 tax filing product and filed a tax return using the TaxAct online product during the Class Period, and whose postal address listed on such tax return was in California." SA (Dkt. 121-2), ¶ 55.a.i.

2. "Nationwide Married Filing Jointly Class" is defined as "all natural persons whose spouse used a TaxAct online do-it-yourself consumer Form 1040 tax filing product and filed a joint tax return using the TaxAct online product during the Class Period, and whose postal address listed on such joint tax return was in the United States." SA (Dkt. 121-2), ¶ 55.b; Dkt. 132 at p. 1. The Nationwide Married Filing Jointly Class includes the California Married Filing Jointly Subclass which is defined as "all natural persons residing in California during the Class Period whose spouse used a TaxAct online do-it-yourself consumer Form 1040 tax filing product and filed a joint tax return using the TaxAct online product during the Class Period, and whose postal address listed on such joint tax return was in California." SA (Dkt. 121-2), ¶ 55.b.i.

**B. Settlement Benefits Negotiated for the Classes**

The Settlement provides for a cash settlement of $17,450,000, for the benefit of the Settlement Classes, comprising a $14,950,000 non-reversionary cash settlement common fund plus up to $2,500,000 of additional funds set aside for Notice and Administration Costs with any remainder of that amount to be distributed to the Settlement Classes ("Total Cash Settlement Amount"). SA (Dkt. 121-2), ¶¶ 49, 63. In addition to the cash component, the Settlement provides for in-kind relief in the form of complimentary access to Xpert Assist for Settlement Class Members who submit a valid claim form. *Id.* ¶¶ 74-76. Xpert Assist is an add-on feature that TaxAct offers to its customers that provides live advice and assistance from tax experts to customers completing a tax return through TaxAct. Xpert Assist is available for any online do-it-yourself consumer Form 1040 tax filing products (including TaxAct's free product) and has been offered by TaxAct at a cost of $59.99. At the achieved 3.98% claims rate, the total redeemable value of the in-kind relief would be as much as $25.4 million.

In addition to the monetary and in-kind relief obtained by Plaintiffs, TaxAct has entered into an injunction with the Missouri Attorney General that prohibits TaxAct from engaging in the practices challenged by Plaintiffs in the instant case. Hammond Prelim Decl. (Dkt. 121-1), ¶ 77.

In exchange for the cash settlement and in-kind relief, described above, Plaintiffs and members of the Settlement Classes will release the claims alleged in their Second Amended Complaint and potential claims based on the identical factual predicate underlying those claims. SA (Dkt. 121-2) ¶ 84.

**C. <u>Allocation of Relief Among Class Members</u>**

The Net Settlement Fund (i.e. the amount remaining after Court-approved awards of attorneys' fees and costs, and service awards) will be allocated according to the Plan of Allocation among the Settlement Class Members who submitted a valid claim form, based on allocation points assigned according to the Settlement Class or Subclass of which they are a member. *See* Hammond Prelim. Decl. (Dkt. 121-1) ¶¶ 71, 78; Plan of Allocation (Dkt. 121-3). As described in the Plan of Allocation and in consideration of the proportional distinctions in statutory damages and relative strength of caselaw in California compared to other states, the points will be assigned and allocated as follows: 3 points to the Members of the Nationwide Class; 6 points to Members of the California Subclass; 1 point to the Members of the Nationwide Married Filing Jointly Class; and 2, points to Members of the California Married Filing Jointly Subclass. If an Authorized Claimant was a member of different Classes or Subclasses during different portions of the Class Period, the Authorized Claimant will be assigned allocation points for the Class or Subclass to which the Authorized Claimant belonged that has the highest number of allocation points. The ultimate monetary recoveries will be proportionate to the allocation points assigned to each Settlement Class Member. Plan of Allocation (Dkt. 121-3).

**D. <u>Released Claims</u>**

The Settlement releases the specified parties, including TaxAct, Inc. and its current, former and/or future parents, subsidiaries, divisions, affiliated and/or departments from all claims asserted in the Plaintiffs' Second Amended Complaint and potential claims based on the identical factual predicate underlying those claims. SA (Dkt. 121-2) ¶ 83.

**E. <u>Attorneys' Fees and Costs, and Service Awards for Class Representatives</u>**

In accordance with the terms of the Settlement Agreement, Class Counsel seek, in a separately

filed motion, attorneys' fees of $4,362,500 (25% of the Qualified Settlement Fund) plus up to $1,450,000 (25% of the estimated actual redeemed value of the in-kind relief, up to a maximum redeemed value of $5.8 million); reimbursement of out-of-pocket litigation expenses, and service awards for the lead Plaintiffs and Class Representatives, in the amount of $10,000 each. *See* Mot. for Attorneys' Fees (Dkt. 134). The Settlement Agreement does not depend on the Court's approval of the requested fees, costs, or service awards. SA (Dkt. 121-2) ¶¶ 95, 97.

## III. NOTICE IMPLEMENTATION AND ADMINISTRATION

### A. The Notice Program

In accordance with the Court's order granting preliminary approval, the Settlement Administrator (Kroll Settlement Administration LLC ("Kroll")) commenced notice to the Settlement Classes on June 13, 2024 by sending direct notice by email, and by a postcard mailed in those instances where only a physical mailing address was available for a Class Member in the data provided by Defendant or when email notice bounced back as undeliverable.[3] Decl. of Scott M. Fenwick of Kroll in Connection with Court's Aug. 17, 2024, Order ("Kroll August Decl.") (Dkt. 137) ¶¶ 7-10. Kroll also sent three email reminder notices, on August 12, August 26, and on September 5, 2024, respectively, in coordination with Plaintiffs' and Defendant's Counsel. Kroll Decl. ¶¶ 11-13, Exs. C-E. Given that TaxAct had email addresses for the vast majority of its customers, and given the fact that Kroll mailed postcard notices in those instances where emails were not available or bounced back, Kroll estimates that the Notice program successfully delivered email or postcard notices to approximately 98.61% of the Settlement Class Members. *Id.* ¶¶ 4, 18.

The notice, substantially in the form set forth in the Settlement Agreement and approved by the Court, clearly summarized the nature of the action, the terms of settlement, including the definition of Classes covered by the settlement, the relief provided, the attorneys' fees and costs and services awards that Plaintiffs intended to seek, and the scope of the release. *See* Kroll August Decl., Ex. A (Dkt. 137-1) (Postcard Notice), Ex. D (Dkt. 137-4) (Email Notice). The notice also described the procedure for

[3] Prior to mailing physical notices, Kroll updated addresses through the USPS's National Change of Address database and Kroll promptly remailed any notices returned with a forwarding address. Kroll conducted an in-depth skip trace for all Notices returned by the USPS without a forwarding address. Kroll Decl. ¶¶ 7, 16-17.

submitting a claim form, for opting out, and for objecting to the Settlement, and provided contact information for Kroll and Class Counsel. *Id.*

Kroll also established a settlement website (www.taxactclasssettlement.com), which contains general information about the case and the Settlement, answers to frequently asked questions, important dates and deadlines, and key documents filed in the case, including: the Settlement Agreement; the Claims Form; the Opt Out Form; the operative Complaint; the preliminary approval papers; the motion for attorneys' fees, costs, and service awards; and the long-form and short-form notices. The website also included a portal where Class Members could complete and submit their Claims Form or Opt Out Form, up through the September 11, 2024, claims and opt-out deadline. Alternatively, Class Members (and any other individual who believed they were a Class Member) could download the Claim Form from the settlement website and submit a copy by email, fax, or regular mail. The settlement website also provides the Settlement Administrator's contact information on the home page, under the "Contact" tab, and the short-form and long-form notice. The FAQs and the long-form Notice also provide the telephone number for Class Counsel. Kroll August Decl. (Dkt. 137) ¶ 4; Kroll Decl. ¶ 8. As of October 8, 2024, the settlement website had received 1,419,597 visits from more than 1 million unique users, totaling 3,055,726 pageviews. Kroll Decl. ¶ 8.

In addition, the Settlement Administrator set up a toll-free number for Settlement Class Members to call and obtain answers to frequently asked questions. Kroll Decl. ¶ 9. On August 26, 2024, the Settlement Administrator switched the hotline to a system through which Class Members could reach a live operator, rather than having to leave a voice message for a call back. *Id.*

### B. <u>Claim Form and Claim Process</u>

The settlement website provided a simple process for Settlement Class Members to electronically submit their claims. Given that Class Members used an online system to file their taxes, and the settlement allows individuals to select their preferred method of payment, the electronic submission of Claim Forms was expected to be the easiest, most secure, and most certain method. The settlement website contained an online Claim portal, which Class Members could access by typing in their unique Class Member ID, which was pre-printed on their respective Notices. The simple Claim Form required only necessary contact information, selection from a drop-down menu of whether the Class Member had

filed a "joint tax return" or an "individual return," contact information tied to the Class Member's www.taxact.com account (if different from their current contact information), and selection of the preferred payment method (Venmo, prepaid credit card, other electronic means, or paper check). Kroll August Decl., Ex. C (Dkt. 137-3); Kroll Decl. ¶ 21. In addition, Class Members were also informed, in the Long-Form Notice, the Short-Form Notice, and the FAQs on the settlement website, that, as an alternative to submitting the Claim Form electronically, they could download, print out and mail in the Claim Form. Kroll Decl. ¶ 22.

### C. <u>Notice Administration</u>

As of October 8, 2024, the settlement website had over 3 million page views. Kroll Decl. ¶ 8. As of that same date, Kroll has received and responded to 12,529 calls (*Id.* ¶ 14) and has received and responded to 8,527 questions via email (*Id.* ¶ 15). Class Counsel received and responded to calls/emails from 18 individuals (one of whom turned out to not be a Class Member). Brandler Decl. ¶¶ 3-8. Both Class Counsel and the Settlement Administrator have promptly responded to inquiries from Class Members about the proposed Settlement and the case. Kroll Decl. ¶¶ 14-15; Brandler Decl. ¶¶ 3-8.

As this Court is aware, Mr. George Dillman complained, to the Court, to Plaintiffs' Counsel, and to the Settlement Administrator of being unable to use the Claim portal on the case settlement website as he did not receive a Class Member ID. *See* Court Order, Aug. 27, 2024; Brandler Decl., ¶ 7; Kroll August Decl. (Dkt. 137), ¶ 13. Dillman was promptly advised by Plaintiffs' Counsel that his name did not appear on the Class list and that he could nevertheless submit a Claim Form by downloading a copy from the Settlement Website, and that the Settlement Administrator would then determine whether he was a Class Member. Brandler Decl., ¶ 7. Dillman submitted a claim form on August 26, 2024. *Id.* Kroll has subsequently determined that Dillman is *not* a Class Member. *Id.*; Kroll August Decl. (Dkt. 137), ¶ 13.

If individuals contacted the Settlement Administrator and/or Class Counsel stating that they were not able to use the claims portal on the Settlement website because they did not have a Class Member ID, which was required to access the portal, Kroll either provided these individuals with their Class Member ID (which had already been emailed and/or mailed to them) or advised the individuals that they were not Class Members according to the information on the Class list. Kroll Decl. ¶ 24. For those

individuals who were advised that they were not Class Members, Kroll and Plaintiffs' Counsel explained that they could still download a Claim Form from the case website, complete it, and submit it via email, fax, or mail and Kroll would subsequently determine whether they were or were not a Class Member. *Id.*; *see* Brandler Decl. ¶ 7.

One individual complained that the settlement website, he believed, had a virus because his virus protection software sent him an alert when he tried to access the case settlement website. Class Counsel immediately informed the Settlement Administrator of this issue, who assured Class Counsel that the settlement website platforms are all "penetration tested" prior to going live, and that additional tests, including manual penetration testers, were employed after the complaint was received, and detected absolutely no issues with the website. Brandler Decl. ¶ 6. This individual was also offered to submit a paper Claim Form if he continued to have concerns regarding the website. *Id.*

The other questions posted by Class Members included questions about whether the Settlement was real and not a scam, how to file a claim form, whether married joint filers were eligible to file two separate claim forms, where to find the Class Member ID, the amount of expected monetary compensation, the expected date that settlement funds would be distributed, how to redeem Xpert Assist, whether Class Member's information would become public if they submitted a Claim Form, whether the settlement website was secure. Kroll Decl. ¶ 15; Brandler Decl. ¶ 5. As noted above, all these questions have been promptly and fully answered. Kroll Decl. ¶¶ 14-15; Brandler Decl. ¶¶ 3-8.

**D. <u>Class Response – Claims, Opt-Outs, Objections</u>**

The reaction of the Classes to the Settlement has been overwhelmingly positive. As of October 10, 2024, a total of 423,965 claims have been submitted, representing a 3.98% claims-rate. Kroll Decl. ¶ 20. This claims rate is in line with many similar consumer class actions. *See e.g. In re Facebook Internet Tracking Litig.,* 2022 WL 16902426, at *8 (N.D. Cal. Nov. 10, 2022) (approving a settlement with a claims rate approaching 2%); *In re Apple Inc. Device Performance Litig.,* No. 5:18-md-02827-EJD, 2023 WL 2090981, at *8 (N.D. Cal. Feb. 17, 2023) (approving a settlement with a 3.6% claims rate). *See also In re Online DVD–Rental Antitrust Litig.*, 779 F.3d 934, 944–45 (9th Cir. 2015) (approving 35 million member settlement where less than 4% filed claims).

And, of the over 10.6 million Class Members, only 1,384 opted out (less than 0.013%), only

three (3) Class Members have filed objections (less than 0.000028%). *See* Kroll Decl. ¶ 26.

### E. <u>CAFA Notice</u>

The Settlement Administrator has provided notice pursuant to the Class Action Fairness Act within ten days of the filing of the Motion for Preliminary Approval to the Attorney General of the United States and to the Attorneys General of 55 states and territories. Kroll Decl. ¶ 3, Exs. A & B.

## IV. THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT

In its preliminary approval order, the Court found that the Settlement Classes met all the Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation and the Rule 23(b)(3)'s requirements of predominance and superiority to support preliminary certification. Dkt. 132. The Court also found that the Settlement is fair, reasonable, and adequate. Id. No developments have taken place between the time of preliminary approval and now that would call into question the Court's earlier finding that the Settlement is fair, reasonable, and adequate. And, as discussed in detail below, none of the issues raised by the three objectors suggests any flaw with the Settlement that would in any way warrant a denial of the instant Motion. Accordingly, Plaintiffs now request the Court affirm its preliminary findings and grant final approval.

### A. <u>The Settlement is Fundamentally Fair, Adequate, and Reasonable</u>

"The primary inquiry [at final approval] is whether the proposed settlement 'is fundamentally fair, adequate, and reasonable.'" *Ramirez v. Merrill Gardens, LLC,* No. 1:22-cv-00542-SAB, 2024 WL 3011142, at *6 (June 11, 2024) (quoting *Lane v. Facebook, Inc.,* 696 F.3d 811, 818 (9th Cir 2012)); see also Fed. R. Civ. P. 23(e)(2); *Cotter v. Lyft, Inc.,* 193 F. Supp. 3d 1030, 1035 (N.D. Cal. 2016). In determining whether a class settlement is fair, reasonable, and adequate, courts are required to consider several factors, including:

> (1) the strength of the plaintiffs' case, (2) the risk, expense, complexity and likely duration of further litigation; (3) the risk of maintaining class action status throughout trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of governmental participants; and (8) the reaction of the class members to the proposed settlement.

*In re Online DVD-Rental Antitrust Litig.,* 779 F.3d at 944 (quoting *Churchill Vill., LLC v. Gen. Elec.,* 361 F.3d 566, 575 (9th Cir. 2004)).

In addition, settlements reached before the class is certified, require a "higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *In re Bluetooth Headset Products Liability Litig.,* 654 F.3d 935, 946 (9th Cir. 2011). The Court must be satisfied that "the settlement is not the product of collusion among the negotiating parties." *Id.* at 946-47. The Ninth Circuit has identified three "signs" of possible collusion:

> (1) "when counsel receive[s] a disproportionate distribution of the settlement"; (2) "when the parties negotiate a 'clear sailing arrangement,'" under which the defendant agrees not to challenge a request for an agreed-upon attorney's fee; and (3) when the agreement contains a "kicker" or "reverter" clause that returns unawarded fees to the defendant, rather than the class.

*Briseno v. Henderson,* 998 F.3d 1014, 1023 (9th Cir. 2021) (quoting *In re Bluetooth,* 654 F.3d at 947).

As this Court made clear, it "review[s] class action settlements just as carefully at the initial stage as [it] do[es] at the final stage." *Cotter,* 193 F.Supp.3d at 1037. In granting Plaintiffs' Motion for Preliminary Approval, this Court has already reviewed the *Chruchill* factors, as well as the "signs" of possible collusion identified in *In re Bluetooth* and has reached the conclusion that the settlement is "fair, reasonable, and adequate." Dkt. 132. Evaluation of the *Churchill* factors and the absence of any signs of collusion continues to support the Court's earlier finding that the Settlement is fair, reasonable, and adequate, and the remaining factor to be considered – the reaction of the Classes, also supports final approval.

**1. <u>The Settlement Satisfies the Bluetooth Factors</u>**

None of the "signs" of possible collusion appear in this case. Class Counsel will not "receive a disproportionate distribution of the settlement"; Class Counsel seeks only 25% of the Cash Settlement Fund and only up to 25% of the actual redeemed value of in-kind relief (up to a maximum redeemed value of $5.8 million). SA (Dkt. 121-2), ¶ 93; Mot. for Fees, (Dkt. 134). The 25% fee request is fair and reasonable both because it is the fees benchmark in the Ninth Circuit and because it is supported by a cross-check multiplier. *See* Mot. for Fees (Dkt. 134), pp. 8-17. The request is further supported and made reasonable by the fact that Class Counsel took the case on a contingent basis and displayed considerable skill and strategic judgment in negotiating a settlement with a value of approximately $23 million while

facing a very real risk of zero recovery. There is no "clear sailing" agreement. Class Counsel is required to move separately for fees and costs (and service awards) and Defendant's Counsel retains the right to object to the fees and costs request (and to the request for service awards). SA (Dkt. 121-2), ¶¶ 93, 95. Finally, the settlement is non-reversionary. *Id*. ¶¶ 49, 116.

### 2. **The Strengths and Risks of Plaintiffs' Case and Risks of Litigation**

The first three *Churchill* factors require courts to assess plaintiffs' likelihood of success on the merits and the range of possible recovery against the risks posed by continued litigation and maintaining class action status through to trial. Plaintiffs believe their claims have merit and have pursued them aggressively, but acknowledge legal uncertainties that threatened their ability to recover and support settlement. Plaintiffs allege that TaxAct collected and shared Class Members' confidential taxpayer information with unauthorized third parties by embedding tracking tools software on its website unbeknownst to Class Members, and thus violated federal, state, and common law. However, as discussed in their motion for preliminary approval, Plaintiffs faced a very significant risk of having their claims compelled to individual arbitration, as well as the risk that the majority of Class Members' claims would be time barred by the one-year statute of limitations provision in Defendant's Terms of Use, and that available damages would be limited to the amounts paid by the Class Members for Defendant's service, also pursuant to a provision in Defendant's Terms of Use. Mot. for Prelim. App. (Dkt. 121), pp. 19-21. Plaintiffs also faced the additional risk that Defendant would be able to defeat class certification. *Id.*, pp. 21, 34, as well as risks with respect to the merits of each claim, even if they won the arbitration issue and certified a class. *Id.*, pp. 21-33.

The Settlement reflects the strengths and weaknesses of Plaintiffs' claims, as well as the risks posed by Defendant's pending motion to compel arbitration, by the limits placed by Defendant's Terms of Use on the statute of limitations and recovery, and by the risks posed by Defendant's arguments on certification and with respect to the merits of each claim. *See* Mot. for Prelim. App. (Dkt. 121), pp. 18-33. "In considering the strength of Plaintiff's case, legal uncertainties at the time of settlement—particularly those which go to fundamental legal issues—favor approval." *Browning v. Yahoo! Inc*., No. C04-01463 HRL, 2007 WL 4105971, at *10 (N.D. Cal., Nov. 16, 2007); *Johnson v. Quantum Learning Network, Inc.,* No. 15-CV-05013-LHK, 2017 WL 747462, at *1 (N.D. Cal., Feb. 27, 2017) (pending

motion to compel arbitration created uncertainty supporting approval).

Moreover, as addressed in Plaintiffs' Motion for Preliminary Approval, further litigation would be risky, expensive, complex, and lengthy. Dkt. 121, p. 33. Even were Plaintiffs to prevail, in part on in whole, on Defendant's Renewed Motion to Compel Arbitration, Defendant would almost certainly appeal, and these proceedings would likely be stayed, pending the result of that appeal. Should this case proceed past a Motion to Compel Arbitration and subsequent appeal, the remaining proceedings would also be time consuming and expensive. Proceeding to trial would likely take years and require extensive fact and expert discovery and motion practice, including a contested motion to certify, and motions for summary judgment. Plaintiffs would face challenges in obtaining class certification in general, and particularly with respect to the Nationwide Married Filing Jointly Class and the California Married Filing Jointly Subclass. *See* Mot. for Prelim. App. (Dkt. 121) at pp. 33-34. Even if Plaintiffs certified a class, there is also a risk that a court would decertify the class, which it can do at any time. *Rodriguez v. West Publishing Corp.,* 563 F. 3d 948, 966 (9th Cir. 2009). In addition, even if Plaintiffs prevailed on the merits, proving injury would be difficult on a class basis and the Court could find that compensatory damages (based on the value of the disclosed information) were fairly small (around $5 per Class Member) or could award only nominal damages, such as $1 per Class Member.

### 3. <u>**The Relief Offered in Settlement Weighs in Favor of Approval**</u>

#### a. <u>The Settlement Provides Substantial Relief</u>

The Settlement provides substantial relief for the Classes both in comparison with the monetary relief in similar pixel settlements and in consideration of the in-kind relief that will be provided. The cash settlement of $17,450,000, alone, places this Settlement within the range of court-approved settlements in similar pixel cases. *See* Hammond Prelim Decl. (Dkt. 121-1), ¶ 86, Ex. 6; Mot. for Prelim. App. (Dkt. 121), pp. 34-35. In addition to the monetary relief, all Settlement Class Members who submitted valid claim forms will be entitled to complimentary use of the Xpert Assist, which represents substantial additional available relief. Further, TaxAct has entered into an injunction with the Missouri Attorney General that prohibits it from engaging in the practices challenged by Plaintiffs in this case.

#### b. <u>The Plan of Allocation is Fair and Reasonable</u>

The proposed Plan of Allocation is fair and reasonable because it ties recovery to the strength of

the claims of each Class and Subclass. As discussed in Plaintiffs' preliminary approval papers, (Dkt. 121), and Plaintiffs' Supplemental Brief in Support of Motion for Preliminary Approval, (Dkt. 130), the proposed allocation is primarily based on the relative value and strength of the California-specific claims pursuant to the Business & Professions Code § 17530.5 and the Tax Preparation Act (Bus. & Prof. Code § 22250, et seq.). These tax-preparation related claims are unique to California and there are no analogous statutes in other states with a private right of action. Mot. for Prelim. App. (Dkt. 121), pp. 36-37; Pltfs' Supp. Brief (Dkt. 130), 1:2-13, 14:6-15; Hammond Prelim. Decl. (Dkt. 121-1), ¶ 78. Accordingly, these California-specific claims warrant the greater allocation of points to California members of the Classes. Mot. for Prelim. App. (Dkt. 121), pp. 36-37; Pltfs' Supp. Brief (Dkt. 130), 1:2-13, 14:6-15.

Additionally, as explained in Plaintiffs' preliminary approval papers and supplemental briefing, a considerable part of the maximum potential recovery for all Class Members is based on Defendant's alleged violation of the federal Electronic Communications Privacy Act ("ECPA"). At $10,000 per Class Member, Defendant's potential exposure based on ECPA violations is greater than $100 billion. The Court would likely award the maximum feasible amount under Plaintiffs' ECPA claim, and therefore is unlikely to award additional amounts based on ECPA's California counterpart statute (California Invasion of Privacy Act ("CIPA")) and analogous wiretapping claims under laws of other states. Accordingly, Plaintiffs assigned little value to CIPA and analogous laws of other states and do not believe that release of these state law wiretap claims affects the allocation of points. Pltfs' Supp. Brief (Dkt. 130), 1:14-22; Mot. for Prelim. App. (Dkt. 121), p. 37.

With respect to members of the Married Filing Jointly Class and California Married Filing Jointly Subclass, there are substantial additional risks associated with certification and the merits of their claims that justify allocating three times as many points to members of the Nationwide Class and the California Subclass as to their Married Filing Jointly counterparts. In particular, it is not certain that Married Filing Jointly Class Members could successfully pursue a claim under the ECPA given that it was their spouses' communications that were intercepted. Likewise, it is not certain that Married Filing Jointly Subclass Members could successfully pursue wiretapping claims under CIPA or other analogous state laws. Given the prominence of these claims (and ECPA in particular) in Plaintiffs' estimate of Defendant's exposure,

members of the Married Filing Jointly Class and Subclass should recover less. Mot. for Prelim. App. (Dkt. 121), p. 37.

### 4. <u>Extent of Discovery and Stage of the Proceedings Support Final Approval</u>

Class settlements are presumed fair when they are reached "following sufficient discovery and genuine arms-length negotiation." *Natl. Rural Telecomm. Coop. v. DIRECTV, Inc.,* 221 F.R.D. 523, 528 (C.D. Cal. 2004). Class Counsel conducted extensive investigation and analysis prior to the filing of the complaint and has obtained substantial information and data through written discovery, depositions, and informal discovery, to further develop and fully evaluate the strengths and weaknesses of Plaintiffs' claims. Class Counsel retained two technical experts who reviewed the network traffic on Defendant's website, tracking tools and their configuration, conducted extensive legal analysis of Plaintiffs' claims, and drafted a detailed 65-page First Amended Complaint, which contained ten causes of actions. Class Counsel reviewed publicly available information, including information in connection with the investigation launched by Senator Elizabeth Warren into the misuse of consumer information by tax preparation companies, including TaxAct, filings in the case against TaxAct by the Missouri Attorney General, and TaxAct's corporate filings. *See* Hammond Prelim. Decl. (Dkt. 121-1), ¶¶ 8, 24-25.

In addition, Class Counsel were able to assess the risks of arbitration given that at the time of settlement the parties had fully briefed Defendant's renewed motion to compel arbitration. All this research, work, and investigation provided Class Counsel with ample information to negotiate the proposed Settlement, which was negotiated through arm's-length, hard-fought and protracted settlement negotiations. *See* Mot. for Prelim. App. (Dkt. 121), pp. 5-6.

### 5. <u>Experience and Views of Counsel</u>

Class Counsel, who are highly skilled and well-regarded members of the bar, with extensive experience in complex class action litigation, including consumer litigation, believe that the Settlement is a very good result for Class Members. They are keenly aware of both the strengths and weaknesses of class claims, have considered the numerous issues in this case, and wholeheartedly endorse the settlement as fair, reasonable, and adequate. *See* Hammond Prelim. Decl. (Dkt. 121-1) ¶¶ 10, 73, 100.

### 6. <u>Presence of Governmental Participant</u>

There are no government participants in this settlement. However, CAFA Notice was duly given

to the Attorney General of the United States and to the fifty-five (55) state and territorial Attorneys General identified in the service list for the CAFA Notice. *See* Kroll Decl., ¶ 3, Exs. A & B.

**7. Reaction of the Class Members to the Proposed Settlement**

The positive reaction of the Class Members to the Settlement weighs in favor of final approval.

a. Over 423,000 Claims Have Been Submitted (a 3.98% Claims Rate)

As of October 10, 2024, which is 27 days after the response deadline, 423,965 claims have been submitted, which represents a claims rate of 3.98%. Kroll Decl. ¶ 20. Kroll continues to review and validate Claim Forms and has validated 421,794 thus far – a validated claims rate of 3.96%. *Id.* This claims rate is in line with the range of rates typically achieved in recent cases involving data privacy and is higher than rates other courts have found to support final approval in similar data privacy and data-breach cases. *See, e.g.*, *In re Facebook Internet Tracking Litig.,* 2022 WL 16902426, at *8 (approving a settlement with a claims rate approaching 2%); *In re Apple Inc. Device Performance Litig.,* 2023 WL 2090981, at *8 (approving a settlement with a 3.6% claims rate); *see also In re Online DVD–Rental Antitrust Litig.*, 779 F.3d at 944–45 (approving 35 million member settlement where less than 4% filed claims); *Touhey v. United States*, No. 08-1418-VAP, 2011 WL 3179036, at *7–8 (C.D. Cal. July 25, 2011) (approving class action settlement with response rate of 2%).

b. The Few Opt-Outs and Objections Do Not Undermine the Conclusion that the Settlement is Fair, Reasonable, and Adequate

To date, only 1,384 Class Members have opted out, and only two objections have been filed. Kroll Decl. ¶ 26. In addition, one request was filed for leave to file a late, supplemental objection; a request on which the Court has not ruled. *See* Dkt. 145. Given that there are over 10.6 million Class Members, these results indicate overwhelming approval of the Settlement by the Classes and support settlement approval. The opt outs represent only about 0.013% of the Class, and the objections represent only about 0.000028% of the Class, both negligible proportions. *See In re Linkedin User Priv. Litig.,* 309 F.R.D. 573, 589 (N.D. Cal. Sept. 15, 2015) ("A low number of opt-outs and objections in comparison to class size is typically a factor that supports settlement approval."); *see also Churchill Vill., LLC v. General Electric*, 361 F.3d at 577 (affirming district court's approval of settlement where 45 of 90,000 class members—or 0.05%—objected to the settlement and 0.56% opted out); *Sugarman v. Ducati N.*

*Am., Inc.*, No. 10-CV-05246-JF, 2012 WL 113361, at *3 (N.D. Cal. Jan. 12, 2012) (noting that objections from 42 of 38,774 class members—more than 0.1 percent – is a "positive response").

*1. Dodson Objection, Dkt. 133*

Objector Professor Scott Dodson filed a written objection (Dkt. 133) on the basis that, he believes, "[t]he settlement and plan of allocation do not contain adequate detail to ensure appropriate distribution of any residual amount of the settlement fund." To the contrary, there are two potential sources of residual funds, and the Plan of Allocation makes clear how those funds will be treated.

First, the Plan of Allocation makes clear that settlement funds that are allocated to the Settlement Classes but are, ultimately, unclaimed by Settlement Class Members who submit valid claims ("Authorized Claimants") will be redistributed to the Authorized Claimants on a pro rata basis if it is practicable to do so. If there are unclaimed settlement funds that are impracticable to redistribute to Authorized Claimants, then the parties will present a proposal to the Court for treatment of those residual funds. *See* Plan of Allocation (Dkt. 121-3), ¶ 8 ("Residual funds"). And the Plan of Allocation explicitly states that "[s]uch method of distribution shall be effected if the Court approves (or approves it in modified form)." *Id.*[4]

Second, the Plan of Allocation explains that "[a]ny portion of the Attorneys' Fees and Expenses Award based on the In-Kind payment and held back by the Settlement Administrator that is not ultimately distributed as attorneys' fees to Settlement Class Counsel will be distributed to the National Consumer Law Center as *cy pres*." Plan of Allocation (Dkt. 121-3), ¶ 8; *see also* SA (Dkt. 121-2), ¶ 94 (same). Thus, there is clarity as to how this category of residual funds will be distributed.

Dodson also expresses concerns that, absent a Court Order specifically addressing it at this time or modifications to the Settlement Agreement, any future process for distributing residual funds may not comport with the Northern District of California's Procedural Guidance for Class Action Settlements and "principles" identified in Dodson's letter. Plaintiffs categorically reject this prospect and Dodson's

[4] Plaintiffs note that Authorized Claimants can choose from 6 methods of receiving their payment, 5 of which are electronic and are unlikely to result in substantial unclaimed funds. Moreover, those Authorized Claimants who receive paper checks will have explicitly elected to receive payment by that method. Accordingly, Plaintiffs do not expect that there will be a substantial amount in residual funds resulting from unclaimed payments. Plaintiffs believe, as reflected in the Plan of Allocation, that it is appropriate to reserve the decision of how to distribute these residual funds until the parties and the Court know the amount involved.

related suggestion that Class Counsel and the Court will not give the process "the attention and scrutiny needed to ensure appropriate disposition of residual funds."

In addition, Dodson questions the parties' selection of the National Consumer Law Center (NCLC) as *cy pres*. Class Counsel has submitted a declaration herewith that sets out how the NCLC is related to the subject matter of the instant case and Class Members' claims, *see* Hammond Decl. ¶¶ 4-8, and Class Counsel and Counsel for Defendant have submitted declarations which affirm that none of the parties nor any of their counsel has any relationship with the NCLC. *See* Hammond Decl. ¶ 9; Postman Decl. ¶ 5; Ducayet Decl. ¶ 6. Dodson noted, in particular, that NCLC has a focus on low-income and other vulnerable people. Class Members, of course, include both low-income and other vulnerable people, but the NCLC's work is not confined to representing the interests of those groups. Indeed, NCLC addresses myriad issues affecting all American consumers. Hammond Decl. ¶ 5. Among the issues addressed by the NCLC which are relevant to the Class Members' claims in the instant case are: advocacy for consumer protection regulation; work to protect state consumer protective statutes prohibiting deceptive practices; and, work to oppose mandatory arbitration clauses and class action waivers in consumer contracts. *Id.* ¶¶ 5-8.

Finally, Dodson asserts that "the court should consider withholding some portion of class counsel's fee award until any residual distribution has been approved." But this is already addressed in the Court's Standing Order which states that: "[t]he Court will typically withhold between 10% and 20% of the attorneys' fees granted at final approval until after the Post-Distribution Accounting has been filed." As indicated in their proposed Order Granting Final Approval, Plaintiffs believe that it is appropriate for the Court to withhold 10% of the attorneys' fees awarded as a percentage of the Total Cash Settlement Amount (Plaintiffs have requested $4,362,500 which represents 25% of the Total Cash Settlement Amount). Plaintiffs also note that they seek an additional award of *up to* $1,450,000 in attorneys' fees which will only be payable at the time (after May 2025) when a reasonable valuation of the redeemed value of the In-Kind Payment can be ascertained; in effect, this represents an additional withholding of attorneys' fees until after any residual distribution has been approved.

While Plaintiffs respect the time Professor Dodson took to express his opinions, his objection does not offer a basis upon which the Settlement Agreement should be modified or the Court should not

grant final approval. Professor Dodson has requested to be heard at the final approval hearing.

2. *Kirkham and Sessoms Objection, Dkt. 135*

Objectors James Kirkham and Matthew Sessoms are plaintiffs in *Kirkham v. TaxAct, Inc.*, No. 23-cv-03303-WB (E.D. Pa.). Plaintiffs in that case have followed the lead of Plaintiffs in the instant case at every turn. The *Kirkham* case was filed nearly six months after the instant case; the *Kirkham* plaintiffs added a putative class of married joint filers only after such a class was added in the instant case; and the *Kirkham* plaintiffs filed a motion for protective order regarding TaxAct's updated terms and conditions only after such a motion was filed in the instant case. Now, having declined to participate in the mediation process in the instant case and having substantially lost in the district court, the *Kirkham* plaintiffs object to the settlement.

Prior to the Court granting preliminary approval of the settlement in the instant case, Counsel for Kirkham and Sessoms sent a letter to the Court raising a number of arguments against preliminary approval. Dkt. 122. Kirkham and Sessoms asserted, *inter alia*, that the settlement improperly discounted the value of "the claims of the putative Pennsylvania (and perhaps, as well, the national) class members"; relatedly, that the settlement unfairly favors California class members; and, that the use of a claim form was unnecessary. *Id.* TaxAct and Plaintiffs in the instant case filed separate responses with the Court which addressed these arguments in considerable detail. *See* Dkt. 123 (Ducayet Ltr. to Court, Apr. 2, 2024); Dkt. 125 (Hammond Ltr. to Court, Apr. 3, 2024).

After the hearing on Plaintiffs' Motion for Preliminary Approval, the Court ordered Plaintiffs to file a supplemental brief addressing the issue of whether the settlement unfairly favored California class members over consumers in other states. Dkt. 129. Plaintiffs filed a 14-page supplemental brief which addressed this issue. Pltfs' Supp. Brief (Dkt. 130). Most importantly, Plaintiffs noted, as discussed above, that there are "tax-preparation-related claims [that] are unique to California, with no analogous statutes in other states with a private right of action, and [which] justify a greater recovery for Californian Class and subclass Members." *Id.* at 1:2-14. The Court subsequently preliminarily approved the Settlement. Dkt. 132.

Now, Kirkham and Sessoms have filed a formal objection to the settlement which, in part, reprises their prior arguments that the use of a claims form was unnecessary and that the allocation of

the settlement unfairly favors class members from California. With respect to the use of a claims form, Plaintiffs previously explained in detail why it was necessary in the instant case. Mot. for Prelim. App., (Dkt. 121), 43:7-44:2. The Court reviewed Plaintiffs' reasoning and approved the use of a claims form. Kirkham and Sessoms do not raise any new arguments that should cause the Court to require any modification to the claims process in the instant case.

With respect to the allocation of the Settlement between California and Nationwide Class Members, Kirkham and Sessoms make four primary claims: (i) that TaxAct is not a "tax preparer" under the California Tax Preparation Act; (ii) that Plaintiffs have overvalued the California-specific claim under California Business & Professions Code § 17530.5; (iii) that Plaintiffs have ignored or inappropriately discounted causes of action under the laws of states other than California; and, (iv) that all Class Members stand to benefit from a federal cause of action which Plaintiffs should have pursued in this case. The gravamen of the argument is that Plaintiffs have overvalued California-specific claims and/or undervalued the claims of non-Californian class members such that the Plan of Allocation unfairly favors California class members. Not so.

As an initial matter, Plaintiffs' Plan of Allocation is fair, reasonable, and adequate because it attempts to "allocate the settlement funds to class members based on . . . the strength of their claims on the merits." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008) (citing *In re Oracle Sec. Litig.,* 1994 WL 502054, *1-2 (N.D. Cal. June 18, 1994) (other internal citation omitted)).

The objectors' attempts to challenge the value and viability of the California-specific Tax Preparation Act and § 17530.5 are unavailing. While no court has considered the issue of whether a tax preparation company such as TaxAct is a "tax preparer" within the meaning of Business & Professions Code § 22251(a)(1)(A) or (a)(1)(B), Plaintiffs are confident that TaxAct falls within one or both of those definitions. Moreover, in estimating the realistic value of this claim, Plaintiffs took Defendant's total maximum exposure of $630 million and reduced it almost 100-fold to $6,382,450. Mot. for Prelim. App. (Dkt. 121), 26:1-21. Plaintiffs have categorically not sought to exaggerate the strength of the California TPA claim when determining the appropriate allocation among Classes and Subclasses. Similarly, Plaintiffs were conservative when they estimated that California residents are entitled to restitution of $5 per year pursuant to Business and Professions Code § 17530.5. As explained, the figure of $5 was "a

usable estimate of the difference between the amount a Class Member paid for TaxAct's services in a given year and the amount a Class Member would have paid had they known their information would be disclosed to third parties." *Id.*, 25:3-7. The objectors are wrong to suggest this is an inappropriate measure of restitution. *See Cortez v. Purolator Air Filtration Products Co.*, 23 Cal. 4th 163, 174 (2000) ("The difference between what the plaintiff paid and the value of what the plaintiff received is a proper measure of restitution.").

The objectors also note that Plaintiffs "discounted causes of action such as those asserted under the Pennsylvania Wiretap Act." Dkt. 135, p. 21. It is not clear that the objectors offer this as an argument or as an observation. To the extent it is the former, Plaintiffs have explained why this is entirely justified. A considerable part of the maximum potential recovery for all Class Members is based on Defendant's alleged violation of the federal ECPA. At $10,000 per Class Member, Defendant's potential exposure based on ECPA violations is greater than $100 billion. The Court would likely award the maximum feasible amount under Plaintiffs' ECPA claim, and therefore is unlikely to award additional amounts based on ECPA's California counterpart statute (California Invasion of Privacy Act ("CIPA")) or analogous wiretapping claims under laws of other states. Accordingly, Plaintiffs assigned little value to CIPA and analogous laws of other states and do not believe that release of these state law claims should affect the allocation of points. Pltfs' Supp. Brief (Dkt. 130), p.1.

In addition, Kirkham and Sessoms suggest, again, that Plaintiffs ought to have pursued a federal cause of action under 26 U.S.C. §§ 6103 and 7431(a)(2). 26 U.S.C. § 7431 is wholly inapplicable to TaxAct, because it provides a remedy for violations of Sections 6103 and 6104 of the Internal Revenue Code, which concern tax return information furnished to the Internal Revenue Service and Treasury Department, and require government personnel (i.e., government employees and government contractors) to keep tax return information confidential. Sections 6103 and 6104 (and by extension, Section 7431) do not apply to private tax preparation firms such as TaxAct. Specifically, even assuming, *arguendo*, that TaxAct does meet the requirements of 26 U.S.C. § 6103(c), which would raise the possibility of a private right of action under § 7431(a)(2), objectors' suggestion that § 6103(a)(3) extends to confer liability for any return information obtained "in any manner" ignores the remainder of that provision. In full, the provision prohibits the disclosure of return information obtained by a person "in

any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this section." 26 U.S.C. § 6103(a)(3). In the context of TaxAct, then, the return information it is alleged to have disclosed must be information it received ***from*** the I.R.S. as a result of TaxAct providing electronic filing services. The objectors are ignoring the language of the statute when they suggest that any entity that receives return information as contemplated in § 6103(c) is liable for the disclosure of any <u>other</u> return information it possesses. Indeed, the objectors effectively suggest that an entity that receives any tax return information for just one taxpayer ***from*** the I.R.S. could be liable under §§ 6103 and 7431(a)(2) for the disclosure of entirely distinct return information, obtained by entirely different means, pertaining to different taxpayers. The language of the relevant statutory provisions does not support the objectors' arguments.

Kirkham and Sessoms also raise arguments that: (i) the Settlement's monetary payments to Class Members fall "well below the range of reasonableness;" (ii) the Plan of Allocation inappropriately favors the Nationwide Class over the Nationwide Married Filing Jointly Class; (iii) the Settlement undervalues that claims in the *Kirkham* action, in particular; and, (iv) "[t]he omission of any injunctive relief in the proposed settlement means that class members and their confidential tax return information are still at risk." Dkt. 135, pp. ii-iii, 23.

Plaintiffs strongly disagree that the Settlement's monetary recovery falls below the range of reasonableness. Of course, the Objectors may want a larger recovery, but "the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes." *Linney v. Cellular Alaska P'Ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (quotation and citation omitted). Here, the Settlement represents an excellent result given the circumstances in which that Settlement was achieved. Plaintiffs will not reprise their lengthy explanations of the value and desirability of the Settlement, but one point of clarification is warranted. The objectors suggest that Plaintiffs erred in using a $5 figure to estimate, for settlement purposes, the value of Class Members' information disclosed by TaxAct in each year in which they used TaxAct's online services. This is incorrect. The $5 figure is supported by a survey which indicated that U.S. consumers would require, on average, $5 per month in order for a financial institution to have the right to share information on their respective account balances with any company or individual willing to pay for it. Hammond Prelim. Decl. (Dkt. 121-1), ¶ 49. There is no basis

to annualize this figure when Plaintiffs are seeking an appropriate estimate for the value of what is, in effect, a single snapshot of Class Members' financial information, rather than year-long access to their financial information. *Id.* at ¶ 50. Additionally, this settlement also includes valuable in-kind relief.

Plaintiffs have also previously addressed, at length, and have discussed above, the respective allocation of points to members of the Nationwide Class and members of the Married Filing Jointly Class. Mot. for Prelim. App. (Dkt. 121), p. 37; *See, supra*, Part IV.A.3.b. The idea for a Married Filing Jointly Class originated with Counsel for Plaintiffs in the instant case and they have vigorously pursued that Class's claims. Kirkham and Sessoms note that members of the Married Filing Jointly Class are not likely to be compelled to arbitrate their claims and face different issues of consent because, arguably, they cannot be said to have agreed to TaxAct's Terms. The objectors ignore, however, the various additional risks faced by members of the Married Filing Jointly Class which, taken into consideration with all of the relative strengths and weaknesses of their situation, justify a smaller allocation of points when compared to the Nationwide Class. To briefly reiterate, there are substantial additional risks associated with both certification and merits for the Married Filing Jointly Class. With respect to the merits, in particular, it is not certain that Married Filing Jointly Class Members could successfully pursue a claim under the ECPA given that it was their spouses' communications that were intercepted and it is not certain that Married Filing Jointly Subclass Members could successfully pursue wiretapping claims under CIPA or other analogous state laws. Given the prominence of these claims (and ECPA in particular) in Plaintiffs' estimate of Defendant's exposure, it is entirely justifiable for members of the Married Filing Jointly class and subclass to recover less.

Kirkham and Sessoms continue to misrepresent the status of their own limited case against TaxAct. They suggest that Plaintiffs, in the instant case, have ignored or somehow underappreciated the "advanced procedural posture of the *Kirkham* Action." Dkt. 135, p. 18. What they do not say is that they failed to defeat Tax Act's Motion to Compel arbitration for the vast majority of their proposed class and that the Eastern District of Pennsylvania enforced the arbitration provision in TaxAct's terms and conditions and granted a stay with respect to the putative direct filers class in light of the arbitration provision. *See Kirkham v. TaxAct, Inc.*, 2024 WL 1143481 (E.D. Pa. Mar. 25, 2024). Thus, the "advanced procedural posture of the *Kirkham* Action" is merely that the claims of Kirkham, the putative

representative of the larger direct filers class in that case, "must be arbitrated" and they cannot get any redress from the court. *Id.* at *13. This is precisely the outcome that Plaintiffs in the instant case were concerned about and considered deeply when deciding to enter settlement while TaxAct's Motion to Compel Arbitration was still pending. As for Sessoms, the putative representative for a putative class of "Joint Filers" in the *Kirkham* action, while his claims were not found to be subject to the mandatory arbitration provision, they are subject to numerous challenges and obstacles as previously set out by Plaintiffs and the Motion to Compel Arbitration as to his claims has been appealed and may still be granted. *See* Mot. for Prelim. App. (Dkt. 121), p. 37; Dkt. 125 (Hammond Ltr. to Court, Apr. 3, 2024). To briefly reiterate, Sessoms' first claim is under the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S.A. § 5701 *et seq.* As a wire-tapping statute, WESCA focuses on the protection of communications and not the data communicated. Thus, 18 Pa. C.S.A § 5725 provides a private right of action to "[a]ny person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of this chapter." It does not provide a private right of action to those whose data is intercepted or disclosed as part of the interception or disclosure of another person's communications. By definition, it was the spouses of members of the "Joint Filers" subclass in *Kirkham* who used TaxAct's online tax preparation software to prepare and/or file a joint tax return, not the members themselves. Thus, there is an obvious and substantial obstacle to any recovery by those remaining putative class members in the *Kirkham* matter whose claims may be permitted to proceed in court *if* the Third Circuit rules in Sessoms' favor; they did not, themselves, communicate with TaxAct and, thus, TaxAct will argue that there were no relevant communications to be intercepted or disclosed in violation of WESCA. And, as discussed above, Sessoms' second cause of action under 26 U.S.C. §§ 6103 and 7431 is likely fatally flawed. Plaintiffs have not, then, unfairly undervalued the claims in the *Kirkham* Action. Plaintiffs further note that while the objectors are confident that they will prevail on appeal before the Third Circuit, it is not unreasonable for Plaintiffs and this Court, in the instant case, not to simply accept that as fact.[5]

---

[5] TaxAct's Third Circuit briefing is included as Exhibits 1 and 2 to the Hammond Final Decl. In that briefing, TaxAct argues Matthew Sessoms cannot avoid arbitration because—*inter alia*—he consented to the arbitration agreement in using TaxAct's services after he instructed his wife to prepare and file his taxes without providing any limitations and with specific awareness that she could use online services and assisted her in doing so by

Finally, Kirkham and Sessoms question the "omission of any injunctive relief in [the] proposed settlement." Dkt. 135, p. 23. But, as explained in Plaintiffs' Motion for Preliminary Approval, TaxAct has entered into an injunction with the Missouri Attorney General that prohibits TaxAct from engaging in the practices challenged by Plaintiff in the instant case. (Dkt. 121), p. 1:15-17; Hammond Prelim. Decl., (Dkt. 121-1), ¶¶ 25, 84-85, Ex. 3. The objectors misread the Stipulated Consent Judgment between TaxAct and the Missouri Attorney General as permitting TaxAct to obtain consent via a banner on TaxAct's website which, the objectors suggest, could mean TaxAct could obtain consent that is not knowingly and voluntarily given. Dkt. 135, pp. 24-25. This is inaccurate. Indeed, even the quote drawn from the Stipulated Consent Judgment by the objectors makes clear that the consumer must "affirmatively agree[] to the action," and that any form of consent must "present[] choices that allow the consumer to consent or not consent to the use of Tracking Technology to collect Consumer Tax Information <u>with the default being not consenting</u>." *Id.* at p. 24. The Consent Judgment binding TaxAct's future conduct is not, then, the toothless instrument the objectors would suggest.

Kirkham and Sessoms also speculate that TaxAct may not comply with the Stipulated Consent Judgment and cite depositions they took of TaxAct corporate designees who purportedly did not know the steps taken by TaxAct to comply with that judgment. This argument is speculative and the objectors' various assertions and claims do nothing to show that TaxAct has not complied or will not comply with the Stipulated Consent Judgment, that the Missouri Attorney General and the Missouri State Court is not capable of policing and enforcing that Judgment, or that Plaintiffs did not act reasonably in relying on that Judgment when choosing not to include injunctive relief as part of the Settlement in the instant case.

Neither Kirkham nor Sessoms has requested to be heard at the final approval hearing either in person or through their attorneys.

*3. <u>Sessoms' Request for Leave to File Supplemental Objection, Dkt. 144</u>*

On September 10, 2024, long after the August 12, 2024, deadline to file an objection, Counsel for Sessoms, who was fully aware of the settlement and had already previously filed an objection, filed

---

authenticating his TaxAct account (that she created on his behalf) by responding to a multi-factor authentication request from TaxAct sent to his cell phone, as well as by providing her with significant personal information necessary to fill out his taxes. *See* Hammond Decl. Ex. 1 at pp. 10-13, 27-58 and Ex. 2 at pp. 1-16.

a request for leave to file a supplemental objection of Sessoms. Dkt. 144. In brief, Sessoms indicated that he intended to object to the settlement on the basis that one question on Part II of the Claim Form – "Is your contact information above the same as the information associated with your TaxAct account at the time you used Tax Act services?" – is confusing to the members of the Married Filing Jointly Class because they never "used" TaxAct services, instead their spouses did. The Court has not granted Sessoms request. Nevertheless, out of an abundance of caution and to allay any possible concerns that might arise in the mind of the Court based on Sessoms' request and the substantive arguments he previewed therein, Plaintiffs submitted a statement in response, Dkt. 145. Plaintiffs explained that the question simply asked Class Members if their current contact information was the same or different from the information associated with their TaxAct account, so that the Settlement Administrator could confirm/verify that claimants were Settlement Class Members. *Id.* at p. 1:19-25. Plaintiffs also noted that there has been absolutely no indication of any confusion among members of the Married Filing Jointly with respect to the Claims process. Dkt. 145, at p. 1:6-8. Plaintiffs' response was supported by a detailed declaration from the Settlement Administrator. *See* Dkt. 145-1. Should the Court grant Sessoms' request to file a supplemental objection, Plaintiffs will respond to it more fully. Nevertheless, no argument or assertion previewed in Sessoms' request would warrant any changes to the Settlement Agreement or should prevent this Court from granting final approval.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant final approval of the Settlement as fair, reasonable, and adequate, and certify the Settlement Classes.

DATED: October 11, 2024

Respectfully submitted,

/s/ Julian Hammond
Julian Hammond
*Attorneys for Plaintiffs and Proposed Class Counsel*